Case 1:26-cv-11554-BEM    Document 1-16    Filed 04/02/26    Page 1 of 533

*Exhibit α*
*Incomplete Transcript 01/24/2006*

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                          DISTRICT COURT DEPARTMENT

IPSWICH DIVISION

ABUSE PREVENTION

NO. 0640-RO-0001

_____

LINDA DONOVAN,                          )

      Plaintiff,                        )

    V.                                    )   Pages 1 - 269

JAMES H. DONOVAN,                       )

      Defendant.                        )

_____        )


209A Hearing in Newburyport District Court

at 10:05 a.m. on Tuesday, January 24, 2006

188 State Road, Newburyport, MA 01950


Reporter:   Janet M. Konarski, RMR, CRR

LegaLink Boston

320 Congress Street, Boston, MA 02210

(617)542-0039

APPEARANCES:


DUANE MORRIS

(By Barry C. Klickstein, Esquire, and

Aaron A. Arzu, Esquire)

470 Atlantic Avenue

Boston, Massachusetts 02210

(617)289-9264

Counsel for the Plaintiff


MINTZ, LEVIN, COHN, FERRIS, POPEO

(By R. Robert Popeo, Esquire,

Jeffrey S. Robbins, Esquire,

Scott C. Ford, Esquire, and

Sarah B. Herlihy, Esquire)

One Financial Center

Boston, MA   02111

(617) 542-6000

Counsel for the Defendant

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Linda Donovan | | | | |
| By Mr. Klickstein | 28 | | | |
| By Mr. Robbins | | 71 | | |
| James Donovan | | | | |
| By Mr. Popeo | 157 | | | |
| By Mr. Klickstein | | 238 | | |

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| 1 | Letter from Ian Crawford | 62 |
| 3 | Police report | 63 |
| 4 | Police report | 63 |
| 6 | Affidavit | 68 |
| 6A | Excerpt from affidavit | 68 |
| 7 | Record of Carl Potter | 119 |
| 5 | Photographs | 254 |

(No Exhibit 2 marked)

Page 4

P R O C E E D I N G S

THE CLERK:  This is the matter of Linda Donovan v. James Donovan. Anyone who will be testifying in the matter, please rise and raise your right hands.

THE COURT:  Good morning, ladies and gentlemen.

MR. POPEO:  Good morning, your Honor.

MR. KLICKSTEIN:  Good morning.

THE COURT:  Just to alert the people in the courtroom the clerk, Jane, and I had a brief meeting with the attorneys in chambers, and no secrets. The only purpose of the meeting was to make sure that this hearing would go expeditiously or obviously be fair to both sides, but again hoping to avoid protracted hearing.

Restraining orders are usually not too complex and are usually resolved within an hour.  I understand all parties, at least one side, has many, many witnesses.  As we go through this hearing, if the intent of one of the sides is to put a witness on, I may ask what the witness is here for, and I may exclude that witness if I find that it's not pertinent or not helpful or it's redundant.  So, please don't be offended if you were called by the attorneys.  They're

doing their job trying to get all their witnesses in here.

It's me, if I should hesitate and say I don't need that witness, that's me that you want to be angry at for coming here today. I'm not saying that is even going to happen, but I'm going to try to make this as expeditious as possible. Counsel, do you wish to be heard?

MR. ROBBINS: Counsel, there are individuals, witnesses who actually work for John Donovan, Sr. and Linda Donovan, whose depositions we have taken in the civil case. We have their testimony. We have subpoenaed them, because we thought the Court might think we shouldn't have the deposition testimony unless they had the chance to testify.

If the Court is prepared to have me read or provide to the Court their deposition testimony about these supposed events, then they may be excused, but I want to be --

THE COURT: Why don't we hold onto everybody for the time being.

MR. ROBBINS: All right.

THE COURT: We'll see what issues come out. Some of the issues that I know you've been

involved with may not be the issues that we're going to deal with today. May or may not be. We'll see how the evidence comes out. Okay.

So, for example, if Incident C is not talked about and it's not part of the alleged abuse, then people that are going to be talking about Incident C won't be necessary. So, we'll see how things spin out. Okay. Does either side wish to make an opening?

MR. KLICKSTEIN: Your Honor, just to accommodate my brother and accommodate the witnesses he subpoenaed, I don't have any objection. We filed with the Superior Court, and I trust your Honor has a copy of some supplemental deposition pages that we pointed out to the Court, and to the extent -- if you don't have it, your Honor, here is another copy. To the extent your Honor has any -- to the extent your Honor decides there is any relevance to any of those deposition witnesses, we would have no objection -- subject to all the evidentiary things, other than it's a deposition, we would have no objection to your considering that testimony from the deposition transcript, as well as the parts we pointed out to you in lieu of the live testimony for whatever purposes your Honor did it, and that way -- there are several

people.  I know, for example, Mr. Lambara has two young children.  He had to make child care arrangements. There are several of those collateral witnesses that could immediately be excused.  Whatever your Honor's pleasure is.

MR. ROBBINS:  Well, they're hardly collateral witnesses, but, as I said, we have no difficulty if the Court wishes to having Mr. Lambara excused.  He works for John Donovan and Linda.  Same with Mr. Jaworski.  We have their testimony on these supposed incidents, and we can provide it to the Court.

THE COURT:  If you gentlemen are in agreement, it's my pleasure.  I'll just put those depositions aside, and I'll read them if that is what you want to do.

MR. ROBBINS:  Yes.  As long as that testimony is offered in the same way as though they were present, that we're content with.

THE COURT:  We're talking about Mr. Lombara.

MR. ROBBINS:  Lombara and Mr. Jaworski, both of whom we have subpoenaed.

THE COURT:  Okay.  And I have, somewhere I have their depositions.

MR. KLICKSTEIN:  What about Mr. Elwell?

THE COURT:  Hold on.  Let me just make sure.

MR. KLICKSTEIN:  It's part of -- your Honor, to make it simple, it's attached to James Donovan's affidavit, one of the tabs.  He has a series of deposition extracts.

THE COURT:  Okay.

MR. ROBBINS:  There is one other individual.  Her name is Penny Petranzio, whom we felt obliged to testify simply for evidentiary reasons.  If the same applies to her, that's fine with us.

THE COURT:  Okay.  Let me see. Mr. Lombara's deposition, where would that occur?

MR. ROBBINS:  That should be attached to the James Donovan affidavit, your Honor.

THE COURT:  Okay.  Would it be tab --

MR. ROBBINS:  Q, I'm told.

THE COURT:  U?

MR. ROBBINS:  Q, as in quest for truth.

THE COURT:  Deposition of Steven Lombara, February 17, 2005.

MR. ROBBINS:  There may be two days, extracts from two days, if my recollection is correct.

THE COURT: Okay. Jane, get me one of those yellow Post-It thingamyjigs. Steven Lombara February 17, and would his other deposition be in here under Q?

MR. ROBBINS: They should be, your Honor. I'll check right now where Mr. Jaworski's extracts are.

THE COURT: I'm sorry. February 24, as well. Is that it?

MR. KLICKSTEIN: With respect to Mr. Lombara's extract, your Honor, the additional part we want read, if you look at Page 2 on the additional deposition testimony thing I just handed you, plaintiff's additional deposition testimony --

THE COURT: Yes.

MR. KLICKSTEIN: -- on Page 2, if you want to put a yellow sticky there, that rounds out the evidence that both sides would offer to your Honor with respect to Mr. Lombara.

THE COURT: So, I have Mr. Lombara's deposition February 17 and February 24 and Page 2.

MR. ROBBINS: Indeed, I'm told Mr. Jaworski's testimony we have submitted is also part of Tab Q, as is that of Ms. Petranzio, and there should be a chart provided for the Court, trying to make that

clear what the excerpts are that we're directing the Court's attention to.

THE COURT: Okay. Jaworski, as in Leon Jaworski. Anybody old enough to remember him?

MR. ROBBINS: I am.

MR. POPEO: Yes.

THE COURT: Steven Jaworski?

MR. ROBBINS: Yes, your Honor.

THE COURT: March 28, 2005?

MR. ROBBINS: That's correct.

MR. KLICKSTEIN: Again, your Honor, the testimony of Mr. Jaworski that we would like to round it out with is on Page 2 of our supplemental affidavit with the pages attached at the end.

THE COURT: Jaworski and Lombara. Okay. Did you say there was a third person?

MR. ROBBINS: Penny Petranzio. Penny Petranzio is an employee of somebody called Myopia Club, where a supposed event occurred, and we --

THE COURT: Is she under the Q tab?

MR. ROBBINS: She's under Q, as well, your Honor.

THE COURT: Yes, gentlemen, I appreciate your consideration for these witnesses. I'm sure they

do, too.

MR. ROBBINS:  Your Honor, there should be one final witness, whose deposition or excerpt of his testimony we have submitted.  That is a gentleman named David Elwell.

THE COURT:  I'm going to ask you to hold off.  I haven't gotten to Petranzio.  Actually, in looking for her, I've come across Elwell.  Do you gentlemen just want me to read the deposition on Mr. Elwell, as well?

MR. KLICKSTEIN:  Again, with Mr. Elwell, we've got the extracts on Page 1 of our additional list.  That would round out -- if you found it relevant, that would round out his testimony.

THE COURT:  How do you pronounce that lady's name?

MR. ROBBINS:  Petranzio. P-E-T-R-A-N-Z-I-O, I believe.

THE COURT:  Pier Petranzio?  P-I-E-R, Pier Petranzio.

MR. ROBBINS:  I'm not sure what the first name is.

MR. KLICKSTEIN:  That's the --

MR. ROBBINS:  It must be the individual,

Penny.  Her nickname is Penny.

THE COURT:  Examination by Mr. Ford?

MR. ROBBINS:  Yes, your Honor.

THE COURT:  Anything in --

MR. KLICKSTEIN:  Nothing in addition.  We don't think that is relevant at all.

THE COURT:  Okay.  We've done it.

MR. KLICKSTEIN:  May those witnesses then be excused, Mr. Lombara, Mr. Elwell, Ms. Petranzio and Mr. Jaworski?

THE COURT:  Unless there is any challenge by your brother, they may.  Thank you, ladies and gentlemen.  If we had known this earlier, we wouldn't have had you make the trip up to the court.  Thank you. I'll read the testimony that you've given previously.

Okay.  Gentlemen, could I just have your names for the record, as well.

MR. ROBBINS:  Yes.  Jeff Robbins and Robert Popeo, in reverse order of importance, on behalf of Jim Donovan.

THE COURT:  And for the plaintiff today?

MR. KLICKSTEIN:  Barry Klickstein, your Honor, and Aaron Arzu, A-R-Z-U, for the plaintiff.

THE COURT:  Is it Klickstein or

Glickstein?

MR. KLICKSTEIN:  Klickstein, K-L-I-C-K.

THE COURT:  Thank you, Mr. Klickstein.  Do you wish to make an opening, Mr. Klickstein?

MR. KLICKSTEIN:  One more housekeeping matter, your Honor.

THE COURT:  Sure.

MR. KLICKSTEIN:  Since there are a number of people to testify, I would ask except for the defendant, who has a right to be here, any witnesses who are going to testify be excluded from the courtroom during the balance of other testimony.

THE COURT:  Any problems with sequestration?

MR. ROBBINS:  Your Honor, there are already affidavits on file.  What they're going to testify to is already before the Court.  Some of them are -- many of them are family members of Jim Donovan, who has been accused of something rather serious. There is no prejudice.  There is no likelihood of any testimony being altered.

The affidavit testimony is already filed with the Court.  There is no need in this case to sequester.

Page 14

THE COURT: I'd rather be safe than sorry. I hear what you're saying. I don't see any harm in sequestering them. I think we'll do that.

MR. ROBBINS: May Jim Donovan's wife be present, Christy? She will be a witness.

THE COURT: Counsel?

MR. KLICKSTEIN: I would object.

THE COURT: No. We're going to sequester all of the witnesses after the openings.

MR. KLICKSTEIN: Your Honor, may it please the Court, my name is Barry Klickstein, and I represent Linda Donovan, who is the plaintiff here in this 209A order. What we propose to do is to put Mrs. Donovan on the stand, and Mrs. Donovan will testify to your Honor from that stand clearly and convincingly that she has been terrorized by James Donovan. That James Donovan has undertaken a course of behavior of making threats to her personal safety, of assaulting her and progressively making her more and more terrified for her own personal safety.

That in fact Mrs. Donovan reasonably believes that James Donovan means what he said to her, that he has the capacity and the intent to carry out those threats, and that pursuant to the statute, she is

fearful of imminent harm from James Donovan unless this Court enters a protective order as provided under the law.

Since this is an unusual proceeding, your Honor, and it's taken an anomalous path and before it reached the bench for an evidentiary hearing today has detoured to the Superior Court and back, I'm aware that the primary defense that my brother is likely to raise to this is not just to deny that Mr. Donovan said this, which would be the routine, garden variety situation that the Court is used to. And your Honor will have the opportunity to assess James Donovan's credibility and truthfulness before this Court. But, also try to fog this matter up with longstanding family litigation between James Donovan and his siblings and their father, Professor John Donovan that has gone on in an acrimonious and incredibly hostile manner with incredibly high feelings, incredibly inflammatory allegations made by the siblings without any foundation in order to secure benefits.

That litigation, your Honor, is relevant only for the fact that Linda Donovan is married to John Donovan, and has, hence, become the focus of James Donovan's personal animus. Anything that Professor

John Donovan may have said and done in other proceedings, anything that has gone on in those other proceedings is irrelevant to the core fact that you have to determine here before you, and that core fact that you have to determine here before you, after evaluating Mrs. Donovan on the stand, is is this person, am I persuaded that this person is in reasonable fear of imminent harm?

And that's based on her testimony of what was said to her, her testimony of what was done to her, and the context in which she is presently living and presently believes and reasonably believes that James Donovan is capable of doing. And I believe that after your Honor hears all of the relevant evidence, and I stress the word "relevant," and culls the weak from the chaff, you will find that this is a 209A proceeding of extreme clarity, of extreme simplicity, of threats made, a person frightened and a person that is entitled to the protection of this Court pursuant to that statute, and nothing more than that. Thank you, your Honor.

THE COURT: Thank you, Mr. Klickstein. Mr. Robbins?

MR. ROBBINS: Thank you, your Honor. One

not going to get into, but if the was Court needs to know, there was an agreement entered into whereby all of the kids, who want nothing whatsoever to do with John Donovan, Sr., nothing whatsoever to do with his third wife, sought to separate themselves utterly, completely, financially, personally and in every other way from their father.

That agreement in turn followed certain evidence about the father's conduct. The father denies that that particular conduct occurred. All of the children are aligned against him. They maintain it did occur.

I'm not going to get into that, but the fact of the matter is two-and-a-half years ago there was an unusual agreement whereby all of the children, Jim and his siblings, asked for and ultimately obtained an agreement to have nothing whatsoever to do with John Donovan, Sr. ever again, and they got an agreement.

Now, the whole -- I say this, because all that Jim Donovan and his wife and his kids and his siblings and their spouses and their kids want to do is to stay as far away from John Donovan, Sr. and necessarily his wife as possible. So, when the Court hears that Jim Donovan and Christy Donovan are

initiating contact with Linda Donovan and John Donovan or that, as Mrs. Donovan has said, as you'll hear that Christy Donovan and Jim Donovan were stalking her, have stalked her or have followed her or have shadowed her or have threatened her or all the rest of it, the Court needs to know that the absolute reverse is the case. It is the absolute reverse. And to give you an example, Jim Donovan and Christy Donovan, who are there (indicating) live about a quarter of a mile down the same street as John Donovan and Linda, and what they have now been forced to do in this Hitchcock-like life that they are forced to lead where they have to go around Hamilton with a knot in their stomach waiting for the latest accusation or the latest appearance is they have to drive miles out of their way to avoid them, to avoid John Donovan, Sr., and that is indeed what they do.

All of the siblings avoid John Donovan, Sr. and Linda Donovan. They stay totally clear. Indeed, it has gotten so bad you'll hear over the last two and half years as these accusations one after the other get filed that Jim Donovan has had to hire a security guard in order to protect his family not only from the harm that he fears, but also to try to protect against false

accusations made so that he is a witness constantly.

This is a real difficulty. You're going to hear that this agreement was signed in March of 2003 by which the kids finally succeeded in saying no mas, no more, we want nothing to do with you. Please let us have nothing whatsoever to do with you. Five adult children.

In rapid succession, here is what occurred. First, in October of 2003, on Halloween night, 2003, Linda Donovan and John Donovan, Sr. asked for and received a 209A order against Jim, alleging that Jim had made threats against the father through a Mintz, Levin attorney and that there was a shooting in the house supposedly, and they were in fear. And so they have Jim Donovan served in front of his children on Halloween night, a two-year old, a three-year old with Christy pregnant with their third kid for the purpose of basically humiliating him the night they're supposed to be an event at the Myopia Club, which they both belong to, where tables were there. They had arranged for tables. So, of course Jim can't go.

Christy gets her uncle to go up and go with her, and they show up for the hearing, Jim and Christy do, two business days later, two days later, the first

Page 21

available time, they're ready to testify.

Linda Donovan and Jim Donovan, Sr. don't show up, and it is vacated.  That is the first thing that happens.  I say this is in the context of the Court knowing that in the last two-and-a-half years since October of 2003, since John Donovan, Sr., who supposedly is the object of all of this, supposedly there are shootings involving him and the like, he doesn't bring this 209 application order.

He has not said any place that he's in apprehension of his personal harm.  It is all now Linda, so here is the next thing that happens:  John Donovan, Sr. files a criminal complaint against another child, Jim's sibling, brother John, John, Jr., hence all of the names.  He has him accused of illegally entering a building in which John Donovan, Sr. works, but the problem is that John Donovan, Jr. is actually owner of that property, so he couldn't possibly have illegally entered it.  So, that is withdrawn.

The next thing that happens is that Linda Donovan takes out a criminal charge in this court against Carl Potter.  Carl Potter is somebody, who is a caretaker for the siblings, and she goes into district court, and she accuses Carl Potter, supposedly at the

direction of Jim Donovan, of having followed her or confronted her with a four-wheel vehicle on a trail of having gotten, followed her on a street in a car, having stared at her and having taken pictures of her and such things.

There is a hearing in Ipswich District Court. The clerk refuses even to issue, even to issue the assault complaint, and a harassment complaint is issued, but it's promptly dismissed before arraignment. That is November of 2004.

The next thing that happens is in January of 2005, about a year ago, Linda Donovan files a civil action in Essex Superior Court making all of the same allegations that she had made in the complaint against Carl Potter that were dismissed, alleging that Jim and Christy stalked her, assaulted her by such things as malevolently lingering, by staring at her at a table at the Myopia Club, by flanking her, skiing down a slope next to her supposedly with the two of them chanting presumably in unison, "Any time, any place," and the like.

Now, I say this because the Court is going to have to believe that Christy Donovan and Jim Donovan did this. That is the essence of the piece of at least

the complaint that has surfaced and that they both flanked her by -- I think on horseback at some Myopia Hunt Club, so that is the complaint that gets filed in Essex Superior Court.

Now, that was a year ago.  And at the end of that complaint there is a prayer for a restraining order against Jim and Christy, because she is in fear, supposedly imminent fear of her physical safety because of these supposed stalking that Jim and Christy did, and there that complaint sits for a year.  There is no motion at all.

We ask to take Linda Donovan's deposition. She refuses to appear to answer questions about these supposed events.  We serve interrogatories asking her to identify the witnesses to these supposed events and provide us with some facts about it.  She refuses to do that, either.

And there is a hearing scheduled for January 12th in Essex, January 12 on whether or not she can continue to refuse to answer questions and continue to not provide any information.  Nine days before that hearing, what occurs?  Linda Donovan accompanied by same counsel, Counsel in the Essex Superior Court action appear in this court, and they fill out that

01/24/2006

Page 24

form where they're asked to say are there any pending actions involving the same parties and allegations of abuse?  And they check that "No," knowing that nine days later, Linda Donovan knows, nine days later there is to be a hearing in Essex Superior Court whether she can continue to refuse to come in and answer any questions at all before the very same allegations.  So, that is what has brought us to this court.

Now, Jim Donovan is the managing director of Goldman Sachs.  He is a member of the board of the Dana Farber Cancer Institute.  He has a law degree from Harvard and an MBA from MIT.  Jim Donovan has, as you will hear, a lot more important things to do -- they've also got three little kids -- than to stalk a Linda Donovan or to care anything about Linda Donovan.

The next thing that happens is that Linda Donovan takes out a criminal charge in this court against Carl Potter.  Carl Potter is somebody, who is a caretaker for the siblings, and she goes in to district court, and she accuses Carl Potter, supposedly at the direction of Jim Donovan, of having followed her or confronted her with a four-wheel vehicle on a trail of having gotten, followed her on a street in a car, having stared at her and having taken pictures of her

and such things.

There is a hearing in Ipswich District Court. The clerk refuses even to issue, even to issue the assault complaint, and a harassment complaint is issued, but it's promptly dismissed before arraignment. That is November of 2004.

The next thing that happens is in January of 2005, about a year ago, Linda Donovan files a civil action in Essex Superior Court making all of the same allegations that she had made in the complaint against Carl Potter that were dismissed, alleging that Jim and Christy stalked her, assaulted her by such things as malevolently lingering, by staring at her at a table at the Myopia Club, by flanking her, skiing down a slope next to her supposedly with the two of them chanting presumably in unison, "Any time, any place," and the like.

Now, I say this because the Court is going to have to believe that Christy Donovan and Jim Donovan did this. That is the essence of the piece of at least the complaint that has surfaced and that they both flanked her by I think on horseback at some Myopia Hunt Club, so that is the complaint that gets filed in Essex Superior Court. Now, that was a year ago. And at the

end of that complaint there is a prayer for a restraining order against Jim and Christy, because she is in fear supposedly, imminent fear of her physical safety because of these supposed stalking that Jim and Christy did, and there that complaint sits for a year. There is no motion at all.

We ask to take Linda Donovan's deposition. She refuses to appear to answer questions about these supposed events. We serve interrogatories asking her to identify the witnesses to these supposed events and provide us with some facts about it. She refuses to do that, either. And there is a hearing scheduled for January 12th in Essex, January 12 on whether or not she can continue to refuse to answer questions and continue to not provide any information.

Nine days before that hearing, what occurs? Linda Donovan accompanied by same counsel, Counsel in the Essex Superior Court action appear in this court, and they fill out that form where they're asked to say are there any pending actions involving the same parties and allegations of abuse? And they check that "no," knowing that nine days later, Linda Donovan knows nine days later there is to be a hearing in Essex Superior Court whether she can continue to refuse to

come in and answer any questions at all before the very same allegations, so that is what has brought us to this court.

You're going to hear about Christy Donovan. You're going to hear what this is really all about. It is about, as you will hear, trying to hit, trying to hurt Jim Donovan's reputation and trying to really sort of work this sort of misery on his family, because as you'll hear, as I said, Linda Donovan and John Donovan, Sr. live a quarter mile down the road.

They're all members of this Myopia Club. As John, Sr. and Linda know very well, Christy's parents live in Hamilton. Her 88-year-old grandmother lives in Hamilton. Jim's sibling, sister, Maureen lives in Hamilton with her five kids. The kids' friends live in Hamilton. They take the kids to the Myopia Club to go swimming. They go to events. They go riding there. And if the Court will essentially buy this order with all of the exhortations about what a low standard it is that you're going to hear, and it's just a matter of a core issue, just issue the order, Judge, then what John Donovan, Sr. and Linda both know is, No. 1, Jim Donovan's reputation is going to be hurt inevitably. And, B, this Hitchcock-like situation where they can't

Page 28

walk around Hamilton with their kids is going to be perpetuated.

So, the reason that I ask for the opening is that there isn't any way of conveying what is actually going on here without putting that in the context for the Court and understanding that this is a series, not the last, most assuredly not the last, but we will at the end ask the Court not only to dismiss this, but to do so in a way that will let Jim and Christy be and at least delay, at least delay the next installment of this kind of thing.  Thank you, your Honor.

THE COURT:  Thank you, Mr. Robbins.  First witness, Mr. Klickstein?

MR. KLICKSTEIN:  Mrs. Donovan.

THE COURT:  Mr. Robbins, do you want to make sure the sequestration is in order, that the correct people step out into the hallway.

MR. ROBBINS:  Your Honor, I'm not going to call Jim Donovan's mom.  Therefore, she will not be a witness.  May she stay with her son?

THE COURT:  She's not going to be a witness.  She can stay in the courtroom, not talk to the other witnesses.  Do you have any problem, Mr. Klickstein?

MR. KLICKSTEIN:  I just have a problem with a woman of her age and inexperience knowing what she can say at a break and whatnot.  I prefer to have her excluded.

THE COURT:  Is that her right there?

MR. KLICKSTEIN:  Yes.

THE COURT:  Mrs. Donovan, good morning.  How are you?

THE WITNESS:  I'm fine.

THE COURT:  A lot of stress, I'm sure.  Mrs. Donovan, just there is an order that everyone is supposed to stay outside while the testimony is being given.  That is sequester all of the witnesses.  Could I ask you that until this case is over not to discuss what is said on the witness stand to other people.

THE WITNESS:  I will not discuss it.

THE COURT:  Okay.  I have your word?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

MR. ROBBINS:  Thank you, your Honor.

MR. KLICKSTEIN:  What is your Honor's preference?  Do you mind if I approach the witness?

THE COURT:  Whatever you're comfortable with.  As long as everyone can hear you.  That is the

01/24/2006

most important part.

MR. KLICKSTEIN:  I'll stay over here. That way I know they'll hear me.  I will be loud.

LINDA DONOVAN, SWORN

DIRECT EXAMINATION

BY MR. KLICKSTEIN:

Q.  Mrs. Donovan can you state your full name for the record?

A.  Linda Joan Donovan.

Q.  You need to keep your voice up, so the reporter can get it, Mrs. Donovan.

A.  Thank you.

Q.  When did you marry Professor John Donovan?

A.  August, 1995.

Q.  And how long were you engaged to him before you married him?

A.  Two years.

Q.  So, you first met him when, Mrs. Donovan?

A.  1991.

Q.  And in 1991, did you meet his children?

A.  I did.

Q.  Could you please tell us who those children were?

A.  Maureen, James, Carolyn, Rebecca and John,

01/24/2006

Jr.

Q.    And directing your attention now from the period when you first met Professor Donovan through the period of say 1998, did you socialize with Professor Donovan's children?

A.    At family gatherings.  Shortly after I met John, James took me to lunch one day, but generally at family gatherings while their father was present.

Q.    Can you tell us what kind of family gatherings those were on a regular basis?

A.    I saw, I generally saw the children once a month when they had family meetings with their father.  I wasn't part of those meetings, but I would see them before or after.  We had family vacations generally, Memorial Day, Fourth of July, Labor Day, Columbus Day, usually some kind of family Christmas gathering.

There was a series of family suppers where everyone would try to get together once a month and have a supper and then just on occasion when they were individually with their father, I would sometimes see them.

Q.    When you talk about family vacations, about how frequently did those occur during that period?

Hearing                                                              01/24/2006

Page 32

        A.    Usually on those holidays.  So, Memorial Day, Fourth of July, Labor Day, Columbus Day.

        Q.    During that period of time, did Professor Donovan own a property in Bermuda?

        A.    He did.

        Q.    And been what was that property, Ma'am?

        A.    It was called Windsor House.

        Q.    And did vacations with the children take place at that location?

        A.    Yes.  Most of the dates that I gave you would be at Windsor House.

        Q.    So, is it fair to say then that several times a year, the professor would invite his children to be his guests with you and the professor at Windsor House in Bermuda?

        A.    Yes.  Regularly and sometimes in Vermont, as well.  But usually that would be two of the kids or three of the kids instead of all of them.

        Q.    And Maureen at that time was one of the professor's daughters, correct?

        A.    Yes.

        Q.    And did she have children during that period of time?

        A.    Yes.  She had her first -- about half of

the time, I guess, because she had her first children in, child in I think 1996, maybe.

Q.   Okay.

A.   So --

Q.   I didn't mean to interrupt you.  Excuse me.

A.   -- they came to the vacations after, once they were born.

Q.   And Maureen for the entire period that she vacationed with the family would bring her children with her to each of these events?

A.   Oh, yes.

Q.   And that was throughout the period?

A.   Yes.

Q.   All right.  And James Donovan when he came to these events, would he bring girlfriends with him when he had a girlfriend?

A.   Yes.

Q.   And would he socialize with you and his girlfriend together?

A.   Yes.

Q.   And would he socialize with you individually at these events?

A.   Sometimes.

Hearing                                                                01/24/2006

Page 34

Q.    And when, do you recall about when he first met his wife Christy?

A.    I think in 1996.

Q.    Okay.  And from 1996, when James was with Christy, did he bring Christy to these family events?

A.    Yes.

Q.    And did James and Christy socialize with you at these family events?

A.    Yes.

Q.    Now, directing your attention now to 2002, at the very end of that, did an event occur at the end of 2002 that dramatically changed the Donovan family relationship?

A.    Absolutely.

Q.    And can you tell us what the family relationship was after this event occurred in 2002?

A.    The -- do you want me to tell you what it was?

Q.    Just tell us -- an event occurred; is that correct?

A.    Yes.

Q.    What was that event?

A.    The children attacked their father and told him they had stolen all of his money and all of

his property and that if he didn't agree to move away from Hamilton, Wenham and Topsfield and never live there again that they would publish in the Boston Globe that he had sexually abused one of his daughters 30 years ago.

Q.    Is that the first time you had ever heard of that allegation?

A.    Absolutely.

Q.    And did they subsequently do exactly what they threatened to do?

A.    Yes, they did.

Q.    And was there at that point a dramatic change in the family relationship?

A.    Absolutely.

Q.    Now, when for the first time, Mrs. Donovan, did James Donovan first threaten you?

A.    He first threatened me -- he made a point to make me very uncomfortable at activities, but to first threaten me verbally was in February, 2003.

Q.    All right.  Can you tell us, please, exactly what happened in February, 2003?

A.    We were at a fundraising event, and toward the end of the evening, I went in to the closet to get my coat, and it was a walk-in closet, so it was

probably 8 feet deep, and there was a rod. My coat was in the corner of the rod, and I walked in, got my coat. I turned around, and when I turned around James walked, was walking toward me. He had walked into the closet, and he was walking briskly toward me, and he reached out and grabbed my hand, and he held my hand and stood over me and said, "I don't know what you guys are doing about this, but you should be very careful. You should be very, very careful." And he did it -- it was very close to me and with this, in a barely controlled anger that made me feel like he might hit me, and then somebody else started to walk into the coat closet, and I said, "James, I'm not going to talk to you about this," and I walked around him, and I walked out of the closet and out of the building.

Q.   Were you alone at this event?

A.   Yes.

Q.   And how did it make you feel when James Donovan --

A.   I was very frightened. I still can remember how hard my heart was beating. I was just shocked that he would threaten me like that.

Q.   What did you do after you left the building?

A.    I called my husband and told him what James had done.

Q.    When was the next time that James threatened you, Ma'am?

A.    I'm trying to remember the exact sequence. When he verbally threatened me or --

Q.    It would be the next time that you recall that James, himself, personally threatened you in any way?

A.    At another event where there was a supper event.

Q.    Can you place this in time, Ma'am?

A.    November of 2003.

Q.    Okay.  And was this event again at the club?

A.    Yes.  It was at the club, and --

Q.    What happened at that event, Ma'am?

A.    They -- at the beginning of the event the woman who was the organizer of the event, the people who organized the event knew that we didn't want to be anywhere near to James, and at the beginning of the event, there is a listing with all the table numbers and then there is a number on each table, and somebody had moved the numbers around so that the table that we

were assigned to and they were assigned to were in proximity, so the organizer of the event, Amy Halloran, took the numbers and put them at opposite corners of the room, and we sat down at our table. And then James sat down at the table right next to us sitting so that he was staring right at us and just glaring and trying to make us uncomfortable. Then during social times, he would just put himself to try to make us uncomfortable, and send this message that he was, you know -- I made sure I wasn't alone, because would he follow me somewhere again if I was alone to cause as much discomfort as he could?

Q. How did it make you feel at that time, Mrs. Donovan?

A. Very frightened. And that was after a series of events that weren't James, personally, but they caused to happen with Carl Potter that had put me in a tremendous amount of fear, as well.

Q. Directing your attention to Carl Potter, do you know who Carl Potter works for?

A. He -- I understood him to work for James, to work at James' direction.

Q. What did you understand that Mr. Potter did?

A.    He helped -- I think he helped Marilyn with her horses, and he was on the property that my husband had put together.  But, I don't know exactly what his duties were.

Q.    All right.  When you talk about the property that was put together, approximately how big is this property where this horseback riding takes place?

A.    It's about 600 acres.

Q.    This 600 acres is privately owned?

A.    My husband spent 30 years putting that land together so that it would always be protected and would always be open for people.

Q.    And after November of 2002, did your husband have ownership of that land anymore?

A.    The children stole it from him.

Q.    With respect to the trail riding, Mrs. Donovan, directing your attention to that, what occurred with Mr. Potter on these trails?

A.    Prior to the riding event, I was responsible for planning the route that went through the area, and so I would go and make sure that the trails were okay, that they were cleared of sticks and rocks and things like that and plan the route with the

person who was going to lead the ride, and --

MR. ROBBINS:  Your Honor, could I just have a date on this?

THE COURT:  November.  I'm sorry.  What is this time frame, Ma'am?

THE WITNESS:  Most of this was -- some in fall of 2003, most of it in fall of 2004, and Carl would be around on the property.  He would get right behind my car bumper and follow my car bumper or -- and I had -- they placed gates.  They kept placing gates around the property and then closing those gates across the trails so that when the ride came through they'd be stopped by the gates.  And I had spoken with the Hamilton Police a number of times, and they told me they had told Carl Potter not to interfere.  And on one occasion in November of 2004, I had told the police, I told them when the events were going to take place, and I was there with Steve Lombara, who works for my husband, to plan the route, and when I drove down the road, I passed Carl on his ATV, and he slammed on the brakes, spun the ATV around to follow me.  Then I went up to where Steven was, and he didn't, Carl did not come, turn up that roadway into that part of the property.  And then Steven and I went over, and we

parked on the Air Force property, and walked down one of the trails. And there is a curve, kind of a blind curve on the trail --

Q. So, at this point you and Mr. Lombara were walking the trail on foot?

A. Correct.

Q. And this trail was out in the woods?

A. Correct.

Q. Okay. Keep going.

A. And I heard the ATV coming very loudly, and I didn't want anything to do with Carl, so I turned around, and I ran as fast as I could away, and he was behind me, and I don't know exactly where, but he was behind me on the trail, and I just could hear the ATV very loudly. So, I ran as fast as I could down the trail, and I was very frightened because of -- Carl is a scary individual. I know that he's been convicted of assault --

MR. ROBBINS: Your Honor, I object.

THE COURT: Sustained.

A. We had been told that he had said to people that --

MR. ROBBINS: Objection, your Honor.

THE COURT: It's hearsay, but the rules of

Page 42

evidence are relaxed.  I'll take it de bene and hear what she says.

A.    That Carl had said he could get to me any time, any place, so I knew those things, and I was very frightened, and I just ran as fast as I could, and Steven stopped Carl on the ATV and then he went away. And then we walked across the street.  And then we heard the ATV again kind of lingering between us and our cars, and I asked Steven if we could walk around, go around the other way.  And we waited there for a little while.  Then the ATV went away.

He went and waited by the cars.  We walked back toward the cars and then I stayed back, and Steven went and told Carl to leave, and he left.  Then I got in my car, and I went to the police station and told the police --

Q.    As a result of that --

A.    -- what happened.

Q.    As a result of that, did you file a request for a criminal complaint?

A.    Yes, I did.  The police suggested getting a restraining order against Carl, and I was advised to file for the criminal harassment.

Q.    And was there a clerk's hearing in this

01/24/2006

Page 43

court on the request for a criminal complaint against Mr. Potter?

A.   Yes, there was.

Q.   And did a complaint issue against Mr. Potter after a hearing where a clerk found probable cause?

A.   Yes, it did.

Q.   Were you ever advised by anyone pursuant to the Victims Right Act that the DA, Assistant DA in this court was going to dismiss that complaint prior to arraignment?

A.   No.

Q.   Did you in fact have a meeting with Mr. Dolly, the First Assistant DA, where he apologized for that?

A.   Yes, I did.

MR. ROBBINS:  Objection, your Honor.

THE COURT:  The basis?

MR. ROBBINS:  It's hearsay.  It's also irrelevant.

THE COURT:  I don't find it irrelevant. I'll allow it.

BY MR. KLICKSTEIN:

Q.   Now, Mrs. Donovan, directing your

Page 44

attention -- strike that.  Did you have a cell phone with you at the time you were in the woods?

A.    Yes, I did.  I was on the phone with my husband talking about the trails and the route at the time that I heard the ATV coming.

Q.    And, to your knowledge, was anybody else at the other end of the phone along with your husband, Professor Donovan?

A.    Steven Jaworski was in the professor's office with him.

Q.    And what do you recall saying or doing over that phone at that time when Mr. Potter came at you with the ATV?

A.    I said that I heard the ATV and that I didn't know how to get away, because it was a narrow trail.  I was so frightened that I remember yelling, but I don't remember even exactly what I said, quite honestly.  I just was very, very frightened.

Q.    Were you frightened that you were going to be hurt right at that moment?

A.    I remember thinking that, Oh, my God if I trip, the ATV could run over me.  I didn't know what he wanted.  I knew that he had put himself in my presence over and over.

Page 45

Q.    Let me direct your attention to another incident.  Did you at one time -- strike that.  Did Professor Donovan at one time own a property in Pomfret Vermont, a ski house?

A.    Excuse me?

Q.    Did Professor Donovan at one time own a property in Pomfret, Vermont?

A.    Yes.

Q.    Can you describe that property?

A.    It's a family home up on a hill near a little ski mountain.

Q.    And who has that ownership of that property now?

A.    The children stole that property, as well.

Q.    Directing your attention now to last winter, were you up there skiing?

A.    Yes.

Q.    Can you describe the ski slope up there?

A.    It's a little mountain with one main slope, five or six trails, and then the other side of the mountain has a small area for beginners skiers.

Q.    Prior to last year, did James Donovan and his wife and family come and ski with you there?

A.    James always refused to ski there.  It's

called Suicide Six, because it was such a tiny mountain. He always wanted to go to Killington, so on family vacations he never went there. He always went to the other mountain.

Q. So, to the best of your recollection, prior to last year, you had never seen James Donovan skiing at Suicide Six with his family?

A. I know I had never seen him there.

Q. Now, tell us what happened there last year.

A. We were there on New Years Day, and we --

THE COURT: I'm sorry. New Years Day, 2005?

THE WITNESS: I'm sorry, yes. 2005. And we went up the chair lift. There weren't very many people on the mountain on the holiday. We went up in the chair lift, got off the chair lift. There is a big, flat area at the top of the hill, and I saw Christy and her daughter Emily ski by me, and then just after that, James skied right up next to me and said, "Any time, any place," and then skied very quickly away to catch up with Christy and Emily.

Q. What was your reaction to Mr. Donovan telling you that at that time?

A.    Shock.   Shock that he would drive three hours up there to threaten me and fear that these, the continual, that the threats were continuing and the fear of what he was going to do to me.

Q.    What were you afraid he might do to you, Ma'am?

A.    Knock me over, push me off the trail. He's crazy.   I don't know what he would do.

Q.    What did you do immediately after that happened?

A.    We went down -- they went down a longer trail.   We went down a short trail and went into the lodge and took off our skis.   And we could see James -- there is one place.   It's very small.   There is one place where you could see anybody coming down the hill. You could see anybody getting on the chair lift.   You could see anybody going out to the parking lot, and James stood there for about a half hour just watching and waiting, and as soon as he left we went and got in our car and went and told the Woodstock Police what had happened.

Q.    While he was standing there watching and waiting, was his wife Christy with him?

A.    No.   He was by himself.

Page 48

Q.   Were any children with him?

A.   No.

Q.   You say you went to the Woodstock Police. Did you make a police report to them?

A.   No.  They referred us to the state police, because that is outside Woodstock.  It was their jurisdiction, and subsequently we wrote a letter explaining what had happened to the state police.

Q.   And that would be the Vermont State Police?

A.   Correct.

Q.   Now, directing your attention to this year -- strike that.  Directing your attention to 2005, later in the year, did any other events occur later in the year that caused you to be fearful that James was going to carry out his threats to you?

A.   Yes.

Q.   Can you tell us what you learned during the year?

A.   I learned through my husband --

MR. ROBBINS:  Your Honor, if I can, on the learning, I know the Court may think, may decide it goes to state of mind, but there is a hearsay, double hearsay, triple hearsay issue here already, and I want

Hearing                                                                01/24/2006

Page 49

to see if we can deal with that.

THE COURT:  Can she elucidate how she came to know certain things or hear about certain things?

MR. KLICKSTEIN:  She's going to say how she came to learn of it.  That gets to the affidavit, your Honor.

THE COURT:  Sure.

Q.  Go ahead.

A.  Eric Rosenbaum told my husband that James had --

MR. ROBBINS:  Objection, your Honor.  For the record, this is now an assertion by Mrs. Donovan that her husband told her that somebody else had told him something.

THE COURT:  We didn't even get that far yet, Counsel.

MR. ROBBINS:  I know.

THE COURT:  It's hearsay.  I'm going to take it for her state of mind and give it whatever reliability I deem appropriate.  Again, you know, in these hearings the rules of evidence are relaxed.  However, fundamental fairness and reliability is still the goal, so I'll take it for what it's worth.

A.  Eric Rosenbaum told my husband that Eric

had been threatened by James and that Eric had heard James say that if he could get away with it, he would kill his father.

MR. ROBBINS: For the record, your Honor, I move to strike.

THE COURT: Overruled. Thank you. If he could kill his father --

THE WITNESS: If he could get away with it, he would kill his father, words to that effect.

BY MR. KLICKSTEIN:

Q. When you heard this, Mrs. Donovan, or learned of this statement made to Eric Rosenbaum, how did that make you feel at that time about James Donovan?

A. Very, very frightened that he would carry out the threats that he had made about my husband, and he had been threatening my husband. I know that is extraneous, but he had been threatening him repeatedly during the three-year period, as well as threatening me, so I was fearful that he would carry them out.

Q. Directing your feelings to how did you feel about the threats he made to you? What did this statement make you feel regarding the threats?

A. Terrified.

Q.    Terrified of what, Mrs. Donovan?

A.    That he would hurt me, that he would hurt me, as well as my husband, that he could possibly kill us.

THE COURT:  Counsel, could we put this in the chronology?  When did Mrs. Donovan hear about this supposed threat?  Was it prior to the ski incident?  Was it after the ski incident?

THE WITNESS:  It was after.

MR. ROBBINS:  Your Honor, could I ask in that regard, could I follow up on the Court's question and ask when the date when she supposedly heard this from her husband.

THE COURT:  Certainly.

MR. KLICKSTEIN:  I would adopt my brother's question.

A.    I don't know an exact date.

Q.    Can you place it whether it was end of --

A.    It was late in the summer.

Q.    Late in the summer of 2005?

A.    Correct.

Q.    So, this was six months or so after James Donovan had told you on the ski slope in Vermont, "Any time, any place?"

A.    Correct.

MR. ROBBINS:  Your Honor, I apologize. Can we simply have some understanding from this witness when it was that she was told that this supposed threat against John Donovan, Sr. had been made?

THE COURT:  Well, she learned of it in the summer of 2005.  And did Mr. Rosenbaum, did he tell you when he had, when he had heard that statement?

THE WITNESS:  I don't know exactly when that would have been.

THE COURT:  Did he give you any time frame at all?  Like, for example, when he told you, did he say, This happened a month ago?  This happened last year?  If he did.

THE WITNESS:  I had the impression it was relatively recent, but I don't know.

THE COURT:  Okay.  Thank you.

BY MR. KLICKSTEIN:

Q.    Mrs. Donovan, after you learned of this at the end of the summer in 2005, did any other events occur that caused you to be concerned about the threats that James had made to your personal safety?

A.    Yes.  On Friday, the 16th of December, I came home, and there were two police cars by my door

01/24/2006

and two policemen, who had just arrived, and the alarm in the house was going off, and we walked into the house.  The house had been broken into.

I turned off the alarm.  We walked into the kitchen, and there were knifes scattered across the kitchen counter and on the kitchen floor.  And the policemen told me to stay.  They left one policeman.  They called another one.  They told me to stay there in the kitchen, and they searched the house.

They came back after a few minutes and they asked me to go outside and asked me to sit in the car, and I got into the car, probably sat there for maybe ten minutes with another policeman there, and then they came out of the house, and they said, "Your husband is with the Cambridge Police."  And I said, "Is he all right?"  And they said, "We don't know.  But, there has been a credible threat, and we're worried about your safety."  And they asked me to go.

I went in an unmarked car with one of the policemen from Hamilton, who took me to the Wenham Police Station.  They said though were afraid to take me to the Hamilton Police Station.  And the detective, Detective Nady talked to me for probably an hour, an hour-and-a-half.  He asked me for the current addresses

of John's kids, James and the kids.  And he asked me anybody that I knew that James might have threatened, and then after an hour, hour-and-a-half, a state trooper came in, and he said -- I'm sorry.  He said, "Your husband has been shot four times.  He's at Mass. General Hospital, and he is expected to live."

I asked if he was conscious, and they said, "I think he's in surgery."  And I said, "Can I go to the hospital?"  And they said, "Yes.  We want to ask you a few questions."

I don't actually remember what the trooper asked me.  I just remember trying to make it succinct and answer as accurate as I could so that I could go, and then Detective Nady, so nice, drove me to the hospital.  In -- then learned on the way that John was at the Mass. Eye and Ear in surgery, and so that was a good thing, because at least he wasn't in intensive care at Mass. General.

Then we got to the hospital, and he had been shot, but was conscious, and then after about an hour or two the detective brought us home.  They let John go home, and he drove us home, and they carried him into the bedroom.

Q.    With respect to this break-in at your home

and the shooting of your husband the first night, how did this make you feel with respect to the threats James had made to you?

A.    I was terrified.  He was carrying them out.  He was obviously carrying them out, and Detective Nady said thank God that I wasn't home, because they could have attacked me.  Somebody wanted to attack me with knives.  They were very concerned.  We had 24 hour security at that point.  They were very frightened about our safety.  I was terrified.

Q.    Now, after Professor Donovan got out of the hospital, did he go up to Vermont?  And this is again late December of this year.  Did you go up to Vermont?

A.    Yes.  We talked with the Cambridge Police about security and what to do and followed their advice, and we went up there for about a week.

Q.    And what occurred, if anything, while you were up in Vermont, just a couple of weeks ago?

A.    While we were there, the house was broken into again.  Someone took a -- some kind of a bar and tried to pry open one of the doors and then they picked a lock to open the door and set the alarm off again, and the alarm called the police again.  And --

Hearing                                                                01/24/2006

Page 56

Q.    When you were advised of this break-in, Mrs. Donovan, can you tell the Judge how that made you feel?

A.    Absolutely terrified that he would continue, terrified that I would be next, terrified that he would finish the job.  My husband was shot.

Q.    And after the second break-in at the house, did you then file this request for a 209A order?

A.    Yes, yes.

Q.    At my request, did you get copies of the police report from the Hamilton Police for both of the break-ins at the house?

A.    Yes, I did.

Q.    Now, can you tell me, Mrs. Donovan, as you sit here today, how do you feel about these threats that James Donovan has made to you?

A.    Very, very frighten --

Q.    What is frightened?

A.    He's crazy.  What wouldn't he do?

Q.    What are you frightened of?

A.    That he will hurt me, that he will attack me again, that he could kill me.

Q.    Now, you heard mentioned in Mr. Robbins' opening to the judge, you heard him mention in October,

2003, the 209A application that was made.  Do you recall that application?

A.  Yes.  Of course, I do.

Q.  What occurred in October of 2003 that precipitated you making that application?

A.  We found that two bullets had been fired into the house.  One was fired into the reading area in the master bedroom, and one was fired into the office where I work, right through the window.  That is right where I sit.

Q.  And as a result of that, did both you and Professor Donovan make an application for a 209A at that time against James Donovan?

A.  Yes.  Professor Donovan went to the court for a 209A order.

Q.  And did you or Professor Donovan fill out the affidavit that accompanied that 209A order?

A.  Professor Donovan.  I didn't go to the court.

Q.  And did the Court at that time issue an ex-parte restraining order against James Donovan?

A.  They did.

Q.  All right.  And what happened to that order, to your knowledge?

A.    The -- James and his lawyers threatened that if we went to the hearing that they would skewer me on the stand.

MR. ROBBINS:  Objection, your Honor.

THE COURT:  I'm going to hear it.

A.    And I was very scared to go to that hearing, and then their lawyer said that they would sign a letter agreeing that James would stay away from us.

Q.    All right --

A.    And that -- it's not true that they ever went to the hearing.

Q.    Mrs. Donovan --

A.    They said they would sign.

Q.    And did you receive a copy of the letter that your attorney, then attorney, Ian Crawford, sent to Henry Sullivan?

A.    Yes, I did.

Q.    Let me show you a document and ask you if this is a copy of the letter you received that your attorney, Ian Crawford, sent to Henry Sullivan at Mintz, Levin on or about November 3, 2003?

A.    Yes, it is.

MR. KLICKSTEIN:  We offer that letter,

your Honor.

MR. ROBBINS: Your Honor, we object. If the Court has been provided with a copy, it's a letter from Mrs. Donovan and John Donovan, Sr.'s attorney, and it is to Henry Sullivan of our office, and it is unsigned, precisely for the reasons that the Court heard about, because it did not represent the agreement. So, if there, as Mr. Popeo indicated before, a signed agreement, which suggests there was an agreement to stay away, we would like to see it. Otherwise, this ought to be excluded.

This was not at all what occurred. What occurred is I thought we almost began to hear, Mrs. Donovan did not want to go and testify, and John Donovan, Sr., the two applicants did not want to testify, and as a consequence they vacated the thing, and that is what occurred. Having a letter sent by their attorney with a place that says if you agree with this, sign it, which noticeably does not have that signature, because that is precisely not what the agreement was, would be terribly unfair.

THE COURT: All I'm going to receive is an unsigned letter, which will bring to my attention the fact that it in fact was unsigned. It's a letter that

Page 60

was sent.  Apparently, as far as I know, it was not signed, so I draw an inference from that that no agreement was actually made.

I'll take it for what it symbolizes, which is perhaps there was some negotiations, and I have no evidence, except from the testimony, of an agreement of having been actually reached.

MR. ROBBINS:  The difficulty is the representation is made the reason this was vacated was because there had been some kind of agreement, and there was no such agreement at all.  So, to offer a document which has as its purpose suggesting there had been some kind of agreement we think ought not to occur.

There can be testimony about what occurred that day.  Mrs. Donovan not showing up, not wanting to testify and so forth.

THE COURT:  She's already testified she was afraid to come because of what was going to happen on the stand.  She's already testified to that.  And this may be some evidence, some other evidence of why she didn't come.  Whether it's factually correct or not that an agreement was reached, in her mind it could be that something was going to happen, and I take what you

said very seriously.  I have no proof.  In fact, I may have some contradictory evidence.

MR. ROBBINS:  You will.

MR. KLICKSTEIN:  Your Honor, just so there is no mistake, what my brother says is absolutely correct.  This letter was never cosigned by Henry Sullivan, as you'll hear.  We're offering it for the fact that it was sent.  Mrs. Donovan permitted her attorney to send it.

It was her understanding that this was what was going to be happening.  And we agree completely with Mr. Robbins Mintz subsequently refused to sign this.

THE COURT:  There was some negotiations.

MR. KLICKSTEIN:  Thank you, your Honor.

MR. ROBBINS:  Our objection is there for the record, your Honor.

THE COURT:  Yes.  Objection is noted.  You may proceed, Mr. Klickstein.

BY MR. KLICKSTEIN:

Q.    Mrs. Donovan, are you familiar with this letter that has now been marked as Plaintiff's Exhibit 1?

A.    Yes, I am.

01/24/2006

Page 62

(Letter from Ian Crawford marked

Exhibit 1.)

Q.    All right.  And based on the contents of that letter, did you not attend the hearing on the return of the 209A order for the October, 2003, complaint?

A.    That is correct.

Q.    Did you subsequently learn that James Donovan and his attorneys refused to sign that letter?

A.    Yes, I did.

Q.    And did you learn that before or after the scheduled hearing?

A.    After.

Q.    Thank you.  Mrs. Donovan, are these copies of the two police reports regarding the December, 2005, break-ins at your home?

A.    Yes.

Q.    And these are the ones you testified you obtained at my request?

A.    Yes.

MR. KLICKSTEIN:  We would offer these, your Honor.

MR. ROBBINS:  We have no objection, your Honor.

Hearing                                                                01/24/2006

Page 63

THE COURT:  You've seen them.  Okay.

(Police report

marked Exhibit 3.)

(Police report

marked Exhibit 4.)

MR. ROBBINS:  Your Honor, may the record reflect there is no reference to James Donovan in those documents.

THE COURT:  As soon as I read them.

MR. ROBBINS:  Thank you.

THE COURT:  Hold on one second.  The record may reflect that the Plaintiff's Exhibit 3, Hamilton Police Department Incident Report entered 12/23/2005 makes -- about an occurrence on 12/16 makes no reference to Mr. James Donovan.

Exhibit 4 refers to a 12/29/05 pried door, and let me just finish reading that.  And no reference to Mr. James Donovan in the second report, as well.

MR. ROBBINS:  Thank you, your Honor.

THE COURT:  Thank you.

BY MR. KLICKSTEIN:

Q.    Mrs. Donovan, who is Eric Rosenbaum?

A.    Carolyn Donovan's husband.

Q.    And who is Carolyn Donovan?

Page 64

A.    One of James' sisters.

Q.    And what is Mr. Rosenbaum's profession?

A.    He's a medical doctor.

Q.    And how long has he been married to Carolyn Donovan, if you can recall?

A.    I think they were married in '99.  I'm not certain.

Q.    Okay.  Let me show you --

MR. ROBBINS:  May we have a copy of that?

MR. KLICKSTEIN:  This is -- certainly.

MR. ROBBINS:  If you have an extra one.

MR. KLICKSTEIN:  Not a problem.

BY MR. KLICKSTEIN:

Q.    You stated, I believe, in your prior testimony that Mr. Rosenbaum, that you learned sometime late in the year, mid summer, excuse me, of 2005, that James Donovan had told Eric Rosenbaum that if he could kill his father and get away with it, he would do so. Is that correct?

A.    That's correct.

Q.    And did you subsequently see this redacted affidavit dated October 13, 2005, that contains that statement made to Eric Rosenbaum by James Donovan?

A.    Yes, I did.

MR. KLICKSTEIN:  Your Honor, we would offer the redacted affidavit for the purpose of showing her state of mind, not the truth of the statement.

MR. ROBBINS:  Your Honor.

THE COURT:  Counsel?

MR. ROBBINS:  We oppose it.  We ask that it be excluded for the grounds that have been set forth in the document that was filed with the Court.  This is, as it indicates, a -- this purports to be a three-sentence excerpt from a copy of an affidavit.  Three pages are blank.  I don't know if the Court has seen it.  We have not.

We have not had the chance even to cross-examine the affidavit of Eric Rosenbaum, because we don't have the affidavit of Eric Rosenbaum, let alone cross-examine Mr. Rosenbaum himself.  To offer this snippet or this purported snippet is entirely unfair.

It is worse simply than hearsay.  I realize the rules are relaxed, but this is a matter of fundamental unfairness.  This has been scheduled and rescheduled with Mr. Rosenbaum, who was, is evidently close enough to John Donovan, Sr. or counsel to have provided this two months ago, three months ago about a

conversation which supposedly occurred in November of 2002. There is no reason why he could not have been here, given the seriousness, the explosive nature of this allegation, which is transmitted via multiple hearsay. We think this is entirely unfair and ask it be excluded.

THE COURT: I'm going to allow it with this caveat: She's already testified about the statements. I read the entire affidavit. It contains personal information, very sensitive, actually, information that is really not relevant to today's -- in my opinion, relevant to today's hearing.

I'm only going to take it for the purpose of bolstering that what she was told, Mrs. Donovan, what she was told, was told by Eric to her husband is bolstered by a statement by Eric himself that he in fact did hear the statement that he allegedly passed on to Mr. Donovan, which was passed on to her.

Again, the statement is hearsay. I don't know where -- I mean I will just take it for whatever weight I'm going to give it.

MR. ROBBINS: May we, since the offer was made, may we have the copy, ask the Court ask that the full affidavit be provided to us?

Page 67

THE COURT:  I'm going to deny that, Counsel.  As I said, very sensitive information that would not cut either way, and I just feel it's not really pertinent to the issues today.

MR. ROBBINS:  The difficulty, your Honor, is for the purpose of the record there needs to be -- it needs at least to be marked for identification. That the Court has read, that the Court has accepted this, and part of the basis of having read that, so I think for the purpose of having a record on this, we need to have that full affidavit or a copy of it marked.

THE COURT:  Okay.

MR. POPEO:  We have no objection to it being impounded, your Honor.

THE COURT:  I hear what you're saying.  It probably should be a part of --

MR. KLICKSTEIN:  I have no objection with that process, either.  I agree with Mr. Popeo.

THE COURT:  Mr. Klickstein, did I return that to you or do I still have it?

MR. KLICKSTEIN:  No.  I wrote across the top of it "Submitted In Camera."

THE COURT:  Yes, indeed.

Page 68

MR. KLICKSTEIN:  In the meantime, so the record will be clear, the redacted record will be clear -- the redacted affidavit is Exhibit 6A.

(Redacted affidavit marked Exhibit 6A.)

(Affidavit marked Exhibit 6.)

MR. ROBBINS:  I don't know whether the Court needs to do this.  I'm wondering if the Court might note for the record the affidavit snippet refers to a conversation which is said to have occurred shortly after November of 2002.

THE COURT:  I am sorry, Mr. Robbins, I'm a little distracted.  I apologize.  Hold onto that thought for just a minute.  Okay.  For the record, I have Plaintiff's Exhibit 6, which is the full affidavit by Eric Rosenbaum, sworn to 13th day of October, 2005.  That will be not disclosed, but it will be kept as part of the record, and I also have Plaintiff's Exhibit 6A, which is the redacted copy of that same affidavit with the pertinent part apparent.  Now, I'm sorry, Mr. Robbins, you're --

MR. ROBBINS:  I simply wanted the record to reflect the fact this snippet that has been admitted

refers to a supposed conversation that occurred approximately November of 2002.

THE COURT:  So noted.

MR. ROBBINS:  Thank you.

MR. KLICKSTEIN:  And I guess, your Honor, just so the record will be clear, the affidavit that was submitted to your Honor in camera which has been marked Exhibit 6, and is going to be impounded, I represented to the Court when I presented it to you in camera that that affidavit had been provided to me by an attorney, by Eric Rosenbaum's attorney under an express agreement that I made with her that it would not be disclosed, except in a court proceeding pursuant to an order of the Court, and that was why I submitted it to you in camera, and ask that you review it in that manner.

THE COURT:  Thank you.

(Discussion off the record.)

MR. KLICKSTEIN:  One last question, Mrs. Donovan.

BY MR. KLICKSTEIN:

Q.  The first time you learned about the statement that had been made to Eric Rosenbaum was late summer of this past year, correct?

A.    That's correct.

Q.    And how did you feel when you learned that this had been said?

A.    Very frightened.

Q.    For your own safety, Ma'am?

A.    Yes.

MR. KLICKSTEIN:  No further questions, your Honor.

THE COURT:  Okay.  Mrs. Donovan, I'd like to proceed, but do you need to take a break?

THE WITNESS:  I'm okay.  That is very nice of you.  Thank you.

MR. KLICKSTEIN:  Your Honor, if I could take a two-minute break.

THE COURT:  Sure.  It's the men that have the problem.  Why don't we take a two-minute break. We'll stretch our legs and come back nice and fresh.  I don't want anybody to come back and tell me there has been any untoward actions in this courthouse.  I wouldn't expect any untoward behavior by anyone in this courthouse.  I don't think I could be any clearer than that.

(A recess was taken.)

THE CLERK:  Please be seated.  Court is in

session.

THE COURT:  You may proceed, Mr. Robbins.

                CROSS-EXAMINATION

BY MR. ROBBINS:

Q.   Good morning to you, Mrs. Donovan.  Let me just review some basic facts.  Are you John Donovan, Sr.'s third wife?

A.   Correct.

Q.   And he is your third husband.  Do I understand that correctly?

A.   Correct.

Q.   And you referred to him as Professor Donovan I noticed a couple of times in direct testimony.  He asks to be identified in that way; is that correct?

A.   It's the way people refer to him in general.

Q.   Is it the case that he --

A.   Because --

Q.   Go ahead.

A.   Because of his career.  It's the way people refer to him.

Q.   Okay.  Is it the case that he asks to be identified as Professor Donovan?

Page 72

A.    I haven't heard him specifically ask it.

Q.    Okay.  Let me ask a couple of short questions before I get to the substance of what I want to ask you.  You indicated that you had seen the affidavit from Eric Rosenbaum in the late summer of 2005; is that correct?

A.    No.  That wasn't correct.

Q.    I'm sorry.  When did you first see it?

A.    I saw the redacted affidavit.

Q.    That is what I meant to say.  When did you see the redacted affidavit?

A.    In -- just very recently.

Q.    Okay.  And so when you read the affidavit, the Court asked you when it was that you understood this supposed conversation with Eric Rosenbaum had taken place.  Do you recall the Court asking you those questions?

A.    That was in the late summer when I was told that Eric had told my husband that Eric had been threatened by James and that Eric had said that if he could get away with it, he would kill my husband.

Q.    So, if I understand this correctly, your husband told you that Eric or Eric's lawyer had told somebody, who had told your husband?  Is that the case?

A.    My husband spoke directly with Eric, as well as the conversations that took place between Mr. Klickstein and Eric's lawyer.

Q.    Okay.  In any event, you assumed when you heard this in the summer of 2005 that this was a conversation which was supposed to have occurred relatively recently?  That is what you told the Court, correct?

A.    I don't remember having, drawing a conclusion about when the conversation had occurred.

Q.    All right.  But, you now know it is said to have occurred in approximately November of 2002, correct?

A.    Yes.  I heard that.

Q.    And it is said to have involved a threat against Professor Donovan, John Donovan, Sr., correct?

A.    Correct.

Q.    Incidentally, John Donovan, Sr. has not actually filed a 209A application in this court, correct?

A.    There is an active police investigation of his shooting.

Q.    Yes.  There is.  I'll get to that in a second.  But, let me simply ask you this:  John

Donovan, Sr. has not actually himself asserted that he is in fear of imminent physical harm; is that correct?

A.    He is certainly in fear.

Q.    Has he filed a 209A application in this court?

A.    He has not.  My understanding --

Q.    Has he?  If I can just have an answer.  Your Honor, if I can make it quickly?

THE COURT:  He is not.  She was trying to elaborate.  If you would like her to --

MR. ROBBINS:  I would rather not.  This is going to be long enough.

THE COURT:  All right.  He has not, as far as she knows.

Q.    You went to court, however, making a statement that as a result of the shooting that had occurred in December, you were in fear of your physical safety, correct?

A.    No.  As a result of James threatening me and having other people intimidate me and harass me over an extended period of time, I had become very, very fearful of James.

Q.    All right.  But in your --

A.    And when the threat that he made to Eric,

that he would kill my husband if he could get away with it was followed by my husband being shot, and by my house being broken into and knifes scattered around my kitchen, and my being fortunate not to be home to have been attacked by the people, who did that, it's clear to me that James is carrying out these threats. Who else? Nobody has ever threatened. That's terrifying to me.

Q. I see. I want to ask you this: In the affidavit you filed with the district court for the purpose of getting the 209A order, you alluded to the shooting that occurred in which your husband was involved; is that correct?

A. That's correct.

Q. Did your husband come with you to court to apply for that 209A application?

A. He did not.

Q. Did he file an affidavit in support of your application for 209A application, providing anything information about what actually had occurred the night of shooting?

A. My attorney did not think that that was necessary.

Q. All right. The shooting, there was a

shooting involving your husband that happened in December of 2005, correct?

A.    Correct.

Q.    And certainly one of the people, who would be in a position to testify about what actually occurred on the night of the shooting would be your husband, naturally, correct?

A.    That's correct.

Q.    And you have now had five or six weeks to talk with your husband -- don't give me any communications with your husband.  But, you have now had five or six weeks to talk with your husband about what actually occurred that night, correct?

A.    There is an active police investigation. They have been specific about not discussing the details of the shooting.

Q.    So, you have not talked about the shooting with your husband?

A.    Of course, I have.

Q.    That is simply all I'm asking.  As we sit here today, you have had five or six weeks to talk with your husband about what actually occurred that night. Is that correct?

A.    That's correct.

Hearing                                                                01/24/2006

Q.    And, therefore, if there was information that your husband had about who actually was responsible for what occurred that night, you would be in a position to specify some of it, at least, in your application, correct?

A.    There is no question in my mind who caused that shooting and that it was James.  We were told by the Cambridge Police not to talk about the investigation.

Q.    I simply am asking you --

A.    I'm sorry if I misunderstood.

Q.    No problem.  As of the time, as of now, you've had five or six weeks to talk with your husband about what occurred, correct?

A.    Correct.

Q.    And if you or he had evidence that suggested that Jim Donovan had anything to do with that shooting, you would be in a position to lay it out for the court today; is that correct?

A.    No.  That not correct.  We are told by the Cambridge Police not to discuss their investigation.

Q.    Your understanding is your husband has been instructed not to provide testimony today?

A.    My understanding is that he has been told

by the Cambridge Police not to discuss the details of the shooting.

Q. Let me ask you this: Your husband contends that he was shot multiple times in a parking lot in Cambridge; is that correct?

A. That is correct.

Q. And that he was sitting in his car at the time, correct? Is that what he contends, to your understanding?

A. Yes. But my understanding is that we're not supposed to talk about the details of it.

Q. The difficulty is you've made certain allegations here, Mrs. Donovan. I have to ask these questions. I apologize.

THE COURT: Your understanding is Mr. Donovan, Professor Donovan claims he was shot multiple times in the parking lot at his office, correct?

THE WITNESS: He was shot multiple times.

Q. And that he was saved by his belt buckle; is that right?

A. (Witness nodded.)

Q. Yes?

A. Yes.

Hearing                                                                01/24/2006

Q.    He was saved by his belt buckle from multiple shots fired at him while he was sitting in a car?  Is that what your understanding is?

A.    The belt buckle kept bullets from going directly into his --

Q.    Yes.

A.    -- belly.

Q.    So that I understand he was shot multiple times.  He was sitting in his car at the time.  He was saved in effect by his belt buckle.  Is that your understanding, as well?

A.    Yes.

THE COURT:  Partially, I'm sure.

THE WITNESS:  Thank you.

Q.    Partially.  Now, do you have any information, Mrs. Donovan, that indeed your husband was responsible for setting up the shooting that occurred in December of 2005?

A.    That is absolutely ridiculous.

Q.    And so we're clear for the record, you have absolutely no information, no information that indeed your husband was responsible for setting up the shooting that occurred in December of 2005?

A.    That is absolutely ridiculous.

Page 80

Q.    I'm simply asking.

THE COURT:  Asked twice, answered twice.

MR. ROBBINS:  I want it for the record. Any information.

THE COURT:  I think you asked that.  She said that's ridiculous.

Q.    You have no information to that effect? Is that your testimony?

MR. KLICKSTEIN:  Objection.

A.    He did not do that.

THE COURT:  I presume the answer is no.

THE WITNESS:  No.

THE COURT:  No information, no evidence.

Q.    Will your husband be testifying today about the details of what actually occurred in December of 2005, to your knowledge?

MR. KLICKSTEIN:  Your Honor, objection. They subpoenaed her husband.  He's available to take the stand, and he'll testify in court in response tots questions my brother chooses to ask.

THE COURT:  I'm sure she doesn't know what he's going to testify to.  She doesn't know what he's going to be asked.

Q.    You have no knowledge of him being asked

by your side to provide testimony about what occurred;
is that correct?

A.    Absolutely not.

Q.    Okay.

A.    He was not going to be.

Q.    And to be fair about it, not only has John
Donovan, Sr. not asked for a restraining order
recently, but he has not asked for a restraining order
in two-and-a-half years; is that correct?

A.    He asked for a restraining order in
October of 2003.

Q.    Okay.  My question is -- not quite
two-and-a-half years.  Since October of 2003, despite
all of the threats that you say are there, John
Donovan, Sr. has not applied for a restraining order
any place.  Isn't that correct?

A.    Correct.

Q.    Now, just to get all of the names
straight, your husband John Donovan, Sr., has five
fully grown children, correct?

A.    Correct.

Q.    Maureen is approximately 40, correct?

A.    (Witness nodded.)  Yes.

Q.    Jim is 39?  Yes?

Hearing                                                                01/24/2006

Page 82

A. Yes.

Q. About. And there is Callie and Becky and John, Jr., John Donovan, Jr., correct?

A. Yes.

Q. They're all fully adult, correct?

A. Correct.

Q. They have never lived in your house, correct?

A. They have lived in my husband's houses. Only Rebecca stayed with us for a period of time in the house that we were in.

Q. I see. I simply want to put it this way, I guess: You have never, they did not grow up in your house?

A. No.

Q. By the time you married?

A. No, no. They never lived with us as a family unit.

Q. By the time you married John Donovan, Sr., they were fully grown, had careers of their own, were out of the house?

A. Most of them were in college when we met.

Q. It is the case, it was alluded to in Direct Examination that in 2002 it emerged that one of

the Donovan children asserted that your husband had sexually abused her as a child, correct?

A.   They made that allegation.

Q.   And is the case that, without getting into the details of it, all of the Donovan children have taken the position that that did indeed occur, correct?

A.   Yes.

Q.   Okay.  And it is the case that since that occurred, the Donovan children have wanted to have absolutely nothing to do with John Donovan, Sr. and by extension yourself, correct?

A.   They wanted him to leave the area, because they had stolen all of his property and money.

Q.   You maintain that the children have stolen your husband's property and money?

A.   As they said to him on December 2nd, 2002.

Q.   Okay.  So, from your position, your view, they have stolen his property.  I just want to have that clear.  Right?

A.   That's correct.

Q.   But, in any event, there was an effort by the children beginning in late 2002 to disentangle totally from your husband.  Can we agree on that?

A.   Yes.

Hearing                                                                01/24/2006

Page 84

Q.   And all of the children, including Jim, have wanted to have zero to do with you and John Donovan, Sr., correct?

A.   They wanted to force him out of the community.

Q.   They have wanted to have zero to do with either of you.  Isn't that correct?

MR. KLICKSTEIN:  Objection.  Asked and answered.

A.   No.

THE COURT:  I'll give him some leeway. The questions are a little distinct.

MR. ROBBINS:  Distinct.

THE COURT:  Well, she is answering they wanted him to force them out of the community, but not necessarily have absolutely nothing to do with him. Positive or negative.

A.   Given that we would not leave the community, they made efforts to make us as unhappy and uncomfortable as they could by threatening, harassing, etc.

Q.   So, from your perspective, all of the Donovan children are threatening and harassing their father and you; is that correct?

A.    James is the primary one by far.

Q.    Okay.  So, you feel he's the primary harasser?

A.    Absolutely.

Q.    And it is the case that an agreement was entered into in late, in early 2003, formalizing the children's desire to disentangle from your husband and have nothing to do with him.  Is that correct?

A.    They under extreme duress of the threat of publishing their lie in the Boston Globe, they battered my husband to sign an agreement.

Q.    You say they "battered" him to?

A.    Yes.

Q.    Okay.

A.    They kept him up nights in a row, all night, going at him, James threatening him to do this.

Q.    Okay.  I simply want to see if I can establish this.  In early 2003, there was an agreement signed --

A.    That's correct.

Q.    -- by which the children achieved their goal of having nothing further to do with your husband, financially or otherwise, correct?

A.    They didn't achieve that goal.

Q.    All right.  There was an agreement signed by which the children separated financially and in other respects from your husband; is that correct?

A.    There was an agreement to try to force my husband to accept that they had taken his properties and money.

Q.    There was an agreement, can we agree there was an agreement in early 2003?

A.    Yes.

Q.    Involving all the Donovan children on one hand?

A.    Yes.  That's correct.

Q.    And your husband on the other, correct?

A.    That's correct.

Q.    Which reflected a, their wish, whether you think it's justified or not, their wish to separate from your husband; is that correct?

A.    Correct.

Q.    Okay.  And it is the case that ever since that agreement was signed, the Donovan children will have nothing to do with your husband or with you?

A.    No.  That's not true.

Q.    Okay.  Will you agree with me that Jim Donovan and his sisters have had nothing to do with

your husband or with you since that agreement was signed?

A. They've threatened me, harassed me.

Q. All right. They've threatened you and harassed you. Apart from what you say are the threats and harassment, would you agree that you understand that Jim Donovan and Christy Donovan and the siblings wish to have nothing to do with you?

A. Okay. Yes.

Q. Okay. Now --

A. I'm not trying to be argumentative. I'm trying to be accurate.

THE COURT: Mrs. Donovan, I understand what you're saying. I think we're going to move on. The crux of the matter is she agrees that there has been animosity and that they have tried to separate and tried, in her words, actually trying to pressure them out of the community. But, she's very clear in that there has been some contact, positive or negative, and she maintains negative contact.

MR. ROBBINS: We're going to get to that contact.

BY MR. ROBBINS:

Q. It is the case that John -- strike that,

that Jim Donovan and Christy Donovan live about a quarter mile down the same road that you and your husband live on, correct?

A.   I believe it's closer to a mile.

Q.   You think it's closer to a mile.  In any event, it's on the same road, correct?

A.   Yes.

Q.   Will you agree with me that the state of the estrangement between Jim and Christy and your, and you and your husband is such that you have never actually met their three children; is that correct?

A.   I have seen their children.  I haven't been introduced to their children.

Q.   Okay.  Fair enough.  And you know that the kids that -- since you've seen the kids, you know that they're all under five years old, correct?

A.   Correct.

Q.   You know that Christy has lived in Hamilton, which is the same town you live in, her family has lived there for 30 years, correct?

A.   So I'm told.

Q.   I'm sorry?

A.   So I'm told.  I don't have knowledge of that.

Hearing                                                    01/24/2006

Q.    Do you understand that Jim's sister, Maureen, also lives in Hamilton?

A.    Moved into Hamilton quite recently, yes.

Q.    You understand that Christy's grandmother lives in Hamilton?

A.    So I'm told.  I don't know where she lives.

Q.    And that Jim and Christy have made a life, have a life in Hamilton, that Christy has lived there her entire life.  You understand that?

A.    Yes.

Q.    You understood that when you came in seeking a 209A order, correct?

A.    Yes, sir.

Q.    Was the idea to come in for a 209A order your own?

A.    Yes.

Q.    And you understood that when, by getting a 209A order to would have an impact on Christy's and Jim's ability to go around Hamilton and live their ordinary life?

A.    What I hoped was that it would stop James from threatening me and that it would preclude the possibility that he might try to attack me again and

might succeed in attacking me, as he had my husband.

Q.    In the same way that you feel absolutely convinced Jim was responsible for the shooting that occurred in December of 2005, correct?

A.    Yes.  There is no doubt in my mind.

Q.    And the same way that you feel certain that Jim was responsible for break-ins or alleged break-ins that occurred in your house?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    And the same way that you say from your perspective you're convinced Jim is responsible for something that occurred in Vermont.  You think he was responsible for that, as well?

A.    For threatening me on the ski slope.

Q.    No.  Wasn't there some break-in in the house in Vermont?

A.    While we were in Vermont, there was a break-in at the house in Hamilton.

Q.    And you're accusing Jim of being responsible for that, as well?

A.    Yes.  Who else would?

Q.    I take it that you put in your affidavit

and you've testified here today to all the evidence that you have that would suggest that Jim Donovan had anything whatsoever to do with any of these things, correct?  You've given us all of the evidence you have?

A.    Yes.  I mean there are many more instances of harassment --

Q.    No.  I'm simply --

A.    -- and creating fear.

Q.    I'm simply asking since you have said that you're convinced that Jim Donovan had something to do with the shooting --

A.    Yes.

Q.    -- in December of 2005 and the alarm going off in your house and a break-in in your house in Vermont, you've given us in your affidavit and in your testimony today all of the evidence that you have from whatever source that Jim had some connection to these events?

A.    Yes.

Q.    Anything you wish to add that is evidence in that regard?

A.    No.

Q.    I'm sorry?

A.    No.

Q.    All right.

THE COURT:  Mr. Robbins, I just want to clarify something.  Mrs. Donovan, when you went to Vermont in December, 2005, the break-in occurred in the house in Vermont or back in Hamilton?

THE WITNESS:  In Hamilton.  In the house in Hamilton.

THE COURT:  Thank you.  Go ahead, sir.

BY MR. ROBBINS:

Q.    Now, it is the case that since that agreement that I alluded to was signed, the agreement between your husband, on one side, and all of the Donovan children on the other, you or you and your husband have filed a series of criminal and civil actions against Jim Donovan, Jim and Christy Donovan, and somebody who did work for Jim Donovan, correct?

A.    I filed the criminal harassment complaint against Carl Potter.  And after the ski slope incident in January, 2005, and all the threats and the harassment over that two-year period, I filed a civil complaint for harassment on the advice of my lawyer to try to get James to stop.

Q.    Okay.  And the law firm in question was the law firm representing your husband, correct?

Hearing                                                                01/24/2006

Page 93

A.    Yes.

Q.    All right.  And that was at a time when your husband was involved in litigation with the children, correct?

A.    Yes.

Q.    And there was a -- the matter was before Judge van Gestel, correct?  Do you recall that name?

A.    Yes.  I'm just not sure of the exact sequence of the dates.

Q.    You know that there was a judge?

A.    Yes.  I know there was a litigation in front of Judge van Gestel.

Q.    And Judge van Gestel appointed a former United States District Court judge to preside over arbitrations of various disputes, correct?

A.    Yes.

Q.    That would be Judge Martin, correct?

A.    Yes.

Q.    You have appeared before Judge Martin, correct?

A.    No.

Q.    Has he ever interviewed you?

A.    I met him once.  I spoke for with him for about ten minutes.

Q.   You know John Donovan, Sr. has testified before Judge Martin, right?

A.   Yes.

Q.   There have been certain findings issued by Judge Martin, which we won't get to right now, correct?

A.   Correct.

Q.   You were advised to file this civil action and the criminal action at a time when, advised to file those two actions by your lawyer, correct?

MR. KLICKSTEIN:  Objection.

THE COURT:  I'll hear you.

MR. KLICKSTEIN:  He's now seeking attorney/client communications.

THE COURT:  I think we are getting a little close to the edge, Mr. Robbins.  I'm going to ask you to be a little careful in your questioning.

MR. ROBBINS:  Yes, I will.

THE COURT:  I understand there were different things going on.  I understand the time frame.

Q.   Let me see if I can do it this way.  You were advised by whoever it was that advised you to file the criminal and civil action?

MR. KLICKSTEIN:  Objection.

Hearing                                                              01/24/2006

Page 95

Q.    You were advised to do that?

THE COURT:    There is an objection.    What was the -- give me the question again.

MR. ROBBINS:    I hadn't finished.

THE COURT:    You said you were advised.

BY MR. ROBBINS:

Q.    I guess I was going to ask.    Forget about who advised you or what they said.    At the time that you were advised to file a criminal and a civil action, there was a matter which was being, your husband was involved in litigation that was being heard by Judge van Gestel and Judge Martin, correct?

MR. KLICKSTEIN:    Object to the relevance.

THE COURT:    For what it's worth.

A.    Correct.

Q.    All right.    And based on the advice, whatever advice you got from whomever, you filed first a criminal action against Carl Potter and then a civil action against Jim Donovan and his wife, Christy?

THE COURT:    Strike the first part of that, and you can just ask her if she filed.

Q.    You filed, during this period of time, you filed first a criminal action against Carl Potter, correct?

A.    Correct.

Q.    Who was somebody who was a caretaker, who works for the Donovan children, correct?

A.    Correct.

Q.    And then you also filed a civil action in Essex Superior Court alleging that Jim Donovan -- and Christy is not here -- Christy Donovan alleging that they were both stalking you and assaulting you, correct?

A.    That's true.

Q.    And alleging that Christy Donovan and Jim Donovan were both threatening you and following you and shadowing you, correct?

A.    James threatened me.  Christy harassed me.

Q.    All right.  Okay.  Now, we'll get back to these matters, but it is -- the first one was the 209A application that you and your husband did together, correct, back in October of 2003?

A.    Correct.

Q.    And that was in your name, as well as your husband's name, but your husband was the only person who filed the affidavit, correct?

A.    That's correct.

Q.    And then that was vacated, correct?

A. Upon the agreement in the letter that was shown earlier.

Q. Did you appear to testify that day?

A. That letter was agreed to, and, therefore, the hearing was cancelled.

Q. We're going to get to that. The criminal complaint that you filed against Mr. Potter, you accused him of assault, as well as harassment, correct?

A. Correct.

Q. The assistant clerk magistrate refused to even issue the assault complaint, correct?

A. Correct.

Q. And then the District Attorney simply dropped the --

A. No. That is not true.

Q. Which part is not true?

A. That he simply dropped the criminal.

Q. Whether it was simply or not, the DA dismissed the harassment claim, correct?

A. Correct.

Q. Now, you told the Court that you understood, you were frightened by Mr. Potter, because your understanding is that he was convicted of assault. That is what you told the Judge, correct?

Hearing                                                        01/24/2006

A.    That's correct.

THE COURT:  You objected to that.  I struck it, but I'll take it now.

Q.    The fact of the matter is that he has never been convicted of assault.  Isn't that correct?

A.    No.

Q.    Do you have documentation that he was --

A.    Yes.

Q.    -- convicted of assault?

A.    Yes.

Q.    Have you brought it with you to court today?

A.    Yes.

MR. ROBBINS:  May we have it now, your Honor?

MR. KLICKSTEIN:  I don't think he's entitled to it now, your Honor.  If your Honor tells me to give it to him, we'll give him the information that she relies on.

THE COURT:  Give him the information, please, Counsel.

BY MR. ROBBINS:

Q.    And while that is being obtained, the assertion that you made in the criminal complaint that

you made against Mr. Potter was that he had been directed to threaten you, and you just knew this, by Jim Donovan, correct?

A.    Yes.  He repeatedly told people he just did what he was told.

Q.    And since he told people that repeatedly, there must be people that he told, correct?

A.    People in the town, people that work for my husband.

Q.    People who work for your husband, and, therefore, would be available to come testify, correct?

A.    Correct.

Q.    And because they worked for your husband, there would have been no trouble bringing them into court at the time that the criminal complaint was filed, so that a judge could hear, or the clerk magistrate could hear from them, correct?

A.    Correct.

Q.    And, yet, none of these witnesses to what you said Mr. Potter did or what you say Mr. -- Jim Donovan told Carl Potter to do were brought by you to testify on your behalf when you appeared in this court, correct?

THE COURT:  Counsel, isn't that irrelevant

to the hearing?

MR. ARZU:  Object.

THE COURT:  If she's accusing someone of assaulting her, does it make any difference whether was doing it at someone's direction or not?

MR. ROBBINS:  You indicated --

THE COURT:  She may believe that.  I understand that is at issue here in some way, but at that hearing, that's not pertinent if whether he was doing it at someone else's behest or doing it on his own.  He was doing it.

BY MR. ROBBINS:

Q.  Let me ask you this, forget about the Jim Donovan part of it.  You claim there was a witness to Carl Potter assaulting you, correct?

A.  Correct.

Q.  The person that you claim was a witness is Mr. Steve Lombara, correct?

A.  Correct.

Q.  So, quite apart from the Jim Donovan aspect of things, nobody would have been in a better position to corroborate your story than Mr. Lombara, correct?

A.  Correct.

Q.   And you did not bring -- and he was available, because he worked for your husband, right?

A.   Correct.

Q.   And, therefore, despite that --

MR. KLICKSTEIN:  Your Honor, I object to this line.  He's gone very far afield.  There was a clerk's hearing.  A complaint issued.  A criminal complaint issued against Mr. Potter.  It was dismissed without notice to the victim.  That is on the Court docket.  Mr. Lombara's testimony, so far as anybody wants you to read it, is contained within the deposition extract he gave you and the deposition extract I gave you.  So, harassing this witness about what occurred there is inappropriate.

THE COURT:  I have to agree with Mr. Klickstein.  I'm really getting a little lost in the relevance of it.

MR. ROBBINS:  Let me bring it to here.

Q.   You've testified here that the supposed assault on you by Carl Potter, the screeching of the four-wheel vehicle and following you and so forth, at least the vehicle incident that Mr. Lombara -- strike that.  You testified here today that Mr. Lombara was present when Carl Potter at Jim Donovan's direction

01/24/2006

Page 102

assaulted you, correct?

A.   Correct.

Q.   And, therefore, it would be no problem to physically bring, to ask Steve Lombara to come here to testify on your behalf, correct?

MR. KLICKSTEIN:  Objection.

THE COURT:  Right.  It would be.  She could have.  She might or might not for whatever reason.

MR. ROBBINS:  I'm entitled to show if there were a witness, if this incident had ever occurred, and there were a witness that she testified was there on Direct Examination, part of her case, that this gentleman would be here to corroborate her story.

THE COURT:  He doesn't have to be.  We can take or believe or disbelieve her about whether those acts were committed.  That is one issue.  The more germane issue is whether I'm inclined to infer that it was at somebody else's behest.  If she wants to bring corroborative witnesses or not, so be it.  Maybe I'll decide that the acts didn't even occur.  I don't know.

MR. ROBBINS:  I agree.  I'm not even getting to the Jim Donovan part.  I'm suggesting where she has been allowed to say on Direct that there was a

witness to a supposed incident with Carl Potter, forget about the Jim Donovan piece, and she -- and this person is under her control, he can be brought to testify, and she has made agree to significance or a decision has been made --

THE COURT:  Okay.  Could you have made arrangements to have Mr. Lombara come here if you had wanted, if you had thought about it in advance?

THE WITNESS:  Yes.  The advice of my counsel was not to do that.

THE COURT:  Okay.  Let's move forward.

MR. KLICKSTEIN:  Just to be clear, your Honor, we're talking about this criminal complaint that issued against Mr. Potter, not this morning when in fact Mr. Lombara was here and excused.

THE COURT:  Thank you.  That's true. That's true.

MR. ROBBINS:  It's the same incident.

THE COURT:  But, Mr. Klickstein's point is well taken.  Mr. Lombara was in fact physically here.

MR. ROBBINS:  We subpoenaed him.  We asked that he be here.  We asked that he be here, because he gave testimony which he said there was no assaulting, and Jim Donovan has never threatened anybody.

THE COURT:  You could have put him on the stand and asked him why didn't you show up at the clerk's hearing, Mr. Lombara.

MR. ROBBINS:  The fact this supposed witness to an incident is not even called by the complaining witness to come forward and tell the Court and say, yes, what I've said is correct --

THE COURT:  Yes.  We've established that.

MR. ROBBINS:  Since we're here, as the Court points out, on your assertion that --

MR. KLICKSTEIN:  Excuse me.  I apologize that I'm interrupting but he is confusing the Court about Mr. Lombara.  Mr. Lombara's testimony today that he's agreed to and we've agreed to that is before you now is that he was present at the ATV assault, that Linda Donovan was upset by the Potter ATV incident, that Lombara had to run to catch up with her after the incident.  She was panting, looked upset, and I knew she felt threatened.  That is the evidence that went in before you this morning by agreement.  This is really disingenuous.

THE COURT:  That is okay.  We're going to move along.  I've heard enough about Mr. Lombara, whether he was at the clerk's hearing or not.

MR. ROBBINS: Okay.

THE COURT: Let's move on.

BY MR. ROBBINS:

Q. But, since you've said --

THE COURT: No, no.

MR. KLICKSTEIN: This is the copy of the docket from the Vermont Family Court that Mrs. Donovan was referring to that consists of this, is the information she had available, and it reflects that there was an adjudication of guilty entered on a domestic assault against Mr. Carl Potter. This is information my client was aware of. We would like it marked.

MR. ROBBINS: Can we have a copy?

MR. KLICKSTEIN: This is the only copy I have. They requested to see it. I would like to mark it as an exhibit.

MR. ROBBINS: If we could have a copy.

THE COURT: I'll ask Kevin. What is your next question?

BY MR. ROBBINS:

Q. Okay. Moving away from Mr. Lombara, since you've said that various people have said that Carl Lombara told them that Jim Donovan directed them to do

something, there must be witnesses, who are available to say that Jim Donovan said any such thing, correct?

A.    Carl Potter, I have been told that Carl Potter said that.  I know he said it directly to Steve Lombara.  I can't name you who else he said it to.

Q.    Since you say, since you say that Steve Lombara told you that Carl Potter had told him that Jim Donovan told him to do something, then Steve Lombara, that same Steve Lombara would be a good person to come in and corroborate?

THE COURT:  Okay.  We've all, if I was sitting here this morning, and I'm not getting metaphysical, Mr. Lombara was told all we needed him for was the testimony I have per deposition, and now he's gone, so I do not want to hear too much more about what he would or wouldn't testify to since he's not here.

MR. ROBBINS:  You have his testimony.

THE COURT:  Excused by everyone, so let's move forward.

MR. ROBBINS:  The Court does have his testimony.

THE COURT:  I have it.

MR. ROBBINS:  In Q.

THE COURT:  With my yellow sticky.

MR. ROBBINS:  Thank you, your Honor.  If I can approach, your Honor?

THE COURT:  Sure.  Are you going to show her something?  You might want to show your brother first, please.

MR. ROBBINS:  Yes.  It's going to be the --

Q.  Let me show you a document and ask simply if you can have a look at it and confirm that it is the complaint for protection from abuse that you and John, Sr. filed on Halloween, 2003?

A.  Yes.  My husband filed this on both our behalfs.

Q.  Your husband filed it, but in your name?

A.  In both our names.

Q.  In your name, as well as his.  May I give the Court a copy?

THE COURT:  Any objection to me seeing this?

MR. KLICKSTEIN:  No objection, your Honor.

BY MR. ROBBINS:

Q.  And you were aware that that was going to be filed, and what the basis for it was, correct?

A.    Yes, I was.

Q.    And it alleges that Jim Donovan threatened his father through a Mintz, Levin attorney; is that correct?

A.    Correct.

Q.    And it alleges that Jim Donovan said that there would be "bombs" dropped over the weekend?

A.    Correct.

Q.    Correct?  And that there had been some kind of a shooting that had occurred in which bullets were found in your house; is that correct?

A.    Bullets were found in our house.  Yes.

Q.    Incidentally, you contend that John -- strike that, that Jim Donovan took your hand at the Myopia Club, grabbed your hand, you say?

A.    Absolutely.

Q.    And that that was a terribly frightening incident, correct?

A.    It was terribly frightening to have him grab my hand, get very close to me and threaten me in a menacing tone and pushed me into the corner of a closet.  Yes.  I was very frightened.

Q.    And that placed you back in February of 2003 in imminent fear of Jim Donovan having harmed you

in some way, correct?

    A.   Yes.

    THE COURT:  Did you say -- I'm sorry.  I know he grabbed your arm.  Did he push you, as well?

    THE WITNESS:  He walked very quickly toward me, so sort of pushed me back.  He didn't shove me.  He just grabbed my hand, but kind of held me in the corner of the closet.

BY MR. ROBBINS:

    Q.   Now, in this document which was filed in your name, you consulted with your husband -- don't give us the communication, but you consulted with your husband about the filing this document?

    A.   This was the advice of our attorney, primarily to my husband.

    Q.   All right.

    A.   We didn't talk in detail about this before it happened.  He was very frightened, and the attorney went to court and filed the order.

    Q.   Okay.  Now, there is of course no reference in this document to you having been grabbed by Jim Donovan supposedly nine or eight months earlier, correct?

    A.   That's correct.

Page 110

Q.    All right.  But this documents does say there was a shooting and that there were threats of "bombs" going off and threats made by managing --

A.    James had been threatening my husband ever since 2002.

Q.    Okay.  And so presumably everything that he had that was a threat as a basis for his threat was based in this?

A.    No.

MR. KLICKSTEIN:  I object.  He's trying to impeach her on a document she says she didn't write.  That is completely inappropriate.

MR. ROBBINS:  It's in her name.

MR. KLICKSTEIN:  He can ask her whatever questions he likes, but to impeach her on a document she testified was prepared by counsel and her husband and shows on its face is improper.

MR. ROBBINS:  Your Honor, I'm trying to get a handle --

THE COURT:  Mr. Klickstein's point is well taken.  It's hard for her.  She had very little to do with the filing of this and the statement in the affidavit.  It's a little difficult for her to respond to what is in it.

Q.   Let me see if I can help.  You had had eight months to discuss this incident you say occurred at the Myopia Hunt Club in which you felt menaced, correct?

A.   Correct.

Q.   It was a very, very disturbing event, you said?

A.   Very disturbing.

Q.   You were extremely frightened?

A.   Yes, I was.

Q.   Without giving us communications at the time that the 209A order was applied for, you knew it was being applied for, correct?

THE COURT:  Let me ask her counsel, Mrs. Donovan, were you asked to take part in what would go in the affidavit and what you wanted put in there?

THE WITNESS:  Not at all.

MR. ROBBINS:  All right.

BY MR. ROBBINS:

Q.   In any event, the first time that any assertion is made about a grabbing incident in the Myopia Club in February of 2003 is about two years later when you file a civil action?

A.   It was in a letter written directly after

that happened by my lawyer to James' lawyer with the understanding that James' lawyer would get James to leave me alone.

Q.    The first time you asserted at least in any court, any place, in any proceeding that there had been, that Jim Donovan had grabbed your hand --

A.    Was when I filed a harassment suit.

Q.    -- was when you filed a civil action against Christy Donovan and Jim Donovan two years afterwards?

A.    Correct.

Q.    Okay.  In any event, the document that we're looking at, which is the 209A application from 2003, we can agree that was vacated, correct?

A.    Upon agreement of the attorneys that James would stay away from us.

Q.    You say that was your agreement.  And your husband has never filed for 209A relief since then, correct?

A.    Correct.

Q.    All right.  Now, by the way, it is the case that your husband does own firearms?

A.    He -- yes.

Q.    He owns a rifle?

A.    I think there is a rifle, yes.

Q.    And he owns a pistol, as well?

A.    I don't know of any pistol.

Q.    Now, this 209A order that was then vacated you understood was going to be served at Jim Donovan's house on Halloween night?

A.    I did not know the procedures.  All I knew was that there were bullets fired into my house.  The police were called.  Our lawyer came, and my husband and our lawyer went to the Court and filed the restraining order.

Q.    Okay.  The Myopia Club, the scene of some of the incidents that are set out in your application for a 209A relief here, that is a club that you and your husband are members of, correct?

A.    Correct.

Q.    And that you know Jim and Christy are members of, correct?

A.    Yes.  My --

Q.    You know that Christy rides horses, and this is a place where there are horse events, correct?

A.    Yes.

Q.    And you know that Jim likes to ride horses with his wife, and they ride horses there, as well,

right?

A.    Yes.

Q.    And you know that they attend functions there, correct?

A.    Yes.

Q.    And you know that in the summers they take their little kids to essentially hang out at the pool there, correct?

A.    I don't know that.

Q.    You have seen them, seen the kids there?

A.    I don't go to the pool.

Q.    Have you seen the Donovan children, Jim and Christy's children at Myopia?

A.    Yes.

Q.    Okay.  So, you know they take them there, correct?

A.    Yes.  I'm sorry.

Q.    And we'll get back to Myopia in a second. At around the time of this 209A order was sought and then vacated, you know that John Donovan, Sr., place it in time, October of 2003 is about six months after the separation agreement between John Donovan, Sr. and his children, correct?

A.    Yes.

Q.   And at about the same time that you and your husband assert that Jim has placed you in, has placed you both in fear of your safety, you know that John Donovan, Sr. also filed a criminal complaint against his other son, John, Jr., correct?

A.   Yes.

Q.   And what John, Sr., what your husband, Professor Donovan did is allege that --

MR. KLICKSTEIN:  Objection.  Completely irrelevant.  How does a son, who is not either in this 209 proceeding or related to this --

THE COURT:  Can you give me an offer of proof, Counsel.  What is going to happen?

MR. ROBBINS:  What I said in my opening, there is a series of these complaints that have been brought by John, Sr. either with Mrs. Donovan or through Mrs. Donovan or through some other instrumentality you will see against one or more or all of the Donovan children and that they have one by one been dropped, vacated, dismissed, determined to be frivolous.

THE COURT:  Okay.  I'm going to just, we're talking about today.  I'm going to start to limit you.  We're talking about today is her request for

restraining order, which is what I have before me today.  And the history of her restraining orders, her being a participant, and in all honesty, Counsel, I'll give you some leeway, but I'm focusing on her application today, what the basis of her application is today.

MR. ROBBINS:  This should be about three questions.  I could do it through an offer of proof.

THE COURT:  No.  Go ahead.  Question No. 1.  I'm kidding.  Go ahead.

BY MR. ROBBINS:

Q.    What your husband charged John Donovan, Sr. [sic], Jim's brother, with was illegally entering a building, correct?

A.    Say that again, because I think you have the names wrong.

Q.    I may have.  What your husband John, Sr. accused his other --

MR. KLICKSTEIN:  Objection, your Honor.

THE COURT:  I guess my statement had no effect.

MR. KLICKSTEIN:  I'm getting confused. The only one that ever refers to Professor Donovan, Sr. is my brother.  In all of this, there is Professor

Donovan.  There is James, Jr., there is James Donovan, and there is junior.  And it really does confuse me, and if they call professor, it's going to be more confusing, because to him John, Sr. is his father.

THE COURT:  Believe it or not, I think I'm following it.  I'm going to let him have it.

MR. KLICKSTEIN:  I withdraw my objection.

THE COURT:  These are allegations between father and son, John, Sr. and John, Jr.

Q.    Exactly.  Professor Donovan is John Donovan, Sr., correct?

A.    Correct.

Q.    Okay.  And we were talking about the fact that he filed a criminal charge against his other son, not in this case Jim, but his other son?

A.    Who broke into the building.

Q.    John Donovan, Jr. for supposedly breaking into a building, correct?

A.    Correct.

Q.    And it then emerged, and this was the building in which Professor Donovan, John Donovan, Sr. worked, correct?

A.    Correct.

Q.    But, it then emerged that John Donovan,

01/24/2006

Page 118

Jr. was actually an owner of that building, correct?

A.    What is correct is that he had, he broke into the building and had no right to break into the building or to take documents from the building.

Q.    I simply want to ask this:  Is it the case that it emerged, emerged that --

A.    He --

Q.    Is it the case that John Donovan, Jr. was in fact the owner of the building that he supposedly --

A.    He is a majority owner.

Q.    He is the majority owner of the building that your husband accused him of having illegally entered, correct?

A.    He did illegally enter it.

Q.    The last question is:  As a result, the criminal complaint that John Donovan, Sr., your husband, filed against his other son was dismissed?

A.    No.  That is not true.

Q.    All right.  Okay.  Let me move on to the next thing, which is your criminal complaint against Carl Potter.

MR. KLICKSTEIN:  This is a good point, your Honor, we had copies made.  We'd offer into evidence the Vermont conviction of Mr. Potter.  They

have a copy of it.  Since they asked for it, they can't object to it going into evidence.  Can I have that marked?

MR. ROBBINS:  Well --

THE CLERK:  Seven.

(Record of Carl Potter marked Exhibit 7.)

MR. ROBBINS:  I'm going to object to it being marked.

THE COURT:  Well, you raised the issue.

MR. ROBBINS:  It was raised first.

THE COURT:  I excluded it, I think.

MR. ROBBINS:  You did.

THE COURT:  You brought it up.  I'm going to allow it.

MR. KLICKSTEIN:  What number, your Honor?

THE COURT:  Seven.

BY MR. ROBBINS:

Q.  And just so that we're clear, does the Court have the -- the Court does, I think, have, if not I can run off a copy of it, the 209A order here and the affidavit that Mrs. Donovan supplied --

A.  Correct.

Q.  -- in support of that application.  The

Court has that and can see the reference to Carl Potter, the allegations about Carl Potter that are a part of the affidavit.

MR. KLICKSTEIN:  Paragraph 5, your Honor, in the affidavit.

THE COURT:  Yes.  Thank you both.

MR. ROBBINS:  Okay.  Now, if I may, if I can approach, your Honor, and give the Court a copy, as well.  What you are looking at --

MR. KLICKSTEIN:  Could I have a copy, as well, sir?

MR. ROBBINS:  You know what.  I have three copies.  Do you have an extra copy?  I have an extra copy.

MR. KLICKSTEIN:  Thank you, Mr. Robbins.

BY MR. ROBBINS:

Q.    This is the application, the statement of facts that you signed when you took out a criminal application against Carl Potter in this court in November of 2004, correct?

A.    That's correct.

Q.    Alleging that Carl Potter had driven at you at a high rate of speed on September 8th, 2004, right?

01/24/2006

A.    That's correct.

Q.    And there, and I hate to do it, but you refer to the fact you were with Steven Lombara at the time?

A.    That's correct.

Q.    And you said that the incident was particularly frightening due to the fact you say that "Carl is employed by James Donovan, who has physically threatened me in the past," correct?

A.    That's correct.

Q.    All right.  And you allude in the last part of this document, you say, "We frequently have groups of horses ride on the property," and you say at James' -- you mean at James' instruction, has repeatedly disrupted these -- Carl Potter has repeatedly disrupted these rides by putting up gates and so forth, correct?

A.    That's correct.

Q.    So, what you were saying was not that you had ever seen Jim Donovan at any of these events, correct?

A.    Yes.  He was at the riding events.

Q.    All right.  Let me ask you:  September 8, 2004, when you say Carl Potter drove at you, do you

Hearing                                                          01/24/2006

Page 122

state that Jim Donovan was there?

A.    No.  He was not there.

Q.    And when you say Carl Potter drove in back of you, do you contend that Jim Donovan was there?

A.    No.

Q.    And when you say that "we frequently had groups of horses" and that "gates were put up and holes were dug" and so forth, you don't contend that Jim Donovan was there then, either, correct?

A.    He was at some of the events.  When the gates were put up, I doubt that he was there.

Q.    Did you see --

A.    But he ordered it.

Q.    Did you see Jim Donovan put gates on this property?

A.    No.

Q.    Did you see him dig holes?

A.    No.

Q.    Now, this property is, these are public trails, correct?

A.    This is property that my husband spent 30 years putting together so that it would always be open and available for the community, and there are trails through that property that we have always let people

Hearing                                                      01/24/2006

Page 123

ride and walk on.

Q.    Now, just so the Court is clear, there is a lot of property involved.  This is part of the 600 acres that we're talking about?

A.    Correct.

Q.    This is the property which you say John Donovan, Sr.'s children stole from him, correct?

A.    That's correct.

Q.    And so you say that they own it, but the way they came to own it, according to you, is that they stole it, right?

A.    Correct.

Q.    So, that would make it, at least subject to somebody agreeing with you that it was stolen, that would make it the children's property and not yours, correct?

A.    They claimed to own it.

Q.    You know it's not your property, correct?

A.    They claim to own it.  There are other claims to the property, as well.

Q.    Well, in fact if you go to the Registry of Deeds, you will find, you'll agree with me you will find that that property is owned by the children, correct?

A.    Yes.

Q.    All right.  So, what you say occurred back in September of 2004 is that the caretaker for the property of the children put gates up and dug holes on property which the children own, correct?

A.    Which the children stole from their father and were trying to chase their father out of the community and away from this property that he put together for the benefit of the community.

Q.    I understand, but I'm simply saying that you agree that they own the property, correct?

A.    I agree that they claim to own the property.

Q.    I thought you indicated they did own it. But, in any event --

A.    I'm sorry.  I am just trying to clarify. I agree that they claim to own the property.  I don't agree that it's clear that they do.

Q.    All right.  But, in any event, what you allege occurred here is that the caretaker for the children -- by the way, you didn't see Carl Potter -- forgive me if I've asked this.  You didn't actually see Carl Potter dig any holes or put any gates up or anything like that on this property?

A.    I did not see him erect gates --

Q.    So, you didn't --

A.    -- or dig holes.

Q.    So, you didn't see Carl Potter dig holes or put gates on any of these trails, correct?

A.    Correct.

Q.    This is property which you agree you don't own, correct?

A.    There are multiple claims to the property.

Q.    Okay.  In any event, you don't see Carl Potter do it.  You don't see Jim Donovan do it.  It's property which you agree if you go to the Registry of Deeds is in the ownership of the children, correct?

A.    The deed, no.  Actually, no.  It's all in trusts that the children inappropriately took control of.  The deed does not have their name on it.

THE COURT:  Okay.  Moving on.

MR. KLICKSTEIN:  Objection.

THE COURT:  We're moving on.  We're moving on.

BY MR. ROBBINS:

Q.    Are there any affidavits or are there any affidavits that have been submitted or is there any testimony you have submitted in support of your claim

Page 126

that Jim Donovan caused holes to be dug, gates to be put up or four-wheel vehicles to have been driven in your vicinity?

MR. KLICKSTEIN:  Again, your Honor, what does this have to do with what we're here for today?

MR. ROBBINS:  Your Honor, that is what the testimony was.  The testimony was that we're here for a criminal complaint in effect against Jim Donovan on the basis of ATMs [sic] going --

THE COURT:  Here is the issue:  In the affidavit -- here is the issue:  In the affidavit at least regarding the trails she's alleged that Carl Potter at the instruction, she believes, of James, has altered, impeded or made dangerous the routes that she and others would have taken over the paths.

MR. KLICKSTEIN:  Excuse me, your Honor, my brother succeeded in confusing you.  In the complaint today that we're here on, that doesn't say that.  What it does go into is just it just says Carl Potter.  It doesn't mention the trails.  It cleans it up to the assault with the ATV to that harassment for which a criminal complaint issued after a finding of probable cause.

MR. ROBBINS:  Your Honor --

MR. KLICKSTEIN: If my brother wants to go into all this, I think we're going to be here for days.

THE COURT: Counsel, I assume he's going to claim she's incorrect on one, maybe she's incorrect on the other. Give him some leeway. I keep distinct the incident which he's identified specifically, not only by her, by someone else, and that behavior and this, this more suspect for lack of a better word incident involving the trails. But, I guess one might flow off into the next. I'll give you some leeway, Counsel.

MR. ROBBINS: The point, I'm mindful of the time. There is a shifting around. This is the basis on which we were here. Now, if it's being withdrawn, that raises other issues about the obtaining of an order by an affidavit. Now, the withdrawal of that and the substitution of it --

THE COURT: Her --

THE WITNESS: There is nothing withdrawn.

THE COURT: We're here today, I'm going to hear what is brought out in evidence today. If someone thinks they have a better case, proving A, D and F, as opposed to A, B, C, D, and, frankly, I'm all the more happy about that, it makes my work a little simpler, so

I think Mr. Klickstein's point is well taken.  I'll give you some leeway to show perhaps if she's mistaken on one she's mistaken on the other.  We're going to forge ahead.  This case is going to be finished today.

MR. ROBBINS:  Thank you, your Honor.

BY MR. ROBBINS:

Q.   Mrs. Donovan, do you have any affidavit or any witness, or any testimony at all that supports your claim that Jim Donovan caused Carl Potter to follow you, monitor you, shadow you or do anything else to you?

A.   Only Carl Potter's statements that he just does what he's told.

Q.   That is you.  Do you have any testimony, affidavits from any witness?

A.   I do not have any affidavits.

Q.   Do you have any testimony in whatever form from anybody who has said that Jim Donovan suggested that Carl Potter harass you, follow you or would know about such a thing?

THE COURT:  She has the statement of Mr. Lombara, and I'll check his affidavit, see what he says.  If it's not in the affidavit form, the point is well taken.

MR. ROBBINS:  It's not in any form.

THE COURT:  So, she's answered the question no.

MR. KLICKSTEIN:  It's also, if your Honor reads the affidavit submitted by Carl Potter, Carl Potter while he tries to shade what it is he was doing, admits that he works for them and that he has done these things, although he says they're all benign.  So, again, careful reading of Carl Potter's affidavit submitted by my brother will support what Mrs. Donovan says.

MR. ROBBINS:  Your Honor, Carl Potter's affidavit directly reputes this.

THE COURT:  I'll read Carl Potter's affidavit.  Note to self, read Carl Potter's affidavit specifically on instructions from D.  Moving ahead, not as rapidly as I want, but moving ahead.

BY MR. ROBBINS:

Q.  We've talked about the fact that the assistant clerk magistrate did not issue an assault complaint.  We can agree on that?

A.  Correct.

Q.  And a complaint was issued on the harassment, correct?

A.    Criminal harassment.

Q.    It was then dismissed, correct?

A.    Without my notification and Dolly then said to me that he apologized, that it was a mistake, and that what he was not going to throw his guy under the bus.  Those were the words he said to me.

THE COURT:  Which guy was he referring to?

THE WITNESS:  My counsel, the Assistant DA who dismissed it.

Q.    So, since you understood that it's a mistake, and it's been a year that it's been dismissed, have you refiled any criminal claim against Carl Potter?

A.    We have had -- Dolly kept promising that he was go to do something.  My attorney can tell you I have asked him over and over and over what is happening on this.  They said they would make it right.  They have not done anything.  I can't explain more than that.

THE COURT:  So, you've left it up to Mr. Dolly?

THE WITNESS:  Yes.

THE COURT:  So to speak.

THE WITNESS:  To my lawyer and Mr. Dolly.

BY MR. ROBBINS:

Q.   Have you filed any complaint, criminal or civil, against Mr. Potter since you say you think this was mistakenly dismissed?

A.   No.

Q.   Now, the next thing that occurred was that you filed a civil action against Christy Donovan and Jim Donovan?

A.   That's correct.

Q.   And you allege that Christy Donovan was stalking you, had stalked you, correct?

A.   That's correct.

Q.   And you allege that Jim Donovan had stalked you?

A.   That's correct.

Q.   And you allege that Christy Donovan was harassing you and following you and glaring at you and the like, correct?

A.   That is correct.

Q.   And you even alleged that Christy Donovan and Jim Donovan together flanked you on a horse and kept you boxed in for 30 minutes, correct?

A.   They didn't keep me boxed in for 30 minutes.  They put their horses near me, and they

stayed near me with the hind ends of their horses.

Q. And that was one of the bases for your allegation against Christy Donovan and Jim for assaulting you, correct?

A. It's a series of intimidation, threats, that caused me to be very fearful.

Q. And you alleged, as well, that Christy and Jim Donovan together skied next to you down the slope?

A. Christy skied -- as I said before, Christy skied past me. James skied right beside me, threatened me, and then skied away.

MR. ROBBINS: If I can have one moment, your Honor.

THE COURT: Yes.

MR. ROBBINS: If I can approach.

THE COURT: Sure. Show your brother what you have.

BY MR. ROBBINS:

Q. Would you confirm that this is -- I'm showing you the Amended Complaint in the civil action of Linda Donovan versus James Donovan and Christina Donovan.

A. I know that incident is --

Q. I'm simply asking -- I'll get to that

incident in a second.  I just want to ask you if you would be good enough to confirm --

A.    Yes.

Q.    -- this is the Amended Complaint?

A.    Yes.

Q.    And you described the incident in Paragraph 5H on Page 4, if the Court has it.  You say that "James Donovan and Christy Donovan, who to plaintiff's knowledge have not skied at this slope for many years, continued their psychological terror campaign against Mrs. Donovan.  They made a point of following her, got in the chair lift directly behind her and then while she was downhill skiing, flanked her closely on either side, boxed her in, and caused her to fear that they would knock her down."

So, there is no doubt about it.  You are alleging in this that "they," Jim Donovan and Christy, made a point of following you, flanked you on either side, and both boxed you in, causing you to fear that they would knock you down.  Have I read your allegation correctly?

A.    They skied by me one at a time.

Q.    Is this a true statement there?

MR. KLICKSTEIN:  Your Honor --

THE COURT:  This is what the attorney gleaned from her testimony.

THE WITNESS:  Right.

THE COURT:  Or her statement and put down. And she's elaborating on it, what actually happened.

MR. ROBBINS:  Your Honor, if I may, this is directly contrary to what she said occurred.  She said a moment ago it was not Christy Donovan, and she files a complaint in her name.

THE COURT:  That is not how I read it.  It says they made a point of following her, got in the chair left directly behind her, then while she was downhill skiing, boxed her in.  Then they threatened her as they skied past.  Apparently, perhaps it was misquoted.  I know she's only saying it's Jim.  Christy actually went by her.  It was Jim.  Your point is, your point is a salient one.  It's a little different than what she's testified to today, but she can't be, unless she's going to say she told her attorney one thing and changed her mind, she can't be --

MR. ROBBINS:  Respectfully, I have to basically point out what she asserted in a court is very much different than what she alleges here, and since we have Christy Donovan who is going to testify,

I think we need to get that nailed down.

THE COURT: I think you already did. She said what actually happened. She said correct, what is stated here is different in some ways from what she's just said on the stand, but it doesn't -- it's slightly different. Go ahead.

BY MR. ROBBINS:

Q. Well, let me ask you this: So the record is clear, do you contend that Christy Donovan and Jim Donovan made a point of following?

A. They both came up the chair lift. I was in a chair. Christy and her daughter Emily were in the chair behind me. They got off and skied by me. James was in the chair behind them. He got off, skied right beside me, said, "Any time, any place," and then skied away quickly to catch up with them.

Q. So, it's not correct that Christy and Jim boxed you in? You say Christy wasn't there?

A. My attorney didn't get that quite right. I apologize.

Q. And you weren't fearful that Christy would knock you down, because you say she wasn't there?

A. I was afraid that James would knock me down.

01/24/2006

Q.    So, that is not quite correct either?

THE COURT:    It's just unclear.    That's all.

Q.    When you say they then threatened you again, you don't mean to say that Christy threatened you, because you say that she didn't say that, right?

A.    James said that.

Q.    So, that is incorrect, as well?

MR. KLICKSTEIN:    Objection.

THE COURT:    He may have it.

Q.    That is not quite correct, either, correct?

A.    It was only James who threatened me.

Q.    And you say, to your knowledge, Jim Donovan and Christy Donovan have not skied at this slope for many years, correct?

A.    They have never skied there when I was there.    They never skied there during the period of time that we had family vacations together.

Q.    How often, how many times a year are you there?    This is Suicide Six, correct?

A.    Correct.

Q.    This is a slope in Vermont, correct?

A.    Multiple times over the Christmas holiday.

01/24/2006

That's all.

Q.    I'm sorry.  How many years, how many years in a row have you been, have you skied there?

A.    At Suicide Six?

Q.    Yes.

A.    Thirteen, thirteen or fourteen.

Q.    And how many times -- how long were you there for when you go?

A.    We stay in Vermont for two weeks, and we go multiple days --

Q.    Okay.

A.    -- during that time.

Q.    Now, you are aware -- perhaps you're not aware.  Do you know how frequently Jim and Christy go skiing at Suicide Six?

A.    No.  I only know that I've never seen them there and that James always refused steadfastly to go there.

Q.    Before he was married?

A.    Before 2002.

Q.    Well, so you don't know if in fact they go there every year, correct?

A.    I do not know that.

Q.    You have no idea how frequently they do go

Hearing                                                          01/24/2006

Page 138

there, correct?

A.    I do not know.

Q.    But, you know, you tell the Court you know that Jim Donovan grew up skiing there as a kid, correct?

A.    That's correct.

Q.    And you know that he took Christy there before they were married, correct?

A.    No, I don't.

Q.    You just have no idea one way or the other?

THE COURT:  She said that.  She doesn't know.

MR. ROBBINS:  Okay.

Q.    So, you have, you don't actually know whether or not Jim and Christy and their children go there every single year, correct?

A.    I do not.

Q.    You agree that they do have a right to go there with the kids, correct?

A.    Of course.

Q.    Now -- so, when you said that the plaintiff's knowledge, to your knowledge, they have not skied there, you didn't mean to suggest that they

didn't ski there.  You just meant to suggest that you didn't know whether or not they skied there, correct?

A.    I'm sorry?

Q.    I'll do that again.

A.    Could you say that again?

Q.    That was a dreadful question.  When you said in your complaint that "To plaintiff's knowledge, Jim Donovan and Christy Donovan had not skied there for many years," you didn't mean to suggest that they never went there.  You meant to suggest that you didn't know one way or the other, correct?

A.    I did not know.

Q.    Now, at the end of the complaint that was filed, and the Court has that there, there is a request for a restraining order to be issued against Christy Donovan and Jim Donovan to keep them away from you as a result of what you contend was their harassment, their stalking and their assaults, correct?

A.    Correct.

Q.    All right.  And that was, the original complaint was filed in January of 2005.  This is the Amended Complaint, correct?

A.    Correct.

Q.    And there was that action has been pending

Page 140

since January for the last year, correct?

A.   That's correct.

Q.   And you know that there were several efforts made to -- there were several notices of deposition that were sent asking you if you wouldn't mind coming in to answer questions about these --

MR. KLICKSTEIN:  Objection.

Q.   -- allegations?

THE COURT:  What, where is this leading to, Mr. Robbins?

MR. ROBBINS:  How it is that we got here when this application was filed by Linda Donovan, a representation was made that there was no pending action between the parties, and that box was checked off "Yes."  And it was filed nine days before there was to be a hearing in Essex Superior Court.

THE COURT:  Counsel, anyone can come in and file a restraining order, whether they start an action in another court, probate court --

MR. ROBBINS:  I'm not saying she can't. But, there was a representation made to the district court that there was no pending action, and indeed there was not only an action pending, your Honor, there was going to be a hearing nine days later on this very

case involving the same allegations in Essex Superior Court on whether or not Mrs. Donovan could continue to not appear to answer questions, come forward and answer questions.

THE COURT:  I'm not concerned about whether she showed up for a deposition.  I'm not concerned about the Superior Court case.  She's a layperson.  I'm not so sure how she answered that.  I'm not sure how relevant it is.

MR. ROBBINS:  She was represented by her counsel.

THE COURT:  Someone puts something in front of your face.  She may not have -- counsel may not have been there with her.

MR. ROBBINS:  May I establish that counsel was there?

MR. KLICKSTEIN:  Your Honor --

MR. ROBBINS:  I'm not blaming counsel.

MR. KLICKSTEIN:  This is at least the third time I've had to listen to this same intentional misrepresentation made.

THE COURT:  I'm going to ask you not to characterize that.  I don't find it relevant, Counsel. We're going to move on to another topic, please.  I

Page 142

note your objection.

MR. ROBBINS:  May I make an offer of proof?

THE COURT:  Very quickly.

MR. ROBBINS:  The offer of proof is that when Linda Donovan applied in this court for the 209A application and was asked in the presence of her counsel to state whether or not there was a pending action involving the same parties involving a claim for abuse prevention, knowing that there was not only a pending action, but a hearing in Essex Superior Court nine days later on whether or not she could continue to refuse to appear to answer questions under oath, whether she could continue to decline to answer interrogatories, that when that representation was made that there were no prior pending actions, she knew very well, and everyone else with her knew very well there was, and there was a false representation made by Linda Donovan, by Linda Donovan, not her counsel, by Linda Donovan to the court.

THE COURT:  You contend that.  I'm not going to hear that.  That's okay.  I don't find it relevant.  Again, as I said, however, that application was filled out, some people would assume it means is

there another 209A in another court.  It could be interpreted in a lot of ways, and, Mr. Robbins, it could even be interpreted the way you're implying maybe it could be.

But, in all honesty I don't find it that relevant to my issues here today.  I know you have a right to question her credibility, but I just don't find filling out of an application, I don't find it that relevant.  I'm going to exclude it and move on to another topic.

MR. KLICKSTEIN:  Your Honor, only because my brother made an offer of proof, in the file there is an affidavit in the file from Attorney Dan Winslow, who was present at the time the 209A application was made, and there is a transcript of the 209A ex-parte hearing, both of which show that Judge Swan was aware --

THE COURT:  Was aware?

MR. KLICKSTEIN:  -- was apprised there had been an October '03 prior 209A order and Mr --

THE COURT:  Pending.

MR. KLICKSTEIN:  And Mr. Winslow's -- by him, and it says in the affidavit there was a Superior Court action, and it was Mr. Winslow's interpretation that prior pending abuse petition refers to 209A and

not to pending civil suits.

THE COURT:  You mean I'm actually right today once?

MR. KLICKSTEIN:  You're actually right.

MR. ROBBINS:  Not quite.  Judge Swan in fact said on the record, "Nobody ever told me about it."  We have a transcript in which Mr. -- Judge Swan referring to this very issue said nobody disclosed to him this pending Superior Court action.

THE COURT:  Okay.  Moving on.

BY MR. ROBBINS:

Q.  Now, you have indicated that there were incidents at the Myopia Hunt Club in which Christy and Jim got their horses too close to you, correct?

A.  That's correct.

Q.  So, the Court is clear, there are these riding events that take place at Myopia, correct?

A.  Correct.

Q.  And hundreds of people attend them, including participants and spectators, correct?

A.  On occasion, yes.

Q.  And you are the hunt secretary?

A.  That's correct.

Q.  And as the hunt secretary, anybody wishing

Page 145

to participate has no choice but to register with you, correct?

A.   That's correct.

Q.   And you are surrounded by people, because you're the central place where people have to go, correct?

A.   That's correct.  Although they don't linger around me.

Q.   But, there are hundreds of people around this place, correct?

A.   On occasion, on large occasions.

Q.   And, therefore, we can be sure that if Christy Donovan or Jim Donovan had gotten their horses too close to you and had threatened you in some way that there would be somebody from the Myopia Hunt Club, who was present to have observed that, correct?

A.   That's correct.

Q.   And there is nobody from the Myopia Hunt Club or from anybody else, any place else, who has come to provide testimony in any form whatsoever that Christy Donovan or Jim Donovan got their horses too close to your horse?  We know that?

MR. KLICKSTEIN:  Objection, your Honor. The horses are not part of this 209A application.  If

my brother ever wants to finish this hearing, your Honor can hear what you will. She was menaced by them on horseback.

She's happy to testify about how James Donovan drove his horse into hers in an attempt to get the horse to throw her, but that wasn't one of the claims that made this 209A. Your Honor's call. I think this is irrelevant.

MR. ROBBINS: Your Honor, if you look in the affidavit --

THE COURT: Counsel, I'm going to let you question her about that, but not very long.

MR. ROBBINS: I think I had, the question probably lasts five minutes in and of itself.

Q. Is there a single human being from Myopia or any place else that you have brought with you today or whose affidavit you have to corroborate that Jim Donovan and Christy Donovan ever got their horse anywhere near you?

A. You subpoenaed my husband. My husband was very frightened by where he saw them put their horses.

Q. We're going to deal with your husband in a second. Apart from your husband, is there anybody else that you have brought forward, either an affidavit

Page 147

form?

A.    No.

Q.    Deposition form?

A.    No.

Q.    Or any place else to corroborate that Jim Donovan or Christy Donovan or their horses got too close to your horse or to you?

A.    No.

Q.    Now, do you allege that there was an incident at the Myopia Club at which the table at which Jim Donovan and Christy Donovan sat was next to your table?  I believe that you testified to that on Direct Examination?

A.    That's correct.

Q.    And that was, you say, also a very disturbing incident for you?

A.    It was, yes, it was very disturbing.

Q.    And that there was some kind of a dinner where you had a table and they had a table, and you were all in the same area, correct?

A.    There is a large ballroom.

Q.    Now, there is a woman, do you know who Penny Petranzio is?

A.    Yes.

Q.    Tell the Court who she is.

A.    She's the club manager.

Q.    I'm sorry?

A.    She's the manager of the clubhouse.

Q.    The manager of the clubhouse.  And, therefore, she was in fact directly involved in making arrangements for that evening, correct?

A.    She and Amy Halloran, who is the organizer of the event.

Q.    Now, Penny Petranzio has offered testimony in this case, to your knowledge, about the fact that she, that Jim Donovan and Christy Donovan had nothing to do with any seating of any table that night, correct?  You know that?

A.    I -- yes.

Q.    And you have brought nobody from Myopia to testify that they had anything to -- that Jim and Christy had anything to do with where their table was placed, correct?

A.    I have not brought anyone from Myopia.

Q.    And there is nobody that you have brought, no witness of any kind to testify that Jim Donovan or Christy Donovan stared at you, made you feel uncomfortable or anything of the sort, correct?

A.    Other than my husband, who you subpoenaed.

MR. ROBBINS:   Other than your husband.

Q.    All right.  The February, 2003 incident --

A.    Yes.

Q.    -- there is a function held at this large area in the Myopia Club, correct?

A.    Correct.

Q.    You are there.  Was your husband there?

A.    No.

Q.    Jim and Christy were there?

A.    Yes.

Q.    And it being February of -- it being February, everybody there had a coat on, correct, brought a coat with them?

A.    That's correct.

Q.    There were about 75 to a hundred people there, correct?

A.    That's correct.

Q.    And this coat area is at the end of the -- is at one side at the area in which this function is being held, correct?

A.    That's correct.

Q.    And at the time, in fact, you could -- it was all part of the same area.  Isn't that right?

01/24/2006

A.    I'm not sure I understand the question.

Q.    You're quite right.  At the time --

A.    It was attached to the main room.

Q.    You referred to it as a closet, but at the time it was not even separated; isn't that correct?

A.    It's a walk-in closet in the corner of the room.

Q.    Okay.  And people at the end of this function are leaving, all of them, they're first getting their coats from this coat area, correct?

A.    Most people had left before James followed me into the closet.  There were not a lot of people left at that point.

Q.    You say he followed you into the closet; is that correct?

A.    Unquestionably.

Q.    Were there people in the area when he got his coat?

A.    I never saw him get his coat.

Q.    I'm sorry.  Were there people in the area when you say that Jim Donovan grabbed your hand?

A.    There was no one in the closet at that point in time.

Q.    Are you certain about that?

A.    That there was no one in the closet?

Q.    Yes.

A.    Yes.

Q.    Okay.  Isn't in fact what occurred is that he stuck out his hand when he saw you like that to shake your hand (indicating)?

A.    No.

Q.    Is it the case that you took his hand and you then thanked him?

A.    No.

Q.    Is it the case that you said to Jim Donovan that you said to Jim Donovan, "You had better be very, very careful?"

A.    Absolutely not.

Q.    Is it the case that after you, after this exchange in the closet, he bolted, he recoiled and basically ran out of there?  Did you see that?

A.    Absolutely not.

Q.    Okay.  And Christy Donovan was right there, correct?

A.    No.

Q.    Christy Donovan was within feet --

A.    No.

Q.    -- of where you and he were; isn't that

right?

A.    No.

Q.    Is there anybody from Myopia or any place else that you have to corroborate that Jim Donovan followed you to get his coat, followed you into the coat room?

A.    No.

Q.    Anybody at all?

A.    No.  It's just clear that he was watching and waiting for me to go in there.

Q.    All right.  Let me just -- maybe I can whiz through this.  You allege that Christy Donovan and Jim Donovan in your civil complaint spread rumors about you?

A.    Unquestionably.

Q.    Is your allegation that Jim and Christy unquestionably spread rumors about you part of your application here?

A.    No.

Q.    No.  All right.  Now, in your application for an affidavit -- strike that.  In your affidavit in support of your application, Mrs. Donovan --

A.    Yes.

Q.    -- you assert that the shooting involving

your husband -- incidentally, the affidavit states that it was, the shooting was Friday, the 14th.  Do you see that?

          A.    It was the 16th.

          Q.    So, that was not correct.  But, you allege that the shooting occurred after an investigator was sent to Goldman Sachs, Jim Donovan's office?

          A.    Correct.

          Q.    Did you hire the investigator?

          A.    No.

          Q.    What is the investigator's name?

          A.    I don't know.  The investigator was ordered to be hired by the company that received disparaging letters about my husband.

          Q.    Now, your husband has been contending that people have been -- your husband has been asserting that people have been disparaging him in letters for about 15 years now; isn't that right?

          A.    I know that there were letters written twice in the last few years.

          Q.    And do you contend that Jim Donovan had something to do with those letters?

          A.    It seems very likely.  Who else would have done that?

Q.    You feel it's likely Jim Donovan is sending letters disparaging to your husband?

A.    He threatened to destroy my husband's business.  Like his other threats, he's carrying it out.

Q.    Is the investigator -- will the investigator -- is the investigator here to testify on your behalf here?

MR. KLICKSTEIN:  Objection, your Honor. What possible relevance could that have?

THE COURT:  I don't know, to be honest with you.

Q.    You have met with a number of people about the shooting that occurred in December of 2005, correct?

A.    Met with a number of people?

Q.    Yes.

THE COURT:  Police, I assume.

Q.    Police?

A.    Yes.

Q.    And you know that the police have met with your husband to ask him questions about what occurred on a number of occasions; isn't that correct?

A.    Yes.

Q.    And without disclosing any attorney/client communications, let me just simply ask this:  Your testimony is that you are aware of no information that your husband arranged and had advanced notice of the shooting that occurred in December of 2005?

MR. ARZU:  Objection.

MR. KLICKSTEIN:  Objection.

MR. ARZU:  Asked and answered, your Honor.

A.    No.  It's ridiculous.

MR. ROBBINS:  Those are all the questions I have.  Thank you.

THE COURT:  Any Redirect, Counsel?

MR. KLICKSTEIN:  I don't see any need for it, your Honor.

THE COURT:  Thank you.  You may step down.  Thank you, Mrs. Donovan.  We're going to take a luncheon break.  We'll resume at 2:00.

(Lunch recess was taken.)

THE COURT:  Gentlemen, I read the, some of the affidavits on the lunch hour.  So, thank you.

MR. ROBBINS:  Thank you, your Honor.

MR. POPEO:  Your Honor, I --

THE COURT:  You've multiplied.

MR. ROBBINS:  We're flanking Mr. Popeo.

MR. POPEO:  I want to object the way they come and bumped me, the way they've done so.  Your Honor, I will try to abbreviate Mr. Donovan's -- oh, you don't have a witness to call right now, do you?

MR. KLICKSTEIN:  No.  You're going forward with Mr. Donovan.  That is why I was being so quiet, Mr. Popeo.

MR. POPEO:  Your Honor, I will try to abbreviate Mr. Donovan's testimony, Mr. James Donovan's testimony, and I'm going to offer into evidence what you already have received.  That is his affidavit with its attachments so that to the extent that I do not cover in detail each of the items, I will look when we file our request for findings and rulings, if necessary, to those items.  But, I'll try to be brief. May I call Mr. James Donovan to the stand, your Honor.

THE COURT:  Certainly, sir.

MR. POPEO:  Also, your Honor, I'm going to refer to a chalk which will expedite both the covering of testimony and time lines.  I will not go into detail on these proceedings, other to point out what they are and when they occurred.  This is attached to the opposition that you have.  I give you another copy of it, but the opposition to the 209A has an exhibit, and

that is the exhibit, the timeline, and obviously

Mr. Klickstein has a copy, as well.

THE COURT:  Thank you.

JAMES DONOVAN, SWORN

DIRECT EXAMINATION

BY MR. POPEO:

Q.    Mr. Donovan, for the record, would you

kindly state your full name and spell your last name?

A.    James Donovan.

Q.    Where do you live?

A.    In Hamilton, Mass.

Q.    And how long have you lived there?

A.    About six years.

Q.    And with whom do you -- what is your

address in Hamilton?

A.    278 Cutler Road in Hamilton.

Q.    With whom do you live at this address?

A.    With my wife and my three children.

Q.    What is the name of your wife?

A.    Christy.

Q.    And can you identify for us your children

and their ages?

A.    Sure.  I have a daughter, Emily, who is

five, a daughter, Sophia, who is four, and a son,

Clark, who is almost two.

Q.    And where did Christy grow up?

A.    In Hamilton.

Q.    Where do her parents live?

A.    They live in Hamilton, about a couple of miles from our house.

Q.    Does she have any other relatives in the area?

A.    She does.  Her grandmother lives in Hamilton, again a few miles from our house, and her brother lives in Hamilton, also a few miles from our house.

Q.    And do you have any other relatives who live in the area?

A.    I do.  I have an uncle and an aunt who live in Hamilton.  I have a sister and a brother-in-law and five nieces and nephews, with their children, who live in Hamilton, and I have a mother, who is here, who lives about 5 miles away in Ipswich, just across the border.

Q.    And from time to time do you visit with your siblings and your other relatives in the town?

A.    Yes.

Q.    How frequently?

A.    All the time.  I would say weekly.  I see them on the weekends typically, sometimes during the week.

Q.    Let me get some of your background.  Where did you grow up?

A.    I grew up mostly in Ipswich and Danvers on the north shore.

Q.    And would you give me your educational background, starting in high school?

A.    Sure.  I went to high school in Danvers at a school called St. John's Prep.  Prior to that, I actually went to grammar school in Danvers at a school called Saint Mary's, then I graduated from college at MIT, and I also got a Master's from the business school at MIT and a law degree from Harvard.

Q.    And the business school is the Sloan School of Management that you got your Master's from?

A.    Yes.

Q.    At MIT.  And your lawyer degree is from Harvard, did you say?

A.    That's right.

Q.    For whom do you presently work?

A.    I work for Goldman Sachs.

Q.    And that is the investment banking firm?

Hearing                                                                01/24/2006

Page 160

A.    Yes.

Q.    How long have you been employed by them?

A.    Since I graduated from school, which would have been 1993.

Q.    Now, and what position do you hold with Goldman Sachs?

A.    I'm a managing director.

Q.    And prior to today, have you ever testified in any proceeding of any kind?

A.    No.

Q.    And getting back to your residence and what you do, tell me when you're not working, what are your hobbies?  What do you do?

A.    I spend most of my time with my kids.  I work a lot, probably 60, 70 hours a week, and when I'm not working, I spend as much time as I can with my wife and my three children.

Q.    And do you work out?

A.    I do.  I try and run every morning before going to work.

Q.    And where do you run?

A.    Around my house on the trails or the roads right around my house.

Q.    How many miles do you cover?

01/24/2006

A.    Five, typically.

Q.    Okay.  And do you ride horses, as well?

A.    I do.  I ride horses mainly with my wife and my three children, and I also ski with my wife and my three children.  Those are the two things that I do most in my free time, other than run.

Q.    And will you briefly cover some of your extracurricular activities in philanthropy.  I don't want the whole list.  Give me a few.

A.    Sure.  I'm very involved in cancer research.  My college roommate died of cancer about four years ago, and I got very involved in cancer research at that time.  I sit on the board of the Dana Farber in Boston.  I also am very involved in environmental causes in and around the north shore.

I do a lot of work for the trustees of the reservations, Ipswich River Watershed Association, which is in charge of preserving Ipswich River.  My wife is on the board of that organization.

I coach my kids' soccer games in town, and I am very involved in their school.  I do a lot of parent/teacher conferences and help the school with some administrative things.

Q.    And who is your father?

A.    John Donovan, Sr.

Q.    And who is your mother?

A.    Marilyn Donovan.

Q.    And were they both in court today at one time or another?

A.    At one time or another.  My father was here earlier.  My mother is here now.

Q.    And are your parents married or divorced?

A.    Divorced.

Q.    And when did that divorce take place?

A.    I don't know exactly.  I think in the early '80s.

Q.    And when did your father marry his third wife, Linda Donovan?

A.    I don't know exactly, but it would have been sometime in the '90s, mid '90s.

Q.    How old were you at the time of that marriage?

A.    Approximately, I was close to 30 or maybe 29, plus or minus a year or two.

Q.    And have you ever lived with Linda Donovan?

A.    No.

Q.    And what kind of relationship would you

say you had with Linda Donovan?

A.    Casual.  No relationship really.

Q.    And could you identify your four siblings for me?

A.    Sure.  I have an older sister, whose name is Maureen.  I have two younger sisters, whose names are Rebecca and Carolyn, and I have a younger brother, whose name is John, Jr.  His name is John.  We call him John, Jr.

Q.    After the divorce of your parents, who had custody of the children, you and your siblings?

A.    My mother did.

Q.    Who raised you and your siblings?

A.    My mother did.

Q.    During that time, what was your relationship with your father?

A.    It was very rocky.  My mother after the divorce got almost nothing, and was --

MR. KLICKSTEIN:  Objection.

MR. POPEO:  Just background, your Honor. I'll whiz right through it.

THE COURT:  I'm going to allow it.  Go ahead.

A.    My mother raised us.

Q.    And after you graduated from school, what was your relationship with your father from college?

A.    It was very volatile, rocky.  There were long periods of time where we didn't have a relationship and then there were periods of time where we did.

Q.    And to the best of your knowledge, what was the relationship of your siblings to your father during that period of time?

A.    Also --

MR. KLICKSTEIN:  Objection.  Relevance, your Honor.

THE COURT:  Siblings?

MR. POPEO:  We have affidavits that go back and forth, your Honor.  This is one question.  I'll tie it all in.

THE COURT:  Okay.  I'm going to give you some leeway, Counsel.  Go ahead.

A.    It was also volatile and rocky.  They had somewhat, at times more close and sometimes more distant relationships with my father.

Q.    Who was the closest sibling to your father?

A.    My younger brother, my only brother worked

for my father for about 15 years.

Q.    And that is John, Jr.?

A.    That's right.

Q.    And turning your attention to the fall of 2002, up until that point in time, had there ever been any litigation between your father and any of your siblings?

A.    No.

Q.    Okay.  And did something happen in the fall of 2002 within your family to change your relationship?

A.    Yes.

Q.    And what happened?

MR. KLICKSTEIN:  Objection.

THE COURT:  The nature of the objection?

MR. KLICKSTEIN:  Irrelevant, your Honor.

THE COURT:  Well, I'm guessing that his relationship with his father --

MR. KLICKSTEIN:  He's already testified that it was rocky, that it was volatile.  He had very little relationship with him.

THE COURT:  I'm going to overrule the objection.  His relationship with his father is I assume is going to tie in with his relationship with

his stepmother.

MR. POPEO:  Of course, it does.  She testified the property was stolen and how this put her in fear.

Q.    So, what happened in the fall of 2002? Was there an incident?

A.    Yes.

Q.    And what was that?

A.    My older sister came to me and my other sisters.

Q.    What is your older sister's name?

A.    Maureen.  And she told us and showed us evidence of the fact that my father had sexually molested her over a very long period of time, when she was young, and that was revealed to me in the fall of 2002.

Q.    And I take it this was a trauma that brought about a drastic change in the relationship?

A.    Absolutely.  We --

Q.    And as a result of that disclosure, what did you and your siblings do about the relationship?

A.    Well, my siblings and I decided that we at that point it was sort of the last straw.  What we were shown was we felt so grotesque and disgusting that we

did not want to have anything to do with my father ever again. So, we negotiated over the course of several months an agreement that separated us from him, because we wanted him to be as far away from us as possible, us and our children and our wives and husbands.

Q.   And was that separation reflected in a written agreement among the parties?

A.   Yes, it was.

Q.   And did it involve property, as well?

A.   It did.

Q.   And from time to time in this courtroom there has been reference to properties in Hamilton and up in Vermont. Could you identify the properties that are involved in the family and who owns them and where they're located?

A.   Sure. There's a piece of property in Vermont. There is piece of property in Manchester, Massachusetts, a piece of property in Hamilton, which has a house on it, another piece of property in Bermuda, and lastly there is a piece of property which spans about 600 acres of land in Ipswich, Hamilton and Essex.

Q.   And does your father and his wife Linda live on one of these properties?

A.    They do.  They live on the property that I referred to as being a house in Hamilton.  They refer to it or call it Devon Glen.

Q.    And how many acres does that property have that goes with it?

A.    About 80 acres.

Q.    And so your father occupies a home that has approximately 80 acres.  Is it known by a particular name?

A.    Yes.  Well, all of the homes that I referred to and the land are all owned by my siblings and I, and the property that we're referring to where my father resides is, again, they call it Devon Glen. It's owned by an entity called Devon Glen Limited Partnership, which is a partnership with five partners. My siblings and I are the five partners.

Q.    And the -- who controlled that property at the time of the separation?

A.    In, up until 2002, the fall of 2002, my brother, John, Jr., was in control of that property, as well as most of the others.  And he had an informal agreement with my father, whereby my father could live --

MR. KLICKSTEIN:  Objection.  Now, we're

talking he's testifying about informal agreements that his brother had with his father. I don't know what the relevance of that is.

MR. POPEO: We've heard a lot of third-party conversations, your Honor. I'll go through this quickly.

THE COURT: Promise.

A. So, my brother had an informal agreement with my father that allowed my father to occupy this house that you're referring to.

Q. And how did your father react when your siblings informed him that they intended to make a complete separation?

A. He was very hostile, and he made a series of threats over the course of the three months that we negotiated the agreement. It took us three months to negotiate this agreement with lawyers on both sides, and he made -- he was hostile at times, which is not atypical for him, and he made a series of threats to all of us during the course of those three months of negotiation.

Q. Do you recall anything specifically that he said to you?

MR. KLICKSTEIN: Objection, your Honor.

What difference do threats that he claims his father made have to do with threats that he made against Linda Donovan?

MR. POPEO: They go to the issue, your Honor, of Linda Donovan's state of mind, which she says that they stole property from her husband, that they shot her husband, they put her in fear of for herself because of the conduct of her husband, so they put into issue the relevance of the relationship between this witness, his siblings and her husband.

THE COURT: I'm going to allow it.

A. Sorry. What was the question?

Q. I asked you in terms of these threats that were made whether you can recall anything specific that was said by him to you?

A. Yes.

Q. Just give me a couple of examples.

A. He repeatedly would say to me that I needed to be very careful, that I had a lot to lose, that he intended to embarrass me nationally and locally, that I had young children and a wife, and that I had a lot to lose and that I should be very, very careful. Those were repeated threats that he made to me. He also made a lot of threats to my sisters, as

Hearing                                                              01/24/2006

Page 171

well.

Q.    Moving on, when was the settlement agreement signed?  And, your Honor, if you don't have a loose copy of this, I'm not going to spend a lot of time on these.  I'll walk right through it quickly. When was the agreement signed?

A.    In March of 2003, after the three months of negotiations, we signed the settlement agreement.

Q.    Okay.  And was this signed by you and each of your siblings and your father?

A.    Yes.  All of the siblings and my father signed it.  It was witnessed, and it affected a separation between my siblings and I, on the one hand, and my father on the other hand.

Q.    And did you believe at the time of signing this agreement that it resolved all disputes among you?

A.    Yes.  We all felt, all of us felt that it was over at that point.

Q.    Now, you're here today, you understand, because Linda Donovan obtained a restraining order against you under 209A; is that correct?

A.    Yes.  That's correct.

Q.    And this is not the first time that Linda Donovan had obtained a restraining order against you,

Hearing                                                                01/24/2006

Page 172

is it?

A.    That's right.  It's not the first time.

Q.    And in fact quite apart from a 209A order, you're aware of the fact that she filed a complaint against you in Essex Superior Court in which one of the prayers is for a restraining order against you?

A.    Yes.

Q.    And that was in 2004?

A.    Yes.  I believe so.  Yes.  At the end of 2004.

MR. POPEO:  Your Honor, I misspoke.  That is January.  On the chart it's January, 2005.

THE COURT:  Mm-hmm.

BY MR. POPEO:

Q.    Now, was there a prior restraining order against you under 209A?

A.    Yes, there was.

Q.    When approximately was that?

A.    It was served on me on Halloween night in 2003.

Q.    October 31, 2003, a restraining order was served on you, and was that obtained by both Linda and your father?

A.    Yes.

Q.    Okay.  And did you have any prior notice that they intended to seek a restraining order?

A.    No.

Q.    Could you tell me the circumstances under which --

MR. KLICKSTEIN:  Your Honor, just for purposes of brevity, I'm obviously not objecting that Mr. Popeo is leading his own client, but I'm reserving the right to object at some point in the future.

THE COURT:  Go ahead, sir.  I just want to -- I understand the point you're trying to make, Mr. Popeo.  I just hope we're not going to have to, and I'm not going to second guess your brother here, but I just hope -- is Mr. Donovan, is he still here, Mr. Donovan, Sr.?

MR. KLICKSTEIN:  He is, your Honor.  He's under subpoena.

THE COURT:  By them?

MR. KLICKSTEIN:  Yes, your Honor.

THE COURT:  Okay.  I was hoping that I just hope, I don't want to prejudge anything, second guessing.  I hope we're not going to have to call him to the stand.

MR. POPEO:  The fact is, your Honor, this

is a restraining order sought by Linda Donovan, as well as by Mr. Donovan, and --

THE COURT:   Not the present one.

MR. POPEO:   No.

THE COURT:   Right.

MR. POPEO:   And she testified to this, as part of the history of her fears, and I'm going to have to refute each and every one of the allegations that she has made in terms of the cumulative effect of these.   This is but one of them.

THE COURT:   Well, I just want to let you gentlemen know what I'm focusing on, and those are the discrete, discrete incidents that your brother brought up as the basis of this restraining order.   I don't want to get too far afield.   I've been giving everybody a little, probably a lot more leeway than I should.

I'm going to let you go ahead, Mr. Popeo, but I don't want to re-litigate everything that was litigated.

MR. POPEO:   This is one of the things that was brought up.

THE COURT:   I understand.

MR. POPEO:   I want to, intend to try to address those things brought up in the context of

either the testimony or in the affidavit in support of the allegations.

Q.    Now, what were the circumstances under which you received notice of this restraining order in October 31, 2003?

A.    It was Halloween night.  I was on my way, or I had just gotten home from work.  It was the first Halloween that my two daughters had bought costumes and were going to participate in Halloween.  So, I was rushing home.  I was late, as usual.

I ran into the house, gave my wife and my two daughters a kiss, went upstairs, changed out of my suit, put my costume on, came downstairs, and there were two police officers in the -- in my kitchen, and they served me with this 209A order in front of my wife and my two daughters.

Q.    How many police officers were there?

A.    Two.

Q.    And how long did they remain?

A.    Probably in total they explained the 209A order to me.  My wife was pregnant, six months pregnant with my son at the time.  She broke down into tears.  My daughters were crying.  They didn't understand what was going on.  They took about 20 minutes to a half

01/24/2006

Page 176

hour to explain the order, answer the questions that we had, so maybe a half an hour.

Q. And you indicated you were about to go trick or treating?

A. That's right.

Q. And did this restrict your ability to go to the various places you wanted to go?

A. It did. We had planned to go to my wife's parents' house, which I mentioned is down the street, then my sister's house, which is also down the street in a different direction, and then my mother's house, which is down the street, and my uncle and aunt's house and my wife's grandmother's house, and then also maybe go around a few houses in their neighborhood. And immediately after being served with the restraining order, I turned to my wife and I said, "I don't know how we can do this," and she said that we had to do it for the children, so we did, and each time we went to a different house, we explained what had happened, first to my in-laws, and then to each other person, and each time Christy would break down into tears. My daughters would -- even though we were trying to keep them from it -- were wondering what was going on, asking why there were two men with guns at our house, and I kept

having to look around.  I kept thinking that we were -- that Linda or my father were going to show up and have me arrested by placing themselves near me while I was trick or treating with my kids.

Q.    And how was your wife responding after the restraining order was served?

A.    She was terrified, as I was.  We were both afraid.  My father has a history of using the criminal system as a weapon --

MR. KLICKSTEIN:  Excuse me.  I can't hear him, your Honor.

THE COURT:  Try to speak up.  I know it's a little difficult.

A.    Sure.  My father has a history of using the criminal system as a weapon.  We outlined that, I think.  He's done that for a long time against all sorts of people.  And we had felt that he was going to try and use this as a way to embarrass me or to have me arrested, embarrass me in the town and hurt, and cause me pain.

Q.    And were either of your wife or your children upset by this order?  How were they reacting?

MR. KLICKSTEIN:  Your Honor, I'm going to object.  This is now so far afield of what is involved

in Linda Donovan seeking a 209A order.  Self-inflicted emotional distress is of no relevance to this proceeding.

MR. POPEO:  This is not self-inflicted. Let me make the record clear that when one brings an action, this court is bound to balance the interests of the parties.  Although as you correctly stated in the lobby the issue of abuse is one of imminent fear of immediate harm, the standard for the restraining order is different, and that is that there has to be a preponderance of evidence of the existence of substantial likelihood of immediate harm.  And we're dealing with preponderance of evidence and substantial likelihood, and the balancing of the interests of the parties.

When one inflicts trauma on another, using the criminal system or using the court system in a particular way, this Court has a right to consider that in the totality of the circumstances, and that is what we're asking you to do.  And I want to make a record of it in the event we have to have a 211C proceeding.  We have to make our record.  I hear his objection.  But, this is very relevant to the facts.

THE COURT:  I have to say, Mr. Popeo, I've

let you get into the restraining order a little bit, but I tend to agree with Mr. Klickstein at this point. I'm going to ask you to try to move along. The impact of the restraining order on his wife and children I don't find particularly relevant.

Let me just state again what I've heard, so we can focus in on what I'm interested in, and it's fairly clear. Here are the incidents: February, 2003, the supposed grabbing, the pushing and the threat in the coat room. Incident two, the supper club and seating. Incident three, Carl whatever his name is, Potter --

MR. POPEO: Porter.

THE COURT: Thank you. Alleged incident; three, New Year's Day, 2005, on the ski slope; incident four, the revelation from Mr. Rosenbaum about the threat; incident five, the knives, etc., in the house; and, incident six, a break-in at the Hamilton residence when they were in Vermont.

Mr. Klickstein, you correct me if I'm wrong. Those were the incidents that you brought up as the basis for her fear of Mr. Donovan; is that correct?

MR. KLICKSTEIN: That's correct, your Honor.

THE COURT:  Okay.  Those are really the incidents.

MR. POPEO:  This is the first one.  This is the -- excuse me, this is the -- sorry.  This is the Halloween incident, and this is --

THE COURT:  I'm going to ask you, Mr. Popeo, to wrap up your questioning about this restraining order, if you would, sir, and if you'd concentrate on the items that I'm concentrating on, and we'll probably make some headway in that regard.

MR. POPEO:  I'm happy to do that, your Honor.  Now, but I do want to state for the record, your Honor, they are in Hamilton, and the breadth of this restraining order has considerable restraint on their liberty, which is a factor to be considered.  I wanted to point out what happens when a restraining gets issued.

THE COURT:  Mr. Popeo, again, you're my senior in age and wisdom and I certainly --

MR. POPEO:  I hope not of age.  Maybe mileage, your Honor.

THE COURT:  But, I would just suggest that would be more appropriate, I believe, on argument and why, and what type of restraining order, if any, maybe

01/24/2006

none at all, and the seriousness of the restraining

order and how it would impact on him, as opposed to

presently.  I understand it was in fact a close-knit

family, at least geographically.  I heard, you brought

out very clearly even the fact of trick or treating is

hampered by restraining orders.  But, I have to be --

in all honesty, that is the secondary, as you know,

that is a secondary interest to me.

      Safety of the public, particularly people

that seek the protection of the court, is my first

interest.  And convenience and everything is second.

      MR. POPEO:  I understand.  I also have to

make a record, and you understand that.

      THE COURT:  I understand.

      MR. POPEO:  I will make the record I have

to make, but I will be expeditious.

      THE COURT:  Thank you.

BY MR. POPEO:

      Q.  This restraining order was vacated?

      A.  It was vacated the first moment we could

get into court, which was Tuesday, right after the

weekend, Tuesday, the first session.

      Q.  As a result of that restraining order, did

you miss an event that weekend that you would have

attended?

A.    Yes.    We were supposed to all be going to a dinner on Saturday night.    My wife and I had a table of ten people at the dinner event, as did my father and Linda.    They had a table also at the same event, which they knew had been planned for months.

The restraining order was given to me on Friday night, as I mentioned, before Halloween and I couldn't go to the dinner on Saturday night, because I couldn't go within a hundred yards of him, so my wife went with her uncle instead and was confronted with people, who had been told all kinds of stories by, about the fact --

MR. KLICKSTEIN:    I'm going to object to that.    Not only wasn't he there, but he's going to tell you what people were told what stories.

THE COURT:    Sustained.

MR. POPEO:    We'll move on, your Honor. Your Honor --

THE COURT:    By the way, Mr. Popeo, this is the restraining order that was not extended, and the one that Mrs. Donovan didn't show up on and what she testified to is that there was, in her mind, anyway, some agreement, unsigned, that things had been squared

away by virtue of some --

MR. POPEO:  Exactly, your Honor.  That is why I have to cover it, because that was not the case.

Q.    Now, were you present in court on that Tuesday?

A.    Yes.

Q.    With your siblings ready to go forward on the trial?

A.    Yes.

Q.    And what was your understanding of any agreement that had been reached with the other side?

A.    My lawyers and --

MR. KLICKSTEIN:  Objection, your Honor.  His understanding can only come from his attorneys.  Unless Mr. Popeo is waiving attorney/client privilege, an issue he doesn't need, it's irrelevant and now he wants him to tell him his understanding of what the attorneys did.  You have in front of you an exhibit.  That exhibit is a letter sent by one of the attorneys to one of the others.

I accept Mr. Popeo's representation or Mr. Robbins that in fact that agreement was never reached, that Mr. Crawford sent that letter and that Mintz never agreed to that letter.  I think that puts

the issue to rest.

THE COURT:  I am going to give him some leeway, as I did you, Mr. Klickstein.

MR. POPEO:  Let me state this.  Maybe we've agreement.  In fact, Mr. Crawford and Todd & Weld were not counsel.  They were local counsel.  This agreement was reached with Akin & Gump, the attorneys, and it was an agreement that was unequivocal and clear, that the restraining order had to be vacated, not simply that the case be dismissed, but the restraining order had to be vacated so there would be no record of it and nothing short of that was agreeable.

When that letter came, it did not represent the agreement reached by the parties, and, therefore, it was rejected unsigned, and Mr. Donovan and his whole family went to court the next day full well prepared to contest it.  Those are the facts that occurred.

THE COURT:  Okay.  Let's go forward.

MR. POPEO:  And, by the way --

THE COURT:  Thank you for testifying, Mr. Popeo.

MR. POPEO:  That is spelled out in the affidavit that I've already offered into evidence, your Honor, so that we would not have to testify to that.

But, if the parties can understand each other in terms of a stipulation, we will, but I cannot stand idly by and see an unsigned letter come in as though it's an agreement and represents the state of mind of an individual having been given it by her attorney.

THE COURT:  Mr. Popeo, let me ask you this:  I was jotting down.  What was the problem with the agreement?  What was sought by the agreement that was rejected?

MR. POPEO:  There were several things sought by.  It was as though the parties were agreeing to refrain from certain conduct as though that conduct had occurred.  That was not agreed to.  All the conduct alleged was denied, and the attorneys, we said we'd go to court and refute it and demonstrate that this 209A had been improperly granted, and they agreed to an unconditional and unequivocal vacating of that order.  So that it is, as it stands, that order has no meaningful judicial weight.

THE COURT:  What do you say, Mr. Klickstein?

MR. KLICKSTEIN:  Mr. Popeo and I finally agree to something.  The October, '03, order has no weight.  We said it.  We don't reference it in these

Page 186

papers for this 209A order.  It has nothing to do with this proceeding, except as a blatant attempt to try and muddy up Mrs. Donovan, to try and gain sympathy for James, because he decided he couldn't trick or treat, although it's unlikely that Linda Donovan and John Donovan would have been at his mother's house, and that has nothing to do with it.

If your Honor looks at the exhibit that my brother indicates was rejected, the rejected offer, in fact it says just what Mr. Popeo said.  Neither party admits that any party is entitled to anything else.  And they agreed to stay away.

I believe him.  I wasn't counsel then.  He said that was rejected.  Mrs. Donovan said she was advised it was rejected, but not until afterwards.  But, all of this is entirely irrelevant.  It's like the other proceedings, your Honor.  Let's muddy up this 209A with other factors, and that is what is going on here.  It is irrelevant to anything we're talking about.

MR. POPEO:  Your Honor, first of all, I didn't offer the letter.  He did.  Secondly, this witness testified that these had been proceedings going on for years, and he was worried, and there were

shootings in the past, as well as the most current shooting, and although that one she says was caused by our clients, so we have to take apart every single one of them and show how specious in fullness they were so that you will understand a cumulative record of failures is not a record of success that justifies the fear, because that has to be based on a preponderance of evidence that is reasonable to substantiate the likelihood of success.  If it never happened over and over again, it cuts quite the opposite way.

THE COURT:  Again --

MR. POPEO:  I hear you, your Honor.

THE COURT:  Let's move forward.  You've got it on the record.  You've got it in.  There was a restraining order.  It wasn't continued.  It caused him some harm.  There is agreements.  The agreement wasn't signed.  It's on record Mrs. Donovan says she didn't appear for the extension, because she thought it was a done deal.  So, we have things are on scale on both sides.  So, let's move on.

MR. POPEO:  I thought she went further than that and said that she had been threatened, and I thought counsel said she had been threatened to be skewered on Cross-Examination.  This is not simply I

cut a deal.  There is other evidence in there, and that is the only reason I wanted to make it absolutely clear that there were no deals made.

THE COURT:  People -- I don't want to bring her back on the stand.  I heard what she said about being skewered.  People say that, and I'm not even saying it was said.  People say that.  I'm not offended by that, because that is what a good lawyer will do that.  It's not even a problem.

MR. POPEO:  If that causes you not to come forward, that is a very different thing from a deal that is made.

THE COURT:  But, she testified that she heard that, was uncomfortable, but she testified she didn't come because she thought there was an agreement that they were going to -- everyone was going to go their separate ways and stay away.

MR. POPEO:  I understand.  She didn't tell you she heard that on any counsel or individuals on the part of the Donovans that she was going to be skewered.  There was no evidence of any threats by them, and I want the record clear on that.

THE COURT:  Okay.

MR. POPEO:  Your Honor, I'll simply call

your attention to the chart, and I won't take any time with it. On September 4, 2003, there was the enforcement of the Judge van Gestel settlement. It's covered in the affidavit, so I will not take any time with it. There has already been testimony that the September 23rd --

MR. KLICKSTEIN: He's questioning the witness or talking about a chart?

THE COURT: He's talking about the chart.

MR. POPEO: If you want me to expedite, I'll expedite.

THE COURT: He's being helpful.

MR. POPEO: If counsel wants me to go through it, I will he be happy to.

THE COURT: Mr. Klickstein, he's being helpful to me in this case. I understand what you're saying.

MR. KLICKSTEIN: Your Honor, I understand all of this, but just because a witness in an affidavit refers to a chart that was prepared by counsel, referencing the status of litigation doesn't make it evidence. I certainly have no problem with the fact that these cases exist. I think it's irrelevant, but it doesn't come in through this witness or even through

his affidavit.

MR. POPEO:  It certainly does, your Honor. I've offered it, and in a 209A proceeding, just as you've had other evidence, I can offer affidavits as evidence, and I have done so, and that is why rather than take time, counsel can cross-examine to his heart's delight on it, but simply because he thinks it's irrelevant doesn't make it so.  Simply because he thinks it doesn't come in this way doesn't make it so, because you're ruling on that, not him.

THE COURT:  I'll state it for about the eighth time the rules of evidence, thank the Lord, are relaxed in a restraining order case, a 209A case.  And so I'm going to take into evidence whatever I deem appropriate and give it what weight I deem appropriate.

So, I have a timeline here of some of the things that have already been testifying to, and I will give you some leeway.  Counsel, go right ahead.

MR. POPEO:  And the others that I will not elicit testimony on are covered in the affidavit, because I don't regard them as going right to the issues that were raised on Direct, but they go to the overall atmosphere created of alleged fear that the witness is alleged to have felt.

Page 191

Q.    Now, directing your attention to an incident at the Myopia Hunt Club in which there was testimony that you had contact with the complainant, Linda Donovan in a coat room, do you recall that testimony?

A.    Yes.

Q.    Could you tell us when that occurred and what occurred that evening?

A.    It was in February of 2003.  There was a fundraiser that was being conducted, and it was in a room about this size, and there were maybe a hundred people there or so.

Q.    The room is about this size for the fundraiser?

A.    That's correct.

Q.    And was there a coat area, as well?

A.    There was.  In the back corner of the room, there was an area where you would hang your coats, and it was completely open to, and --

Q.    Did it have doors?

A.    No.

Q.    And describe the size of that area, that coat area, and whether or not it was a confined area.

A.    Not a confined area.  It was completely

open to the rest of the area where the people were

mingling and listening to this presentation.  It was

the size of a conference room, probably -- I'm not sure

of the dimensions, but fairly big.

Q.    And what happened?

A.    I had decided that I was going to leave.
I needed to go get my coat, and I was with my wife.  I
was standing right near the area where the coats were
hung.  I walked in to a group of people, who were
milling around that area.  I walked past them, and I
looked up, and Linda was looking at me, and this was in
February, so it was while we were negotiating with my
father on the settlement agreement.

I then put my hand out, as I normally
would, when I saw Linda, and she smiled and took my
hand and shook it.  We -- I released it, and I said to
her, "Linda, what has happened between my father and my
siblings and I is awful, and it really does not concern
you at all."  She then looked at me, and pointed at me
and said, "James, you should be very, very careful."

I then took a step backwards, because I
was shocked that she had said that.  I recoiled
backward.  I got my coat, went to my wife, and we left.

Q.    Did you have any other contact with her

that evening?

A.    No.

Q.    Did you say anything to her after she had said what she did to you?

A.    No.

Q.    In any way, did you threaten her that evening?

A.    No.

Q.    In either by words or conduct?

A.    No.

Q.    Now, there has been testimony that on or about November 23rd, 2004, at a dinner at the country club, you positioned yourself in a way to be menacing and staring at her in a threatening way.

Could you tell us when this dinner was, where you sat, and whether you know anything about these allegations?

A.    It was November of 2004, I believe, and it was the annual event at the club, and we, my wife and I were going to that, as we do every year. We got to the -- we had a table of people, who were sitting with us. We got to the event. We saw there was a map on the -- a poster board with tables and where we were assigned to be seated, so we saw our table. We went

and were seated at our table, and I never stared or --
I stayed as far as way from Linda and my father as I
possibly could, as did my wife.

We had no contact with them at all and
we wouldn't have contact with them at all.

Q.    Now, did you cause your table to be
changed so that you would be closer to her?

A.    Absolutely not.

Q.    Did you have any knowledge of where your
table may have been, as opposed to when you went in
there and saw your seating plan on this board?

A.    No.  I showed up.  I saw where my table
was.  I was with my wife and a friend, two friends, and
we walked in, saw where our table was, walked in and
sat at that table.

MR. POPEO:  Your Honor, we have the
testimony of Ms. Petranzio.

THE COURT:  I read it over the luncheon
break.  If I recall, Counsel, she says that the parties
were in fact originally scheduled to sit next to each
other, but when it was brought to her attention somehow
they rectified the situation, and the seating was
changed so that they wouldn't be sitting too close to
each other.  More or less, I think that is basically

what she said.  And she couldn't say later on -- well, Mr. Popeo, she does say, though, in her affidavit that once that is done, she has no control over who might go sit at another table, in any event, whether it's assigned to them or not.  I think she says that in there, but she says, "I rectified the situation as best I could.  As far as I know, they were assigned tables far away.  It was an oversight, and we do that to accommodate people."  Correct me if I'm wrong.

MR. POPEO:  I'm going to offer her testimony, your Honor, because what she does say is that she made this in advance, that she, the seating arrangement, that she had made a mistake prior to the event, she made the change, and that Jim Donovan had nothing whatever to do with the changing of the seating arrangement.  When he arrived, he arrived, and there is testimony here that notwithstanding that, at some point in time during the course of the night Linda Donovan came to her and complained, and she -- I'll read the testimony at some point, and this is on Page 27, and I'm going to offer the entire testimony so that it's clear.

"QUESTION:  During the course of the night, did Linda Donovan come to you to complain about the

seating arrangement?"

"ANSWER: No. She did come to me. Both of them came to me. Both, each side, Chrissy and Jim and she to thank me for remembering and making it more comfortable."

THE COURT: I remember reading that, yes.

MR. POPEO: And this was the event, itself. And Linda Donovan was expressing to you her thanks for actually separating them, correct?

THE COURT: Mm-hmm. But we also have Mrs. Donovan's testimony that at some time during the night, correctly or incorrectly, this is her testimony, that Mr. Donovan came and sat still sat close to her and was glaring at her.

MR. POPEO: I understand that, your Honor. What was unclear is whether that was his seating arrangement, which is what it was implied to be, rather than -- and there is previous testimony that he moved their seats, which he did not. That is why this testimony was elicited.

Your Honor, I don't know whether you have the full transcript or not. If you do, I may not offer it. If you don't --

THE COURT: I have the pertinent language.

That is what I was reading over the luncheon break.

MR. POPEO:  Thank you, your Honor.  That is part of the affidavit that we have then.  I'll just rely on it, because we have offered that.

Q.    Now, Mr. Donovan --

THE COURT:  Mr. Popeo, I just want to make sure, and I'm going to ask Mr. Klickstein to correct me if I'm wrong, my understanding, and I'll check, was despite, despite the fact that the seating arrangements were changed, that nevertheless Mr. Donovan came and sat next to her.  That was my understanding of the testimony from Mrs. Donovan.  Mr. Klickstein, correct me if I'm wrong.

MR. POPEO:  That was not mine, your Honor.

MR. KLICKSTEIN:  That is exactly what Mrs. Donovan testified to.

THE COURT:  Okay.  I'll correct my notes later.  I understand you're saying --

MR. POPEO:  I'm glad you brought it up then.

THE COURT:  I want to be sure I'm getting it down correctly.

BY MR. POPEO:

Q.    At any time after you arrived at the

Hearing                                                          01/24/2006

Page 198

dinner that evening, did you change your seat or locate yourself in an area where you could be closer to Linda Donovan and stair at her?

A.    No.  I did not.

Q.    Did you ever do that?

A.    No.  I never did, never would.

Q.    Now, are you familiar with a gentleman by the name of Carl Porter?

A.    Yes.  Potter.  Potter.

Q.    P-O-T-T-E-R.  And who is Carl Potter?

A.    He's a person, who used to work for my father, and then was a caretaker on some of the properties that my siblings and I own.

Q.    And did he previously work for your father?

A.    Yes.

Q.    And when did he, and what was his job when he worked for your father?

A.    He was a caretaker, cut lawns and generally took care of some property for my father.

Q.    And for whom does he work now?

A.    I don't know who he works for now.  He did for a period of time work for one of the entities that owned the property that my siblings and I own.

Q.    And at the time he worked for one of the entities owning the properties that you and your siblings own, to whom did he report?  Who supervised him?

A.    My mother, because he would take care of her house, where she lives, which we own, and he would, you know, cover lawns and things like that.  He also reported to my sister, Becky, who was a manager of the entity that owns the property.

Q.    Do you know anything about an incident in which Mr. Potter allegedly chased or in some way intimidated Linda Donovan with the use of an all-terrain vehicle?

A.    No.

MR. POPEO:  Your Honor, at this time I'm going to offer the testimony of Mr. Clark and Mr. Lombara, both of whom have personal knowledge of the incident, both of whom were present when this alleged incident occurred, and I want to read portions of it into the record, your Honor.

THE COURT:  Again, I think --

MR. POPEO:  Parties have agreed.

THE COURT:  That's fine.  Again, I think these were the excerpts, the entirety that I read over

the lunch hour.  But go ahead, you may.

MR. KLICKSTEIN:  Your Honor, I'm sure Mr. Popeo is doing this inadvertently, because he's not familiar with the matter, but what was just handed to me is not the transcript of depositions that were submitted with the affidavits, but it's a transcript from a show cause hearing in this courtroom.  It was not previously submitted, as far as I can tell.

THE COURT:  I thought we were going to be reading from the cumulative.

MR. KLICKSTEIN:  So did I.  And we have no objection to what has previously --

MR. ROBBINS:  Your Honor, it's very simple.  The Clark testimony is the testimony that was provided at the show cause hearing in this court, and Mr. Klickstein has it.  Everybody has it.

MR. KLICKSTEIN:  No.

MR. ROBBINS:  The testimony of Mr. Lombara is testimony that he elicited at a deposition at which Mr. Klickstein or his office was present.

THE COURT:  We agree to the deposition. We let Mr. Lombara go, because we all agreed it was the deposition, as far as Mr. Lombara.

MR. ROBBINS:  Clark testimony is testimony

in this court at the time that Mr. -- that Mrs. Donovan made her application and Mrs. Donovan's then counsel cross-examined Mr. Clark, and the Court may have that as well.

MR. POPEO: First of all, we let Mr. Clark go. Secondly, you can take judicial notice, because it happened right here in this court, and we have it.

THE COURT: Was Mr. Clark here and excused?

MR. KLICKSTEIN: No.

THE COURT: Was Mr. Clark in here?

MR. POPEO: Mr. Clark was here.

MR. KLICKSTEIN: Excuse me, your Honor. I know exactly what I did. We agreed that with respect to the witnesses that my brother had been so kind as to put in his submission to the court under its numerous tabs, that with respect to those and those are the ones I had advanced notice of, and we had had the opportunity to go through their depositions and put in counter testimony. We said we would waive the right to have any of those witnesses that were part of the submission testify. So long as the Judge, you were made aware of the additional parts of the deposition, which we gave you, and we specifically called out the

Hearing                                                                01/24/2006

Page 202

names --

THE COURT:  Correct.

MR. KLICKSTEIN:  -- of those individuals. I'm not going to be sandbagged by something from Mr. Clark.  Mr. Clark was not deposed.  His testimony was not part of the submission that was given to me a week ago.  I did not agree to anything with respect to Mr. Clark.

MR. POPEO:  Your Honor, I'll accept that. Mr. Clark is here.  I'll take care of that.  He can review that.

THE COURT:  Let me ask you this, Mr. Popeo.  Is Mr. Clark put on your witness list so that Mr. Klickstein would know he would be coming to testify today?

MR. POPEO:  There was no witness list provided to either party.  We didn't have their witness list, and they didn't have our witness list, and I don't know of any requirement that we submit as defendants in this case a witness list.

MR. KLICKSTEIN:  Your Honor, when we appeared before Judge Swan for scheduling this, Judge Swan asked me in open court how many witnesses would I put on the stand?  I identified Mrs. Donovan as being

the witness I would put on the stand, subject to any rebuttal witnesses I would need.  Mr. Robbins stood up in open court and said, Judge, we're going to have the witnesses from whom we provided the affidavits.

Now, I agree with Mr. Popeo, again, unusual, but I do, that there was no order that we disclose a witness list, you know, nor is there a ruling in 209A you must.  But, no one told me Mr. Clark was going to testify.

MR. POPEO:  Your Honor, just so that you know what was said before Judge Swan was that a number of witnesses would be called, as many as 15.

THE COURT:  Mr. Clark is here?

MR. POPEO:  He's here.  And I've given the transcript of the magistrate's hearing, what we want, which is two paragraphs.  We'll do that at the appropriate time or I'll put Mr. Clark on, and I can cover that quite easily.  Your Honor, Mr. Lombara was excused.

MR. KLICKSTEIN:  Your Honor, my associate points out to me that I misspoke, and Mr. Robbins did include the extract from Mr. Clark's testimony in the submission that he gave me.  Although he wasn't one of the witnesses we referred to.  I don't want to mislead

01/24/2006

Page 204

my brother and the Court.

THE COURT:  Thank you, Counsel.

MR. POPEO:  Thank you for clarifying that. Your Honor, I want to --

THE COURT:  Go right ahead.

MR. POPEO:  -- first refer to Mr. Lombara's testimony, which I believe you have.  Do you want to give the Court another copy.  We'll give you a copy just for convenience, your Honor.  Your Honor, I'm going to call certain excerpts to your attention, if I may.

THE COURT:  Certainly.

MR. POPEO:  I'll start at Page 165.

MR. KLICKSTEIN:  Again, so I don't interrupt my brother, are these the same excerpts that we have in exhibits?

MR. POPEO:  They are absolutely the same.

MR. KLICKSTEIN:  Well, no, excuse me, Mr. Ford said there may be some differences.

MR. FORD:  I can't do a red line comparison.

MR. KLICKSTEIN:  I suggest, your Honor, they're going to direct their attention, they return to the transcripts.  Go to what they filed as Exhibit Q.

That is what we agreed to as testimony.  They can read all or part.

THE COURT:  Why don't we be as careful as we can.  I read the transcript.  I read the deposition over the lunch hour, and I realize Mr. Lombara, that he describes the whole incident as rather -- Lombara, as rather benign, so I guess we're here at Tab Q.  There was a February 17th, February 24th depositions, and I have also Mr. Klickstein's reference to some of Mr. Lombara's testimony that he believes is helpful to him, I believe.

MR. POPEO:  Your Honor, attached to the affidavit as Exhibit Q are certain excerpts.

THE COURT:  Yes, sir.

MR. POPEO:  And we have the Lombara -- we have Lombara here under subpoena.

THE COURT:  Yes, sir.

MR. POPEO:  We can bring him back on a moment's notice if Mr. Klickstein would like to cross-examine him, but I'll deal with the excerpt first that there can be no question, so I don't do a red line.  On Page 8 of the --

MR. KLICKSTEIN:  What does this have to do with this witness?

Hearing                                                                01/24/2006

Page 206

MR. POPEO:  It has everything to do with this witness, your Honor, because this witness has said that she was confronted --

MR. KLICKSTEIN:  This witness, Mr. Donovan.

MR. POPEO:  I have asked him about the ATV, and at this point I'm offering it in connection with the subject matter I'm offering here.

THE COURT:  Gentlemen, I guess it's relevant in this regard, that part of her testimony is I'm afraid of him, because he put Carl Potter up to this horrible incident.  And Mr. Popeo is going to show that it wasn't even a horrible incident, let alone put him up to it, so I goes it's relevant to that degree.

MR. POPEO:  Your Honor, it starts on Page 8 of Exhibit Q, bottom of the page, with Mr. Lombara:

"QUESTION:  Do you have any information of any kind about the allegations, 'Carl Potter while driving in an ATV has driven at and chased plaintiff causing her to run away and safety?'"

"ANSWER:  Yes, I do, but you know that."

"QUESTION:  And what is that information?"

Then there is a paragraph of Carl Potter is

a friend, and so forth, which is not substantive. The very next paragraph:

"QUESTION: So, she was far enough ahead of you at the time that you finished your conversation with Carl Potter that you could not even see her on the trail, correct?"

"ANSWER: Yes."

"QUESTION: What did Carl Potter do and Jeremy Clark do when the conversation finished?"

"ANSWER: They left."

"QUESTION: They turned around, didn't they?"

"ANSWER: They turned around."

"QUESTION: They did not proceed up the trail towards Linda, correct?"

"ANSWER: No."

"QUESTION: In fact, they took the opposite route, didn't they?"

"ANSWER: Yes."

"QUESTION: In an effort to avoid them, didn't they?"

There is an objection by Mr. Klickstein.

"ANSWER: Yes."

"QUESTION: During the course of your

Page 208

discussion with Carl Potter, did you feel threatened?"

"ANSWER:  No."

"QUESTION:  Was he acting in a hostile manner towards you?"

"ANSWER:  No."

"QUESTION:  In fact, he was acting just the opposite, wasn't he?"

"MR. KLICKSTEIN:  Objection."

"ANSWER:  Yes."

"QUESTION:  Because he wanted to avoid any confrontation, didn't he?"

"MR. KLICKSTEIN:  Objection."

"ANSWER:  Yes."

"QUESTION:  Now, when you first came up to Linda, did you speak first or did she speak first?"

"ANSWER:  I don't know."

"QUESTION:  What was discussed during the conversation -- strike that.  Did you have a conversation with Linda?"

"ANSWER:  I talked with -- I talked to her, but we just continued on the trails.  I don't remember exactly what was said."

"QUESTION:  Did you tell her that you had a discussion with Carl Potter?"

Hearing                                                                01/24/2006

"ANSWER:  Yes, yes."

"QUESTION:  What did she say to you in response?"

"ANSWER:  I think I -- I think what I said was that I talked to Carl, that he asked us to open the gates."

"QUESTION:  And what did she say to you?"

"ANSWER:  Nothing.  I don't recall."

"QUESTION:  Was she crying?"

"ANSWER:  No."

"QUESTION:  Was she yelling?"

"ANSWER:  No."

"QUESTION:  Was she screaming?"

"ANSWER:  No."

"QUESTION:  Was she in any way upset that you observed?"

"ANSWER:  Yes."

"QUESTION:  In what way?"

"ANSWER:  She was -- she was panting."

"QUESTION:  Panting?"

"ANSWER:  Well breathing heavily."

"QUESTION:  You just walked up a hill on the trail, right?"

"ANSWER:  Yes."

"QUESTION:  Other than the panting or breathing heavy, did you observe anything else about her that led you to believe that she was in any way upset?"

"ANSWER:  She looked upset."

"QUESTION:  In what way?"

"ANSWER:  I don't know.  The way somebody looks upset she looked."

"QUESTION:  She wasn't crying?"

"ANSWER:  No."

"QUESTION:  Did she say anything to you about her being upset?"

"ANSWER:  Not that I recall."

"QUESTION:  Did she say anything to you about feeling threatened?"

"ANSWER:  Not that I recall."

"QUESTION:  Did she say anything to you about any perceived hostile behavior on the part of the two men on the ATV with whom you had just had a discussion?"

"Objection."

"ANSWER:  Not that I recall."

MR. POPEO:  Also on Page 8, your Honor, Mr. Elwell, who was here, and was also dismissed on the

01/24/2006

basis that we had his excerpt --

MR. KLICKSTEIN:  Your Honor, Mr. Elwell wasn't even there at the ATV incident.

MR. POPEO:  Your Honor, I'm just submit the excerpts.  You have them.  I have given you Lombara.  I will use Clark.  I will submit it to you. If they want me to call Clark, I will do so.  He is here and available in the court.

So, I'm going to submit to you the Clark deposition.  If counsel has a problem with it, he's here and ready and willing aked able to testify.

THE COURT:  Mind if I look at his deposition at sometime, Mr. Klickstein?

MR. POPEO:  It's not a deposition.  It is the court magistrate's transcripts.

THE COURT:  I'm sorry.  From the clerk magistrate's hearing.

MR. KLICKSTEIN:  Your Honor, that was a three-hour hearing.  This is a few pages from it.

MR. ROBBINS:  Your Honor, Mr. Clark's testimony is extremely short.  I'm sure the Court can breeze through it very quickly.  He was asked about what happened.  How far he was, how far they were, basically no lose closer than 50 feet from Linda

01/24/2006

Donovan, and that was that.

MR. POPEO:  Your Honor, I don't want my brother to be prejudiced.  If he wants Mr. Clark here, Mr. Clark will take the stand today.  If he wants to look at these excerpts, they're here.

THE COURT:  Okay.  Hold on, gentlemen, just a second.

MR. ROBBINS:  I think it's Pages 70 and 71, your Honor, if my memory serves.  General recollection.

THE COURT:  Have you had a chance to look at this, Mr. Klickstein?

MR. KLICKSTEIN:  Your Honor, I think that, again, it's part of a hearing, which after hearing all of the evidence, the clerk magistrate found probable cause and issued a complaint against Mr. Potter for criminal harassment of Mrs. Donovan.

I think that all this man says in this is Potter was riding an ATV in front of him.  He came around the corner.  He was surprised to see Steve, and he never saw Mrs. Donovan's face.  So, I don't object.

For whatever value this extract of the proceeding may have, I don't object to it.  I think your Honor can weigh it appropriately.

Page 213

THE COURT:  The fact of the matter is the court magistrate issued the complaint.

MR. KLICKSTEIN:  Yes, your Honor.

THE COURT:  We all know harassment has to have at least three -- well, a legal definition of harassment has to be at least three distinct incidents. Whether this -- and maybe this was not, I don't know. I don't want to try that.

MR. POPEO:  The allegation is the ATV allegation.  That is what I'm dealing with.

THE COURT:  I understand.

MR. POPEO:  Ultimately, the complaint was dismissed, but let's deal with the issue of whether or not Mr. Donovan had anything to do with it, and we're taking their employees and getting their testimony, both at the magistrate's hearing and in deposition. Not ours.

THE COURT:  I think we're near now.  What I've heard is Mrs. Donovan's portrayal of the event. What I've heard is Mrs. Donovan on Direct.  I've heard Mrs. Donovan's portrayal of the event, what it did to her, how she perceived it, and I've -- I have Mr. Lombara's description, and I have Mr. Clark's description.

MR. ROBBINS: Your Honor, you also have Carl Potter's description.

THE COURT: Carl Potter's description. I apologize.

MR. POPEO: So, you have --

MR. KLICKSTEIN: And yet a third one, your Honor, a fourth one, Mr. Jaworski, who was on the phone, who heard, who gave you that extract with ours, Mr. Jaworski, who overheard Mrs. Donovan, because she was calling on a cell phone, screaming. So, that's before you, as well. Your Honor can weigh all of these appropriately.

MR. POPEO: All we want, your Honor, is to take notice of the fact that her employees, who were present, we've given you the abstracts of their testimony. They are percipient witnesses to the event, and bearing in mind the standard is that it is a preponderance of the evidence that there was an existence of a substantial likelihood of harm, that is a reasonable standard. It's not a state of mind standard, and, therefore, your Honor, using percipient witnesses who were there is important.

THE COURT: I understand. It's an objective standard, not a subjective standard.

Hearing                                                      01/24/2006

Page 215

Mr. Klickstein, I read quickly Mr. Jaworski's statement. Who in fact is Mr. Jaworski again?

MR. KLICKSTEIN: Jaworski is an employee of Linda Donovan's, as is it -- they are both employed by them, Lombara. Mr. Lombara was actually on the trail with Mrs. Donovan.

THE COURT: Right. That, I know.

MR. KLICKSTEIN: And Jaworski was on the other end of the phone. Mr. Potter was employed by the now we learn not James alone, but the siblings, as was the fellow that was with Mr. Potter. So, you now have evidence --

MR. POPEO: That is not so.

THE COURT: But, the call to Jaworski was made --

MR. KLICKSTEIN: By Mrs. Donovan as the incident was occurring. It was an excited outburst. So, you have in evidence before you regarding the SUV event, then you can weigh each one of the testimonies as you will. You have Mr. Potter's testimony, Mr. Lombara's testimony, Ms. David -- I'm blanking on his name. Elwell -- No. Elwell was not there.

THE WITNESS: Jeremy Clark.

MR. KLICKSTEIN: Jeremy Clark's testimony,

and Linda Donovan's testimony.  Those are all of the people that were either there or there by telephone.  You've heard from all of them either by deposition form or on the stand.

THE COURT:  Hold on one second, gentlemen.  I want to go over Jaworski's.  If you look at this, that was my problem.  I didn't see the relevance of Jaworski's statement, because in these few pages, if I'm missing something, and maybe I am, it doesn't reference him receiving a phone call on that, at that time and place.  It's in Q.  Do I have the right deposition, March 28, 2005?

MR. ROBBINS:  Yes, you do, your Honor.

THE COURT:  It talks about -- it doesn't reference.  I thought it was me just getting old.  I don't think it references what you just said, Mr. Klickstein.

MR. KLICKSTEIN:  Unfortunately, the pages of Mr. Jaworski's that are attached that I gave you the supplemental pages appear to have been assembled out of order.  If you leaf through Mr. Jaworski's, you'll see the Page 174, which is the one I referenced in the summary --

THE COURT:  Yes.

Hearing                                                                01/24/2006

MR. KLICKSTEIN:  -- in fact follows the higher numbers, and on that page, he testifies that he was on the phone with the professor at the time.  If you've got Page 174 --

THE COURT:  Oh, I'm sorry.  I have in Q, it goes --

MR. KLICKSTEIN:  Not in Q.  It's in the supplement I gave you, your Honor.

THE COURT:  This one?

MR. KLICKSTEIN:  Yes.  Look in the supplement, go to the section for Mr. Jaworski.

THE COURT:  Okay.

MR. KLICKSTEIN:  Unfortunately, and I take full responsibility --

THE COURT:  That is okay.

MR. KLICKSTEIN:  -- it goes Page 247 in the upper, right, to 227 to 231.  It's assembled backwards, 233, 219, then Page 174.

THE COURT:  174?

MR. KLICKSTEIN:  Of the Min-U-Script, where it says Page 175.  Do you have it?

THE COURT:  I do.

MR. KLICKSTEIN:  In context, he testifies previously that she called from on the trail.

THE COURT:  I apologize.  This is Steven Lombara's.  In here I should have --

MR. KLICKSTEIN:  In that attachment, your Honor, you should have --

THE COURT:  Jaworski.  Here we go.  Which page are you referencing?

MR. KLICKSTEIN:  I'm referencing either 174, but the pages are in there backwards.

THE COURT:  Okay.  174.  Lower, left-hand corner.

MR. KLICKSTEIN:  Yes.  If you read, I of course tried to give you pages in context.  The context of that is he testifies that he was in the professor's office.  Linda called in on a speaker phone, and --

THE COURT:  She's calling from the trail?

MR. KLICKSTEIN:  Calling from the trail. And I remember she screamed, and she sounded like she was running.

THE COURT:  Mrs. Donovan was at -- this is I think you talking to him, questioning him. Mrs. Donovan was at the time walking some of the trails which will be used in the upcoming hunt?  Do you see that.  Yes.  I guess he was on.

MR. KLICKSTEIN:  In fact, your Honor, that

was James' attorneys questioning him.  I was not questioning him.

THE COURT:  But she was calling, this was a speaker phone conversation.  Mr. Jaworski was --

MR. KLICKSTEIN:  She was calling from her cell phone from the trail, as the event occurred.  She called in to the professor, who was at his office on his speaker phone with Mr. Jaworski, who was with him.

MR. ROBBINS:  Your Honor, this --

MR. KLICKSTEIN:  This was testimony elicited by my brother at Mr. Jaworski's deposition.

MR. ROBBINS:  Your Honor, so that we have, and I have another excerpt for you, we have Mr. Jaworski's testimony that Mrs. Donovan called her husband as evidence not only that Carl Potter did something, but that Jim Donovan, Sr. -- strike that.  Jim Donovan caused Carl Potter to do something.

I would direct the Court's attention to some of the pages that we've -- 145 in Mr. Jaworski's deposition.  Again, Mr. Jaworski works for John Donovan, Sr. and for Linda Donovan.  And here is what he testifies in part on Page 145 --

THE COURT:  Is that in here, too, sir?

MR. ROBBINS:  It should be.  I hope it is.

Hearing

01/24/2006

Page 220

The question at Line 11.

MR. KLICKSTEIN:  Your Honor, excuse me, if it's not in Q, okay, if it's not in Q, I object to it going before you.  If it is in Q, they should make the reference to Q, so I can follow what he's saying.

MR. ROBBINS:  It's on Page 145 of the deposition.

MR. KLICKSTEIN:  Fine.

MR. ROBBINS:  Mr. Jaworksi, Line 11.  The question is:

"QUESTION:  You have never seen Carl Potter assault Linda Donovan in any way; isn't that correct?"

"ANSWER:  Correct."

"QUESTION:  You have never seen James Donovan assault Linda Donovan in any way, correct?"

"ANSWER:  No, sir."

"QUESTION:  What I've said is correct?"

"ANSWER:  Yes."

"QUESTION:  You've never seen Christy Donovan assault Linda Donovan in any way, correct?"

"ANSWER:  Correct."

Page 146:

"QUESTION:  Have you ever seen any interaction between Carl Potter and Linda Donovan that

was unusual in any respect?"

"ANSWER:  Not that I recall."

"QUESTION:  Have you ever seen any interaction between James Donovan and Linda Donovan that was unusual in any respect?"

"ANSWER:  Not that I recall."

"QUESTION:  Have you ever observed any interaction between Christy Donovan and Linda Donovan that was unusual in any respect?"

"ANSWER:  I have not observed anything. No."

THE COURT:  Okay.  Thank you.  I'm sorry we went off.

MR. POPEO:  Your Honor, he has called your attention to the excerpts, beginning on Page 174, I believe.  Maybe I think it's worth your reading that to see, without my characterization of it, just what Mr. Jaworski had to say in those two pages.  They start -- it's very brief, and you'll get a feel for just what percipient witness Mr. Jaworski was.

THE COURT:  Is Jaworski in Q again?

MR. POPEO:  Page 174.

MR. FORD:  The plaintiff's submission, your Honor, supplemental submission.

Hearing                                                          01/24/2006

Page 222

MR. POPEO:  I can give you it, your Honor.

THE COURT:  Just read it to me.  In all honesty, we're getting so far afield now, let's pull back a second.  Okay.  I think I've had enough about the incident on the trail.

MR. POPEO:  Okay.

THE COURT:  What I have is, and I agreed that Lombard -- I keep saying Lombard --

MR. POPEO:  Lombara.

THE COURT:  Lombara.  His characterization, at least in the deposition, was rather, rather benign, but I have other evidence, as well.  So, we'll just leave it at that.

MR. POPEO:  The reason I'm referring this to you is, on the one hand, you have testimony that the witness was crying and upset, and, on the other hand, all the percipient witnesses say that did not occur.

THE COURT:  Actually, I have to correct you.  He did say that, Lombara said she was upset.

MR. POPEO:  Not crying, not screaming, not any of the above.

THE COURT:  No.  But, he said she was upset.  She did make a phone call to her husband.

BY MR. POPEO:

Hearing                                                                01/24/2006

Page 223

Q.   Now, Mr. Donovan, quite apart from what may or may not have happened on the trail with Mr. Potter and Linda Donovan, do you have anything whatsoever to do with it?

A.   No.

Q.   Did you ever instruct Mr. Carl Potter to threaten Linda Donovan or run his ATM machine -- ATV machine in a way that would in any way cause her fear or anything like that?

A.   Absolutely not.

Q.   Did you ever even discuss any of that with him at any time?

A.   No.  I never did.

Q.   Did you have any knowledge of it, other than what you learned as a result of these proceedings?

A.   No.  I had no knowledge of it, other than these, what I learned from these proceedings.

Q.   Now, let me direct your attention to January 1th of 2005, the New Year's area, New Year's Eve time frame.  Where were you at that time?

A.   I was skiing in Vermont with my family.

Q.   And where were you skiing?

A.   At Suicide Six.

Q.   What is Suicide Six?

A.    It's a small family mountain in Vermont that I take my family to when we go skiing.

Q.    What types of skiers is that area generally known?

A.    It's mainly an area for children and families.  It's very small.

Q.    And when did you first start going there?

A.    I first started going there about 30 years ago with my mother, who taught me and my siblings how to ski.  That was one of the places we went to.

Q.    And did you return as an adult?

A.    I did sporadically go back as an adult.

Q.    Okay.  And when did you return there with your family?

A.    In 2001, after I was married, I went up to Suicide Six.  My best friend has a house in Woodstock, and I stayed with him, and my wife and we had a -- we skied there with them, and we agreed that we would or we thought that we would bring our families there every year from that point on to ski at Suicide Six.

Q.    Did you return to that location thereafter?

A.    I did.  Every year.

Q.    And did you lease a house?

A.    I did.

Q.    And do you have those leases here with you today?

A.    I don't have them, but I think they're in the papers.

MR. POPEO:  We have them, your Honor.

Q.    And did you also get ski lift tickets when you went?

A.    Yes.

Q.    Do we have copies of those here today?

A.    Yes.  I had season passes at the mountain for my two daughters and myself, which we have here for that year 2005, and I have leases for 2002, 2003, 2004 and 2005, because every year I went there with my kids to ski.  That is where I taught them how to ski.  That is where we go every year.

Q.    And did you go there to be in any way near Linda or James Donovan [sic]?

A.    My father, John Donovan.  No.  You said James Donovan.  I never went there to be anywhere near Linda Donovan or my father.  I've never seen Linda Donovan at that resort or any other resort.  I didn't know Linda Donovan could even ski.  I've never seen her on skis.

Q.    Now, directing your attention to the allegations, on the stand Linda Donovan testified that you and Christy skied down the mountain and flanked her in some way.  Did that incident occur?

A.    No.

Q.    Do you have any knowledge of why she would say that?

A.    No.  None at all.  It could not have occurred.

Q.    And in her affidavit, she says that you, while skiing, skied past her and threatened her by saying, "Any time, any place."  Did that ever occur?

A.    No.  It never did.

Q.    Tell me how you ski when you go there with your children.

A.    I have two daughters.  When we -- what we do is when my wife and I ski there, one of us takes one of my daughters, the other one of us takes the other, and when you teach a little toddler how to ski, you have to ski with them between your legs.  You have to hold onto them or be within feet of them at all times, and so in 2005, when Linda claims that my wife and I flanked her and did this, my daughter Emily was four and my daughter Sophia was three, and I was skiing with

my daughter Sophia and my daughter Emily literally in contact with them the entire time, teaching them how to ski. I never would have or could have gone outside of maybe a foot or two from one of my daughters.

Q. At any time, did you let your daughters ski alone?

A. No.

Q. At any time while you were there, did you ski alone?

A. No.

Q. At any time while you were there, to your knowledge, did Christy ski alone?

A. No. She couldn't have.

Q. So, is it your testimony that at no time while you were skiing were you outside the presence and physical contact with your daughter?

A. That's right. One of my two daughters.

MR. POPEO: Your Honor, if the Court wants, I have the passes. I have the ski passes.

THE COURT: That's okay.

MR. KLICKSTEIN: I'm not going to cross-examine him on those issues.

MR. POPEO: Your Honor, I have them. I represent to the Court I have them. I don't want to

Page 228

clutter the record any more --

THE COURT:  Thank you.  I have Mr. Donovan's testimony.  That's fine.

MR. POPEO:  Thank you.

BY MR. POPEO:

Q.  At any time, did you position yourself on the ski lifts so that you would be positioned behind Linda Donovan?

A.  No.  I never saw Linda.  I've never seen Linda ski on any mountain ever in my life.

Q.  During the period from 2001, when you went back with your family, right up until this alleged incident on New Year's Eve of 2005, have you ever seen Linda or James -- excuse me, sorry about that, Linda or Professor Donovan skiing that mountain?

A.  I've never seen either Linda or my father ski at Suicide Six from 2001 on.  That's correct.

Q.  Now, did you have a dinner in 2002 at which you and Christy and Eric and Callie -- or is her name Carolyn?

A.  Carolyn.

Q.  -- were present?

A.  Not that I can recall, no.

Q.  Do you recall at any time, at any time,

whether at dinner or otherwise, making any statements to Eric or anyone else that if you could kill your father and get away with it, you would do so?

A.    Absolutely not.  I never said that.  I absolutely would never say that.  That is a lie.

Q.    And an affidavit has been filed in part by Mr. Eric Rosenbaum that indicates that at a dinner sometime in 2002 with you, Callie, and Christy, you made that statement.  Is that correct?

A.    I saw the affidavit, so it's correct that he, I believe, filed that affidavit.

Q.    Is that statement contained in that affidavit false?

A.    Yes.

MR. POPEO:  Your Honor, I want to call your attention, as well, to the affidavits of each of the other parties, who were allegedly present at that dinner, which are on file as part of the opposition, and I want to supplement the affidavit of Christina Donovan.  I will offer it to you right now.

MR. KLICKSTEIN:  I'm going to object to these affidavits, your Honor.  Everything else in this case has been served according to the rule, at least a day prior to the hearing.  These are Donovan children.

One of -- they are both sisters of the defendant. They're available to him to testify. Christina, his wife, is here to testify. And Dr. Carolyn Rosenbaum has decided not to testify. So, since my brother sent me, Mr. Ford sent me a very vigorous letter a week agree minding me of the rule and saying we vigorously object to any affidavit that wasn't properly served on them at least one day in advance of the hearing, I'm going to insist on the same rule. I object to these affidavits being filed.

THE COURT: Mr. --

MR. POPEO: There are two aspects of it. One, we did not know whether or not the Eric Rosenbaum affidavit would be admitted, admitted in whole or in part. We moved to strike it, so we were not certain one way or the other whether that would be offered, and it has been offered today. Christina Donovan is here and available to testify, and if the time permits, Mr. Klickstein or I can call her, but I want to be sure that we had on record her statement, nevertheless, but she is here, so Mr. Klickstein is in no way prejudiced by that.

THE COURT: As far as Christina --

MR. POPEO: I beg your pardon.

THE COURT:  As far as Christina is concerned.

MR. POPEO:  That's right.

THE COURT:  It's the other person that he's objecting to vehemently, but, Mr. Klickstein, unless you want to be heard further, because I allowed Eric's statement to come in, I'm going to allow that for whatever purpose, whatever weight I give it.

MR. KLICKSTEIN:  Certainly, your Honor has the clear authority to do that over my objection.  Give it what weight you intend to give it.

THE COURT:  Okay.  In fact, I'm just going to take a very, very short break to stretch my legs.  Is that a good metaphor?

MR. POPEO:  May I ask if that is because of age, your Honor?

THE COURT:  It definitely is, sir.  Five minutes, and we'd return.

THE CLERK:  Court's in recess.  All rise, please.

(A recess was taken.)

THE COURT:  Gentleman, it's been a while since we had a short break.  I might as well tell you, it's obvious unless a miracle happens, we're not going

to finish today, much to my chagrin.  So, we'll be back here tomorrow morning at 9 o'clock sharp.  I'm supposed to be somewhere in the afternoon.  I would like to see if we can wrap this up in the morning.  I don't want to prejudice anybody.  Let's see how it goes.

MR. POPEO:  It's your schedule, Judge. There is a possibility we could wind it up today.  I don't know how long the cross is.

THE COURT:  Let's see.

BY MR. POPEO:

Q.    Mr. Donovan, did you hear Mr. Klickstein say that Mr. Carl Potter and Mr. Jeremy Clark worked for you?

A.    I did.

Q.    And did Jeremy Clark ever work for you?

A.    No.

Q.    Do you know who he is?

A.    I've never met Jeremy Clark.  I saw him today, I believe, in the corner of the courtroom.

Q.    Is this the first time, to the best of your knowledge, you ever saw Jeremy Clark?

A.    Yes.

Q.    And prior to -- your connection with Mr. Potter is because Mr. Potter took care of the

properties of your father and continued to take care of those properties thereafter when you and your siblings owned it?

A.    He took care of properties.  He worked for my father taking care of properties that we owned, and then he also took care of a property that my mother lives on.  He would mow lawns and weeding and do landscaping services on the properties that we owned.

Q.    Now, let me direct your attention to December of 2005.  There was testimony that your father was shot.  Do you recall that testimony?

A.    I do.

Q.    By Linda?

A.    Yes.

Q.    And how did you learn of that shooting?

A.    I learned of it when the police came to my house that night.

Q.    And tell us what happened.

A.    About 9 o'clock at night, a little after, two -- I'm sorry, three armed police officers came to my house, rang the doorbell, came into the house, and began to look around the house.

Q.    And what did they tell you the reason for there being there was?

A.    To protect me and my family.

Q.    And the shooting of your father took place in Cambridge?

A.    That is what I'm told.

Q.    And your home is in Hamilton?

A.    That's right.

Q.    Did you have anything whatsoever to do with the shooting of your father?

A.    No.

Q.    Did you have anything to do with anyone, who may have had any involvement with the shooting of your father?

A.    Absolutely not.

Q.    Do you know anything about the shooting of your father, other than what you've been told?

A.    No, nothing.

Q.    And at any time, did you contemplate shooting your father?

A.    No.

MR. KLICKSTEIN:  Objection.

A.    I never did and I never would.

Q.    And when --

THE COURT:  Gentlemen, when there is an objection, if you can just slow down, so I could

actually rule on it, that would be helpful.  We're beyond that, but seriously, I know you're involved in trying to elicit some testimony.  Go ahead.

BY MR. POPEO:

Q.    And the statement is allegedly attributed to you back in 2002 that if you could do it and get away with it, you would shoot your father, does that have anything to do with the events that occurred in December of 2005, to your knowledge?

A.    No.  I never said that.  I never would say that, and that was Eric Rosenbaum is going through a bitter divorce with my sister and has been for a number of years.  I don't remember ever having dinner with him in 2002, and I never, ever said anything like that to him or anyone else.

Q.    What is your relationship with Eric Rosenbaum?

A.    It's nonexistent.  I have no relationship with him.

Q.    And is that divorce with your sister still pending?

A.    Yes.

Q.    And is it contentious?

A.    Yes.

Q.    And you've been supporting your sister through that divorce?

A.    I have.

Q.    Now, there was further testimony by Linda Donovan that there was a shooting at Devon Glen, at the time of the shooting there was a break-in, excuse me, at Devon Glen.  Do you know anything whatsoever about that?

A.    No.

Q.    Do you recall her testimony that knives were scattered on the counter and on the floor?

A.    Yes.

Q.    Do you recall where you were at the time of that shooting?  According to Linda Donovan, that occurred on the Friday before New Years, 2006?

A.    I'm sorry, the Friday between -- before New Years of 2000 --

Q.    On the Friday before New Years, 2006, the Devon Glen home was allegedly broken into, and she testified to that.  Do you know where you were?

A.    On the Friday before New Years of 2006, I was in Vermont skiing with my family, as I always do.

Q.    And was your whole family there?

A.    Yes.

01/24/2006

MR. POPEO: Your Honor, I have American Express receipts, which show his presence in Vermont at that time. I can introduce them or if counsel is not going to cross-examine on this issue, I will not clutter the record with them.

MR. KLICKSTEIN: I'm not going to cross-examine him on whether or not the Friday before New Years he was in Vermont.

THE COURT: Thank you.

MR. POPEO: I just represent for the record I have them. I have all the American Express slips, which show that he was in Vermont at that point in time, and was signing these slips.

Q. Do you have any knowledge whatsoever about that break-in?

A. No.

Q. Do you know who was responsible for it?

A. No.

Q. Have you heard of anybody, who may have done that?

A. No.

Q. You've heard the testimony of Linda Donovan that you have over the years with Christy or without stalked her, intimidated her, assaulted her.

Page 238

Is any of that, to your personal knowledge, true?

A.    No.

Q.    Have you ever sought to give the impression that that is what you were doing?

A.    Absolutely not.

Q.    Is there any reason why you would want to do that?

A.    No.  Quite the contrary.  I try and stay as far as way from my father and Linda as possible, and I try and keep them as far away from my children and my wife and everybody in my family as possible.

MR. POPEO:  I have no further questions, your Honor.

THE COURT:  Thank you.  Counsel?

CROSS-EXAMINATION

BY MR. KLICKSTEIN:

Q.    Mr. Donovan, you were asked by your counsel to prepare an affidavit in this matter; is that right?

A.    That's correct.

Q.    And let me ask you this, you went through your educational background to this Court; is that right?

A.    Some of it.  Most of it, yes.

Q.   And when you prepared this affidavit, and when you gave this Court your educational background, you were trying to be candid and complete when you did that, weren't you?

A.   I was answering the questions completely, yes.

Q.   And when you prepared this affidavit -- strike that.  Did you prepare this affidavit yourself?

A.   No.

Q.   It was prepared by your counsel; is that right?

A.   That's right.

Q.   Are you admitted to the Bar anywhere?

A.   I'm inactive.  I never practiced law, but I did take the Bar exam when I graduated from law school in Massachusetts.

Q.   In Massachusetts.  Did you pass it?

A.   I passed it, but I never practiced.  I always was -- I checked the box inactive every year.

Q.   Were you ever sworn in?

A.   I'm not sure.  I believe so.

Q.   So, you know, then, based on your legal education, that when you sign an affidavit to the Court, and you file it with the Court that you read it,

and you vouch for the accuracy of what is contained in this affidavit. Is that right?

A. That's right.

Q. And you wanted this Judge when he read this affidavit to have confidence that you were being complete and candid with him about the information you gave in this affidavit, weren't you?

A. Yes.

Q. So that when you talked about your education in Paragraph 4 of this affidavit --

MR. ROBBINS: Your Honor, could the witness have a copy since he's being asked about it?

MR. KLICKSTEIN: Certainly. If my brother has a copy, I'll be happy to hand it up.

Q. If you look at Paragraph 4 of your affidavit --

A. Yes.

Q. -- toward the end of it --

A. Yes.

Q. All right. "After high school, I left the north shore for college."

A. Yes.

Q. "And graduated from MIT in 1989, with both a BS in chemical engineering and an MS from the Sloan

01/24/2006

School of Management."

A.    Right.

Q.    That was complete and accurate?

A.    Yes.

Q.    All right.  And in the paragraph before that, you said that you worked your way through high school doing odd jobs on the north shore, such as mowing lawns.  Is that correct?

A.    That's correct.

Q.    Who paid for you to go to MIT?

A.    My mother and my father did.

Q.    And that was your father, John Donovan?

A.    Yes.  That's correct.

Q.    Okay.  And then the next sentence says, after you said you graduated with an MS from the Sloan School of Management is, "I graduated with a JD from Harvard Law School in 1993."  Did I read that correctly?

A.    You did.

Q.    Okay.  You seem to have left out here, sir, in your educational background the fact that you attended Yale University Law School for two years and then were forced to leave that school.  Isn't that true?

A.   No.

Q.   Did you or did you not attend Yale University Law School for two years?

A.   No.

Q.   How long did you attend Yale University Law School?

A.   A year-and-a-half.

Q.   And why didn't you put down in this, when you were giving your complete education, that you had attended Yale University?

A.   I didn't think it was relevant.  I didn't get a degree from Yale.

Q.   You didn't think it's relevant to terms and circumstances under which you left Yale University?

A.   Absolutely not.

Q.   And in fact you didn't want to let this Court know that you were forced to leave Yale university, weren't you, sir?

A.   No.

Q.   Sir, isn't it true that you had to leave Yale University?

A.   No.

Q.   Why did you leave Yale University, sir?

A.   I had decided that I didn't want to be a

lawyer. I decided that I wanted to be a businessman instead. I felt the degree from Harvard would be better than Yale for business, not law, and also my mother lived in Massachusetts. I wanted to be closer to her, so I decided that I wanted to move from Yale to Harvard, and that was over the objection of the dean of the Yale Law School and other people at Yale Law School, as well.

Q. It wasn't as a result of you being involved in a scandal releasing LSAT scores for minority students that the dean said either you withdraw or I'm throwing you out?

A. God, no. Absolutely not.

Q. Absolutely not. So, you gave up after law school -- how many years did you have to attend Harvard to graduate?

A. I attended Harvard for two-and-a-half years, because I was pursuing two degrees there, a Master's degree and a JD at the same time.

Q. And when did you make the decision that you were going to leave Yale Law School?

A. I don't remember when. I think it would have been during my, the fall of my second year at Yale.

Page 244

Q.    Which was what year, sir?

A.    '89, '90.  I believe 1990.

Q.    All right.  So, it's your testimony before this Court that in the fall of 1990, that you had made the decision to leave Yale, and you left Yale?

A.    I believe that's right.  It was 15, 16 years ago.  I may not have the exact year right, but if was my testimony that I wanted to leave Yale Law School to go to Harvard.

Q.    And it was also your testimony that you made this decision to leave and that you left a year-and-a-half into Yale Law School?

A.    I believe that's right.  Yes.

Q.    Let me show you a resume that appears --

MR. ROBBINS:  May we have a copy?

THE COURT:  Maybe you should show your brothers.

MR. KLICKSTEIN:  I only have one copy of this.

Q.    Let me show you your resume.  Take a look at that, please.

A.    Okay.

Q.    Do you recognize that as a document you prepared, sir?

A.    I don't know if I prepared this or not. It's dated 1991.

Q.    All right.  And do you notice, sir, in the upper, right corner it's dated Friday, July 12, 1991. Have I read that accurately?

A.    That's correct.

Q.    The very first entry is "Education, Yale Law School, JD expected June, 1992."  So, in fact, sir, at least as of July, 1991, after completing two years of Yale Law School, you were still at Yale Law School and expecting to graduate the next year.  Isn't that true?

A.    I honestly don't remember, but I believe that what I did was when I transferred to Harvard for the first year or the first semester I was on what is called a hardship program.  I wasn't admitted to the school, then it wasn't -- I wasn't admitted to the school until after one semester when I was there to transfer.

Q.    And are you aware while you were at Yale of the problem that occurred with respect to minority students and the release of their LSAT scores and the allegations that they didn't belong there, because they were less qualified?

Hearing                                                              01/24/2006

A.    Am I aware of the allegations?

Q.    Are you aware of that event occurring while you were at Yale?

A.    Yes.

Q.    And you're aware of the Dean Calabrese being very concerned about that event?

A.    Yes.

Q.    And it's your testimony as you sit here today that you had absolutely nothing to do with that event?

A.    No.  It's my testimony, as I sit here today, that that had nothing to do with my transferring from Yale to Harvard.

Q.    What did you have to do with the release and the furor over those minority LSAT law scores?

A.    Very little.  What happened is I was in a class called Diversity in Higher Education.  Again, this was 15 years ago or more.  Actually, I think it was 16 years ago, and it was in the spring of 1989 or '90, and I was writing a paper, as was another student in the class, a woman, about just looking at the correlation between admission to the school and different attributes.  We were writing this paper, and we had been given data from the admissions office to

write the paper, both of us had.

Q. And in that paper, you released information that asserted that the minority students were less qualified than other students in that school, correct?

A. No. I never wrote any paper. I never asserted anything.

Q. How did this all get publicized at that point, sir?

A. I don't remember exactly, but I think either the admissions office came forward and said that they had made a mistake in giving us the information, because it was information on Yale Law School, which is a small school, and they had felt that if someone looked hard at the information they could figure out what particular student might have gotten a particular score or grade point average, and so they requested the information back from us, from myself and the other student.

We gave it back to them. I think was within a few days. We never wrote the paper. I never even wrote one word of any paper.

Q. Shortly thereafter, you left Yale; is that right, sir?

A.    No.  I would have left Yale.  That was in the spring of my first year of Yale.  I left Yale the next year.

Q.    Now, sir, let's look at your affidavit a little bit further.  If you turn to Page 11 of your affidavit, and you look at what you wrote in Paragraph 30 regarding the February, 2003, event, where Mrs. Donovan testified that you accosted her in the closet, and you threatened her, you read that paragraph that you wrote in response to that?

A.    Yes.

Q.    Okay.  And at the time you wrote this, this was your best, truest and most accurate rendition of what happened at that time?

A.    I believe so.  Yes.

Q.    Well, then where in the world, sir, is the story you fabricated today on the stand?

MR. POPEO:  Objection, your Honor.

Q.    That Mrs. Donovan --

THE COURT:  The word "fabrication" will be stricken.  Go ahead.

Q.    Show me in Paragraph 30 where it says that Mrs. Donovan told you that you should be very, very careful, as you just testified to not more than half an

01/24/2006

hour ago.  Show me that in Paragraph 30, sir.

A.    It's not in Paragraph 30.

Q.    Show it to me.  Is it in Paragraph 31?

A.    It's not in the affidavit.

Q.    Show me where there is any mention of Linda Donovan threatening you in this affidavit you carefully prepared and submitted with 2 inches of other papers to this Court?

A.    There is nothing in there about Linda threatening me.

Q.    Didn't you think when you signed this affidavit that when you said, "I deny that I told her she should be very, very careful, and I deny that I used menacing tones," that the story that she in fact threatened you would be one that should be brought forward to this Court?

A.    No.

Q.    Okay.

A.    We didn't respond in detail to every paragraph in here.

MR. KLICKSTEIN:  Sir, there is no question.

MR. POPEO:  Your Honor, he can explain his answer.  He's not limited to a yes or no simply because

counsel would like him to have that.

THE COURT:  Well, the question did call for a yes-or-no response.  Go ahead, Mr. Klickstein.

BY MR. KLICKSTEIN:

THE COURT:  You'll have your opportunity on Cross --

MR. POPEO:  Thank you, your Honor.

THE COURT:  -- Redirect.  Excuse me.

BY MR. KLICKSTEIN:

Q.  Now, sir, you've been very firm about the skiing incident, and in fact you've testified without equivocation that you've never seen Linda Donovan on skis; is that correct?

A.  That's correct.

Q.  And that you've never seen Linda Donovan at Suicide Six, correct?

A.  That's correct.

Q.  Never seen your father at Suicide Six?

A.  No.  That is not correct.

Q.  In recent years?

A.  In recent years, that's correct.

Q.  Correct?  And that especially in January of '05, when Mrs. Donovan testified that you skied up to her and threatened her, "Any time, any place," that

01/24/2006

Page 251

that didn't happen, correct?

A.    That never happened.

Q.    Do you and your wife and kids buy new ski clothes every year?

A.    I don't -- my children, because they grow, are often buying new ski clothes.

Q.    Do you pass them down from year-to-year from one child to the next?

A.    Yes, we do.

Q.    Okay.  What color is your ski suit?

A.    Red.

Q.    What color was your ski suit last year?

A.    I believe it would be red.

Q.    Same ski suit, this year and last year? You didn't buy a new one?

A.    That's correct.

Q.    Okay.  What color was your wife's ski suit last year?

A.    I don't know.  I'm color blind.  I think it's a light blue or purple or pink color.

Q.    It's light blue, or purple would look about the same to you?

A.    Yes.

Q.    Did your daughter Emily, your oldest

daughter, have a ski suit that was about the same color?

A.    I don't think so.  No.  I don't believe so.  I don't know what -- I can't, again, I can't really tell if they're the same color or not.

Q.    But, the look was tones of gray similar to your wife's?

A.    Emily's?

Q.    Yes.

A.    Yes.  Probably.  A light ski suit.

Q.    And is your ski suit that you're referring to, is it a one-piece suit or a two-piece suit?

A.    It's a two-piece suit.

Q.    What color are the pants?

A.    Black.

Q.    With respect to your wife's bluish or grayish outfit, does she wear black ski pants, as well?

A.    I don't know.  I think so.  They're dark.

Q.    It's a color that would look black to a color blind person?

A.    I think so.

Q.    And let me show you a photograph now.

MR. ROBBINS:  Do you have extra copies?

MR. KLICKSTEIN:  I do have extra copies.

Hearing                                                              01/24/2006

Page 253

Q.    Now, Mr. Donovan, can you recognize off to the left in this picture the ski house that is at top of Suicide Six?

A.    Yes.

Q.    All right.  So, this is recognizable to you as Suicide Six?

A.    Yes.

Q.    All right.  When you open this picture up, there is a little bit larger picture on the next page?

A.    Right.

Q.    Okay.  Can you recognize that as being your ski jacket and in fact you in that photo?

A.    It looks like my ski clothes, but I can't tell if it's me or not.

Q.    Looking off in the distance, again, look at the other page.  I know it's not a terrific picture. Does it look familiar to you that that is your wife, Christy, and her outfit?

A.    Yes, sir.

Q.    And your daughter next to her?

A.    Yes.

MR. KLICKSTEIN:  I'd offer this as Exhibit 5A.

THE COURT:  Any objection?

MR. POPEO:  No objection.

THE WITNESS:  That is one of my daughters, but I don't know which daughter that is.

THE COURT:  It may be entered.

(Photographs marked Exhibit 5.)

BY MR. KLICKSTEIN:

Q.  Judging from the size of your daughter in that picture, sir -- let me give the picture back to you.  We handed your copy up to the Judge.  If you flip to the next page, judging from the size of that picture, you can identify in fact that that picture was taken of you at last year, just from your daughter's size, can't you?

A.  No.

Q.  All right.  So, you're unable to tell whether or not it was last year or some other time?

A.  That's correct.

Q.  Okay.  Now, sir, looking at this picture, does this refresh your recollection at all that in fact in February -- strike that.  I'm sorry, January of 2005, January of 2005, as Linda Donovan alleged, in fact you skied by her on Suicide Six?

A.  Sorry?  What is the question?

Q.    Does the picture I'm showing you refresh your recollection?

A.    No.

Q.    Not at all?

A.    No.

Q.    So, you still deny that in January of 2005 that you skied up to Linda and threatened her as she testified?

A.    That's correct.

Q.    In that picture, assuming, sir, you did identify the picture as being you, your wife and child, correct?

A.    I don't know if it's me or not.  It looks like me, and it looks like my wife, and it looks like one of my daughters.

Q.    And where is the daughter that was never more than a foot away from you at any time while you were skiing, as you testified before?

A.    I don't know.  I don't know when this was taken.

Q.    Okay.  You also testified at great length about the very minimal nature of your relationship with Linda Donovan from the time she met your father in 1993, to the time she married him in 1995, up until

what you've testified to was the family separation in November of 2002, correct?

A.    What I said was it was social, and not substantial.

Q.    And you also went on to say it was extremely minimal, if my notes were correct?

A.    I would describe it as minimal.  Yes.

Q.    When you say "social," in your affidavit, you went on to say the contacts you had with Linda, and I'm referring now, sir, to Paragraph 6 of your affidavit --

A.    Yes.

Q.    -- "Linda married my father in 1995 when I was 28 or 29.  It is my father's third wife.  I had little, if any, relationship with my father at that time."  Did I read that correctly?

A.    That's correct.  Yes.  It was purely social.

Q.    Does it say I only had a social relationship with my father or does it say I had little, if any, relationship with my father at that time?

A.    I did not have the relationship that a father and son would have.  I had very little, but a

social relationship with my father at that time, yes.

Q.　Mr. Donovan, I understand that your relationship with your father is something that is unique to the two of you.  My question is specifically what you said at this time.  Could you point in that sentence, sir -- I mean we do agree that you have a law degree, correct?

A.　That's right.

Q.　And you have an MBA from the Sloan School, correct?

A.　That's right.

Q.　And you're a managing director of a major investment company, correct?

A.　That's correct.

Q.　Investment banking firm.  So, language is something you're reasonably familiar and precise about, aren't you?

A.　Yes.

Q.　So, when somebody says "I had little, if any, relationship with my father at this time," that means you had little, if any, relationship.  Not that you had only a social relationship.  Is your testimony now, sir, changed?  And now you want to say only you had a social relationship?

Hearing                                                                01/24/2006

Page 258

A.    It is not changed at all.  My relationship with my father was very rocky and was a social relationship only.  My father has never met my children.  That is not typically what a father and son would have in their relationship.  I have -- at that time, I had a purely social relationship with my father.  We would get together socially for vacations and things like that, but it was not substantive.

Q.    Well, in other words, you would take advantage of the vacations and the other opportunities your father offered you?

A.    No.

Q.    But, you gave him nothing back?

A.    I'm not sure that I understand the question.

Q.    I'm not sure I understand what you're saying, sir.  You were an adult at that point in time, weren't you?

A.    Yes.

Q.    You hadn't paid for any of your education. Your father and mother had paid for that, correct?

A.    No.  That is not true.  I did pay for a good portion of my education, as well.  I had student loans.  I paid a lot for my room and board, but my

mother and father paid for most of it.

Q.    Paid for most of it.  You testified to this Court earlier about a vast amount of properties that you and your siblings claim to own now, correct?

A.    We do own properties.  Yes.

Q.    And with respect to these properties, maybe we need to go through them a little bit.  You didn't acquire and pay for the acquisition, original acquisition of Pomfret, Vermont.  Your father paid for that, didn't he?

A.    I don't know.  I don't know.  We purchased the property from my father at some point, but I don't know when or how he purchased it.

Q.    Where did you get the funds to acquire --

A.    Where did he get them?

Q.    No.  Where did you get them, sir?

A.    They were in an entity that bought the property at the time called Pomfret Mountain View LLC.

Q.    How did they get into that entity, sir?

A.    I don't know.

Q.    So, you, an investment banker, an attorney and an MBA, are telling this Court under oath that the acquisition of the Pomfret property from your father was funded by an entity you owned, but you don't know

Page 260

how the money got there?

A.   My brother was the controlling partner of the entity.  I was a passive limited partner only.

Q.   Okay.  So, you didn't know?

A.   At the time, at that time, I didn't know, no.

Q.   What about the estate in Bermuda, who is the owner of that now that you claim?

A.   My brother and I are the owners of that.

Q.   How did you and your brother acquire that property in Bermuda?

A.   We purchased that property from the owners sometime in the '90s.

Q.   And who is the owner that you purchased it from in the '90s?

A.   I don't remember her name.

MR. POPEO:  Your Honor, I'm trying to give latitude here, given the fact you are telling us it's the specific allegations and the -- I have not yet seen the relevance --

THE COURT:  Credibility.

MR. POPEO:  -- of property ownership, because he did not testify to that.  I leave that to the Court.

Page 261

THE COURT:  Thank you.

BY MR. KLICKSTEIN:

Q.  How did you and your brother obtain the funds by which you acquired the Bermuda estate?

A.  We obtained them from a trust that we were beneficiaries of.

Q.  And how did the funds get into that trust that you were beneficiaries of?

A.  I believe the trust made investments over the years, and that's how it acquired the money.

Q.  And did you set up that trust, sir?

A.  No.

Q.  And did you put the initial funding into that trust, sir?

A.  No.

Q.  Do you know who did that?

A.  I don't.  Not for sure, no.

Q.  Okay.  Now, let's talk about the estate in Manchester, Mass., Seagate.  Is that another property that was originally owned by your father?

A.  I believe some of it was, but I'm not certain.

Q.  And that is a property you're now claiming you and your siblings own?

A.    That's right.

Q.    How did you and your siblings acquire that property?

A.    Same as Vermont.  It was purchased either from third parties or from my father sometime in the '90s.

Q.    And, again, you don't know the source of the money that was used to purchase that property?

A.    I wasn't involved in it directly at the time, so I couldn't give you a certain answer.

Q.    Right.  I'm asking you, sir, whether you know, and your answer is you don't know.  Isn't that true?

A.    I'm not certain.

Q.    Okay.  Now, sir, let's talk about the 600 or so lot acres that comprise the Donovan conservation property.  Is that another property you claim you and your siblings own?

A.    Yes.

Q.    And that 600 acres was property that was assembled by your father over the course of 30 years, wasn't it?

A.    No.

Q.    It wasn't?

A.   No.

Q.   That property was owned by your father prior to your acquiring it, wasn't it?

A.   No.

Q.   Who was it owned by?

A.   There are 600 acres.  There are various owners, and it was purchased -- some of it was purchased from my father.  Much of it was purchased from third parties over the years.

Q.   All right.  And how much money did you put up to purchase that property over the years from third parties?

A.   I would have put up, I have a one-fifth ownership in the entity that owns that property.  So, one-fifth of the money would have come from entities that I had a one-fifth ownership in, interest in.

Q.   Mr. Donovan, that was not an answer.  Where did you get the money that acquired that property from?

A.   I believe it was distributed to us from other entities, trusts.

Q.   And how did it get into those trusts?

A.   I believe it was acquired through investments over a number of years in those trusts.

Q.    And, again, your answer is you don't know who made those investments in those trusts over the number of years?

A.    I do know.   I know who might have made them, but I don't know what the investments were.   I was not intimately involved.   The trustees would have made those investments.

Q.    You know for sure it wasn't you that initially put that money in, true?

A.    I did not initially put the money in. That's correct.

Q.    Now, let's turn to your father's home at Devon Glen.   Are you familiar with that property?

A.    Yes.

Q.    And that is another property you now claim to own?

A.    That's correct.

Q.    And how did you acquire that property?

A.    I believe that the entity that owns it, which my siblings and I are the owners of, bought it from a third party.

Q.    How did you and your siblings acquire the funds to purchase that property?

A.    The same way as the Vermont and the

Page 265

Hamilton land property, through another entity which we were beneficiaries of.

Q. But, again, you know that you didn't originally put that money in there, either, correct?

A. I'm not sure what you mean by put money in where. In the trust that it distributed money to?

Q. Sir, you know that you, personally, did not fund any of these trusts initially, did you, sir?

A. I'm not sure I can answer that. Let me explain. The entities that own these properties I'm a one-fifth owner of. The entities purchased the properties either from my father or from third parties. The money to make those purchases came from primarily trusts that I was a beneficiary of. But, I didn't control. I didn't have insight into that, where that money came from.

Q. And you didn't establish or fund any of those trusts, did you?

A. I did not establish or fund them.

Q. Thank you. Now, sir, it's also true that as soon as you decided in November of, December of '02 to sever all relationships with your father, almost immediately thereafter, you caused him to be served with a notice of eviction from his home, didn't you?

A.    My brother, my sister and I served a notice of eviction on him.  Not from his home, no.  From the home that we owned.

Q.    Where he lived?

A.    No.  Where he lived part time.  He lived in Cambridge at the time.

Q.    Well, sir, we're all talking about Devon Glen.  Isn't it in fact true you served a notice of eviction for your father out of Devon Glen?

A.    Yes.  Yes.

THE COURT:  Counsel, I don't mean to interrupt your flow.  I'm wondering if this might not be an appropriate time to stop and resume tomorrow.

MR. KLICKSTEIN:  Fine with me.

THE COURT:  Gentlemen, is that okay with you?

MR. POPEO:  Whatever your schedule is.

MR. KLICKSTEIN:  One housekeeping matter.

THE COURT:  Certainly.

MR. KLICKSTEIN:  I believe by the terms of Judge Swan's order that the 209A that is in effect expires now, and I would like to ask the Court and until your Honor has made a decision in this matter, as Judge Swan did, as Judge MacIntyre did, and as Judge

Swan did again to continue the 209A order in effect until you make a decision based on the evidence.

THE COURT:  I think that is imminently reasonable.

MR. POPEO:  Absolutely.  I'm assuming the decision on the evidence will follow sometime shortly after all the evidence is in, so under those circumstances, your Honor, of course.

MR. KLICKSTEIN:  Thank you, Mr. Popeo.

THE COURT:  Let me just write that up, gentlemen, and make sure we all are in agreement. Gentlemen, what I've written there will be a further extension.  I had a hearing, at which the defendant appeared.  The prior order dated January 20 '06 shall continue in effect, without modification, until the expiration date noted below, and I put it for January 25th, and I put a note "hearing on extension currently ongoing."

MR. ROBBINS:  Your Honor, what is your sense of the scheduling tomorrow?  Your Honor's schedule tomorrow?

THE COURT:  I'm supposed to be at an evidentiary seminar in the afternoon.  I'm hoping that this will finish up tomorrow morning, pending, again,

it's much more involved than I thought.  And I want to make sure everybody feels they've been given an ample opportunity to present whatever they want to present. But, I'm hoping, depending on how many witnesses there are, to go, that we can wrap this up in the morning, hopefully by noontime, get my body to Marlboro, where I'm supposed to be, but that is -- again, I only say that hopefully, hoping that we can wrap it up, but I'm not going to cut anybody short.

MR. ROBBINS:  We're going to make every effort to make sure that you don't miss that.

THE COURT:  Okay.  Great.  Thank you.

(Discussion off the record.)

THE COURT:  Counsel, I am going to be liberal.  I'm going to allow him to talk to his client.

MR. KLICKSTEIN:  Whatever your Honor's pleasure.

(Proceedings adjourned.)

Volume:  II

Pages:  270 - 534

Exhibits per index:

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                          DISTRICT COURT DEPT.

IPSWICH DIVISION

ABUSE PREVENTION

- - - - - - - - - - - - - - - - - - x

LINDA DONOVAN,

                    Plaintiff,

                                    DOCKET NO.

vs.                                 0640-RO-001

JAMES H. DONOVAN,

                    Defendant.

- - - - - - - - - - - - - - - - - - x

        209A HEARING NEWBURYPORT DISTRICT COURT

        BEFORE THE HONORABLE STEPHEN ABANY

            JANUARY 25, 2006 - 9:30 A.M.

                188 STATE STREET

            NEWBURYPORT, MASSACHUSETTS

        Reporter:  Donna J. Whitcomb, CSR/RPR/RMR

01/25/2006

A P P E A R A N C E S:


        LAW OFFICE OF DUANE MORRIS

        By Barry C. Klickstein, Esquire

        and Aaron A. Arzu, Esquire

        470 Atlantic Avenue

        Boston, Massachusetts   02210

        (617) 289-9264

        On behalf of the Plaintiff.


        MINTZ, LEVIN, COHN, FERRIS, GLOVSKY

        AND POPEO, P.C.

        By R. Robert Popeo, Esquire

        Jeffrey S. Robbins, Esquire

        Scott C. Ford, Esquire

        Sarah B. Herlihy, Esquire

        One Financial Center

        Boston, Massachusetts   02111

        (617) 542-6000

        On behalf of the Defendant.

I N D E X

| EXAMINATION OF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JAMES DONOVAN | | | | |
| By Mr. Klickstein | | 279 | | 369 |
| By Mr. Popeo | | | 348 | |
| CHRISTINA DONOVAN | | | | |
| By Mr. Robbins | 370 | | | |
| By Mr. Arzu | | 406 | | |

REBUTTAL TESTIMONY

| EXAMINATION OF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LINDA DONOVAN | | | | |
| By Mr. Klickstein | 447 | | | |
| By Mr. Robbins | | 450 | | |
| CHRISTINA DONOVAN | | | | |
| By Mr. Robbins | 471 | | | |
| By Mr. Klickstein | | 473 | | |

CLOSING ARGUMENTS:

By Mr. Robbins.........................483

By Mr. Klickstein......................507

E X H I B I T S

| PLAINTIFF NO. | | PAGE |
|---|---|---|
| 7 and 7A | Handwritten Letter, 11/9/98 | 309 |
| 8 | Birth Announcement, Re:  Emily 5/12/00 | 310 |
| 9 | Picture, Re:  Emily 5/12/00 | 311 |
| 10 | Note, Christy to John and LInda | 312 |
| 11 and 11A | Address Label and Note | 314 |
| | Christy to John and Linda 11/00 | |
| 12 | Address Label and Picture | 314 |
| 13 | Picture, Re:  Bermuda | 316 |
| 14 | Picture, Re:  Bermuda | 317 |
| 15 | Picture, Re:  Wedding John and Linda | 320 |
| 15A | Picture, Re:  Wedding Party | 321 |
| 16 and 16A | Pictures, Re:  Bermuda | 322 |
| 17 and 17A | Pictures, Re:  Summer '97 | 324 |
| 18 | Picture, Re:  Christy and Linda Boat | 324 |
| 18A | Picture, Re:  James and John Boat | 325 |
| 19 and 19A | Picture, Re:  Bermuda 10/97 | 326 |
| 20 | Family Picture | 327 |
| 22 | Picture, Re:  Riding at Devon Glen | 331 |
| 23 and 23A | Pictures, Re:  Social Dinner | 332 |
| 25, 25A and 26 | Picture, Re:  Christy Riding | 335 |
| 27 | Picture, Re:  Engagement Party Devon Glen | 338 |

E X H I B I T S

PLAINTIFF NO.                                                      PAGE

28    Pictures, Re:  Christmas Party at Maureen's 340

29    Picture, Re:  Wedding James and Christy      340

30    Picture, Re:  Christy and James at Seagate   341

31    Picture, Re:  Baby                           343

35 and 35A  Picture, Re:  Hunt Event              344

Hearing, Vol. 2                                                    01/25/2006

Page 275

PROCEEDINGS

JUDGE ABANY:  Good morning.  I hope everyone had a safe trip up here to Newburyport.

MR. POPEO:  Can we have Mr. Donovan take the stand?

JUDGE ABANY:  Please, if you would, Mr. Donovan?

THE WITNESS:  I was sworn yesterday.

JUDGE ABANY: That's all right, you can be sworn again.

JAMES DONOVAN, Sworn

BY MR. KLICKSTEIN:

Q.    Good morning, Mr. Donovan.

A.    Good morning.

Q.    After we adjourned this courtroom yesterday did you have a chance to consult your attorneys regarding this matter?

A.    I talked to my attorneys after we left, yes.

Q.    How long did you talk to your attorneys?

A.    I don't know.

Q.    So from yesterday to today you can't remember how long it was you spent with your attorneys?

A.    No, I talked to them on the phone maybe for -- off and on maybe a half an hour.

Q.    You talked to them in the courtroom for a while after the judge left the bench?

A.    That's right.

Q.    About how long was that?

A.    15 minutes.

Q.    Did you talk to anyone else other than your attorneys about this matter?

A.    No, I did not.

Q.    Discuss it with your wife?

A.    No.

Q.    Your mother?

A.    No.

Q.    Your mother-in-law?

A.    No.

Q.    Would you like to change any of the testimony you gave under oath yesterday?

A.    No.

Q.    Do you recall testifying under oath regarding the event that took place where Linda Donovan has testified that you accosted her in the coat closet, you were present when she testified to that?

A.    I was.

Q.    And you testified yesterday that, in fact, you didn't threaten Linda Donovan, correct?

A.    That's correct.

Q.    But, in fact, she had threatened you?

A.    That's correct.

Q.    And you told the Judge that she told you -- she approached you and said, "You better be very, very careful"; is that correct?

A.    I told the Judge that she said to me that "You should be very, very careful."

Q.    And when that event happened, did you have conversation with your attorneys after it happened? Not the substance of the conversation just whether or not --

A.    I'm sorry, I don't understand the question.

Q.    Immediately after that event happened at the hunt club, within the next day or so, did you have conversation with your attorney?

A.    I don't remember.

Q.    Well, do you recall that your attorney received a letter from Linda Donovan's attorney immediately after the event?

A.    I do.

MR. KLICKSTEIN:  And I believe that letter is part of the Mintz submission, Your Honor, Exhibit T, if I'm correct Mr. Arzu?

MR. ARZU:  Exhibit U.

MR. KLICKSTEIN:  Excuse me?

MR. ARZU:  Exhibit U.

MR. KLICKSTEIN:  Exhibit U -- no, it's Exhibit T, Your Honor.

JUDGE ABANY: Okay, hold on one second.  I'm sorry, is it "U" or is it "T"?

MR. KLICKSTEIN:  It is "T" and then we will look to "U."  So once you find "T" if you put a sticky on "U" that will be the next place we go to, Your Honor.

MR. KLICKSTEIN:  May I approach the witness?

JUDGE ABANY:  Yes.  Would you just hold on one second?

MR. KLICKSTEIN:  Certainly.

JUDGE ABANY:  I have a February 10th letter, February 10th, 2003...

Okay, you have brought my attention to this letter from Attorney Murphy to Mintz, Levin.

MR. KLICKSTEIN:  I'm now showing the witness the letter that was marked Exhibit T.

Q.  And do you recall that you received a copy of that letter?

A.  I don't know if I received a copy of the letter but I recall reading it.

Q.  So you do recall reading that letter?

A.  I do.

Q.  Do you recall reading it soon after its date?

A.  I don't know when I read it.  I don't know what "soon after the date" means.

Q.  What does it mean to you, sir?

A.  I would have read it some time after my lawyers received it; within a few days I would think.

Q.  That's fine.  That's fine.  And you read that letter carefully when it was received?

A.  I don't know how carefully I read it.  I read it.

Q.  And you saw in that letter, didn't you, sir, that Mr. Murphy on behalf of Mrs. Donovan said: Following the fund raiser, James Donovan followed Mrs. Donovan into a small coat room located in the

Page 280

far corner of the function hall.  James Donovan blocked Mrs. Donovan's exit and grasped her hand. According to Mrs. Donovan, James Donovan stated to her in an intense and menacing manner, I don't know what you guys are doing about this but you should be very careful.  You should be very careful, end quote.  Do you recall reading that letter that came from Mrs. Donovan's attorney?

A.    Yes.

Q.    And did you authorize your attorneys to reply to that letter?

A.    I know they replied to the letter.  I don't know if I authorized it or not.

MR. KLICKSTEIN:  And referring Your Honor to Exhibit U, which is a letter dated February 24th, 2003 sent to Attorney Murphy by Henry Sullivan.

Q.    I ask you if you saw a copy of that letter either at the time it was sent or shortly thereafter?

A.    Yes.

Q.    Did you ever advise anyone, sir, that that letter was incorrect?

A.    No.

Page 281

Q.   Can you point out in that letter where it says to Mr. Murphy:  Mr. Murphy, there was no coat closet in the room?

A.   It doesn't say that.

Q.   Can you point out where in that letter it says to Mr. Murphy:  Mr. Murphy, I didn't speak to Linda in any way.  Linda threatened me.

A.   What the letter says is that --

Q.   No, sir, I'm asking you if you can show me in the letter where it says that?

A.   I can show you in the letter where it says --

MR. POPEO:  Your Honor, he asked a question.  The witness is entitled to answer it.

JUDGE ABANY:  The witness is entitled to answer.  It's cross-examination.  Simply listen to the question and answer it.  You'll have a chance perhaps on his redirect to make an answer.

Q.   Where in that letter does it say to Mr. Murphy:  Mr. Murphy, I didn't say to Linda, "You should be very, very careful."  Linda threatend me and said to me I should be very, very careful?

A.   Doesn't say that.

Q.   In fact, the letter sent by your attorney

to Mr. Murphy in response to the threats by Linda does not mention that she threatened you as you allege for the first time yesterday?

A.    That's right.

Q.    Thank you.

Now, in fact, Mr. Donovan, there is a coat closet in that function room, isn't there?

A.    There's a coat area.  There's no door on it.  There was no door on the area at the time of this event.  There is now.

Q.    Oh, okay.  So now you tell us that there is a specific area, not just a corner of the room where a rack was held for coats?

MR. POPEO:  Objection, Your Honor.

A.    That's not what I said yesterday.

JUDGE ABANY:    Hold on, hold on. Nature of the your objection?

MR. POPEO:  The objection is that he is seeking to recharacterize the witness' testimony, "Now he testifies."  The witness has testified.  If he wants to ask a question on cross-examination, he can go anywhere he wants to go.  But he is now restating it as though the witness has testified to the contrary when, in fact, the witness has

testified it was a coat area yesterday and described it in detail.

JUDGE ABANY:  Mr. Popeo, I'm sure Mr. Donovan will let him know that it is an incorrect statement.

JUDGE ABANY:   Go ahead.

A.   That's an incorrect statement.

Q.   So when you were testifying to the Court yesterday, you didn't say to the Court that there was no coat closet; is that right?

A.   I said yesterday there was a coat area in the corner of the room which was open and in full purview of the rest of the room with no doors on it and it was the size of a small conference room is, I believe, what I said in my testimony yesterday.

Q.   And it's your testimony that at the time of this event that there were no closet doors on that coat closet?

A.   That's correct, yes.

Q.   When were the closet doors put on there, sir?

A.   I don't know, maybe a year later.  There were no doors for sure at the time of the event.

MR. KLICKSTEIN:  Your Honor, we would

Hearing, Vol. 2                                                                                01/25/2006

Page 284

show a set of pictures to Mr. Donovan?

JUDGE ABANY:  Have your brothers seen them?

MR. KLICKSTEIN:  I've given them to my brothers and there's a set for Your Honor.

JUDGE ABANY:  Thank you.

MR. KLICKSTEIN:  Oh, I gave my brother my set so...

JUDGE ABANY:  Do you have a set?

Q.   Looking at the first picture in this pack, file of pictures; is that a picture of the room and the coat closet?

MR. POPEO:  As of what date?

A.   Which picture?

MR. KLICKSTEIN:  You can ask the witness what question -- I'm sorry, Your Honor.

JUDGE ABANY:  Okay, slow everything down.  First of all let's make sure we're all looking at the same photo.  Could you show him the picture you have, Mr. Klickstein?

Q.   I'm now showing you --

JUDGE ABANY:  I'm sure we'll get around to the date but let's take it step by step.

Q.   Is this a photo of the room where the

event was held?

A.    Yes.

Q.    Is this a photo of the room looking toward where the coat closet presently exists?

A.    It's not a coat closet, it was a coat room at the time, coat area.    But, yes, that is a picture of the coat area with doors on it that were not there at the time.

Q.    Try and answer my question and we'll go a little more quickly.    Is this a picture of where the coat closet is today?

A.    Yes.

Q.    And is that the area where the -- what you testified to was the coat area was then?

A.    Yes.

Q.    And it's your testimony that the only difference is that these doors you say were recently added?

A.    I don't know about recently but they were not there at the time of this event in February of 2003.

Q.    But the coat area was in that precise location?

A.    Yes.

Q.    And the room had that precise finish of wood, the dark wood paneling and the wood floor?

A.    I don't know.  I couldn't -- I couldn't tell you that.

Q.    I see, so you can tell us whether the doors were there or not but you can't tell us whether the room looked the same?

A.    That's right.

MR. KLICKSTEIN:  I offer that, Your Honor, as an exhibit?

MR. POPEO:  What I'd like to know, Your Honor, is when is the date of this photograph because the witness has testified this does not represent an accurate portrayal of the event about which he testified; that is to say, what the closet was -- the coat area was at the time.

JUDGE ABANY:  No, he was very clear on that.  So, actually, I don't find that the date is actually pertinent.  He testified that -- sans the door, except for the door that is a true depiction of how that place looked on the date of the incident.

MR. POPEO:  No problem then, Your Honor.

BY MR. KLICKSTEIN:

Q.   Let me show you another picture.  This is a closer approach of the closet; is it not?

A.   Yes.

Q.   This is another picture of that same coat area?

A.   Right.

Q.   This is closer to the coat area with one of the doors open, correct?

A.   That's correct.

Q.   And but for the doors that show in this picture, this is a true and accurate picture of how that coat area looked the night of the event?

A.   I think -- yes.

MR. KLICKSTEIN:  All right, we'd offer that one as well.

MR. POPEO:  No problem, Your Honor.

JUDGE ABANY:  Thank you, gentlemen.

Q.   I show you another picture.  This is a picture, sir, is it not, of that coat area with both doors open?

A.   Yes.

Q.   And is that a true and accurate picture of how that area looked whether -- strike that -- is

your testimony without the doors but how the area looked?

A.    That is -- my testimony is that without the doors that is the picture of the coat area.

MR. KLICKSTEIN:  We'd offer that one, Your Honor.

JUDGE ABANY:  Gentlemen?

MR. POPEO:  No problem, Your Honor.

Q.    Now, you testified that that coat area was the size of a small conference room, I believe?

A.    That's right.

Q.    So from where the doors are presently located, all right, going in, how deep is that area?

A.    I don't know.  Can I look at the picture?

Q.    Well, can I have your recollection first?

A.    I don't recall off of the top of my head but it would be several feet deep.

Q.    Yesterday you said a small conference room?

A.    Small conference room.

Q.    You're talking 8 by 10 when you say a small conference room?

A.    I don't know.

Q.    All right.  Now, looking at the picture

and perhaps I can give you another one; that makes it easier, all right?

MR. KLICKSTEIN:  I'm showing him this picture.

MR. POPEO:  Okay.

Q.    Now, this is a picture taken yet closer to the closet showing apparently child seats on -- infant seats on one side, a coat rack on that side and gives you more of an idea of the depth; does it not?

A.    Yes.

Q.    And based on that and your recollection having been there, about how deep is that closet area?

A.    I don't know.  Looks like it might be about 6 to 8 feet deep.

Q.    And but for the door it's your testimony that that's a fair and accurate representation of the coat area on the night of the event?

A.    That's correct.

MR. KLICKSTEIN:  I'd offer that, Your Honor.

JUDGE ABANY:  Gentlemen, any problem?

MR. POPEO:  No, no objection, Your

Honor.

JUDGE ABANY:   Okay.

Q.   Let me show you another photo; that's from the room looking toward the closet area?

MR. KLICKSTEIN:  Mr. Popeo?

Q.   Do you have that picture in mind?

A.   Yes.

Q.   And, again, but for the doors that gives some relationship of where that coat area was at the time of the event?

A.   That's right.

Q.   Which is way off in the right-hand corner of that room; is that correct?

A.   It's as I described it.  It's in the left-hand corner of the room back there (gesturing).

Q.   So if you're inside the room looking toward the glass doors that appear in the earlier picture, the closet's still to the left?

A.   Right, exactly.

Q.   Thank you.

MR. KLICKSTEIN:  We'd offer that, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:   Thank you.

Q.    And finally, sir -- next to finally.  I show you a picture from approximately the middle of the room, again, looking at the closet in the right of the picture of the coat area as we're calling it. And but for the doors on the coat area is that a fair and accurate picture of the layout of the room on the night of the event with the coat area on the right-hand side with the doors closed which it's your testimony didn't exist at that time?

A.    Rephrase the question.

Q.    Certainly.  Is this picture a fair and accurate representation of how the room looked the night of the event looking toward the coat area but it's your -- with the exception that it's your testimony that there were no doors on the coat area which appears in the --

A.    That's correct, except these tables were not arranged this way that night but the room -- this is the room and that is the coat area.

Q.    Thank you.

A.    But the tables might have been arranged differently that night.  I don't know.

Q.    Okay, that's fine.

MR. KLICKSTEIN:  We'd offer that.

MR. POPEO:  No objection, Your Honor.

JUDGE ABANY:  Thank you.

Q.    And last photo of the room, can you identify this picture, sir?

A.    It's another photo of the room.

Q.    And in this photo of the room, can you tell us approximately where the coat area is located?

A.    On the right.  It's right -- you can't see it in this photo, it would be right here (indicating).

Q.    So it would be on the far right-hand side of the photo off the picture?

A.    Yes, this is looking the other way.  So it's looking from that direction, this way (indicating).  The coat room would be over there (indicating).

Q.    But this gives us a fair and accurate view of approximately the size of the room at the time of the event?

A.    I think so.  I said it was about the size of this room.

MR. KLICKSTEIN:  Thank you, we'd offer that, Your Honor.

MR. POPEO:  No objection, Your Honor.

JUDGE ABANY:  Thank you.

Q.    Mr. Donovan, you testified that there came a time in late 2002 when as a result of information given to you by your sister, Maureen, you and your siblings determined that you wanted to end all relationships with your father and Linda Donovan, correct?

A.    Yes.

Q.    And about what months of the year 2002 did this take place?

A.    Did what take place?

Q.    The revelation?

A.    The revelation?  I don't recall.  It was in the fall of 2002, fall-winter of 2002.

Q.    And when did you first meet with Professor Donovan to tell him that the siblings had decided to sever all relationships with him?

A.    When did I first meet with him?

Q.    Yes, sir, you, sir?

A.    Me personally?

Q.    Yes, sir.

A.    I don't remember.  Maybe December, January -- December probably.  I don't remember

exactly.  My sister, my brother and the lawyers met with him far in advance of any meetings that I had with him.

Q.    Oh, okay, okay.  So the original meeting when it was revealed by the siblings that they wanted to terminate all relationship took place, so far as you know, at your lawyers' office in the presence of your brother, John, Jr., and which of your sisters?

A.    My sister, Becky.

Q.    Not Marie?

A.    I don't think so.

Q.    And when did that first meeting take place when your siblings first -- siblings and your attorneys, correct?

A.    The attorneys represent all -- they represent all; they are not "my attorneys," they represent all of my siblings.

Q.    Right, Mr. Rosenthall at that time was one of them?

A.    Yes.

Q.    And he was present at that first meeting where your siblings for the first time advised Professor Donovan that they wanted to terminate all

relationships because of this allegation?

A.    I wasn't at the meeting but I believe he was.

Q.    Were you advised that it was going to take place before it took place?

A.    I think so, yes.

Q.    When did that take place?

A.    I don't remember.

Q.    You can't even place something that cataclysmic by a month?

A.    I would say it was end of November, beginning of December.

Q.    And that's the best you can do for a date?

A.    That is the best I can do for a date.    I was not there.

Q.    You don't know other than what people told you what transpired at that meeting?

A.    That's right.

Q.    What did you and your siblings do in the, say, months of October and November to prepare for the separation of all interests with your father?

A.    Mainly what we did was talk to each other a lot and our spouses.    But mainly my mother, the lawyers, about what we could do.    We -- you know, it

was -- it was very emotional.  It was -- we had seen the evidence, it was compelling.  It was grotesque what he had done and I remember a lot of very emotional conversations.  I'm not sure what you're asking but I remember talking to my sisters and my mother a lot and there was a lot of people crying and it was very emotional.

Q.    All right, well, let's talk about something not emotional; let's talk about money. What did you do financially to effect the separation from your father before you even told him it was going to happen?

A.    I don't know what you're asking; what did we do financially?

Q.    Well, do you have some event that you might be able to draw your mind to that took place in November that related to separating your interests from your father?

A.    My brother up until that point had controlled the entities that owned the properties. If you remember, the children, the five of us own these various properties through entities.  My brother had controlled those entities.  He decided that he would turn over control, instead of just

himself alone, to the three -- to myself and -- and my sister, Becky, so three of us would have voting rights instead of just him prior to that.

Q.    And did you know, prior to your brother turning over control, did you know what was in these entities and how they were controlled?

A.    I had a sense, yes.  I was not intimately involved.  I was a passive limited partner and my brother was really running the entities.

Q.    So your brother was running the entities and it was his decision to turn over control to you; is that right?

A.    That's correct.

Q.    And other than --

A.    I'm sorry, I'm sorry, that's not accurate. It was his decision to turn over control to a combination of me, my sister, and him.  We all had equal voting rights instead of just him being in control by himself.

Q.    So he agreed or you agreed among yourselves and he effected it that he would share control of these various entities amongst you?

A.    That's correct.

Q.    And these are the entities you testified

Page 298

yesterday you didn't know how funds got into these entities but you do know that you didn't provide any personal funds to these entities; don't you?

A.    That's not an accurate -- that's not accurate.  That's not what I said yesterday.  Can I restate what I said yesterday?

Q.    No, let me withdraw the question then.

MR. POPEO:  Well, excuse me, Your Honor, you don't withdraw the question.  There is no objection.  He's asked it.  He's got a right to answer it.  He may not like the answer but he's asked a question.  You can not withdraw it.

JUDGE ABANY:  He asked him a question based on premise.  He said that that's not accurate and that therefore the question has evaporated.

MR. POPEO:  Fine.

JUDGE ABANY:  We're going to go forward.

Q.    What other unusual things did you do in November once you made the determination to sever your interests with your father?

A.    I don't -- I don't know what you're talking about.  I don't recall what you're talking about by unusual -- what unusual things did I do in

November?  I don't know.

Q.    Don't know.  Well, let me ask you this, sir.  Do you have any recollection at all that in November 2002 you and your siblings took distributions of almost 30 million dollars from these various trust entities that you say your brother John controlled?

A.    I didn't say my brother John controlled trust entities.  I don't know what you're talking about.

Q.    Do you know what I'm talking about when I say you and your siblings took distributions of almost 30 million dollars?

A.    We did not take distributions.  There was a trust, we were the beneficiaries of the trust.  My brother did not control that trust.  This is a separate entity that was set up many years ago.  The trustee distributed money to my siblings and to me and it was not 30 million dollars as far as I know.

Q.    Who gave the trustee instructions to distribute that money to you?

A.    I do not know.  I did not.

Q.    Who was the trustee?

A.    An institution called Harrington Trust

Page 300

Company.

Q.    Who was authorized to make requests to Harrington distributions be made?

A.    No one, just the trustee.

Q.    So it's your testimony here under oath that somehow, and you don't know how, the trustee in November decided to distribute 29 million dollars to you and your siblings?

A.    No, that's not my testimony.  You keep saying 20 -- you said 30 and now 29, that's not a correct number, one; two is I didn't have any contact with the trustees.  When -- any decisions they would have made they made without my knowledge or input.

Q.    Let's be careful about this, sir, because you are under oath.

A.    I did not have contact with --

MR. POPEO:  Excuse me, Your Honor. Excuse me, Your Honor.

JUDGE ABANY:  Okay, question, answer, question, answer.  You finish your statement.  You were saying something, Mr. Donovan?

A.    I'm saying that I did not ask the trustees to distribute money.  I don't have that power.  They

have the full power to make any decisions they like under the trust. I've never asked them to distribute money and I couldn't ask them to distribute money.

Q. Did you have discussions with John, Jr., about soliciting the distribution of money from the trust?

A. John mentioned to me that because he was the only one of us or the primary contact with the trustees who held these trusts for the benefit of the five kids, that he was going to discuss with them the abuse and what had happened; that was the extent of my discussions with my brother.

Q. So your testimony is the extent of your discussions with your brother was he was going to discuss the abuse with the trustees but you don't know what the purpose of that discussion was?

A. I at that time did not know what the purpose of these discussions with the trustees were.

Q. So you would have the Court believe that your brother John had a discussion with you telling you that he was going to go to Bermuda to discuss abuse with the trustees and you had no idea what he had in mind the outcome of that discussion would be?

Page 302

A.    That's correct.

Q.    So were you surprised when all of a sudden 4 1/2 million dollars was distributed to you and your wife during that month?

A.    No, the trustees had indicated to my brother that they were going to dissolve the trusts and distribute the remaining funds to the beneficiaries of the trust.

Q.    So you weren't surprised that you got 4 1/2 million dollars in November?

A.    I'm not sure of the number.  You keep saying 4 1/2 million dollars in November, I don't know if that's exactly the amount but was I surprised when the trustees distributed the money to us at that time?  No, because my brother had indicated that after discussions with them that they had indicated that they were going to dissolve the trusts.

Q.    Now, Mr. Donovan, do you receive so many millions of dollars a month that you can't testify to this Court with any degree of accuracy what the amount of money was that you received in November of 2002?

A.    I believe it was 4.6.  Something like 4.6

or 4.7 million dollars.

Q.    And when I said 4 1/2 million, that didn't refresh your recollection that it was 4.6?

A.    Well, you had said 30, then 29 and now 4.5.  I don't know the exact number.  I believe it was around 4.6 or 4.7.

Q.    To you?

A.    That's right.

Q.    And the same amount was distributed to each of your siblings; is that right?

A.    No.

Q.    How much was distributed to your other siblings?

A.    I believe that my three sisters each got the same amount and I do not know what my brother got.

JUDGE ABANY:  Mr. Klickstein, could I see you and the other gentlemen over here just a second?

(Side bar conference)

BY MR. KLICKSTEIN:

Q.    When you say you're supporting your sister who is married to Eric Rosenbaum in her divorce, how were you supporting her?

Page 304

A.   My sisters and I are all, first of all, emotionally supportive.  She has two young children and she's going through a divorce.  She feels very alone because she lives in New York and none of our -- she doesn't have any family members down there so it's a lot of conversations and emotional support with her primarily.

Q.   You're not suggesting that you financially supported her?

A.   Financially supporting her?  I don't believe I am financially supporting her in any way.

Q.   In fact, in your support of your sister, you went and had a negotiating session on her behalf with Doctor Rosenbaum and his father; do you recall that?

A.   Yes.

Q.   And you recall that you did meet with him and you tried to negotiate a settlement?

A.   I did.

Q.   All right, let's talk a little bit about the minimal relationship you had with your father.  You do recall that in about 1993 you asked your father to give you 5 million dollars and he did?

A.   What's that?

Q.    Do you recall, sir, that in 1993 you asked your father for 5 million dollars?

A.    No, I never did.

MR. POPEO:  Your Honor, we're getting into collateral matters that have absolutely nothing to do with this.  The objection all along has been this is not Sr.'s matter, this is Linda's matter. And, yet, this whole issue, everything that has been drawn here is about Sr., not about Linda in any way, and now we've gone from trusts to divorce to now a whole new subject matter, none of which was covered on direct, none of which goes to the issue of this witness' credibility at all because it's a collateral matter, so I want to put my objection on the record.

JUDGE ABANY:  Objection overruled. It was brought up on direct and you may continue.

BY MR. KLICKSTEIN:

Q.    So you don't recall that event?

A.    I never asked my father for 5 million dollars and he never gave me 5 million dollars.

Q.    What amount of money did your father give you in 1993 and 1994?

A.    I don't think he gave me any money in 1993

or '4.

Q.   Do you recall prior to 1995 that your father gave you a large sum of money?

A.   No.

Q.   So it's your testimony that you've never been given a large sum of money by your father?

A.   That's correct.

Q.   Did your brother, John, Jr., from entities that are related to your father or through trusts that he controlled give you 5 million dollars or an amount close to that?

A.   No, my brother doesn't control any trusts that have 5 million dollars in them.

Q.   Did you receive the sum of 4 or 5 million dollars sometime prior to 1995?

A.   My brother and I purchased a house in Bermuda as I testified earlier.  The money to purchase that house came from a trust, the same trust that we were talking about earlier as my brother and I were beneficiaries of the trust.

My father had nothing to do with that and didn't give me and I didn't ask for any money from him.  My brother doesn't control that and couldn't have asked the trustees to distribute that

money or any money, if that's what you're even talking about.

Q.    In the acquisition of this property in Bermuda, sir, how much of your own personal funds did you put into that acquisition?

A.    The money that came -- I was the beneficiary of the trust so the monies were distributed to me; those were my personal funds and that was used to buy the property in Bermuda.

Q.    And how much was that, sir?

A.    I believe it was about 5 million dollars.

Q.    Thank you, sir.  Now, sir, did there come a point in 1998 when you asked your father for a large sum of money?

A.    No.

Q.    Now, what was the state of the your relationship with your father in 1998?

A.    I don't recall exactly.  That was the year I got married to my wife.  So my relationship with my father would not have been great at that time.

Q.    And let me show you a document that's been marked Plaintiff's Exhibit 7 and 7A.

MR. KLICKSTEIN:  That's being given to Mr. Popeo as we speak.

Q.    Do you recognize that handwriting on page 7A?

A.    Sorry, on 7 and 7A, do I recognize it?  I believe it's -- no, I don't recognize the name really.

Q.    Now, on the envelope where it says Mr. and Mrs. James H. Donovan, 278 Cutler Road, Hamilton, Mass.; who is that, sir?

A.    That's me.

Q.    And it's addressed to Mr. John Donovan, 482 Bay Road, Hamilton, Mass.; is that correct?

A.    Yes, that's correct.

Q.    And that's your father?

A.    That's correct.

Q.    Turning to page 7A?

A.    Yes.

Q.    There's a note in there that says:  Dear Dad, we're both so excited about the dining room table and French sofa, they truly are the nicest gifts anyone has given to us as a couple and are so much more important to us because they came from you, exclamation point.  We will think of you each time we see/use them in our house.  We can't wait to have you and Linda over to enjoy them with us.

We'll see you soon.  Love Christy and James, dated November 9th, 1998.  You don't recognize your wife's handwriting; is that right?

A.  I can't say that I do.  Looks a little different but that would not be surprising -- I'm not surprised that she wrote this note because that was the year that we got married; this might have been -- I think it was the wedding gift that my father might have given us for our wedding which was in August of 1998.

Q.  Did you just testify three minutes ago that in 1998, the year you got married, that's when your relationship with your father was really bad?

A.  No, I did not.

MR. KLICKSTEIN:  All right, I would offer Plaintiff's Exhibit 7 and 7A as evidence.

MR. POPEO:  No objection, Your Honor.

(Documents marked as Plaintiff's Exhibit Nos. 7 and 7A in evidence.)

Q.  Now, sir, let me show you Exhibit 8.  Can you recognize your daughter's picture in Exhibit 8?

A.  Yes.

Q.  Do you recognize the birth announcement?

A.  Yes.

Q.    And is that announcing the birth of Emily April 12th, 2000?

A.    Yes.

Q.    Is that sent to Mr. and Mrs. John Donovan?

A.    Yes.

Q.    Some time after April 12th, 2000?

A.    Yes.

MR. KLICKSTEIN:  All right, we will offer that, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 8 in evidence.)

Q.    Let me show you Plaintiff's Exhibit 9.  Do you recognize that picture?

A.    Yes.

Q.    Is that a picture of your daughter, May 12th, 2000, one month old?

A.    Yes.

Q.    Is that a photo that your wife sent to Linda and John Donovan?

A.    I don't know.  I have no idea.

Q.    Do you have any idea how they would have got a picture of your daughter at one month old if

your wife didn't provide it?

A.    No, they have pictures of me skiing at Suicide 6.  I don't know where they get their pictures from.  But we may have sent this to them in 2000.  It wouldn't surprise me.

MR. KLICKSTEIN:  May I offer that, Your Honor?

MR. POPEO:  I don't have any objection, Your Honor.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 9 in evidence.)

Q.    Now, what was your relationship with your father in the year 2000 when Emily was born?

A.    I don't remember.  My relationship with him in the '90s and in 2000 through the revelation in '02 was very rocky.  I couldn't tell you year by year.  There were years that I went without talking with him and there were some years where I talked to him and saw him at social events as I told you.  I don't remember what my relationship was like in the year 2000 with him.

Q.    And your wife would regularly send him notes and pictures of your child; isn't that true,

sir?

MR. KLICKSTEIN:  Exhibit 10.

A.    I don't know.  She may have in the year 2000.

Q.    Now, can you recognize your wife's handwriting in Exhibit 10, sir?

A.    I think that looks like her handwriting.

MR. KLICKSTEIN:  We'd offer Exhibit 10.

MR. POPEO:  No objection.

(Document marked as Plaintiff's Exhibit No. 10 in evidence.)

Q.    And incidentally in Exhibit 10 your wife sends a note to John and Linda.  I thought you would enjoy having these pictures of Emily.  Hope your summer is going well.  Love Christy.  Is that what it says?

A.    Yes.

MR. KLICKSTEIN:  Okay, 11 and 11A.

Q.    On 11 is that an address label from your wife and addressed to Professor John -- excuse me, to Mrs. John Donovan?

A.    It is an address label from my wife and it's addressed to Mrs. John Donovan.

Q.    And you know that Mrs. John Donovan's address is Linda Donovan who's sitting in court today?

A.    That's right.

Q.    And if you look at 11A, is that a note that your wife wrote in November of 2000 to Linda?

A.    I don't know.  I can't say that I know.  I don't know that I have ever seen this note.

Q.    Can you recognize your wife's handwriting, sir?

A.    Looks like it, yes.

Q.    And that note says:  Dear Linda, what a fabulous surprise.  Thank you so much for the 8 by 10 framed picture and the album of smaller pictures from the joint meet hunt.

A.    Right.

Q.    They are so much fun to have.  It was extremely thoughtful of you to put this together for us.  I hope you gathered all the great shots of yourself as well to enjoy.  We hope to see you out Thanksgiving -- on Thanksgiving day.  Thanks again for your thoughtfulness.  Fondly, Christy and James.  Did I read that correctly?

A.    You did.

Page 314

MR. KLICKSTEIN:  We'd offer 11, Your Honor.

MR. POPEO:  No objection, Your Honor.

(Document marked as Plaintiff Exhibit No. 11 in evidence.)

MR. KLICKSTEIN:  12.

Q.   Again, can you recognize in 12, sir, that it's an envelope with your wife's address label addressed in her hand to Mr. and Mrs. John Donovan?

A.   That's right.

Q.   And is that a picture of your daughter, Emily, at her first birthday?

A.   It is.

MR. KLICKSTEIN:  I offer that, Your Honor.

MR. POPEO:  No objection, Your Honor.

(Document marked as Plaintiff's Exhibit No. 12 in evidence.)

Q.   Now, you said that you had very little, if anything, to do with Linda in the early days.  You, personally, now with Linda in the early days when she first was with your father; is that right?

A.   I said I had a purely social relationship with her.

Q.   Well, what else other than a social relationship would you expect to have with her?

A.   We were not close friends but I had a social relationship with her.  She was my father's third wife so I would typically see him with her or her with him and it was a social relationship. Casual, I would say.

Q.   And when you availed yourself of vacations at the Bermuda estate for several days, your father paid for you to come down there for those vacations, didn't he?

A.   I don't -- no, I don't remember whether he did or didn't.  There were times when he might have and there were lots of times when he didn't.

Q.   When you went down there was he the host?

A.   No, not -- not typically.  Sometimes my sister -- it was sort of a family thing.  My sister -- I don't know what you mean by "host," but my sisters would cook, usually with one of my brothers-in-law who was a good cook.  I'm not sure what you mean by was he was host.

Q.   It was a family thing and Linda was included as part of that family thing at the vacation, correct?

A.    That's correct.

Q.    Let me show you Plaintiff's Exhibit 13 and ask you if those photos contain your picture along with Linda vacationing in Bermuda in 1994?

A.    It says -- it says -- I don't know.  The note says July '94 or '95 so I can't tell you what year this was, but that is me vacationing with Linda in Bermuda.  I don't know when it would be.  My guess is in the '90s but that would be a guess.

MR. KLICKSTEIN:  We'd offer that, Your Honor.

MR. POPEO:  No objection, Your Honor.

(Document marked as Plaintiff's Exhibit No. 13 in evidence.)

MR. KLICKSTEIN:  Exhibit 14.

Q.    Can you tell us where that picture was taken, sir?

A.    Bermuda.

Q.    And who is in that picture?

A.    My brother, me, Linda, my father, my three sisters, Becky, Callie and Maureen and Maureen's husband, George.

Q.    Was that taken on a family vacation in Bermuda with Linda and your father?

A.    I believe so.  Probably the same one as the last picture but it --

Q.    You would frequently go more than one time a year, wouldn't you?

A.    I don't know what you mean by "frequently."

Q.    Let me withdraw that.  Would you often go more than once a year to Bermuda?

A.    On several -- I on several occasions went more than once a year.

Q.    Thank you, sir.

MR. KLICKSTEIN:  We'd offer Exhibit 14.

MR. POPEO:  No objection, Your Honor.

(Document marked as Plaintiff's Exhibit No. 14 in evidence.)

Q.    Now, in 1995 when your father and Linda got married, what was the state of your relationship with them at that time?

A.    I don't remember; that was ten years ago. I can't remember if that was an up or down time.  I think it was okay.  '95, same.  Social but not very close.

Q.    Well, in fact, sir, you participated in

Linda and your father's wedding, didn't you?

A.    I went to the wedding.

Q.    And you were part of the wedding party?

A.    No, I was not part -- I was not part of the wedding party.

Q.    You didn't dress up in the same outfit --

A.    No.

Q.    -- as everybody else in the wedding and join with them for wedding pictures?

A.    My father was in a white tuxedo, I believe, at the wedding and I don't remember what I was wearing but there was no wedding party.  It was a very small wedding and I was there just as my brother and sisters were there.

Q.    Let me be very specific about this, sir. Your father was wearing a white tuxedo?

A.    I thought he was.  I'm not sure but I remember him in a white outfit.  But I could be wrong on that.  It was, again, ten years ago.

Q.    And you could also be wrong in the fact that you didn't dress up in the same outfit as the rest of the wedding party?

A.    I don't remember but I don't think there was a wedding party.  I remember there was maybe 15

people or 20 people at the wedding.  It was a pretty small wedding.

Q.    Sure.  And of the 15 or 20 people, Professor Donovan's immediate family, you, his son, John, and he all dressed up similarly for the wedding?

A.    I thought I had khaki shorts on and a collard shirt.  I just don't remember what I was wearing, I'm sorry.

Q.    Well, for instance, you've been to some weddings in your day, you know, you've seen people in the wedding party with boutonnieres?

A.    I think everybody at this wedding wore a boutonniere because there were only about 20 people at the wedding.

Q.    Let me show you Exhibit 15 and ask you if that refreshes your recollection that, in fact, you participated as part of the wedding party at your father and Linda's wedding?

A.    No, I wasn't part of the wedding party but this confirms what I just said.  My father wore a white tuxedo and I'm wearing khaki shorts and a collard shirt.  That's my brother and brother-in-law and I don't believe this was a wedding party in the

traditional sense of the word.

Q.   All three of you are wearing boutonnieres on your left shoulder?

A.   That's right.

MR. KLICKSTEIN:  Thank you, we'd offer Exhibit 15.

MR. POPEO:  No objection, Your Honor.

(Document marked as Plaintiff's Exhibit No. 15 in evidence.)

Q.   Exhibit 15A is another -- some more pictures.  Those were taken on the beach?

JUDGE ABANY:  Do you have 15, counselor?

MR. KLICKSTEIN:  Did I take it away?

A.   I have it.

Q.   That was for the Judge.

Exhibit 15A, sir, are you in the top wedding picture of the wedding party?

A.   That's not the wedding party; that's a picture of the family.

Q.   And you participated in that picture?

A.   Yes, I'm in that picture.

Q.   And the picture below, that's you and your wife, Christy?

A.    No.

MR. KLICKSTEIN:    15A is the pictures.

A.    That's not my wife.

Q.    Who is that you're with in that picture?

A.    That's a girlfriend I was dating a long time ago in 1994, I believe, or '5 or something like that.

Q.    That was at your father's wedding?

A.    I don't know.  I don't know where that picture's taken.  It could have been.  Could have been.  I do not know.

Q.    Does it give you a hint that you're wearing the same boutonniere that you're wearing in the wedding pictures?

A.    Yeah, it looks like it could be the same wedding.

MR. KLICKSTEIN:    We'd offer that exhibit, Your Honor.

MR. POPEO:    No objection.

JUDGE ABANY:    Thank you.

(Document marked as Plaintiff's Exhibit No. 15A in evidence.)

MR. POPEO:    Your Honor, I don't have any objection to all of these coming in if he just

wants to put them in or for your sake so we save some time.

MR. KLICKSTEIN:  I'm doing it as quickly as I can, Mr. Popeo.

JUDGE ABANY:  Thank you.

Q.  Let me show you Exhibit 16 and ask you if you can identify -- and I will show you 16A at the same time.  Can you identify those pictures, sir?

A.  Yeah, that looks like it's us in Bermuda; that is I'm in it -- I'm in them.  I'm in those pictures.

Q.  Are you playing touch football on the beach in Bermuda with Linda Donovan?

A.  Looks like we're playing kind of a game. Maybe it's Frisbee or just horsing around.  I can't -- I don't know what we're doing.

MR. KLICKSTEIN:  Okay, we'd offer that one, Your Honor, 16 and 16A.

MR. POPEO:  No objection.

(Documents marked as Plaintiff's Exhibit Nos. 16 and 16A in evidence.)

Q.  Let me show you 17 and 17A.  Is that now your wife appearing in the picture?

A.  Yes.

Q.    Okay, when did you start dating your wife?

A.    We were married in 1998 so I would guess '96.

Q.    Okay, so you have no reason to think that this didn't occur summer of '97 as indicated on the picture?

A.    I don't know when it occurred.

Q.    Do you know from the location of the pictures where these pictures were taken?

A.    Look likes Bermuda.

Q.    Another family vacation at the Bermuda estate?

A.    Yeah, we pretty much once a year usually, as Linda said, in July or sometimes a little more often than that.

Q.    In 17 that's you sitting --

A.    Yeah, that's me.

Q.    -- in your bathing gear next to Linda having a casual breakfast apparently?

A.    That's right and Christy on my other side.

MR. KLICKSTEIN:  We'd offer 17, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

Page 324

(Documents marked as Plaintiff's Exhibit Nos. 17 and 17A in evidence.)

Q.   Can you identify your wife Christy in Exhibit 18?

A.   Yes.

Q.   Was that also taken in Bermuda while Christy and Linda were out boat riding together?

A.   It's taken in Bermuda on a boat and those two were on the boat.  I don't know who else was on the boat.

Q.   Thank you.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff Exhibit No. 18 in evidence.)

Q.   I have 18A that I should have shown you at the same time.  Does that show you and your father on the boat together and then the bottom picture, you, your wife, Linda and I don't know who the other woman is?

A.   The bottom picture is not me.

Q.   Oh, I'm sorry.

A.   That's my father, my wife, Linda, and I don't know who the other person is.

Q.    That's your wife Christy on the beach with your father, Linda, and one other person?

A.    That's what it looks like, yes.

MR. KLICKSTEIN:  We offer 18A as well.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you, counsel.

(Document marked as Plaintiff's Exhibit No. 18A in evidence.)

MR. KLICKSTEIN:  Does Your Honor have 18A because I seem to have two now.

JUDGE ABANY:  I have 18 and now I have 18A.

Q.    Let me show you Exhibit 19 and 19A, the October vacation in 1997 also in Bermuda, sir; is that correct?

A.    I have no idea when this -- I don't know the date of this picture but this is a picture of us in Bermuda.

Q.    From right to left can you identify the people?

A.    My father, Linda, me, my sister, Maureen, her husband, George, looks like my sister, Becky, and my brother-in-law, John, and George is holding a

child.

Q.   All right, and that's one of your nieces or nephews?

A.   I think so.

Q.   And your sister, Maureen, appears to be pregnant?

A.   Could be.  I don't know.

Q.   Does that help you fix the date at all?

A.   No.

Q.   All right.

A.   Maureen has five children.  I have no idea.  She's been pregnant a lot and I don't know -- so it doesn't help me to fix the date at all.

Q.   All right, 19A, does that also show you, your brother, your sister, John, and Linda Donovan and in the kitchen in Bermuda?

A.   It's two pictures of us in Bermuda, yes.

MR. KLICKSTEIN:  We'd offer 19 and 19A.

MR. POPEO:  No objection.

(Documents marked as Plaintiff's Exhibit Nos. 19 and 19A in evidence.)

Q.   Exhibit 20, one of Maureen's children in -- more of Maureen's children in this picture?

A.    Yes.

Q.    Can you identify the people in this picture?

A.    Becky, my brother, my sister, Becky, my brother, John, me, Christy.  I'm not sure if she was my wife then or not but she's now my wife, Christy. Linda, my father, Maureen, and her husband George. I don't know -- I can't recognize the person with the hat on because I can't see -- that could be one of my other sisters.

Q.    All right, and are both the little ones in that picture, Maureen's children?

A.    I think so.

MR. KLICKSTEIN:  We offer 20, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you, sir.

(Document marked as Plaintiff's Exhibit No. 20 in evidence.)

Q.    Now, you also saw your father in places other than Bermuda and socialized with him, didn't you?

A.    Yes.

Q.    You'd go out for boat rides on boats from

Seagate?

A.    From Manchester, Mass., sometimes, yes.

Q.    And riding you've testified in your direct testimony is something that's important in your life and your wife's life, correct?

A.    Correct.

Q.    And that was always important in your father's life; is that right?

A.    No.

Q.    How long has it been important in your father's life?

A.    It was always more important in my mother's life.  My father never really was a very good rider but he -- so he wasn't really into the animals or the riding.  But he has enjoyed riding for -- we've always had little ponies when we were kids.  We all enjoyed it for a number of years.  I don't know whether it was important or not to him.

Q.    And your father's entertained you at his home, just you and he and whatever girlfriend you were with to go riding from time to time over the years, right?

A.    You say his his home, what do you mean by that?  The homes were --

Page 329

Q.    I mean the place where Linda Donovan lives, where your father stays, and where you and the other children tried to evict Linda Donovan from; do you understand where that place is?

MR. POPEO:  Objection, Your Honor. That is inflammatory.

JUDGE ABANY:  Maybe you could couch it in a different way?

MR. KLICKSTEIN:  Certainly.

Q.    Let's call it Devon Glen; is that where the riding took place?

A.    Devon Glen which we own, the five children own, and after the sexual abuse was revealed to us we attempted to -- or we asked my father to leave Devon Glen.

Q.    Now, in answer to my question your father and Linda took you and girlfriends and subsequently your wife riding at Devon Glen on occasions over the years, didn't he?

A.    When you say took us we --

Q.    Took you --

A.    No, we would occasionally ride with them at Devon Glen over the years; that's correct.

Page 330

Q.    Let me ask it another way.  Did you ride with them as their guests, in other words, not just show up there and ride along with, but be invited to ride with them, go there for the purpose of riding with them?

A.    Yes, sometimes.

Q.    And showing you Exhibit 22 and 22A, is this an occasion when you and a young lady and Linda Donovan and your dad were riding at Devon Glen socially?

A.    That's a picture of me with a young lady -- with the woman I was dating back in 1994, I believe, with my father and Linda and then there's another picture of us riding.  I don't know where this is.  I don't recognize the trees and the grass and the structure there (indicating).  I don't know where -- I don't know where it's taking place.

Q.    All right, so you can recognize you at the event and riding with Linda and John but you can't be certain it was at Devon Glen?

A.    That's correct.

MR. KLICKSTEIN:  We offer 22, Your Honor.

MR. POPEO:  No objection.

Page 331

(Document marked as Plaintiff's Exhibit No. 22 in evidence.)

MR. POPEO: Your Honor, I don't know how to expedite this. We have been 50 minutes on photographs and I am -- excuse me, we have been 40 minutes on photographs and I'm willing to admit all of them and move to have them all identified. I'm willing to concede that from time to time they socialized with father, Linda, and -- but I think we we do want to finish today. If we do want to finish today we're certainly not making progress in doing so.

JUDGE ABANY: Thank you, Mr. Popeo, I'm going to let Mr. Klickstein continue, thank you.

BY MR. KLICKSTEIN:

Q. Now, from time to time you also got together with with your father and Linda and had dinners with them at restaurants; is that right?

A. That's correct.

Q. And that occurred occasionally over the years --

A. That's correct.

Q. -- when you'd go out as a family with your father, Linda, some of your brothers and sisters,

whoever was available, and Linda Donovan and whoever you were dating at the time, correct?

A.    That's correct.

Q.    Let me show you 23 and 23A and ask you if that's reflective of those dinners that you went to?

A.    Reflective?

Q.    Well, is that -- strike that.

Specifically, is this picture one of those dinners that you went to with your folks?

A.    I have no idea.

MR. KLICKSTEIN:  All right, we offer that, Your Honor.

MR. POPEO:  No objection to the photograph, Your Honor.

(Document marked as Plaintiff's Exhibit Nos. 23 and 23A in evidence.)

Q.    Now, as a horse person, does it make any difference whether you're riding my horse or Mr. Popeo's horse or your own horse?

A.    For what --

Q.    Assuming, of course, that Mr. Popeo and I would ever have a horse.

A.    What do you mean by does it make any difference?

Q.   Well, I know for instance when you're skiing it's important to have your own ski equipment; when you do certain sports they require specialized knowledge and equipment; and I'm asking if when you're riding you need to have any special relationship with the animal you're riding?

A.   I don't know what you mean by "special relationship."  It helps to know a little bit about the horse, whether it's young or old, or you know, dangerous or not or if -- you know, spirited or not. But I don't know -- so in that respect it's good to know a little bit about the horse.

Q.   And do people routinely let other people ride the horses they use for the hunt?

A.   Yes.

Q.   And is that something you'd do to someone that you didn't like or is it something -- a courtesy you would extend to a friend?

A.   I think you typically would let a friend or an employee or somebody like that use a horse as opposed to someone you didn't like.

Q.   Okay?

A.   Just like your car or anything else.

Q.   Let me show you a picture, Exhibit 25 and

25A, and I'll move this along and give you 26 at the same time.  And ask you if you can identify your wife riding Linda's horse in 1997 in that picture?

A.   I don't know.  I can't identify that that's my wife.  I can't -- I mean, at all in this picture.

Q.   Is that you in the foreground?

A.   It is.

Q.   If you look at 25A, are you able to identify your wife in that picture?

A.   No.

Q.   Are you able to identify yourself, though?

A.   Yes.

Q.   All right, who else in 1997 would you have been riding with at Devon Glen with another -- what other young lady other than your wife?

A.   My sisters, any number of people.  We're dressed up here which means that we're probably going to one of the formal parade hunts and this woman could be anybody.  Could be my wife but I don't know -- I don't know who it is.

Q.   Do you recall riding the hunt in 1997 when your wife used Linda Donovan's horse?

A.   I don't remember, no.

Q.    If you look at 26, again, the surroundings are Devon Glen, right?

A.    Yes.

Q.    And does that at all help you to determine whether or not riding along with you in this 1997 picture is your wife?

A.    No, I can't really -- no, it doesn't really.

MR. KLICKSTEIN:  We'd offer 25, Your Honor.

MR. POPEO:  No objection to the document, Your Honor.

(Documents marked as Plaintiff's Exhibit Nos. 25, 25A and 26 in evidence.)

MR. KLICKSTEIN:  Let me just state for the record, Your Honor, so my objection is noted, you have indicated that you were going to define testimony to the issues in this case; not one of these photographs, not one of these vacations, not one of these events take place during the period during any of these allegations.

And in relevance to any of the allegations these all predate them, some by as much as ten, twelve years.  And we're going on and on

with photographs of events that I'm willing to concede, vacations, events that took place prior thereto which have no issue whatsoever to do with any of the allegations of abuse that are in this case.

JUDGE ABANY: Unfortunately in this case credibility definitely is an issue. As you've heard, Mr. Popeo, there are contrary statements made by the parties and therefore credibility is an issue and therefore if someone makes a statement about what type of relationship someone's had or where one was or what something looked like on a certain day, even though it might not go to the specific incidents that I highlighted, it does go to credibility.

And I appreciate the tedium that this might produce but I feel obligated to let Mr. Klickstein give him some latitude in trying to establish what credibility or lack of credibility there is in this case.

MR. POPEO: I understand, Your Honor, we're talking credibility on collateral issues, not on direct issues and therefore none of the matters that we have been covering now for the -- almost the

last 45 minutes deal with this at all.

JUDGE ABANY:  Right, but credibility on collateral issues can shed light on credibility on the salient issues so I'm going to allow him a little more leeway.

MR. KLICKSTEIN:  I'm almost through, Your Honor, the numbers believe it or not end at 32 and we're going fast.

JUDGE ABANY:  I was hoping they would end in the 20s but go ahead.

MR. KLICKSTEIN:  We're getting up to what Mr. Popeo requested which is more current dates.

BY MR. KLICKSTEIN:

Q.  You stated that at the time that you became engaged to Christy and your marriage that your relationship with your father was at a low point; is that correct?

A.  No.

Q.  What was your relationship with your father at the time you and Christy became engaged?

A.  I would describe it as not terrific or not good I think I said but -- it was social but it was not terrific.  He didn't participate in my -- in my

wedding in the way that a father of the groom would physically participate at the wedding ceremony.  He was there at the wedding ceremony.

Q.   Well, sir, isn't it in fact true that the relationship with your father was so, quote, not good, as you said, that he and Linda threw you and an engagement party in their barn?

A.   My brother and my siblings and I owned that property.  My brother's idea was to have the party there.  My father agreed.  He thought it would be a good thing to do.  So my brother and my father organized a party in the barn at Devon Glen for us. It was an engagement party so -- you know, prior to our wedding.

Q.   Let me show you these pictures, Exhibit 27.  This is a picture taken at the engagement party in the barn?

A.   Yes.

MR. KLICKSTEIN:  We'd offer 27.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 27 in evidence.)

Q.   Did you also attend family events at other

siblings' houses?

A.    In?

Q.    In 1997 when you got engaged?

A.    Probably.

Q.    Do you recall that in '97 your sister, Maureen, used to have people over for Christmas?

A.    Yes.

Q.    And, in fact, at that Christmas party in 1997 all of the wives gave Linda Donovan a bouquet of flowers as a gift?

A.    I don't remember that but that could have happened.

Q.    Could have happened.  And is this a picture of that Christmas party, Exhibit 28?

A.    This is a picture at the house that Maureen was living in at that time -- or two pictures.  I don't know whether it was a Christmas party or not.  It could have been.

Q.    Well, do the table decorations give you any clue?

A.    Yeah, they're evergreen so it probably was around -- could have been around Christmastime.

Q.    And is Linda Donovan sitting there at the table with one of your nieces and nephews on her

lap?

A.    Looks like she is sitting with one of Maureen's children.

Q.    One of Maureen's children.

MR. KLICKSTEIN:  We'd offer 28, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 28 in evidence.)

Q.    Now, Exhibit 29 is a wedding photo.  It was taken at your wedding, sir?

A.    Yes.

Q.    Is that your father and Linda Donovan in the wedding picture?

A.    Yes.

MR. KLICKSTEIN:  We'd offer 29, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 29 in evidence.)

Q.    Now, shortly after the wedding you and your wife went to visit with and spend time with

your father at Seagate; is that right?

A.   Could have been.

Q.   And it was just the four of you; it was spending a little time, you, your wife, Linda, and your father, correct?

A.   Could have been, yes.

Q.   And Seagate is the estate in Manchester; is that right?

A.   That's right.

Q.   All right, is Exhibit 30 a picture of you, and your wife where you're standing with your arm around Linda?

A.   Yes, yes.

MR. KLICKSTEIN:  We'd offer 30, Your Honor.

MR. POPEO:  No objection.

JUDGE ABANY:  Thank you.

(Document marked as Plaintiff's Exhibit No. 30 in evidence.)

Q.   Now, do you recall visiting at Maureen's home in either 2000 or 2001 where Professor Donovan and Linda Donovan were present along with Maureen's children?

A.   I don't -- I'm sure it probably did happen

but I don't recall a specific example.

Q. All right, let me ask if Exhibit 31 helps refresh your recollection of one of those family visits at Maureen's house in 2000 or 2001.

A. That's a picture of me with my wife. My wife's holding a baby and then I have -- and then I have one of my nieces on my lap. But I don't know where that -- or when that is but it could have been -- it could have been in '00 or '01.

MR. POPEO: I don't have any objections to that, Your Honor.

Q. Can you recognize in the bottom picture before you scoot it up to the Judge -- in the top picture is that one of Maureen's children?

A. Yes.

Q. Do you know the child's name?

A. Yes, Olivia.

Q. And your wife is holding a baby in that picture; do you know who that baby is?

A. I don't. I mean, it could be -- it could be our daughter or it could have been one of Maureen's babies. I don't know.

Q. If the picture was taken in 2000 would it have been your child?

A.    No.

Q.    So if it was 2001 it could have been?

A.    If it was 2001 it could have been mine but if it was 2000 it wouldn't have been mine.

Q.    You can't recognize that baby?

A.    I can't, no.

Q.    So this picture wouldn't help you to say whether or not Linda Donovan or John Donovan have ever seen your child?

A.    They have seen my child; they have never met my children.

MR. KLICKSTEIN:  We'd offer 31.

(Document marked as Plaintiff's Exhibit No. 31 in evidence.)

MR. KLICKSTEIN:  I'm going to skip a few exhibits, Your Honor, you'll be happy to hear.

JUDGE ABANY:  Thank you.

Q.    And let me ask you if Exhibits 35 and 35A you can recognize what's generally occurring in those pictures?

A.    It's the beginning of a hunt which is -- I don't know if you want me to describe that or not -- but it's a gathering before one of the rides that we go on.

Q.    And this hunt is at the Myopia Hunt Club?

A.    It is not -- it doesn't look like it's at the Myopia Hunt Club but the Myopia group might be meeting somewhere else to go on a ride.

Q.    So it was a ride organized by that group?

A.    That's correct.

Q.    And there are people mounted, not mounted, people on the ground and around?

A.    That's right.

Q.    Is that generally what it looks like prior to starting a hunt?

A.    Yes.

          MR. KLICKSTEIN:  We offer 35 and 35A.

          MR. POPEO:  No objection.

          (Documents marked as Plaintiff's Exhibit Nos. 35 and 35A in evidence.)

          MR. KLICKSTEIN:  If we could take three minutes I may be able to shorten this considerably.  I think this might be a good point to take a break.

          JUDGE ABANY:  Certainly.

          (A brief recess was taken.)

          COURT OFFICER:  Be seated, the Court's in session.

Page 345

MR. KLICKSTEIN:  Your Honor, we made very good use of the break.  I have one more very short area and then we're going to conclude the cross-examination.

BY MR. KLICKSTEIN:

Q.    You testified, I believe, on direct examination, Mr. Donovan, that you've lived in Hamilton for approximately six years?

A.    Yes.

Q.    Do you know how long Linda Donovan has lived in Hamilton?

A.    I don't know.  I know that they -- my father and Linda have an apartment in Cambridge and they typically would stay there in the week and then go out to Hamilton on the weekends, Hamilton or Manchester, for the weekends.  For many years that's what they did.

Q.    Do you know for at least since the time that they were married Linda has spent, by your testimony, at least a good portion of the time in Hamilton, correct?

A.    A good portion of the time, yes.

Q.    Who is Lee Apgar?

MR. POPEO:  What was the name?

Hearing, Vol. 2                                                   01/25/2006

Page 346

MR. KLICKSTEIN:  Lee, L-e-e, A-p-g-a-r.

A.    Lee Apgar.  I'm not sure that I recognize the name.

Q.    Do you know Lee and Laura Apgar?

A.    Lee and Laura Apgar.  I believe their children -- I believe I do know them.  I think that their children go to school with my children.

Q.    Do you recall taking a flight to New York where you and Lee happened to be sitting together recently?

A.    With Lee Apgar?

Q.    Yes.

A.    No, I don't recall that.

Q.    All right, so do you have any recollection of telling Lee that you have purchased or acquired an interest through some entity in a 16 million dollar farm in Virginia?

A.    No, I don't recall telling Lee Apgar that.

Q.    Do you recall telling anybody that, in fact, you and your wife through some entity or another has acquired an interest in a farm in Virginia?

A.    Yes, we bought a home in Virginia, a

second home in Virginia, and we have told some people that.

Q.   And what was the purchase price of the second home you acquired in Virginia?

MR. POPEO:  Objection, Your Honor.

JUDGE ABANY:  Is it relevant?

MR. KLICKSTEIN:  Yes, it is.

JUDGE ABANY:  How so?

MR. KLICKSTEIN:  It's relevant to show his connection with the community, Your Honor.

JUDGE ABANY:  Go ahead.

A.   Purchase price was approximately 14.7 million dollars.

Q.   How much time do you plan in the future to spend in Virginia?

A.   We're thinking about moving my children and my wife down there because -- we're considering it because of the fear and because of everything that's gone on between the family and to protect my children from what's been happening in the community.  We're considering it.

MR. KLICKSTEIN:  No further questions.

JUDGE ABANY:  Thank you.  Redirect?

MR. POPEO:  Absolutely, Your Honor.

REDIRECT EXAMINATION

BY MR. POPEO:

Q.    What was the purpose of buying this home in Virginia about which you were just questioned?

A.    It was to buy a second home with the idea that we would look into the possibility of moving there because my wife and I are and have been for some time extremely afraid of my father and Linda because of all of the things that he has done.

Q.    I'm going to direct your attention to two photographs that you were shown, exhibits, Plaintiff's 5A and B which are photographs of a ski mountain.  And first let me show you the larger photo which has the individuals more visable.

MR. POPEO:  5B, Your Honor.

Q.    And first, do you know when that photograph was taken?

A.    No.

Q.    The ski outfit that you are wearing, is that one that you currently wear?

A.    Yes.

Q.    So that's a picture that has you in an outfit that is a contemporaneous outfit to what you

use to go skiing today?

A.    That's correct.

Q.    What are you doing in that picture?

A.    I'm stopped and I'm buckling my boots getting ready to ski.  And I don't -- and I don't have any ski poles.

Q.    Can you identify your wife and one of your children for me, please?

A.    It looks like my wife, Christy, up on the right and it looks like one of my daughters next to her.

Q.    And who is the daughter that is next to her?

A.    I can't tell by this picture.

Q.    Who does it look like?

A.    I mean, I don't know when the picture was taken and it's hard to see, but based on the size of that person, that child there, that looks like it's my older daughter.

Q.    How old is your older daughter now?

A.    5.

Q.    And if that picture were taken this year, that would be a picture of your daughter at age 5?

A.    That's right.

Page 350

Q.    Now, a year ago, obviously, going back to the event of January of '05 which is the event that Linda Donovan testified that you and your wife flanked her and in an affidavit it said that you skied by her; do you recall that testimony?

A.    Yes.

Q.    Now, why aren't you using ski poles?

A.    Because I -- when I ski with my daughters, as I mentioned earlier, you typically have them between your legs.  You can't have ski poles because they get in the way.  So when you ski with a young child you ski without poles so that you can grab them and pick them up if they fall, so you can be really close to them and have them right between your legs when you your skiing.

Q.    Could you direct your attention to the photo of your wife; she is not in possession of ski poles either, is she?

A.    That's right, she is not.

Q.    Where is the fourth child?

A.    My other daughter would have to be near me in this picture.  My assumption is she's either on the right or typically what happens is this looks like it's right when you get off the chairlift.  So

Hearing, Vol. 2                                                      01/25/2006

Page 351

I would have gotten off the chairlift with my daughter, younger daughter, bent down, buckled my boots, turned around and had them ski down to me and then the four of us would have gone down -- Christy's up ahead with my -- it looks like my older daughter because she would have gotten off the lift before me and done the same thing with her.  It looks like she's waiting for us.

Q.    Now, assuming this picture was taken a year ago, would you ever have left a three year old alone to ski by herself?

A.    No.

Q.    Would you have left her alone at the lodge?

A.    No.

Q.    Was there ever a time that you can recall when you go skiing with your daughters and your wife that you ski without them?

A.    No.

Q.    So when they are with you they ski with you?

A.    That's correct.

Q.    And you do not ski alone and they do not ski alone?

Page 352

A.    That's correct.  They are 5 and 4 now; 4 and 3 last year; 3 and 2 the year before.  You cannot ski -- you can't leave a three year old or four year old baby or girl on the mountain by herself.

Q.    Now, were you aware that someone associated with Linda Donovan was taking photographs of you and your family?

A.    No.

Q.    On the ski slope?

A.    No.

Q.    Were you aware that there was someone present there that had an interest in you?

A.    No, I had no idea and it's pretty alarming, again, not surprising but alarming, that they would do this.

Q.    Now, fastforward to this year when you went skiing.  I had indicated that one of the things you do is run in the morning.  Do you run in the morning when you go skiing as well?

A.    I do.

Q.    And on the occasion when you were skiing this year, did you observe anybody taking photographs of you?

A.    I did.

Q.    When was that?

A.    Same New Year's day of this year.  Same time as last year when we were up there in Vermont in the same house.  I went for a run and -- on that morning and there was someone taking rapid shots of me running in the town.

Q.    Where did that take place?

A.    In the town of Woodstock.

Q.    As you were jogging in the morning?

A.    As I was jogging in the morning.

Q.    Approximately what time of morning was this?

A.    Probably seven o'clock in the morning.

Q.    Were you aware that anyone had an interest in the clothing you were wearing?

A.    No.

Q.    Or the clothing that your children were wearing?

A.    No.

Q.    Now, let me direct your attention to the questions that were asked you about the eviction notice that was served by you and your siblings upon your father.  At some time -- you testified on cross

that the knowledge came to your attention some time in the fall or the winter of this sexual abuse that your father had committed upon Maureen.  How soon thereafter was the eviction notice sent?

A.    After we learned of it.  A few months, I think.

Q.    And was there an attempt to settle that matter and reach a negotiated settlement with your father on all issues that existed between you?

A.    Yes.

Q.    And did you reach a settlement?

A.    Yes.

Q.    And when was that settlement reached?

A.    It was signed March 3rd, 2003.

Q.    And by the terms of that settlement can you tell us how the matter of your father's occupancy of Devon Glen was resolved?

A.    He was to be given the ability to live at Devon Glen and all the properties for the rest of his life.  He was going to be given a life estate.

Q.    And Devon Glen, how many structures are on Devon Glen?

A.    There's a main house --

Q.    How many rooms in that main house

approximately?

A.   It's a big house.  I don't know, maybe it's 15 rooms, 20 rooms; something like that.

Q.   And what other structures are on the property?

A.   There are two or maybe three barns.

Q.   And do any of those have living accommodations?

A.   Yes, there's a very nice apartment alongside of and above one of the barns and there's also an apartment on the end of the house, the main house.

Q.   And how many acres does this property encompass?

A.   80.

Q.   And does your father live there rent free for life under this agreement?

A.   He does.

MR. KLICKSTEIN:  Objection.

JUDGE ABANY:  I'm going to allow it.

Q.   Just one question I forgot to ask you about this picture.  Do you know who that person is that is not a family member in the left-hand corner of that picture?

A.    I -- I don't -- I'm not certain.  It could be my mother-in-law.

Q.    It is not Linda?

A.    I don't believe so.  I've never seen Linda, again, on skis anywhere.

Q.    And has your father remained at Devon Glen using those 80 acres since that agreement was made?

A.    Yes.

Q.    Has there been any attempt to evict him thereafter?

A.    No.

Q.    Or in any way cause him to leave that property?

A.    No.

Q.    Now, you were shown an affidavit that was prepared and submitted in this litigation; do you recall that?

A.    Yes.

Q.    Who prepared that affidavit?

A.    The affidavit that I signed was prepared by my lawyers.

Q.    And by "your lawyers" you mean the attorneys at Mintz, Levin?

A.    That's right.

Q.   Now, going back to the incident at the club in the coat area, did you give your attorneys all of the information that you testified to in these proceedings before that affidavit was prepared?

MR. KLICKSTEIN:  Objection.

JUDGE ABANY:  Nature of the objection?

MR. KLICKSTEIN:  It's attorney-client privilege.  If he opens this up then anything he's told them is fair game now.

JUDGE ABANY:  That's true.  He may answer it if he wishes.

MR. POPEO:  I'm going to have him answer it.

Q.   Did you give your attorneys the information that went into that affidavit, the information -- did you give the attorneys all the information that you testified to on the stand prior to the preparation of that affidavit?

A.   I did.

Q.   And do you know whether or not the -- do you know what the purpose of that affidavit was?

A.   The purpose of the affidavit?

MR. KLICKSTEIN:  Objection, Your Honor, this has nothing to do with his direct examination.

MR. POPEO:  It has everything to do with the redirect.

JUDGE ABANY:  One at a time, please. The matter was explored on cross.  I'm going to give him the opportunity to explore it himself.  You may continue.

Q.    And do you know what the purpose of that affidavit was when it was being prepared for submission?

A.    It was to rebut or counter the allegations that Linda had made in her lawsuit and in this lawsuit regarding my supposedly grabbing her arm.

Q.    And do you know whether or not the omission of the threatening language that you testified to on the stand was deliberate or by oversight?

MR. KLICKSTEIN:  Objection, Your Honor, leading.

MR. POPEO:  It's calling for a, yes, or no.  I didn't ask him which of the two it was.

MR. KLICKSTEIN:  It's still --

Page 359

JUDGE ABANY:  I'm going tie allow it. Go ahead answer the question, sir.

JUDGE ABANY:  You might want to restate it for your client.

Q.    Do you know whether or not the omission of the allegations with respect to her threats to you were deliberate or by oversight?

MR. KLICKSTEIN:  Objection.

A.    I don't know.

MR. POPEO:  He doesn't know.  Thank you, Your Honor.

Q.    Now, were there other allegations about which you spoke to your attorneys that were omitted from that affidavit?

MR. KLICKSTEIN:  Objection, Your Honor.  I mean, really, we're going to be here for an extra week if he opens this area up.

MR. POPEO:  Your Honor, if we can tolerate these photographs for 50 minutes we certainly can go into the very heart, as he called it, "core" of his cross-examination.  He opened it up, not I.

MR. KLICKSTEIN:  Your Honor, with all due respect, I'm going to have to inquire from him

of all the conversations he had with Mintz attorneys in the preparation of these things.  If Mintz negligently failed to include things in these affidavits, whether it was negligence, whether it was tactics, and by asking him about these conversations with his attorneys, he's opening up that entire area.  I've never seen that in all of my 33 years.

MR. POPEO:  So now he has seen it.

JUDGE ABANY:  There's time for everything.  I'll give you some leeway, Mr. Popeo. I don't think it's going to be -- depending on his tactics, I don't think it's going to last too much longer, go ahead.

MR. POPEO:  That's right but it's very relevant.

Q.  Were there other allegations you left out?

A.  There were a number of other threats, as I mentioned before, that Linda and my father had made and allegations that I didn't mention in that affidavit because I didn't think that -- I thought the affidavit was -- the purpose of which was to counter her allegations, not to make allegations back at her.  For example, I mean, Mr. Klickstein

knows well I sat in his office --

MR. KLICKSTEIN:  Move to strike everything after "For example" as not responsive.

Q.    Okay, give us an example of one of the allegations that was not included that you knew of.

A.    I sat with Mr. Klickstein and Linda Donovan in his office --

MR. KLICKSTEIN:  Your Honor, this was a meeting we had for settlement purposes only.  Are we now going to give evidence of settlement meetings?

MR. POPEO:  The fact is that when there is an offer of compromise, the offer of compromise is not admissible in evidence.  But if there is matter that is discussed that goes beyond the offer of compromise, as this does, it is admissible in evidence under Massachusetts law, under federal law, and under the Proposed Rules of Massachusetts law.

So we are not going to go into an offer of compromise; we are not going to try to use this as an admission which the whole purpose of the Offer of Compromise Statute is it may not be used as an issue of liability.  But to the extent that

threats were made at that meeting in the presence of Mr. Klickstein, this witness has a right to testify to.

JUDGE ABANY:  Is your client going to testify that threats were made in a lawyer's office?

MR. POPEO:  Absolutely.

MR. KLICKSTEIN:  Your Honor, I find this the most repugnant creation of an issue.

JUDGE ABANY:  Gentlemen, gentlemen, let's just take a step back and relax for a second. Let's just take a step back.  I do not want to hear about anything that took place in a lawyer's office in regards to settlement discussions.  I'll note your objection, Mr. Popeo.  If he has other things he wants to say testify to --

MR. POPEO:  How about an offer of proof, Your Honor?  Will you take an offer of proof either by voir dire or I'll say it.  But you can have the offer of proof.

MR. KLICKSTEIN:  Your Honor, I object to him making an offer of proof on this.

MR. POPEO:  Your Honor, I am making a record, Your Honor, and I have a right to make an offer of proof whether or not an objection is made

and whether or not you rule on it; that's the whole purpose of an offer of proof.

JUDGE ABANY:  Well, we have already established that you wish to -- I don't think -- I think the record's clear, I think you're protected. I don't think I need to have -- I think you're protected, Mr. Popeo.

MR. POPEO:  I'm not protected, Your Honor, unless the Court has an opportunity to see what was excluded because --

JUDGE ABANY:  We already know.

MR. POPEO:  Just a moment -- I'm sorry, go ahead.

JUDGE ABANY:  Correct me if I'm wrong, we already know that your position is that some threat was made by Linda towards him in the course of negotiations.  So I think the record is clear that that's your position.

MR. POPEO:  The question of negotiation, Your Honor, she is not a party to any proceedings.  There is a court ordered mediation, she is not a witness in those proceedings.  She is not a party in those proceedings.  She is not a principal in any way.  And when a -- she is,

however, the complainant in this action and the whole issue in this action is whether or not she is by a preponderance of the evidence which will show that she is in immediate fear of bodily harm.

And if she is sitting in an office reading from a script and making allegations, I believe that weighs heavily on the issue of whether or not she has any fear, quite apart from whether or not it is immediate.

JUDGE ABANY: Okay, Mr. Popeo, I am not going to go into this line of questioning any further. If there are things outside of the lawyer's office that you want to bring up, fine. Your objection is noted for the record.

MR. POPEO: You're not going to permit me to make an offer of proof?

JUDGE ABANY: I am not going to permit you to make an offer of proof on some alleged threatening remark made in a lawyer's office, alleged. And your objection is noted.

MR. POPEO: Let me note for the record then, Your Honor, that I believe that ruling is inconsistent with taking an affidavit from a party that's not present here, Mr. Rosenbaum,

permitting a snippet to be used against us in these proceedings. I believe, Your Honor, that is disparate treatment with respect to how you are ruling on the evidence but I just wanted to say that for the record.

JUDGE ABANY: So noted.

BY MR. POPEO:

Q. Now, with respect to your relationship with your father, has he ever been introduced to your children?

A. No.

Q. Has he ever held your children?

A. No.

Q. Has he ever embraced any of your children?

A. No.

Q. To your knowledge, other than through pictures or seeing them at a distance, has he ever been in their presence in any social event of the family, any family gathering?

A. No.

Q. And are you familiar with any pictures of the type that Mr. Klickstein has introduced today that were taken after 2000, the year 2000?

A. No.

Q.    The incident that took place in the area of the Myopia club where the coats were; do you recall that?

A.    Yes.

Q.    That is alleged to have taken place in about February of 2002; is that correct?

A.    February 2003.

Q.    Excuse me, I'm sorry.  And thereafter did Linda Donovan seek a 209A complaint against you at some time thereafter in 2003?

A.    Yes.

MR. KLICKSTEIN:  Objection, Your Honor, beyond the scope of cross.

JUDGE ABANY:  That's correct I think -- that's correct.

MR. POPEO:  That was opened up, Your Honor, because -- he's opened up this whole area of the incident now.  This goes to credibility.  The credibility of Linda in terms of if she really was in fear of this incident that she testified against him in 2003, in February, then why is that she doesn't say so when she seeks an application --

JUDGE ABANY:  It's not that it's not relevant, but you've had Linda on the stand, you've

had the opportunity to cross-examine her. He's your client, you could have brought it up and it wasn't gone into in cross. We are in redirect now.

MR. POPEO: We did bring it up.

JUDGE ABANY: Yes, you had you're opportunity; that's the point now. We're on redirect.

MR. POPEO: I understand. He opened that area up again by going into the specifics of this and the issues of what he said and did not say in terms of fear and that goes to her credibility, not his.

JUDGE ABANY: I think we've dealt with that. We're going to move on from the restraining order that --

MR. POPEO: For the record, and I believe this is established already in the record, but I want to say at this time as part of the offer of proof that the Court can take judicial notice as well as the exhibit that has been put into evidence with respect to the 209A complaint by Linda wherein no reference is made to this prior conduct in that affidavit or in the 209A complaint.

BY MR. POPEO:

Q.    Now, you testified that at the time of the incident in February this coat area had no doors; is that correct?

A.    That's correct.

Q.    This was at a function that was taking place in that room?

A.    Right; that's right.

Q.    How many people were there?

A.    Roughly I would guess around a hundred people.

Q.    How many people were in that area that is shown in these photographs, in the immediate adjacent area, when you were going for your coat?

A.    There were people in that area where the coats were hung and there were people just outside of it.

Q.    Approximately how many?

A.    Maybe a dozen.

Q.    And at that time did anybody seek to come and intervene or say anything to you or to Linda about anything that was happening in that coat area?

A.    No.

Q.    Are you aware of any witnesses who may have observed this conduct at that time that has

been described by Linda in this court room?

A.    No, there are none.  And it didn't happen.

MR. POPEO:  Your Honor, I have no further questions of this witness.

JUDGE ABANY:  Thank you, Mr. Popeo. Mr. Klickstein, any recross?

MR. KLICKSTEIN:  Although, Your Honor, I really am not below going into the area that my brother opened up, I think the Court has adequate foundation on credibility and I'm going to decline his invitation to ask further in that area. I just do have one question.

RECROSS-EXAMINATION

BY MR. KLICKSTEIN:

Q.    Of course, that means, Mr. Donovan, with respect to the coat closet that there are absolutely no witnesses to your allegation that Linda threatened you in the coat closet, are there?

A.    That's correct as well.

MR. KLICKSTEIN:  No further questions, Your Honor.

MR. POPEO:  May I approach side bar, Your Honor?

JUDGE ABANY:  Certainly.

Page 370

(Side bar conference)

MR. ROBBINS:  Your Honor, we're going to call for Christine Donovan, Your Honor.

CHRISTINA DONOVAN, Sworn

DIRECT EXAMINATION

BY MR. ROBBINS:

Q.   Good morning, Mrs. Donovan.  Would you state your full name for the record, please?

A.   Christy Donovan.

Q.   To whom are you married?

A.   To James Donovan.

Q.   You may want to keep your voice up a little bit.

A.   I'm sorry, James Donovan.

MR. KLICKSTEIN:  I'm having trouble hearing her, I'm sorry.

A.   Christy Donovan.

Q.   And where do you live?

A.   In Hamilton.

Q.   And tell us where you grew up?

A.   In Hamilton.

Q.   Do you have family in Hamilton now other than your immediate family?

A.   I do.

Q.    Who are they?

A.    I have my parents and a brother lives with my parents and I have a grandmother.  We have our three children that live with us.

Q.    How old are your three children and what are their names?

A.    Emily is 5 1/2, Sophi is 4 1/2, and my son Clark is --

MR. ARZU:  Excuse me, Your Honor, I can't hear the witness at all.  Is it possible for her to speak up?

JUDGE ABANY:  Does that microphone actually amplify?

COURT OFFICER:  No, it doesn't.  It just records.

JUDGE ABANY:  I know it's difficult being in unusual surroundings but try to keep you voice up.

MR. ARZU:  Your Honor, may I sit in the jury box?

JUDGE ABANY:  Any objection, Mr. Robbins?

MR. ROBBINS:  Absolutely.

JUDGE ABANY:  I know it's an unusual

setting but as loudly as you can.

Q.    I think I had asked you how old your three children are and what their names were?

A.    Emily is 5 1/2, Sophi is 4 1/2, and Clark is almost 2.

Q.    And do you work?

A.    I work as a full-time mom.

Q.    I'm sorry, I couldn't hear you.

A.    Full-time mom.

Q.    Do you and Jim and your kids have occasion to see your -- first of all, do you know Linda and John Donovan, Sr.?

A.    I do.

Q.    And do they live on the same road that you and your husband live on?

A.    Yes, they do.

Q.    Approximately how far away?

A.    A quarter to a half-mile, somewhere in there, down the road.

Q.    Do you have occasion, you and Jim and some or all of the kids, to visit your parents in Hamilton?

A.    Quite often.

Q.    For what kinds of occasions?

A.   To stop by and say hello.  We go to the park, there's a park right beyond my parents' house, so oftentimes I will stop at the park -- at their house to go to the park.  We'll get together for dinner.  We'll have -- either go out to dinner, we'll go to their house.  I will have them come to the park with us, to different children's events after school or other areas around town.

Q.   Does Jim have family members who live in Hamilton as well?

A.   He does.

Q.   Who?

A.   His sister, Maureen, lives in Hamilton and our brother-in-law, Tripp, her husband, and their five kids.  His mother lives on the Hamilton-Ipswich line.

Q.   Do you and Jim and the kids have occasion to go visit with Maureen and her husband and their kids?

A.   We do.

Q.   In addition to visiting family members there, do you take the kids to places in Hamilton?

A.   We do.

Q.   How do you use the Town of Hamilton?

A.     I use it as the town that I've used my whole life.  Our bank is there, I go grocery shopping there.  We go out to lunch.  We go out to dinner.  There's parks, a couple of parks in Hamilton; there's another park in Wenham.  I have friends that live in Hamilton.  We go over for play dates; go to friends' houses for dinner in Hamilton.

Q.     When you pick up pharmaceutical stuff for your kids where do you buy it?

A.     That's at the CVS in Hamilton.

Q.     How often do you and your husband and the kids see Maureen and their -- Tripp and the five kids?

A.     I would say fairly regularly.  She has some kids who are similar in age to my kids and they really enjoy getting together.  And on all of the major celebrations:  Thanksgiving, Christmas, Easter, all the holidays, we get together as a family with Jim's other sisters and his mom so...

Q.     Now, you were married to Jim when?

A.     In August of 1998.

Q.     Has there been a period of time during which you and Jim have essentially been estranged from John Donovan, Sr., and Linda?

A.    Yes.

Q.    And what's that period roughly?

A.    Some time before my first daughter was born which would have -- she was born in April of 2000, so at some point in 1999.

Q.    And to your knowledge has John, Sr., ever met any of your kids?

A.    No.

Q.    Has Linda met any of your kids?

A.    No.

Q.    How would you characterize the relationship that you and Jim have with Linda and John Donovan, Sr., over the last four or five years?

A.    We -- I would say that we try and avoid them at all costs.  I try and protect my kids from them.  I have instructed my baby-sitters -- I'm sorry -- instructed my baby-sitters to stay away from them.

Q.    And when you say that you have -- you and Jim try to avoid them at all costs, what do you mean?

A.    If we see them somewhere that we're -- we just -- we try and go to the opposite place, totally different area, or we'll leave.

Q.    Why?

A.    Because we don't feel safe and we know that they're just going to -- I mean, I worry that they will kidnap our kids.

Q.    Why?

A.    Or do something to set us up.

Q.    On what basis?

A.    Because of the history that's there.

Q.    Let me show you pictures -- a picture that's I think been marked as Exhibit 5.

MR. ROBBINS:  Does the court have Exhibit 5B?  It's the blown up ski picture.  I have the non-blown up picture for the Court if that's easier, 5A, would the court like that?

JUDGE ABANY:  Please.

Q.    Can you identify yourself in that picture?

A.    Looks like that's probably me.

Q.    Can you identify your child?

A.    Yes.

Q.    That's next to you?

A.    Yeah.

Q.    Can you identify Jim?

A.    It could be him.  It looks like stuff that he's wearing but I can't -- I can't see his face.

01/25/2006

Page 377

Q.    Where do you go skiing every year with your kids?

A.    Well, we used to go up to Suicide 6 for the last four years or so and this year we have not gone there.

Q.    The last four years or so is roughly from 2001 to 2005 or thereabouts?

A.    Right.

Q.    You've taken your kids there?

A.    Yes.

Q.    Can you identify where you are there at Suicide 6?

A.    Looks like it could be -- because at the top they have a little hut for the ski patrol which could be on the left.

Q.    Were you aware at any time that there was anybody who had any reason to be taking pictures of you and your children?

            MR. ARZU:    Objection as to "any reason as to."

            JUDGE ABANY:    Will you rephrase the question?

            MR. ROBBINS:    Sure.

Q.    Are you aware that anybody associated with

Linda Donovan or John Donovan, Sr., was taking

pictures of you and your children on Suicide 6 at

any point in time?

     A.    I've never been aware of that incident,

no.  At other times but not this.

     Q.    You have been aware of John Donovan, Sr.,

and Linda taking pictures of you on other occasions?

     A.    At times.

     Q.    Would you tell the Court what those

occasions were?

     A.    (Pause)

     Q.    You may have to keep your voice up.

     A.    A couple of different occasions if we

would be -- if we were somewhere and they were at

the same place, whether it was a horse event or

social function, we would be trying to keep our

distance and at times I'd see them take out a

disposable Kodak camera.

     Q.    Who did you see do that?

     A.    Usually John Donovan.  And one particular

incident was extremely disruptive and I couldn't

even carry on a conversation.  He was --

     Q.    Tell us, first of all, where that occasion

took place?

A.    That took place at Devon Glen Farm.

Q.    What was the nature of the occasion?

A.    It was an award ceremony after a horse competition that I had competed in and had been invited to, and I was there to see how I did and to receive any ribbons or awards and trying to just talk to people.  And he was within 1 to 2 feet of me at times clicking, clicking, clicking, clicking, and -- and disruptive and people around me were commenting about it and -- and at one point he was standing -- he came around where I was having a conversation and he was standing directly behind me breathing down my neck.

Q.    Was that the same occasion or a different occasion?

A.    Same event.

Q.    Tell the Court what happened?

A.    And I was talking to a friend of mine and her mother and he literally was right there (indicating).  I could feel his clothing brushing against my back.

Q.    Where was he before he moved to your back to do that?

A.    He was across the room and then he moved

himself around and I didn't know where he was walking. All of a sudden he's directly behind me to the point where if I tried to move I was going to bump into him.

Q.    What did you do?

A.    I stood there because I felt safer talking to my friend and her mother than moving away and being by myself. And other people were saying, you know, Since when did you have a paparazzi? And, what, are you guys -- are you talking again? You know, He's taking pictures of you, he must want these pictures of you. I didn't want to leave and walk back to my car which was parked in a field because I was worried about what John and Linda would do.

Q.    Let me ask you about Suicide 6. You've indicated that you and Jim have gone with the kids every year to ski at Suicide 6 for the last -- well, for the years at least from roughly 2001 to 2005?

A.    Yes.

Q.    And was there a period of time when you and Jim would take the kids to do that?

A.    Yes.

Q.    When was that?

Hearing, Vol. 2                                                01/25/2006

Page 381

A.    (Pause)

Q.    What time of year was that?

A.    To go skiing?

Q.    Yes.

A.    It depends on the year but first couple of years.  So back in 2001, '2 or 3, it would be spring, February-March time.  And then last year and this year we rented a place for -- for the season.  So we'd start after Christmas and go the Christmas week and through March.

Q.    The place where you take the kids skiing, what kind of a slope is that?

A.    A fairly easy -- is that what you're asking?

Q.    Yes.  How old were the kids -- so the Court will know and take judicial notice of it -- how old were your kids on New Year's of 2005?

A.    They would have been 4 -- 4 1/2 and 3 1/2, approximately.

Q.    Did you expect to see John Donovan and Linda Donovan at Suicide 6?

A.    No, I had never seen them before.  In the other years that we have been there, I've never seen them.

Q.    In fact, were you at Suicide 6 on January 1st of 2005?

A.    Yes.

Q.    Who did you go skiing with that day?

A.    Jim was there and my two girls.  And I believe my parents and brother were staying with us that week.

Q.    Did you at any point on that date, to begin with, ski past Linda Donovan?

A.    No.

Q.    Slowly, quickly or in any fashion?

A.    I never saw her that day.

Q.    Did you ever flank her either alone or with somebody else?

A.    No.

Q.    Were you with Jim on the slopes at Suicide 6 during the period when you were out skiing that day?

A.    Repeat the question?

Q.    Yes.  Were you in Jim's presence --

A.    Yes.

Q.    -- your husband, Jim's, presence?  Did you see him ski past, flank, or have any interaction with Linda Donovan?

A.    No.

Q.    Did you see Linda Donovan on the slope that day?

A.    I did not.

Q.    Have you ever seen Linda Donovan skiing?

A.    I have never seen her ski.

Q.    Now, did there come a point on January 1st, 2005 when you heard from somebody else that Linda Donovan and John Donovan, Sr., were around someplace?

A.    Yes, my parents saw them.

Q.    How did you find out that your parents had seen them?

A.    Because they -- they saw them and we were, I believe, outside and they came -- or my mother, I believe, came to find us to tell us that she had seen John and Linda somewhere in the lodge.

Q.    I'm sorry, where were you and Jim and your children when your mother came over to you to say that she or your dad had seen John and Linda?

A.    We were getting ready to put on our skis to go up the chairlift.

Q.    And what -- was it your mom who told you?

A.    Yes.

Q.    What did she say?

A.    She said, you know, Jim, your father and Linda are here at the mountain.  We saw them at the lodge.

Q.    Do you recall what Jim did?

A.    He said, Where are they?

Q.    Okay, and then what did he do?

A.    And then she said she saw them walking -- she saw their backs walking towards -- on the left side of the lodge, opposite side from where we were heading in the other direction.  He said we're going to go up the chairlift the other way.

Q.    Can you say -- just for the record, because I got your gesture, your mom told you that Linda and John Donovan, Sr., were going in one direction; is that right?

A.    Yes.

Q.    And Jim indicated that you were going to go in --

A.    The opposite direction from where she last saw them walking.

Q.    Do you know why?

A.    Because we didn't want to bump into them or see them or come into any contact with them

whatsoever.

Q.    Have you ever at any time gone anywhere near Linda Donovan on any ski slope or any ski area anyplace?

A.    No, I have never seen her at any ski slope anywhere in my life.

Q.    Either on January 1st, 2005 or at any other time have you ever seen Jim anywhere near Linda Donovan on any ski slope doing anything?

A.    No, never.

Q.    Now, you are a rider, a horseback rider?

A.    Yes.

Q.    How long have you been a horseback rider?

A.    Since I was 8.

Q.    And over the last nine or ten years -- let's put it this way, since you married Jim how often do you ride?

A.    Quite frequently.  We tend not to ride December through April but during the spring, summer and fall I ride as much as I can.  Bringing up three young kids and being pregnant and nursing, you know, that's been limiting times but I would say --

Q.    That's what?

A.    That's been limiting, having children,

being pregnant and having newborns, but I would say fairly frequently. As much as I can.

Q.    And you and Jim are members of something called the Myopia club?

A.    Yes.

Q.    Just briefly what is that?

A.    It's a club that has a pool with a snack bar and casual dining area and there's tennis courts, golf courts -- I mean, golf course. Formal dining area. They will hold functions, they hold kids functions, they hold adult functions. They organize different events; they have the stables affiliated with the club. You don't have to be a member of the club to ride at the stables or keep your horse there, so it's somewhat separate.

Q.    Do you use the club -- we'll get to the riding in a second -- do you use the club for your kids?

A.    I do.

Q.    Under what circumstances?

A.    We use it fairly regularly. I go to the pool quite often and have lunch there at the pool occasionally. And more recently they started a few little tennis clinics.

01/25/2006

Q.    They have started a?

A.    Tennis clinics in the summer.

Q.    And John Donovan, Sr., and Linda are also members there?

A.    They are.

Q.    Do you from time to time see them at the same -- at that club?

A.    Yes.

Q.    And what do you and Jim do when you see them?

A.    We try and stay as far away from them as possible.

Q.    And why is that?

A.    Sometimes we'll leave the event and sometimes we'll stay at the event and just try and maintain distance.

Q.    By the way, have you or Jim ever moved over to where they are, in the last five, six years, have you ever moved over in the direction of where they are at any point?

A.    Never.

Q.    Why not?

A.    Because we're -- we have no desire to be anywhere near them because of how they make us feel.

Page 388

Q.   In addition to using the club as a place to bring your kids to swim, you and your husband go to events there as well?

A.   Yes.

Q.   What kinds of events?

A.   Some events that are children's events or brunches for Mother's Day or Easter.  Christmas, children's gatherings where Santa comes.  There's different occasions where you go -- we go to dinner together or with friends either in the casual dining area or the more formal area.  There's other -- if we're riding some of the riding events take place there and start at the club.

Q.   You do ride at certain special events that the club holds?

A.   Yes.

Q.   And some of those events that the club holds use the property which is called Devon Glen?

A.   Right.

Q.   And is that by agreement, everybody's agreement to your knowledge?

A.   Yeah, the equestrian events, they change places, change properties, and with the agreement of people living on those properties they are able to

start the events there or pass through different properties. And that's how we're able to ride as big groups through the territory and the lands there.

MR. ARZU: Your Honor, I'm going to ask the relevance of this line of questioning and as to the riding and --

MR. ROBBINS: Well, there are allegations and it goes to credibility about which we heard a fair amount since Linda Donovan has alleged that Christy Donovan and Jim Donovan flanked her and boxed her in and so forth. I'm entitled to ask about whether or not that ever occurred since the Court has indicated credibility is an issue here.

JUDGE ABANY: I'm going to allow it. Go ahead, counsel.

MR. ROBBINS: Thank you.

Q. There's something called a Thanksgiving hunt?

A. Yes.

Q. Tell the Court what that is?

A. It's a riding event with horses.

MR. KLICKSTEIN: Can she keep her

voice up, Your Honor?

A.    It's a riding event with horses and I'd say it's one of the biggest and most largely attended of the year.  It's one of the last ones of the year.  There are many, many riders and many spectators that have made it their custom, their tradition with their families and young kids to observe and watch.

And there's a location that's chosen -- the last few years it's been the same location in the field and you are on your horses; those people participating are riding their horses.  And at the start of the meet you have to check in and all the people watching are sort of intermingling with the people on horses as well and -- and then it's about a two- or three-hour ride through the country and the trails and the woods through different land owners and properties in the area.

Q.    All right, let me ask you --

MR. ROBBINS:  I don't know if the Court has Exhibits 35 and 35A available?  It's -- the note that I have is 2004 Thanksgiving on the top?

JUDGE ABANY:  Yes.

MR. ROBBINS: May I approach, Your Honor?

JUDGE ABANY: Yes.

Q. Have a look at Exhibits 35 and 35A which at least according to the notes say Thanksgiving 2004. There are, as you can see, a fair number of people milling around; are you able to identify at what point of the event that would be?

A. (Pause)

Q. By the way there is a Thanksgiving hunt; is that correct?

A. Thanksgiving Day -- Thanksgiving Day Hunt; this looks like the beginning.

Q. Does Linda Donovan play a role in these hunts?

A. She does.

Q. Tell the Court, please, what that role is?

A. She is the -- as her title would be the hunt secretary.

Q. Now, if you want to participate as a rider in the hunt, you have to register?

MR. ARZU: Objection, Your Honor, leading.

MR. ROBBINS: I'm sorry, it's a

foundation question, Your Honor.  There's not much of a dispute about it.

Q.    How does one enroll in a hunt?

A.    Well, you would -- at the beginning of every meet you would go to the hunt secretary or whomever is checking horses in, which is usually the hunt secretary, which would be Linda, or her assistant which would be standing right next to Linda, and they have a clipboard with all the names of the people and they would check your name off as -- as being there and present.

Q.    Is there any way once you're there to check in without going over to the hunt secretary and handing in your form?

A.    No, and it's not a form.  It's just you announce yourself by name saying, "Christy and Jim Donovan are checking in."

Q.    Now, in 2004 did you participate in the hunt?

A.    Yes.

Q.    And did Jim as well?

A.    He did.

Q.    Did you go together?

A.    We went together.

Q.    Were you together the entire time?

A.    The entire time.  We always ride together.

Q.    And did you check in?

A.    I did.  I usually check in for the two of us.

Q.    You say -- well, let's ask you this:  How did you check in?  What did you do in order to check in?

A.    Well, I'm on my horse so I would find Linda or her helper with the clipboard and go up and stand a few feet away and just announce myself by name and say I'm checking in.

Q.    Do you have any choice -- is there any way of registering other than doing that?

A.    No, in fact, we get reminders constantly through e-mail that you check in by name at the beginning of every meet, typically 15 minutes before, at the start of every ride.

Q.    Now, you told us that you checked in for Jim; is that right?

A.    Yes.

Q.    By which you mean to say that Jim stayed away when you checked in?

MR. ARZU:  Objection, Your Honor,

Page 394

leading.

JUDGE ABANY: Well, if you could just phrase it differently?

BY MR. ROBBINS:

Q. Where was Jim when you checked in?

A. He would walk towards the person with me and then he would just stop his horse and I'd continue forward because he simply doesn't want to be in a close proximity to Linda or his father. So I will announce -- I just announce it for the two of us.

Q. I'm sorry, I couldn't hear you?

A. I just announce that Jim and I are checking in.

Q. Now, Mrs. Donovan, did you ever flank Linda Donovan that day?

A. Meaning what?

Q. I don't know. Did you ever have contact with Linda Donovan or stay at her side?

A. No.

Q. Did Jim ever do so?

A. No.

Q. Were you with Jim the entire time?

A. Jim the entire time.

Hearing, Vol. 2

01/25/2006

Page 395

Q.    Did you box in or provide half of a box to the side of Linda Donovan that day?

A.    While I'm on my horse?

Q.    Right.

A.    While she is on her horse?  No, never, never, never did.

Q.    Well, did you -- let me do it this way. Did you and Jim ever box in Linda Donovan that day for 30 minutes?

A.    Never did.

Q.    20 minutes?

A.    It's physically impossible.

Q.    Any minutes?

A.    No minutes.

Q.    Did Jim Donovan have any contact with Linda that day?

A.    No contact.

Q.    Other than checking in and saying, Linda Donovan and Jim Donovan are checking in, or words to that effect, do you have any contact with Linda Donovan that day?

A.    No contact.

Q.    Have you ever followed Linda Donovan in any way?

A. No.

Q. Talked her?

A. Never.

Q. Malevolently lingered at her house?

A. Never.

Q. Have you ever threatened her in any way?

A. I have never.

Q. Have you ever seen Jim get his horse close to Linda's horse?

A. No, never have. In fact, she usually is riding in a completely different section.

Q. Let me ask you that; what do you mean by that?

A. There are typically two fields when you're riding with the hunt: There is the Hill Topping Field which goes more slowly and takes off in a very different route through the territory and then there's the Jumping Field which goes faster and goes through the jumps and takes a faster route.

And she often is the Hill Topping Field Master which is the first person leading the Hill Toppers, the slower group, and we are way far ahead and we ride in the front of the jumping field. And other than the beginning of the meet and perhaps

certain times when we would stop very occasionally throughout the hunt, we would never see her.

Q.   Let me turn your attention to two evenings.  There was a dinner of some kind held at the Myopia club within the last several years in which your table was placed next to the table of John Donovan, Sr., and Linda; do you recall that?

A.   Yes.

Q.   Do you recall when that was?

A.   Yes.

Q.   When was it?

A.   I believe that was the fall of -- fall of last year.

Q.   2000 --

A.   2004 -- well, 2004, right, not '5.

Q.   And had you and your husband arranged to have a table of which friends of yours would be seated?

A.   Yes.

Q.   And how did you arrange that?

A.   I called up friends, asked if they would join us and sit at our table at the function.  And there was about -- I think there was ten of us total at the table.

Q.    Approximately how many people were at this dinner?

A.    Hundred -- 120 to 150 perhaps.

Q.    I'm sorry?

A.    Or more, I can't remember.

Q.    Did you have any idea that the table that you and your guests were going to be sitting at would be next to or near to the table in which John Donovan, Sr., and Linda were going to be sitting?

A.    No idea.

Q.    Did you arrange for that to occur?

A.    No.  You don't have a choice about where your tables are.

Q.    When you got there what did you do to know where you were supposed to sit?

A.    You arrive and when you walk in there's a table where two people were seated checking people in and then telling you what your table assignment was.  And then there's a chart that you go and look at to see where in the ballroom area that your table was located.

Q.    Did you and he desire to be seated at the table next to John Donovan and Linda?

A.    No, the opposite.

Q.    What's that?

A.    The opposite.

Q.    Why?

A.    Because of the history that they have created in terms of making us feel very uncomfortable and false accusations and the allegations that they make.

Q.    What are you referring to?

A.    I'm referring to another restraining order, the fact that she's suing me.

MR. KLICKSTEIN:  Could she keep her voice up, Your Honor?

JUDGE ABANY:  If you could keep your voice up?

A.    You know, she is suing me and my husband for assault.  They have just always -- since this thing erupted they have made us feel very uncomfortable.

Q.    Did you stare at either John or Linda Donovan that night?

A.    No.

Q.    The night of this dinner?

A.    No.

Q.    Did Jim Donovan place himself at the table

that was assigned to you guys in a way so as to be close to Linda or John Donovan?

A.   No.

Q.   Where was he seated vis-a-vis their table?

A.   I believe he sat on the side of our table that was as far away physically as he could sit from their table.

Q.   Were you in his presence the entire evening?

A.   Yes.

Q.   Did you follow or shadow or talk to Linda Donovan that night?

A.   No.

Q.   Or at any other time?

A.   No.

Q.   Did Jim Donovan follow or shadow or talk to Linda Donovan that night or any other time?

A.   No.

Q.   Let me ask you about an incident which is said to have occurred in February of 2003.  Let me direct your attention to a -- some kind of a fund raising related event that occurred on an evening of February 2003 at Myopia; do you recall that?

A.   February of 2003, yes.

Q.    Do you remember the event?

A.    I believe it's when the equestrian committee for Myopia was trying to raise money to renovate the barn and the stables there.

Q.    And you were there with Jim?

A.    Yes.

Q.    And approximately how many people were also there?

A.    About 75.

Q.    Linda Donovan was there?

A.    Yes.

Q.    How long did this event last?

A.    Couple of hours.

Q.    Did you or Jim go over to Linda at any point that night?

A.    No.

Q.    Where in relation to Linda did you and Jim stay?

A.    As far away as we could.

Q.    Now, at some point -- first of all, it was a February night; did you and Jim bring coats that night?

A.    Yes.

Q.    Was there an area of the room in which

this was held where there were places set aside to hang your coats?

A. Yes.

Q. Now, at some point you went in and got your coat?

A. I did.

Q. And that was because you were going to leave?

A. Right.

Q. At some point thereafter did Jim go in to get his coat?

A. Right, yes.

Q. And this area, was it enclosed in any way as of February of 2003?

A. No.

Q. I'm sorry?

A. No.

Q. Is it enclosed now?

A. At times. I think there is times when the doors may be closed or open.

Q. Do you recall whether or not the area in which the coats were -- which people went to hang their coats was open in February of 2003?

A. I remember it being open.

Q.   Now, do you recall waiting for Jim when he got his coat?

A.   Yes.

Q.   And do you recall him coming out and getting you to go?

A.   Yes.

Q.   Would you describe for the Court his demeanor when he came out and got you to go?

A.   I would say that he was upset and -- you know, he was upset about something and unnerved.

Q.   When you say "unnerved," what do you mean?

A.   He just didn't seem himself.  He seemed uncomfortable.

Q.   Did he indicate to you what had occurred in there?

A.   He said that when he had gone to get his coat that Linda was in there.

Q.   Did he indicate why he was upset?

A.   He said that Linda had threatened him.

Q.   I'm sorry?

A.   He said that Linda had threatened him.

Q.   Finally, there is somebody named Eric Rosenbaum?

A.   Yes, Rosenbaum.

01/25/2006

Q.    Rosen --

A.    -- baum.

Q.    And he was or is in the process of no longer being married to Jim's sister, Callie?

A.    They're going through a divorce.

Q.    I'm sorry?

A.    They're going through a divorce.

Q.    And have you and Jim been supportive of Callie in this process?

A.    Very.

Q.    What has that entailed?

A.    Talking to her on the telephone, having her and the kids come up for family events, Thanksgiving and Christmas.

Q.    How old are her kids?

A.    Charlie is 5, I believe, and I think Lucy is 3 1/2.

Q.    Now, are you aware that there has been an allegation that at a dinner involving you and Jim and Callie and Eric Rosenbaum, Jim threatened or asserted that if he could kill his father and get away with it, he would; are you aware of that allegation having been made?

A.    Yes.

MR. KLICKSTEIN: Your Honor, may we approach side bar?

JUDGE ABANY: Sure.

(Side bar conference)

BY MR. ROBBINS:

Q. I had asked you whether or not you were aware that an allegation had been made that at a dinner in November of 2002 with you and Jim and Callie and Eric, Jim had said something to the effect of if I could kill my father and get away with doing so, I would do that; are you familiar with that allegation?

A. Yes.

Q. Is there any truth to that allegation at all?

A. No truth.

Q. Has Jim ever made such a threat or such a statement?

A. I've never heard him threaten that to anybody.

MR. ROBBINS: That's all I have.

JUDGE ABANY: Thank you.

MR. KLICKSTEIN: Could we have a one-minute necessary break?

JUDGE ABANY:  Certainly.  Feel free to step down, if you'd like, for a few minutes.

(A brief recess was taken.)

THE CLERK:  All rise.  All right, please be seated.  Court is in session.

MR. ARZU:  May I inquire, Your Honor?

JUDGE ABANY:  You may, sir

CROSS-EXAMINATION

BY MR. ARZU:

Q.    Good afternoon, ma'am.

A.    Hi.

Q.    How long have you been married to James Donovan?

A.    Since 1998.

Q.    When did you first meet James Donovan?

A.    In 1996.

Q.    Is that when you started dating?

A.    Yes.

Q.    And you have three children; is that correct?

A.    Yes.

Q.    Now, you testified that you like to ride horses; is that correct?

A.    Yes.

Q.    And James rides with you?

A.    Yes.

Q.    Have you been riding horses together for some time?

A.    Since I first met him.

Q.    Now, you testified that in February of 2003 you went to an event at the Myopia Hunt Club; is that correct?

A.    Yes.

Q.    And you went with your husband?

A.    Yes.

Q.    You said there were approximately how many people at that event?

A.    75.

Q.    75 people.

A.    I'm not good with numbers though.

Q.    Where was the event held?

A.    At the lower clubhouse at the Myopia Hunt Club.

Q.    I'm going to show you a photograph.

        MR. ARZU:  May I approach, Your Honor?

        MR. ROBBINS:  Is that the same one that --

(Photograph shown to Mr. Robbins)

MR. ROBBINS:  It is okay, thank you.

BY MR. ARZU:

Q.   Was this a view of the room that the event was held in?

A.   Yes.

Q.   You said there were about 75 people in that room; is that correct?

A.   My best estimate.

Q.   I'm going to show you another photograph.

MR. ARZU:  Your Honor?

Q.   Is that the area in the room where the coats were stored?

A.   Yes.

Q.   Is that the appearance that the coat room had at that time?

A.   No.

Q.   Other than the fact that there are no coats in the room at that time?

A.   No, there were no doors at that time.

Q.   Was it open to view?

A.   It was open to view at the time of the event, yes.

Q.   And you're saying beyond the fact that

there were no doors there, that's the appearance of the coat room; is that correct?

A.    To the best of my memory.

Q.    Okay, thank you very much.

Now, you testified that at that event you arrived with your husband; were you with your husband the entire time?

A.    Yes.

Q.    You never left his side?

A.    Not that I remember.

Q.    So it's your testimony that you never left your husband, so you were present when your husband went to get his coat?

A.    I was standing a few feet away.

Q.    Were you with your husband when he went in to get his coat?

A.    At the doors.  I was at the doors to leave which are right outside of that area.

Q.    When I asked you the question, "Were you with your husband the entire time?  You answered, "yes," correct?

A.    Yes.

Q.    And I said "Were you with him?"  Not, "Were you near him?"  Is that correct?

01/25/2006

MR. ROBBINS:  Objection, Your Honor.

JUDGE ABANY:  It's allowed.

A.    I considered it the same.

JUDGE ABANY:  Overruled, go ahead. I'm sorry, why don't you ask her again so we can all hear.

Q.    I asked if you were with your husband the entire time; is that correct?

A.    Yes.

Q.    And you testified that you were with him the entire time?

A.    Yes.

Q.    You testified on direct examination that you actually went to get your coat first; isn't that correct?

A.    Correct.

Q.    At the time you went to get your coat your husband was not with you, was he?

A.    He was right behind me.

Q.    He was not with you, was he?

A.    We were there together so I guess you need to define "with" for me.  I don't understand that. I considered him with me the entire time.

Q.    When you went to get your coat, ma'am, did

you see Linda Donovan in the coat room?

A.   I did not.

Q.   Now, you say that you were near enough to your husband that -- you were by the door when he went to get his coat; is that correct?

A.   I was by the door waiting to leave while he got his coat.

Q.   Were you facing your husband when he went to get his coat?

A.   I was not looking directly at him.

Q.   Did you see your husband go to get his coat?

A.   I knew he was going to get his coat.  I don't remember whether I was looking at him exactly when he went to get his coat.

Q.   The question, ma'am, was did you see him go get his coat?

A.   No, I did not.  I don't remember.

Q.   I'm sorry, did you see him or you don't remember?

A.   I -- I don't remember seeing him going to get his coat or any -- I did not see Linda in there so...  To the best of my knowledge, I guess, I did not see him actually get his coat off the rack.

Q.    In connection with this application, you filled out an affidavit; is that correct?

A.    I'm sorry?

Q.    In connection with this application you filled out an affidavit; is that correct?

A.    The application for this?

Q.    For this 209A order?

A.    I believe so, yes.

Q.    In fact, you filled out an affidavit and a supplemental affidavit; is that correct?

A.    Yes.

JUDGE ABANY:  Counsel, do I have that in my packet?

MR. ARZU:  You should, Your Honor.

MR. ROBBINS:  Your Honor, this actually may be a good point to put -- I know you have received them, but to make sure that they have marked all the affidavits that have been submitted from our side.  I don't know if you want to do that now or after this witness but since you're not sure if you have these affidavits, I thought I might do it now.

JUDGE ABANY:  Actually, I just wanted to take a look at it while counsel --

01/25/2006

Page 413

MR. ROBBINS:  Why don't we provide the one that we have.  Have we provided them?

THE CLERK:  Yes.

JUDGE ABANY:  Is it in here perhaps?

(Pause)

JUDGE ABANY:  Here we go.  Here we go.  Actually, I think I have two of these.  Do we want to number these as we go along?

MR. ROBBINS:  That would be correct from our perspective, Your Honor.

JUDGE ABANY:  Now, we have the affidavit of Christina Donovan and the supplemental behind it...

MR. ROBBINS:  This way Your Honor can retain his set and we can have marked, if I'm following it properly, we can have marked as exhibits in the hearing itself essentially the second set.

JUDGE ABANY:  I think I actually have two sets anyway.  Whatever's easiest.  But presently I do have the affidavit of Christina Donovan and perhaps in that case I'll wait until after this witness is finished.  Okay, counsel, is this what you have, sir?

MR. ARZU:  Yes.

JUDGE ABANY:  What I just received is supplemental, but let's proceed.

MR. KLICKSTEIN:  Do you have the supplemental?  His Honor doesn't have that?  Mr. Robbins is handing that up.

JUDGE ABANY:  Thank you, it may be somewhere.

MR. KLICKSTEIN:  It was duly served and noticed.

JUDGE ABANY:  Thank you both.

MR. ARZU:  Your Honor, may I approach the witness?

JUDGE ABANY:  Yes.

Q.   I'm showing you your affidavit; is that your affidavit, ma'am?

A.   Yes.

Q.   Is that your signature on the back page of the affidavit?

A.   Yes.

Q.   And you submitted that affidavit in connection with this case; is that correct?

A.   Yes.

Q.   You submitted and you're attesting to the

fact that the facts that you allege in the affidavit are true; is that correct?

A.    Yes.

Q.    And you did so in support of the motion to deny this restraining order; is that correct?

A.    Yes.

Q.    And you did so at the request of your attorneys to make sure that the information that you had would be in that sworn form; is that correct?

A.    I guess.

Q.    Did you actually write the affidavit?

A.    No.

Q.    The affidavit was prepared by your attorneys; is that correct?

A.    Correct.

Q.    And you gave them the information to prepare the affidavit; is that correct?

A.    Correct.

Q.    And you gave them all the facts that you needed because you wanted the affidavit to be complete; is that correct?

A.    I gave them the facts and they put together the affidavit.  I read through it to make sure that they were accurate and true and I signed

01/25/2006

my name at the end.

Q.   Now, testified that when your husband came out of the coat room he seemed distracted; is that correct?

MR. ROBBINS:  Objection.

A.   No.

JUDGE ABANY:  Slow down.  Basis of the objection?

MR. ROBBINS:  Misstates the testimony.

JUDGE ABANY:  Right, she is going to correct it.  I don't think she actually used that word and she said she didn't.

Q.   You described her husband's demeanor when he came out of the coat room; is that correct?

A.   Yes.

Q.   What was your description of his demeanor?

A.   That he was upset; that he was unnerved.

Q.   He was upset and he was unnerved; is that correct?

A.   Yes.

Q.   And you attributed that to Linda Donovan threatening your husband in the coat room; is that correct?

A.    After he told me that she did.

Q.    He told you that she threatened him; is that correct?

A.    Correct.

Q.    Can you look in your affidavit and point to where you state that Linda Donovan threatened your husband?

A.    I don't know if that specifically is in here or not.

(Witness perusing document)

Q.    So you did not put that in the affidavit?

A.    I'd have to read through the whole thing to see if that's in here.  I don't remember if that specifically is in here.

JUDGE ABANY:  Take your time.

(Witness perusing document)

MR. ROBBINS:  Your Honor, I think, for the record, that I'm not certain that February 2000 --

A.    That's not in here.

MR. ROBBINS:  I'm not certain that the 2003 allegation is even covered by this affidavit.

A.    No, it doesn't talk about that.

Q.    Let me direct your attention to paragraph 5 where it talks about the two social events that are described in the complaint.  You deposed and stated in the affidavit that you were with your husband; is that correct?

A.    What -- what -- do you have Linda's paragraph 4 in her affidavit?

Q.    You read the affidavit, did you not?

A.    I did read the affidavit and I -- and I will sign my name to the fact that we made every effort to avoid the two, John and Linda, and that I never saw my husband voluntarily interact with her, Linda or his father, John, at these two events and did not physically threatened or menace Linda whatsoever.

Q.    And paragraph 5 you said that those two social events that you were with your husband and those allegations are untrue; is that correct?

A.    Do you have -- may I see her paragraph 4?

              (Document presented to the witness)

A.    So what I signed my name to there is accurate.

Q.    You signed your name that that was untrue?

A.    That was untrue.

Q.    That her allegations of what happened in February of '03, that was untrue; that's what you signed your name to, correct?

A.    I signed my name to exactly what was written on this paper which would be that you made every effort to avoid John and Linda and I've never seen my husband interact -- voluntarily interact with Linda or John and he did not physically threaten or menace Linda nor has he ever done so.

Q.    But you didn't put in that Linda threatened him at the February event, did you?

A.    It wasn't for me to put in.  My lawyers did not put that in here.

Q.    Did you discuss with your lawyers what should go into the --

MR. ROBBINS:  Objection, Your Honor. That's an entirely privileged communication.

MR. KLICKSTEIN:  Your Honor, may I be heard?  Mintz, I believe, waived attorney-client privilege for this proceeding.

MR. ROBBINS:  No, we have not done such a thing.  He's asking about a communication between Linda --

JUDGE ABANY:  Actually, Mr. Robbins,

if I remember right, when Mr. Popeo had James on the stand I think we went into that; didn't we?

MR. ROBBINS:  Yes, we did, but Christy Donovan, first of all, there is no waiver of the attorney-client privilege.  Moreover, Christy Donovan is a party in a different suit.  Even if there was a waiver it wouldn't apply to Christy Donovan and communications with her counsel.  So the disclosure of communication would be totally unwarranted.  It's entirely --

JUDGE ABANY:  She's a different person than James.

MR. ARZU:  I'll withdraw the question.

JUDGE ABANY:   Thank you.

Q.   The fact is that your prior testimony about James coming out appearing distressed appears nowhere in that document, does it?

A.   No, it does not.

Q.   And your testimony that Linda threatened James in the cloak room appears nowhere in that document, does it?

A.   Does not.

Q.   I'm showing you your supplemental

affidavit, you filed a second affidavit in this matter, did you not?

A.   I did.

Q.   And in this affidavit -- this affidavit was done subsequent in time to the first affidavit; is that correct?

A.   Yes.

Q.   And in that affidavit you had the opportunity to put additional facts about what happened; is that true?

A.   I did.

Q.   Can you show me in the supplemental affidavit where in February 2003 it's alleged that Linda threatens James Donovan?

A.   It is not in the supplemental affidavit.

Q.   Can you show me in the supplemental affidavit, which again was filed later in time to the first affidavit, where you observed your husband come out of the cloak room and appear to be distraught?

A.   I don't believe that the affidavit's -- it was my understanding that they were not going to be inclusive of all of the facts of this case and so I didn't sign my name to the fact that every -- every

piece of information was going to be included in this.  There was no statement saying that this is all that I would be able to testify to.

Q.    I understand.

A.    It's only par -- it's only certain things that my lawyers decided to put on paper to have me sign the truth that they were accurate.

Q.    Well, let me ask you a question.  You testified at great length to the amount of fear which you feel at the hands of Linda Donovan; is that correct?

A.    Linda and John, yes.

Q.    And the Professor John Donovan; is that correct?

A.    John Donovan, yes.

Q.    And you testified, I think, to an event that occurred where Mr. Donovan was taking pictures; is that correct?

A.    Yes.

Q.    And you testified you felt how close he was pressed up against you?

A.    Yes.

Q.    And that you were terrified by this; is that correct?

A.    I wouldn't say "terrified," I'd say he made me feel extremely uncomfortable.

Q.    Extremely uncomfortable?

A.    To the point where I could not continue conversations with people, with friends of mine --

Q.    Can you show me in either one of your affidavits where it says that?

A.    -- and to which I had to apologize to.

Q.    Can you show me in any of these affidavits where you describe one of these events?

A.    They're not in either of these applications.

Q.    So your testimony is that you produced on the stand earlier about how the Professor's actions made you uncomfortable, how you were afraid because of all the picture taking that was going on, you didn't see fit to include those in your affidavits?

A.    They are not in these affidavits.

Q.    You testified that there was, in fact, an entire campaign of people taking pictures of you and your family; is that correct?

A.    No.

Q.    Did you testify that at the event -- I believe your testimony was that the Professor was

Page 424

within one to two feet of you snapping pictures constantly, click, click, click; was that your testimony?

A.    That's correct.

Q.    And your testimony was that you were uncomfortable by that?

A.    Yes.

Q.    And you heard testimony that -- excuse me, you gave testimony that on the ski trip you were informed by your parents that the professor was there; is that correct?

A.    I'm sorry, I don't know who "The Professor" is?

Q.    Professor Donovan.

A.    Mr. John Donovan?

Q.    Is there more than one Professor Donovan in the family?

A.    I don't know.  I know John Donovan.

Q.    Professor John Donovan Sr.?

A.    Yes.

Q.    And that you are, in your words, desperate to be in a place where he was not?

A.    That we made attempts to stay away from them physically.  When we knew that they were in the

same place as we were, we would many times leave the place and many times we would not leave the place but we would keep our distance as much as we could.

Q.  Now, your testimony was that you were afraid that the professor and Linda may try to kidnap your children; is that correct?

A.  Yes.

Q.  Did you ever file a 209A protective order?

A.  I never have, no.

Q.  So your testimony before this Court is that you're afraid that these people were going to kidnap your children and you saw fit to be, I think your term was, wherever they were to be opposite from them, as far away as you could?

A.  I keep my children as far away as I can.

Q.  And you try to keep you and your husband as far away from them as you could; is that correct?

A.  When we can.

Q.  And you never sought to get a 209A protective order against Professor Donovan and Linda Donovan?

A.  I have not taken that measure yet.

Q.  May I have the exhibit back, please? Thank you.  Do you have Exhibits 5A and 5B in front

Page 426

of you, the photographs taken on the ski slopes?

A.    I have exhibit -- whoops -- I have Exhibit 5B.

MR. ROBBINS:   The Court may have 5A.

JUDGE ABANY:   I believe a smaller version but -- I mean, they're duplicates, an enlargement I should say.

Q.    And that was taken at Suicide 6; is that correct?

A.    I believe so.

Q.    I believe you testified on direct examination that that would be you in the blue looking back; is that correct?

A.    It could be.  It's similar to the clothes I wear but I can't see the face.

Q.    You testified that the figure next to you was your daughter; is that correct?

A.    It could be.  Again, I can't see her face.

Q.    In relative size, in comparing the size, which daughter would that be?

A.    It's hard to say because the perspectives are hard for me to tell.

Q.    And you testified that the clothing that the individual with his back to the camera is

consistent with the ski clothing that your husband

wears; is that correct?

     A.    Could be, yes, and I can't see all of it.

     Q.    But you testified on direct that that's

the clothing that he wears?

     A.    Similar to it, yes.

     Q.    Now, you testified that you were given --

you went to an awards that was given in Devon Glen

for your horseback riding; is that correct?

     A.    The award ceremony, right.

              MR. KLICKSTEIN:  Your Honor, could

she keep your voice up?

     A.    The award ceremony, yes.

     Q.    When did that event take place?

     A.    It would have been spring of 2004.  I

can't exactly remember.

     Q.    But you were at --

     A.    I believe it was after a hunter trials;

that typically happens -- one in the spring and one

in the fall, but I believe this was a spring event.

     Q.    And that was at Devon Glen Farm; is that

correct?

     A.    The award ceremony was at Devon Glen, yes.

     Q.    In fact, was it indoors or outdoors?

Page 428

A.    It was mostly indoors.  It was in the barn.

Q.    It was in the barn at Devon Glen Farm. And the Professor Donovan, John Donovan, was there, was he not?

A.    He was there.

Q.    And, in fact, you arrived at that ceremony fairly early; isn't that correct?

A.    No.

Q.    In fact, you were probably one of the first to arrive; is that true?

A.    No, I was not.  I made sure I was not because I had somebody come with me as a -- as a witness and I -- I arrived when everybody else was arriving.  All the cars were -- you know, there were many people there already when I got there.

Q.    And, in fact, you were one of the last to leave; isn't that correct?

A.    No, I was not.

Q.    You were not one of the last to leave?

A.    I was not one of the last to leave.

Q.    Well, how many people were there in total?

A.    It's hard for me to say.  Perhaps 50 to 75.

Q.    And you testified that you were talking in a circle with people when John Donovan, Sr., was taking pictures of you; is that correct?

A.    There were different points in time where I was having conversations with people and sometimes he was standing further away taking pictures, sometimes he was standing directly behind other people facing me taking pictures.  He was taking pictures with me receiving my ribbon.

And in fact I noticed he continued clicking the camera even after the film was out because on the disposable cameras, usually when you rewind it, it stops at a certain point when the picture is ready to be taken, but he was rewinding, rewinding, rewinding and -- but you can keep clicking and the flash keeps going off on these disposable cameras.  He kept doing it even after the film ran out simply to harass me and make me feel uncomfortable.

Q.    Devon Glen, is this where Professor Donovan and Linda Donovan live?

A.    That's where they live.

Q.    So it's unusual for the Professor to be taking pictures at an event at his home; is that

your testimony?

A. No.

MR. ROBBINS: Objection, Your Honor, she could not know how unusual it is to --

JUDGE ABANY: She's answered, we'll move on.

Q. You testified at some length as to your ties to Hamilton; is that correct?

A. Yes.

Q. Your family lives there?

A. Correct.

Q. You take your children to visit relatives in the area; is that correct?

A. Yes.

Q. I believe you even testified that you shop at the CVS there; is that correct?

A. Yes.

Q. Do you run into Linda Donovan when you go to your relatives with your children?

A. She is not at their house but in other areas of Hamilton I will see her.

Q. So you see Linda Donovan -- well, how often would you see Linda Donovan in Hamilton, every day?

A.    No, not every day.

Q.    Every week?

A.    Perhaps every week.

Q.    Where would you see her?

A.    At the CVS or at Myopia Hunt Club or at other equestrian events that were held throughout -- around the area.

Q.    Isn't it true that the only contact that you have with Linda Donovan is when you and she attend events at the Myopia Hunt Club?

A.    That's not true.

Q.    Isn't it, in fact, the only events you and Linda Donovan have in common are the horse events at Myopia Hunt Club?

A.    That's not true.  There are social events as well and that we have R.S.V.P.'d, no, to because we felt that there was a high likelihood that they'd be there.

Q.    And the social events at the Myopia Hunt Club, for example, you continue to go?

A.    There are certain events that we go to and others we choose not to.

Q.    In fact, even at the Thanksgiving hunt you even registered with Linda Donovan?

01/25/2006

A.    Which Thanksgiving hunt?  Everybody at the hunt is registered with -- either checking in with Linda or her assistant that is next to Linda.

Q.    Now, you said you've been married since 1998; is that correct?

A.    Yes.

Q.    And you and your husband have been living in the same house together and have three children; is that correct?

A.    Yes.

MR. ARZU:  I have nothing further, Your Honor.

JUDGE ABANY:  Thank you.  Any redirect?

MR. ROBBINS:  I have no redirect, Your Honor.

JUDGE ABANY:  Okay, you may step down.

THE WITNESS:  Thank you.

JUDGE ABANY:  Thank you.  Gentlemen, we'll take a luncheon break.

MR. ROBBINS:  Your Honor, I think I may be able to help in this regard.

JUDGE ABANY:  Are you going to buy

lunch?  Just joking.  Go ahead, please, Mr. Robbins.

MR. ROBBINS:  We want to offer, if the Court will have them, the affidavits of each of the witnesses we have submitted as part of the Court file.  We'd like to have them marked as exhibits in the case so that there is a record of them having been admitted.

JUDGE ABANY:  Here's what we're going to do.  I'm not going to attend this thing that I have to attend this afternoon and I can se we have some work to do.  What I'm going to ask you to do is -- this file is voluminous.

And in fact I did find, finally, I guess it was passed up, I did find the affidavit of Christine and the supplemental in one of these piles.  What I'm going to ask you and your brother to do is go through the files, go through what I have, what has been received as evidence in this case, make sure that we have that marked and add them as part of the record.

The affidavits I'm not accepting.  I'll hear you after lunch if you wish.  The only affidavits I am accepting of are the ones that we've dealt with in this hearing which is the ones with

Christina, obviously, that were marked just now; the ones I read yesterday that were marked and I believe that's the -- and later on if you wish me to add in any other affidavits my intent is not to.

MR. ROBBINS:  Does that include Carl Potter and Jim Donovan and the exhibits from the Jim Donovan deposition?

JUDGE ABANY:  Did that come in yesterday?

MR. ROBBINS:  That has not been marked as an exhibit.  We had been proceeding, I thought, as though it had been marked as part of the record in the case.

JUDGE ABANY:  I thought I instructed when we let those witnesses go yesterday, I read those affidavits in lieu of live testimony, so those should be part of the record.  I'm trying to think back.  Was the Carl Potter affidavit used in any way?  I mean, he was mentioned of course but was it used for impeachment?  I don't remember.

MR. KLICKSTEIN:  I'm sorry, Your Honor, which one are you referring to?

JUDGE ABANY:  Mr. Robbins referred to Carl Potter's affidavit.  Did we use that in any

fashion yesterday?  I don't remember reading it.

MR. ROBBINS:  We can bring him in to testify if that's what the Court's preference is?

JUDGE ABANY:  If you agree that I should take that as part of the evidence in this case I will.  But, I mean, I have a plethora of affidavits.  What I'm going to decide on is what I've heard in the courtroom and any affidavits that you've agreed that I should read and consider.

MR. ROBBINS:  The ones that you are presently in that posture --

JUDGE ABANY:  Right.

MR. ROBBINS:  -- consist of the deposition testimony of Messrs. Lambara, Jaworski, the court testimony of Jeremy Clark, as I recall. You remember he was somebody who was excused because there was this testimony that he had given.

JUDGE ABANY:  If there was I'd have it marked with tabs.  If those are the ones you agreed on, those are the ones I read yesterday.

MR. ROBBINS:  Those are exhibits to Jim Donovan's affidavit.

JUDGE ABANY:  Over lunch you and your brother will tell me what we agree on is what I'm

going to consider, okay?  If there's any questions we'll resolve it today.

MR. ROBBINS:  Will you permit us to be heard for ten minutes on the closing?

JUDGE ABANY:  After lunch definitely. In fact, I appreciate, Mr. Robbins, I was trying to get to this seminar but I'd be late if I left right now.  So rather than to do that I'm just going to have everybody relax.  We've spent a lot of time, it's an important case, interests are serious.  So we'll come back at 2 and I'll give you plenty of time to argue.  Of course I'm going to -- I haven't asked, is there any more live testimony?

MR. ROBBINS:  Well, I think that may depend on whether or not we can agree on the affidavits.

JUDGE ABANY:  And actually, Mr. Klickstein, I suppose I should ask you, too, this may not be an answer you can give me right now, but Professor Donovan is still not available, I assume?

MR. KLICKSTEIN:  He was called by them.  I had no desire to call him.

JUDGE ABANY:  I apologize; that's correct.

MR. KLICKSTEIN:  If we resolve the Potter issue, the only other witness that I would have to go on is two minutes of Linda Donovan and that would be solely to authenticate Exhibit 5A since there's an issue of when it was taken and what it was.

JUDGE ABANY:  Okay.

MR. KLICKSTEIN:  And that would be it.  I would have nothing -- anticipate nothing else.

JUDGE ABANY:  Okay, so why don't we do this:  We'll take the luncheon break, you both gentlemen have a little work to do.  I'll give you more time, of course, so we all agree on what the Court is considering at this hearing.

And, again, not to -- if you can agree on affidavits that you wish me to take a look at, that's fine, but in all honesty what I'm considering is the live testimony I've heard, the affidavits and the deposition testimony that was agreed upon that should become part of this case. Anything else, if you don't agree on it I'll hear you after lunch.

MR. KLICKSTEIN:  Thank you, Your

Honor.

MR. ROBBINS:  Let me ask the Court, is it the Court's position that the Court's going to take the Rosenbaum affidavit excerpt?

JUDGE ABANY:  Oh, yes.

MR. ROBBINS:  But not the affidavit that has been submitted in response to that affidavit excerpt?

JUDGE ABANY:  Talk to your brother. Christina's is here; that's one of them that's already come in she says never took place; there's testimony from James never took place.

MR. ROBBINS:  There's --

JUDGE ABANY:  If there is more talk to your brother and If you can agree.  And if not I'm going to rule; simple as that, okay?  Again, I apologize I have -- well, get yourself some lunch, when you come back -- I'm going to leave these here. I'm going to ask you to go through these with the clerk and see if you can agree at least initially what's come in and what I'm considering.  And then what additional things you want me to consider, whether there's an argument about that or not, fair enough?

MR. KLICKSTEIN:  No problem.

MR. ROBBINS:  Thank you, Your Honor.

(Luncheon recess)

COURT OFFICER:  All rise.

JUDGE ABANY:  You may be seated.
Counsel, are you waiting for your brother?

MR. ARZU:  Yes, thank you, Your
Honor.

(Pause)

JUDGE ABANY:   Thank you.

Yes, thank you for your yeoman's work
over the luncheon recess.  I know there was a lot of
paperwork and the Court appreciates your making the
record as clear as possible so thank you.  Now,
where are we now, gentlemen?

MR. ROBBINS:  Your Honor, we're at a
state where I think that the parties have agreed as
to the submission of certain affidavits and
deposition excerpts to be marked as exhibits and if
that is correct, maybe I'll have Mr. Ford walk
through that and if that's correct then we'll be in
a position to rest as I indicated.

I just found to out that Mr.
Klickstein would like to call Linda Donovan to

provide some additional testimony so I will need to examine her as indicated in chambers and then possibly put on a quick rebuttal to rebuttal.

JUDGE ABANY: Okay, Mr. Ford, as to the depositions that we're going to enter that haven't been made part of the record, do you have knowledge of what those are?

MR. FORD: Yes, but -- yes, Your Honor, but for the record and convenience of the Court there have been two changes to the exhibit numbering that should just be made part of the record at this point and that would be that the exhibit marked as No. 7, that being some paperwork from Vermont, has now been marked Exhibit 7P for "Potter" simply because there were three Exhibit 7's prior to this.

Similarly, there are two sets of exhibits that span the numbers 8 through 13, one series of those exhibits were the photographs from the coat area at the Myopia Hunt Club; that problem has been rectified by numbering those 8C through 13C. Otherwise, the numbers continue -- 7C, thank you, through 13C. Otherwise the numbers continue sequentially with the exception to several

omissions.

Secondly, Your Honor, as it pertains to the deposition testimony, there are two categories of deposition testimony. The first of which is and was attached as Exhibit Q to the affidavit of James Donovan and the second of which was the rebuttal submission offered by Linda Donovan's attorney in the superior court that has been apparently marked as an exhibit.

It is our position, Your Honor, that the deposition testimony ought to stay attached as Exhibit Q of the James Donovan affidavit which ought to come in in its entirety, that way maintaining the integrity of the document, that way making sure that the entire affidavit is, in fact, complete which in fact was a subject of cross-examination of Mr. James Donovan, whether or not his affidavit was a complete and accurate document.

I believe that the opposition to this procedure of keeping it as an intact document is that certain attachments to the document are objectionable and not relevant. But as you may recall, Your Honor, the history of litigation between the parties and related parties is very

pertinent in our position as to why this 209A was sought in the first place and we'd like to maintain that record and make it clear.

And, in fact, we avoided spending even additional time yesterday with the clerk in not going into all those documents with the understanding and expectation that the entire affidavit would be admitted. So to now take it apart piece-by-piece when, in fact, it would be prejudicial to Mr. James Donovan by excluding evidence that he anticipated would be admitted and also evidence that he was cross-examined on.

JUDGE ABANY: Do you wish to be heard, counsel?

MR. KLICKSTEIN: Just very briefly, Your Honor. We have agreed on most of the affidavits that we think should come in as well as supplemental deposition extracts which had come in and with respect to the folks that have left and -- your clerk during the break has marked all of those exhibits. We think we have narrowed down the numbers.

The problem with the James Donovan affidavit is that it's an affidavit that is more

usually done -- it is really two affidavits in one. One affidavit is an affidavit of precipient witness talking about things he was involved in, he observed, he heard, he saw and he knows about or that people have told him about that relate to the events that are part of this transaction.

The other affidavit is much more like the affidavits we're used to in complex civil litigation where an attorney files an affidavit and says attached hereto are true and correct copies of various documents. There isn't any issue that they have attached copies of various pleadings from various courts and we're not arguing about the authenticity of those documents. But those are attached to James Donovan's affidavit and they're not properly part of this record before the Court unless there was cross-examination or examination about those.

An example, Your Honor, is they have included a transcript of a hearing before Judge Allan van Gestel in the Suffolk Superior Court in a matter between Professor John Donovan and these siblings in which Mrs. Donovan is not a party relating to the settlement agreement that you've

heard Mr. Donovan talk about.  They have attached a transcript or it purports to be a decision made by a retired federal judge in an arbitration proceeding that goes to Professor John Donovan's credibility; that is not in any way a matter in this proceeding and other documents like that.

So it was my suggestion that there are certain parts that were examined on in court that were specifically referred to.  For instance, the correspondence between Ian Crawford and Henry Sullivan relating the October '03 209A order.  The witness has read those, Your Honor, those should be part of the record.

The rest of it really is, I think, not properly part of the evidence in this proceeding.  Although it's certainly part of the file, they filed it.  If their worry is really going up on appeal and having a complete record, those documents are filed.

What I believe is going to attempt to occur is that these will be bootstrapped as evidence in the hearing when, in fact, they were not evidence in the hearing and that's why I can't assent to having that two inch stack, the binder, come in as

evidence.

JUDGE ABANY:  Thank you, counsel, I'll limit the affidavit to the affidavit that was presented to me at this hearing, the original affidavit.

MR. FORD:  Okay, Your Honor, there are, however, as I indicated before a number of exhibits and so in order to be consistent even Mr. Klickstein acknowledges a number of those were referenced as part of the proceedings and ought to come in.

JUDGE ABANY:  Counsel, I'm going to limit it to the affidavit that was presented.  Let's move on.

MR. FORD:  To be clear you're --
Exhibit Q to the affidavit does include that deposition testimony that is previously referred to.

JUDGE ABANY:  I'm going to repeat my --

MR. FORD:  Exhibit Q --

JUDGE ABANY:  I'm going to limit it to the affidavit.  Everything else we've spoken about is part of the record.  That's part of the record.

MR. ROBBINS: Your Honor, are you excluding the deposition testimony that you stated was taken?

JUDGE ABANY: I referenced -- we're talking about James' affidavit; is that correct?

MR. ROBBINS: Yes, but what we're talking about is Exhibit Q. You may recall the deposition testimony of Lambara and Jaworski?

JUDGE ABANY: Oh, no, that was agreed on as coming in.

MR. FORD: We have not marked that as an exhibit.

JUDGE ABANY: That's what you were responsible to do over lunch.

MR. FORD: This is the last one, Your Honor. This is -- Exhibit Q is Exhibit 44.

MR. KLICKSTEIN: I have no objection to that, Your Honor.

JUDGE ABANY: Okay. Now, let's proceed. Does defense have any other witnesses?

MR. ROBBINS: No, Your Honor, the defense would rest.

JUDGE ABANY: Okay, counsel.

MR. KLICKSTEIN:  I would call, Mrs. Donovan.

JUDGE ABANY:  Okay, Mrs. Donovan, please.

REBUTTAL

DIRECT EXAMINATION

LINDA DONOVAN

BY MR. KLICKSTEIN:

Q.   Good afternoon, Mrs. Donovan.

A.   Good afternoon.

MR. ROBBINS:  Your Honor, pardon me, I apologize.  It will probably be the case that either Christy Donovan or Jim Donovan will be the rebuttal to Mrs. Linda Donovan.  Would you like --

MR. KLICKSTEIN:  I have no objection to them.  This is so brief and I have no objection to them being present.

JUDGE ABANY:  Thank you.  No, they can stay.

Q.   Mrs. Donovan, let me show you what's been admitted into evidence in this Court as Exhibits 5A and 5B; do you see those photos?

A.   Yes, I do.

Q.   And were you present when those photos

were taken?

A.    Yes, I was.

Q.    When were those photos taken?

A.    On New Year's day, January 2005.

Q.    Where were those photos taken?

A.    At the top of the main hill at Suicide 6 ski resort.

Q.    And by whom were those photographs taken?

A.    They were taken by my husband.

Q.    Do you know what kind of camera he used to take those?

A.    A cardboard camera.

Q.    Excuse me what kind of camera?

A.    I'm sorry, a cardboard camera, disposable camera that he had in his ski jacket.

Q.    And in this picture can you identify the object in the left-hand side of the picture?

A.    It's the ski patrol house that's at the top of the hill.  The chairlift is over here (indicating).

Q.    And can you identify the individual wearing the red ski parker skiing away from you with his back to you?

A.    James Donovan.

Page 449

Q.    Can you identify the individual in the blue ski parker facing you?

A.    Christy Donovan.

Q.    And can you identify the person standing next to Christy Donovan?

A.    Christy's daughter.

Q.    And do you have in mind the events that took place that you testified to previously?

A.    Yes, I do.

Q.    In time, now, when was this picture taken with respect to the events that you testified to yesterday?

A.    Just after -- just after James skied beside me.  He skied right beside me and said, "Any time, any place."

Q.    So if you were to locate yourself in this picture, where would you be located?

A.    I'd be here (indicating).

MR. ROBBINS:  May I approach, Your Honor, so I can see?

JUDGE ABANY:  Yes.

MR. KLICKSTEIN:  Certainly, Mr. Robbins.

Q.    If you were to place yourself in the

picture where would you place yourself?

A.    I'd be about here (indicating).

Q.    And that would be indicating behind James Donovan, outside the frame of the picture?

A.    Correct.

Q.    Were any of the children around at the time this picture was taken?

A.    They were not.

MR. KLICKSTEIN:    No further questions, Your Honor.

MR. ROBBINS:    Your Honor, I have a few.

REBUTTAL

CROSS-EXAMINATION

BY MR. ROBBINS:

Q.    Just for clarification sake, to begin with --

A.    Yes.

Q.    -- you've had these pictures for about a year or this picture for about a year?

A.    Correct.

Q.    And you knew there was going to be a hearing in this matter for a while?

A.    Correct.

Q.    It was rescheduled a couple times because of various factors?

A.    Correct.

Q.    And you had a chance to meet with your lawyer, although don't provide any communications about these pictures?

A.    Correct, I gave them to my lawyer.

Q.    When did you give the pictures to your lawyer?

A.    Some time ago.  At the time that all of these events were reviewed with my lawyer.

Q.    Months ago?

A.    Yes.

Q.    And you prepared with your lawyer for the purpose of beginning this case giving introductory testimony and the first direct testimony as part of this case which you gave yesterday, correct?

A.    Correct, as my lawyer advised.

Q.    And yet these pictures were not introduced through you, correct?

A.    Correct.

Q.    And you offered no testimony in your direct testimony about these pictures, correct?

A.    Correct.  I answered all the questions

that I was asked.

Q.   Rather the decision was reached to have you testify about these pictures after Jim and Christy had completed their testimony, correct?

MR. ARZU:  Objection.

JUDGE ABANY:  If you know, I mean, it's not in her mind what was decided on as a tactic.

MR. ROBBINS:  Okay, that's fair enough.

Q.   You knew that you were not going to be actually offering these pictures and purporting to describe how these pictures were taken as part of your direct examination?

A.   No.

MR. KLICKSTEIN:  Objection.

JUDGE ABANY:  If you even know.

A.   I knew that I was going to answer questions that I was asked.

Q.   Okay, fair enough.  Now, as I understand it you and Professor Donovan were behind Jim and Christy and his family, correct?

A.   John and I were on the chairlift together on one chair.  Christy was on the next chair behind

us, James was on the -- Christy and her daughter. James was on the next chair behind Christy and her daughter.

Q.   So there's no doubt in your mind that if you were right in front of Christy Donovan, as you say on the chairlift going up, she would have seen you, correct?

A.   Yes.

Q.   No doubt about that, right?

A.   She saw me.

Q.   Okay, and how do you know she saw you?

A.   She's standing here looking straight back at me as her husband skied right beside me to speak to me.

Q.   Okay, and let me ask you about that.  As I understand it you're standing behind Jim and Christy Donovan and their -- this child, correct?

A.   No.

Q.   Well, when this picture was taken you're standing behind them; are you not?

A.   At the time the picture was taken.

Q.   And you're standing next to your husband, correct?

A.   Yes.

Q.    And you and your husband are back in back of Jim and Christy and one of their children, correct?

A.    Correct.

MR. ROBBINS:  And if I may approach, Your Honor?

JUDGE ABANY:  Sure.

Q.    And this is very close to the -- where Jim Donovan --

MR. ROBBINS:  Does the Court have these pictures?

JUDGE ABANY:  Yes.

MR. ROBBINS:  May I provide at least one of these for the Court to have while I'm asking these questions?

JUDGE ABANY:  Go ahead.

Q.    So that we're clear, where Jim Donovan is right here is within feet of where the ski lift dropped him off, correct?

A.    Not that close.

Q.    About 20 feet?

A.    I'm at least 20 feet.  I'm not very good at distances but where you get off the chairlift is up here (indicating), and when we got off -- and

then this hill kind of falls away -- and when we got off the lift we went over to the side. So we weren't right where you ski off. We went over to the side a little bit.

Q.   Well, to which side?

A.   To the right, I'm sorry, to the right. So the chair comes up here (indicating) and this is the top of the hill and it's stopped by trees, whatever. And then the hill kind of slopes away and all the trails come off of that. And there's a fairly large area up here that's relatively flat and we had skied a little bit over to one side. So, for example, when Christy went by, she came by, she didn't come right close to me because we were off a little bit to the side.

Q.   Surely she would have seen you?

A.   Oh, she would ever seen me; there's no question.

Q.   Okay, all right.

A.   But James had to make a point to ski right beside me.

Q.   Okay?

A.   It wasn't like he gets off the chairlift and he has to go by us because that's where we are.

Q.    But is it the case that he is about 25 or so feet from where the ski lift dropped him off?

A.    How long is this room?  It's about that, I'm sorry --

JUDGE ABANY:  That's okay.  Is it about this distance?  The distance of the length of the courtroom?

THE WITNESS:  I would say that it's at least twice that distance.

Q.    And you say that he skied past you very quickly?

A.    Quite quickly.

Q.    Quite quickly.

A.    He skied up beside me and said, "Any time, any place," and then he skied away.  I don't actually know how fast he skied up to me because the first I knew, he was right beside me.  After he said that you can see in this picture that he was skating away, skating away.

Q.    Skating away.  You see he has no poles there, correct?

A.    Correct.

Q.    Okay, so you say that he passed you and when he passed you you say he said, "Any time, any

place," correct?

A. That's correct.

Q. And you were extremely frightened by that, correct?

A. I was very, very startled and shocked that he was there and that he would say this to me; this is after two years of threatening and harassing.

Q. I understand. And then he skied as fast as he could away, correct.

A. He skied away very quickly.

Q. And then you, although you were very upset, you said to your husband words to this effect: John, do you have a camera?

A. No.

Q. But somehow or other you were able to communicate to your husband, get a camera out?

A. No.

Q. He just happened to have a camera out?

A. He carries a camera that he sometimes takes pictures with. I said, "That was James," and he took a picture.

Q. And so basically in between the time you maintain that he got off the ski lift, got out to you and then whizzed down, you turned to your

husband and communicated to him in some fashion that that was James and you wanted him to take a picture --

A.    I mean, a picture was absolutely the farthest thing from my mind.

Q.    Okay, if I could just finish the question.

A.    I'm sorry.

Q.    Somehow or other you communicated to your husband to somehow get that camera --

JUDGE ABANY:  She answered that she did not.

A.    No, no.

JUDGE ABANY:  Counsel, listen to -- she's responded that she had no intention of -- she didn't know -- she didn't know he had --

MR. ROBBINS:  Okay, I understand.

JUDGE ABANY:  Ask a question.

Q.    So did he have a camera?  Was his camera in his pocket?

A.    I did not see where his camera was.

Q.    So you don't know whether he hearing you say, "That was James," took the camera out of the pocket and quick, took a picture, or if he just happened to have the camera there and took a

picture?

A.    I don't know.

Q.    All right.

MR. ROBBINS:   Now, I need to do something -- try to do something.  Your Honor, I'm going to give you a copy of the complaint and the amended complaint filed in the civil case; the complaint and the amended complaint for you to have a look at.

Q.    And, Mrs. Donovan, I'm going to ask you to look on with me -- I'll give you a copy as well.  Take a look at the complaint first.  This is the complaint that you filed against James Donovan and Christina Donovan and it was filed on your behalf on January 19th, 2005; is that correct?

A.    I look for the date?

Q.    It should be at the back.

JUDGE ABANY:   Last page.

A.    Sorry.  Yes, that's correct.

Q.    And you describe this incident originally in the complaint at paragraph -- on page 3, paragraph 5H, and you say in this -- and this was by the way filed just a couple of weeks after this event that you say took place, correct?

A.    (Pause)

Q.    I'm simply asking this complaint was filed on your behalf something like 18 days or so after this event that you allege occurred, correct?

A.    Yes, yes.

Q.    And the way you describe the event in the original complaint was:  On or about January 1st, 2005 while Plaintiff was on an annual ski trip in Vermont, Defendants, who to Plaintiff's knowledge had not skied at the slope for many years, got in the chairlift directly behind Linda, then at the top of the hill skied close beside Plaintiff.  While skiing passed Plaintiff James threatened her by saying, "Any time, any place"; do you see that?

A.    Yes, I do.

Q.    Now, there is an amended complaint which was filed just about two months later on March 14th, 2005 and you have that in front of you as well?

A.    Yes.

Q.    And you see that in the amended complaint you elaborated on the incident that had occurred on January 1st, 2005.  If you look to paragraph 5H?

A.    Yes, I see it.

Q.    And having had the benefit of thinking

about this further, you added some additional facts to the complaint?

A.    Actually, this com -- actually, this complaint which was the original complaint that I read, went over with my lawyer (indicating); this was added by the lawyer (indicating).  Now, we talked about it but he added this language; that's why -- that came up yesterday.

Q.    Yes, I know.  I want to simply go --

A.    Which was surprising to me because this is -- what I testified to is exactly what happened.

Q.    All right, but you did have a chance in between the time the complaint was filed and the amended complaint to talk with your -- without giving me the communications -- to talk with your lawyer about the subject matter of what had occurred according to you, correct?

A.    Honestly, I don't remember talking about that incident.

MR. ARZU:  Objection.  Objection, Your Honor.  Your Honor, I believe that this line of questioning that counsel's going into was done in depth where counsel examined Mrs. Donovan on paragraph 5H of the amended complaint at some

length, and if my recollection serves me right, making a point to focus on the language of the complaint.

JUDGE ABANY:  Gentlemen, I'm going to make it easy for all of us here.

Mrs. Donovan, which is more accurate?

THE WITNESS:  The complaint.

JUDGE ABANY:  The first one?

THE WITNESS:  Yes.

MR. ROBBINS:  Well, Your Honor, I think I need to be entitled to cross-examine this complainant on the fact that when she -- in the amended complaint she amended the complaint to add the fact that it was James Donovan and Christy Donovan, they made a point of following her, and then while she was downhill skiing flanked her closely on either side --

JUDGE ABANY:  Counsel, we all know that she probably herself, as well as with the other clients, she didn't actually write the draft of complaint.

MR. ROBBINS:  Your Honor, you did permit a fair amount of examination of Jim Donovan and other witnesses about documents that were

drafted by lawyers.  This is about as fundamental as it gets.  We have a document that was literally changed.

JUDGE ABANY:  Counsel, let's proceed. I've given -- Mrs. Donovan, which version is the more accurate version?

THE WITNESS:  The original complaint.

JUDGE ABANY:  Did you dictate this other one?

THE WITNESS:  No.

JUDGE ABANY:  Well, go ahead, I'll let you do your job; not much though.  I'm getting a little frustrated with where this is going. Continue counsel.

BY MR. ROBBINS:

Q.   Yes, Mrs. Donovan, when you had -- you filed the amended complaint --

JUDGE ABANY:  The attorney filed it for her.

Q.   Was this amended complaint filed on your behalf?

MR. ARZU:  Objection, Your Honor, asked and answered at length yesterday.

JUDGE ABANY:  That's okay, she didn't

file it herself.  It was filed by her attorney, I assume; is that correct?

THE WITNESS:  That's correct.

Q.   Did you authorize it to be filed?

A.   I do not have this amended complaint in my own records.  My attorney can tell you I had read this one carefully (indicating).

Q.   Let me ask it this way.  Was Duane Morris authorized to file an amended complaint on your behalf?

A.   Yes, yes.

Q.   And did it do so on your behalf?

A.   Yes.

Q.   And in the amended complaint that was filed on your behalf, by the lawyers authorized to file it on your behalf, the way you described the incident on January 1st, 2005 was that Jim Donovan and Christy Donovan made a point of following you, got in the chairlift directly behind you, and then while you were downhill skiing flanked you closely on either side, boxing you in, and causing you to fear that they would knock you down again?

MR. ARZU:  Objection, Your Honor, asked and answered.

JUDGE ABANY:   Overruled.

A.   How did you say the beginning of the question, I'm sorry.

JUDGE ABANY:   That's okay.

Q.   No problem.   When you filed -- when this amended complaint was filed by your attorney on your behalf, the way the complaint filed on your behalf described the incident, your allegation, was that you had -- was that Jim and Christy Donovan had made a point of following you, got in the chairlift directly behind you, and then while you were downhill skiing, flanked you closely on either side boxing you in and causing you to fear that they would knock you down?

A.   If I understand it you're asking two different questions.

JUDGE ABANY:   Let me ask you, is party of that inaccurate?

THE WITNESS:   Yes.

JUDGE ABANY:   Which part is inaccurate?

THE WITNESS:   It's inaccurate that we were on the hill skiing down or still at the top. It's inaccurate that they flanked me closely on

either side and boxed me in. Only James skied right beside me. He caused me a great deal of fear.

JUDGE ABANY: Is it possible that the attorney misinterpreted how you --

THE WITNESS: Yes.

JUDGE ABANY: Let's move forward.

BY MR. ROBBINS:

Q. And you say that they then threatened you again, quote, "Any time, any place," as they skied past. I take it that that's also not correct?

A. James said those words as he skied close beside me.

Q. Now, you have seen your husband take pictures of Jim and Christy Donovan on more than one occasion; is that correct?

A. Yes.

Q. On how many occasions approximately have you seen John Donovan, Sr., take pictures of either Christy or --

MR. ARZU: Objection, Your Honor, this line of questioning is beyond the scope of her rebuttal testimony authenticating the fact that she observed the photograph being taken at that time.

JUDGE ABANY: Please, I'm going to

give him some leeway.  It's been opened up about him taking pictures.

Q.   Let me be more clear.  Over the last couple of years, since the sexual abuse disclosures were made, it is the case that your husband has taken pictures of either Christy Donovan or Jim Donovan on more than one occasion?

MR. ARZU:  Object to form.

JUDGE ABANY:  If you know.

A.   Yes.

Q.   And on how many occasions have you seen John Donovan, Sr., for some reason take pictures of Jim or Christy Donovan?

A.   He took this -- my husband took the ski picture at Suicide 6; he took the picture at Thanksgiving that had James and Christy in it on their horses, and he takes pictures.  You saw from the family pictures, he takes pictures so -- at events, Christy talked about an event, we have four events like that a year that I run.  So, yes, he took pictures.

Q.   Will you agree with me that over the last several years, Mrs. Donovan, your husband has not been taking snapping pictures of Jim and Christy for

the purpose of compiling the family album?

A.    Yes.

Q.    He has been doing so for the purpose of making accusations against Jim, Christy and others?

MR. KLICKSTEIN:    Objection.

A.    No.

Q.    Do you know why John Donovan, Sr., took the pictures that have been marked as Exhibit 5 and 5A?

A.    I think he took these pictures because he was so startled and shocked that James would be right beside me.

Q.    Do you believe that -- you were startled, correct?

A.    Very.

Q.    And you think he was startled?

A.    I know he was.

Q.    And both of you being startled, both of you were startled, but you think he took pictures of Jim and Christy and their daughter because he was startled?

A.    Because he was so surprised that they were there and because they had been repeatedly harassing me for two years.

Q.    This is a bunny slope?

A.    This is not a bunny slope.

Q.    Did you go skiing with John, Sr., down the children's slope that the Donovan's and their kid were skiing on?

A.    This is not a children's slope.  The children that they were teaching to ski would not have come up this slope (indicating).  This is the main slope -- it's a small mountain but this is the main slope.  There is no bunny slope on that chairlift.

Q.    Did you follow the Donovans down the slope?

A.    No, as I said yesterday they went down a slope that goes straight ahead of what you see in this picture and we went down a shorter slope off to the left to remove ourselves and then went into the lodge.

Q.    How many pictures did John Donovan, Sr., take that day?

A.    As far as I know this one.

Q.    Just took one picture?

A.    As far as -- yes, as far as I know.

Q.    Now, it is the case that John Donovan,

Hearing, Vol. 2                                                           01/25/2006

Sr., was present with you on New Year's Day of 2005?

A.    Yes.

Q.    And he would be in a position, obviously, to provide testimony that would support your version of the events?

A.    Yes.

Q.    Because he was right next to you, correct?

A.    Yes, he was a few feet away.

Q.    Thank you.

JUDGE ABANY:  Thank you.  Anything else, counsel?

MR. KLICKSTEIN:  Nothing, Your Honor.

MR. ROBBINS:  Yes, Your Honor, I'm going to call Christy Donovan.

JUDGE ABANY:  Thank you, Mrs. Donovan.

THE WITNESS:  Thank you.

JUDGE ABANY:  You can step down.

THE WITNESS:  Should I leave these?

JUDGE ABANY:  Why don't you leave those.  Counsel, those are the complaints.

MR. ROBBINS:  Does she need to be resworn?

JUDGE ABANY:  No, you're still under

oath.  I just remind you.

REBUTTAL

DIRECT EXAMINATION

CHRISTINA DONOVAN

BY MR. ROBBINS:

Q.    Now, you just heard the testimony of Linda Donovan?

A.    Yes.

Q.    Is that true, her testimony true?

A.    No.

Q.    Was she and/or John Donovan, Sr., in front of you on the ski lift going up Suicide 6 on January 1st of 2005?

A.    No.

Q.    Were she and John Donovan, Sr., off of the ski lift when you got off the ski lift?

A.    I never saw them.

Q.    Did you go past them?

A.    No.

Q.    Did you have any interaction with them at all on January 1st, 2005?

A.    None.

Q.    Were you with any child other than your oldest child on January 1st, 2005 skiing?

A.    We had both our daughters skiing with us.

Q.    Did you at any point that day leave one child back while you went skiing with the other child?

A.    No.

Q.    When you went skiing down Suicide 6 on January 1st, 2005, how many kids were with you then?

A.    Two.

Q.    Now, you see that Jim Donovan has no skis with him; do you see that?

A.    I see that he has no poles.

Q.    I'm sorry, no poles with him?

A.    Yes.

Q.    Do you know why that was?

A.    I don't have my poles either and that's because when you're teaching children to ski it's very difficult to manage your poles, and so we would never have our poles with us, and you have to help our kids on and off the chairlift.  I would always be with one child and Jim would be with the other child, and so we were picking them up off the snow with our hands and poles always just got in the way.

Q.    Is there any truth to the statement that John Donovan, Sr., or Linda Donovan were in your

sight or near you on January 1st, 2005?

A.    I have never seen them on a ski slope anywhere in my entire life; not that day, not any day.

Q.    How about on the ski lift?

A.    On the ski lift, never.  I couldn't tell you what they wear skiing.  I do not know.

Q.    No further questions.

JUDGE ABANY:  Counsel, any questions?

MR. KLICKSTEIN:  I'm sorry, I didn't hear him say he was finished.

JUDGE ABANY:  Very quitely he said, "No further questions."

MR. KLICKSTEIN:  Just one or two.

REBUTTAL

CROSS-EXAMINATION

BY MR. KLICKSTEIN:

Q.    Last year in January of 2005 you had three children at that time, didn't you?

A.    Yes.

Q.    Where was the third child while you say you were skiing with the other two?

A.    He was at home with a baby-sitter because he was under a year.

Q.    At home with a baby-sitter in Hamilton?

A.    No, in Vermont.

Q.    He had a baby-sitter in Vermont?

A.    Yes.

Q.    And that baby-sitter could have been watching the other child that's not in the picture, couldn't she?

A.    She never would have.  We brought our two girls every single time we went skiing.  We brought the two girls every single time; never left one back.  They're a year apart and they would be devastated if it we took one and not the other.

Q.    Now, your brother and your parents were also there, weren't they?

A.    Yes.

Q.    And when you ski is it just like when you were telling us at Myopia that you never leave your husband's side, that your children are never, ever with anybody else in the family other than you and James?

A.    They're not.

Q.    All right, so it's your testimony to the Judge that when you go to the ski slope the children are with you and James every minute, not with any

other member of the family?

A.    They were with us every minute.  This time -- since they were three and four years old.  My parents and brother are not confident skiers enough to even feel comfortable bringing them up on the chairlift or being comfortable with them skiing down the slopes.

Q.    How long can the kids go out and ski at a time?

A.    An hour, maybe two and we take breaks.

Q.    Whenever you take breaks do you and James ever go skiing yourself, do a run or two by yourself?

A.    No.  We are very family-oriented.  He -- he wants to spend every minute he can with the kids on the weekend.  We stick together as a family.  We don't --

Q.    Do you have an au pair at home?

A.    No.

Q.    Do you have a regular baby-sitter at home?

A.    We have a baby-sitter who comes in part time.

Q.    How many days a week?

A.    Part time.

Q.    How many days a week?

A.    A few days a week.

Q.    Full days?

A.    No.

Q.    During horseback riding season, when you're riding from April through the end of the season how many days a week do you ride?

A.    Probably at most four.

Q.    Four days a week you ride.  And I take it your daughters don't ride behind you and in front of you on the saddle at that time, do they?

A.    (Pause)

Q.    Do you ride your kids with you, one in front and one in back when you go riding?

A.    No.

Q.    Of course not.  You go riding by yourself, don't you?

A.    On the saddle myself, yes.

Q.    Four or five days a week.  Thank you, no further questions.

JUDGE ABANY:  Okay, thank you.

Gentlemen, anything else?

MR. ROBBINS:  Not other than closing, Your Honor.

JUDGE ABANY:  Okay, the affidavits that are going to become part of the record, the affidavit of the Carl Potter, do you have any other affidavit that I haven't seen that I should be privy to?

MR. FORD:  Yes, Your Honor, just for the record, and I believe that the clerk may have given you copies already, Jim Donovan's affidavit now --

JUDGE ABANY:  I've seen that.

MR. FORD:  -- without the exhibits is 36.

JUDGE ABANY:  Right, and that's -- that I've been privy to, go ahead

MR. FORD:  Christy Donovan has two affidavits that have been admitted.

JUDGE ABANY:  I've seen those.

MR. FORD:  You've seen both of those, Your Honor, 38 and 39.

JUDGE ABANY:  Right.

MR. FORD:  Callie Rosenbaum has an affidavit that has been admitted that is denying the allegations of her soon to be ex-husband, Eric Rosenbaum, the alleged dinner; that's Exhibit 4,

Your Honor.

JUDGE ABANY:   Okay.

MR. FORD:   Carl Potter, Your Honor, has two affidavits in this case, both of which counsel have agreed to be admitted and they are submitted at Exhibits 41 and 42.

JUDGE ABANY: And Mr. Potter says what in his affidavits?

MR. FORD:   The second affidavit -- the first affidavit makes it clear that James Donovan has never made any threats of any kind towards Mr. John Donovan, Sr., or Linda Donovan or anyone else for that matter.

The second affidavit, Your Honor, provides a much more detailed account of the alleged ATV incident essentially rebutting what both Steve Lambara, Linda Donovan's worker, testified about the event.

And Jeremy Clark, who is a third party, reinforced Lambara and said nothing happened, and Jeremy Clark said nothing happened and how far apart they were.  Carl Potter goes into more deal about that.  Again, Jeremy Clark is a third party.

JUDGE ABANY:   Carl Potter is the same

gentleman against whom a complaint of harassment was issued from this Court?

MR. FORD:  Yes, but subsequently dismissed, Your Honor.

JUDGE ABANY:  Right, but there was probable cause to issue, apparently, by an assistant clerk magistrate of this Court?

MR. FORD:  Yes, Your Honor.  To make it clear there were two charges that were pursued. Only one issue was an assault charge; no process was issued on that.  The second of harassment the process issued but two months later the district attorney affirmatively dismissed that charge.

JUDGE ABANY:  Yet an assistant clerk magistrate of this Court found probable cause at issue from what I understand?

MR. FORD:  That is procedurally what occurred, Your Honor.

JUDGE ABANY:  Okay, thank you.

MR. FORD:  And there's one other affidavit, Your Honor, which is No. 43.  And that's the affidavit of Mary Wood and that affidavit is relatively brief in the sum and substance of it.  In addition it makes it clear that James Donovan never

made any threats toward Linda Donovan and/or anyone else, and it says on the alleged second break-in at Devon Glen which was on December 30th, 2005 she was skiing in Vermont with Jim and Christy Donovan hundreds of miles away from Devon Glen at the time of this reported break-in.

JUDGE ABANY:  I don't think anybody has -- there has not been any evidence to the contrary.

MR. FORD:  Oh, but Linda Donovan has testified, Your Honor, that she believes that Jim Donovan is responsible for that break-in.

JUDGE ABANY:  Right, but she hasn't said he was physically there but that's -- and getting back to the other, Mr. Potter, part of his affidavit is that he's never heard Mr. Donovan make any threat; is that --

MR. FORD:  That's the first affidavit.  The second affidavit, however, goes into great detail about this purported ATV incident confirming that he road up the trail.  As soon as he saw Steven Lambara and Linda Donovan well beyond them, 30 to 50 feet, he had a brief conversation with Steven Lambara.

Hearing, Vol. 2                                                      01/25/2006

Page 481

He immediately turned around for the purpose of, as Steve Lambara himself said, going away from Linda Donovan and having no interaction with her at all because he, like James Donovan, wanted to avoid her.

JUDGE ABANY:  Thank you, Mr. Ford. So I think I've heard basically all the evidence so far, so we're ready for closing argument?

MR. FORD:  One more point, Your Honor.  Carl Potter's affidavit also makes it clear that James Donovan has had no involvement in this alleged shooting, nor did Carl Potter for that matter, and that he did not work for James Donovan.

JUDGE ABANY:  I'm sorry, you said that Mr. Potter?

MR. FORD:  Mr. Potter's affidavit as well states that --

JUDGE ABANY:  States that Mr. Donovan has had no --

MR. FORD:  No involvement in that purported shooting at Devon Glen in 2004 -- 2005.

JUDGE ABANY:  How would he know?  I mean, he may be right but how would he know?

MR. FORD:  True, Your Honor, but the

Page 482

other allegation is that Carl Potter had some

involvement in that.  He denies that.

MR. ROBBINS:  Let make this clear,

Your Honor.  That since the theory is that Carl

Potter did things which placed Linda Donovan in

fear, Carl Potter makes clear that, A, he did no

such thing; but, B, moreover, Jim Donovan had

nothing whatsoever to do with any of these events;

did not direct him to do any of these things.

So there is no link at all, there

literally is no evidentiary link at all, that

supports the idea that Jim Donovan caused Carl

Potter to drive ATVs, dig holes in trails or do

anything else directed to Linda Donovan.

JUDGE ABANY:  Right, so there's a

theory that Carl Potter, if he did anything, he was

doing it on his own; if he did anything he might

have been doing it on his own.  But there was also

some evidence that there was a statement by Carl

Potter that he acts at the, correct or incorrect,

there was some evidence that there was a statement

of Carl Potter that he acts at the direction of Mr.

Donovan?

MR. ROBBINS:  All there is is a

statement by Linda Donovan that she understands that Carl Potter has told others that Jim Donovan tells him to do things.

JUDGE ABANY:  Correct.

MR. ROBBINS:  So it is about fourth or fifth level; that's the extent of the evidence, quote, unquote, evidence on that point.

JUDGE ABANY:  Okay, thank you.  Okay, are we now ready for closing arguments?

MR. ROBBINS:  Yes, Your Honor, I am. Would you like me to go first?

JUDGE ABANY:  Well, you're the defendant and he has the burden of proof so you should go first.

## CLOSING ARGUMENT

MR.ROBBINS:  Your Honor, the first thing I would like to say with your permission is what the standard is, which the Court I know knows, but which has real significance here.  It is not the same standard as exists initially.  It is the standard -- the burden is on the part of Linda Donovan to demonstrate by a preponderance of the evidence the existence of a substantial likelihood of immediate danger of abuse.

Page 484

Her burden is to demonstrate to your satisfaction and to the satisfaction of reviewing Courts that she has shown by a preponderance of the evidence the existence of a substantial likelihood of immediate danger of abuse.  Let me simply deal with some background and then I'm going to get right to the events which I think that the Court has identified as the ones, quote, unquote, in play.

First of all, this is a statute which is intended to deal with familial relationships. And without conceding, as we do not, that this relationship applies, we have here the third wife of Jim Donovan's father.  There has never been any relationship where they lived in the same house; that it is conceded that by the time Linda Donovan became John Donovan's third wife, Jim Donovan was about 30 years old, so you begin with that.

JUDGE ABANY:  Well, you would concede, I assume, though that they are related by marriage.

MR. ROBBINS:  I concede that they are related by marriage in the thinnest possible way. Technically they are related by marriage.

JUDGE ABANY:  And that's what the

statute calls for.

MR. ROBBINS: Well, whether or not the purpose of the statute is to embrace this or whether the standard of evidence should remain the same, given the purpose of the statute is a question I'll leave for a separate day. We think it is different, it ought to be different given what the purpose of the statute is.

I do not intend to be impolite. I cannot help but say, as I said at the beginning, that it needs to be understood why this has occurred. You will recall that Linda Donovan herself said repeatedly with some heat and with some bitterness, "They're trying to steal the property from us"; "They're trying to ruin us"; "They're trying to take the property from us."

And indeed the series of actions that you have heard brought by Linda Donovan personally, Linda Donovan with John Donovan, or John Donovan through some other instrumentality, since the resolution was reached of the separation, the separation occasioned by the disclosure of John Donovan's sexual abuse, since that occurred and since all of the siblings have been aligned against

John Donovan, Sr., I don't mean to be impolite but the fact of the matter is there had been a series of these actions that have been filed by either Linda or by John Donovan against the kids making accusations and this is what brings us here.

There should be no doubt about what this is about. It is an attempt to use Your Honor and this Court as a pawn to attempt to gain leverage in connection with a dispute that if it has to exist at all should not be litigated through the means of these criminal charges: A criminal 209A complaint against Jim that had to be dropped, a criminal complaint against the other son that had to be dropped, a criminal complaint against somebody who works for the kids that had to be essentially dropped.

I realize that the Court has said, well, probable cause was found. The Court knows very well what that entails and does not entail and I'm assuming the Court is not inferring that that's evidence of anything particularly when the district attorney made the decision to dismiss that charge.

JUDGE ABANY: There is some evidence that a impartial magistrate found probable cause to

issue; wouldn't you agree?

MR. ROBBINS: It is not, we submit, evidence that this Court can use to base a 209A or the fact that there was a issuance of a complaint. It would be one that was then dismissed cannot be used.

JUDGE ABANY: Why not?

MR. ROBBINS: Because it's not evidence. It's not evidence at all. The evidence is what the evidence is. That's not sworn evidence, it's not a finding, and doesn't have collateral estoppel.

JUDGE ABANY: I can't take judicial notice of the documents or the files in this courthouse?

MR. ROBBINS: You can take judicial notice of the fact that they occurred but you may not find that that is evidence that Carl Potter did anything let alone that Jim Donovan did anything.

JUDGE ABANY: It's evidence that a magistrate, an impartial magistrate in this Court found probable cause to issue a complaint and I take that for what it's worth. I understand it's been dismissed and it's been debated about why it was

01/25/2006

Page 488

dismissed.  I don't mean to get into a debate with you about why it is dismissed.

MR. ROBBINS:  I'm sorry -- no, The Court may have a view and I may have a different view and we understand that fully.  So that what Your Honor is asked to be here is an instrumentality of John Donovan, Sr., and in this case I fear to say Linda Donovan.

We heard all of these things on direct examination about reports to the police.  Where are the police?  If there is anything that links Jim Donovan to anything, anything that causes the police to think that Jim Donovan did anything, where is a single policeman?  We've heard about John Donovan, Sr., who supposedly is a witness to certain of these events and certainly was a witness to the shooting, the recent shooting which is used as an illustration of why LInda Donovan is so fearful.  How could it be that one's own spouse who is a percipient witness who is the key person in this is not here?

Now, I know that he's not here today and I understand what will be said and I have no comment on why Mr. Donovan, Sr., is not here today.

Page 489

But the fact of the matter is Mrs. Donovan rested her case yesterday without calling John Donovan, Sr., as a witness and as Mr. Klickstein said he had no desire to have John Donovan here to testify as a witness.

John Donovan, Sr., is a witness, if these events occurred, to the events and he is not here. And the only thing that supposedly has happened in the last year is a shooting, is a shooting involving John Donovan, Sr. --

JUDGE ABANY: The only thing that's happened?

MR. ROBBINS: In the last year?

JUDGE ABANY: Right, that's kind of an understatement, "The only thing that's happened is a shooting"?

MR. ROBBINS: Oh, I'm sorry, there is a break-in in which absolutely zero evidence is offered that Jim Donovan is involved. In fact, it's really an attempt, frankly, to take advantage of this Court to say, uh-huh, there was a break-in or at least the alarm went off, however the alarm went off, and therefore I'm entitled to that 209A order against Jim Donovan.

There is not a shred of evidence, not a shred of evidence offered that Jim Donovan had anything to do with the alarm going off in either the Devon Glen or in Vermont and there is not a shred of evidence that Jim Donovan had anything to do with the shooting.

So for a witness -- for a complainant to come in and say, well, what has occurred in the last year is two break-ins and a shooting, and of course I'm entitled to a 209A order without the Court saying, okay, where's the evidence that Jim Donovan had something to do with the supposed break-in at Devon Glen? Where is the evidence that he had something to do with knives being scattered? Where is the evidence that he had something to do with the shooting? In fact, where is even the witness? Where is the key person in this, John Donovan Sr.? He's not even produced.

Now, the Court is entitled to draw some inferences and to say, well, I'm entitled to draw whatever inferences I want. I'm suggesting that it isn't enough to come into this Court and say there was a break-in, sorry, there were two break-ins and a shooting; ruin this guy's

reputation.

Let's in the middle of family litigation in which all the kids are aligned against the father and the father is an enormously resourceful guy, there is a break-in, there's an alarm, give me a 209A order. Not one thread of evidence.

You have Linda Donovan saying I feel absolutely certain I know he did it. He's absolutely crazy. Really? Jim Donovan's crazy; where is the evidence if she is so certain? Nothing of the sort, nothing of the sort.

My on song some of these things have supposed to have occurred in my money. In some cases a hundred or so people milling around. Not one witness from Myopia. Not one witness of any kind not one single bless he had witness. And it's not because it's just well, it was a strategic decision. I suggest there was a reason why not one witness from Myopia not John Donovan no police no nothing is because there is no evidence because it's very clear there is no evidence of it other than Linda Donovan's own belief that if they came before Your Honor and said look at all these things I'm

terribly afraid Your Honor said well it's is a low standard I'm going to give them a 209A order it doesn't matter what the evidence is.

And so the standard as I've said let me simply go through the list as I understand it. Given the standard that exists, given the standard of the Jones versus Gallagher case, Carroll versus Kartell case and the other cases vacating abuse orders in recognition of the fact that this is a statute which has tons of possibilities for abuse, tons of possibilities for abuse in being utilized.

And this is Exhibit A, Exhibit B, and Exhibit C in the abuse of this statute with all due respect in our view. And before I get to the list, I would ask the Court to think to consider who is really doing the stalking here? Who is really following whom? Who is really putting whom in apprehension of physical harm? You have a situation in which people are taking -- John Donovan, Sr., if you believe it without Linda is walking and snapping pictures in Christy Donovan's space walking around her back basically and standing with his clothes pressed against her clothes. Filing these accusations, threatening that they're going to --

that you've got to be very very careful or that one of the other of them will ruin Jim's reputation because he's the managing director of Goldman Sachs, he's a respected member of the community, he's on the board of Dana Farber.

He's enormously well-regarded, respected person in the community so they know what they're doing when they say we'll ruin you; they are in the position to do that and they are asking the Court in effect to be an accomplice which I implore the Court not to do.

Let me go through the list of these incidents in February 2003 Myopia hunt incident. The first thing is, if you believe Linda Donovan, this occurred 2003 just about three years ago. Well, that wouldn't do it even in the best case but if the court is inclined to believe -- to proceed beyond that hearsay what you have you have Linda Donovan's testimony on one side that Jim Donovan follows her into the coat area grasps her hand and says, "You've got to be very, very careful" in the middle of an event in which there is 75 to a hundred people in the throws of leaping a dinner it is February there would be 75 to a hundred people going

Page 494

no into get 75 to a hundred coats Jim Donovan says it never occurred that it occurred the other way around; Christy Donovan says that she did not see what happened or didn't happen in there but she knows when he came out he is unnerved. He is shaking. When he she asks him what happened he just says she just threatened me. And that's pretty much where the testimony stands on that event from three years ago, that supposed event; somebody's hand got grasped, somebody said to the other you've got to be very, very careful.

Through the years you have Linda Donovan saying it was Jim, you have Jim saying it was Linda; you have Christy essentially reinforcing Jim's testimony in a place where there are lots of people around if there'd been any threat, any physical or any kinds of assault by Jim Donovan which he'd have to be awfully stupid to do it, not one witness to it.

November 2003 seating an issue of over seating. Well that's over two years ago; that's over two years ago. And the testimony this is what the testimony is according to Linda Donovan Jim sat down at the table right next to Linda and

Sr., sitting so that he was staring us a I'm quoting from the transcript sitting so that he was staring at us and just glaring and trying to make us uncomfortable then during social times he would just put himself to try and make us uncomfortable; that's the testimony about November 2003, the seating caper.

And what you have is Jim Donovan saying it had nothing to do with the table we didn't want to have anything to do with this table we sat where we were assigned you have that reinforced by Mrs. Donovan, you have that reinforced by the person at Myopia Hunt Club who deals with this, Penny Petranzio who says that it was a mistake on her part.

Not one witness including her husband who's sitting there right there at the table, not one witness to any -- anything that Jim or Linda did, not one. On the other hand you have Penny Petranzio saying that after this was over Linda crossed over to her and thanked her for the way it was handled which is hardly the way if there was something to complain about you'd complain to the administrator or the head of the club; that's the

second incident, staring -- supposedly in the best case staring and making her feel uncomfortable at a dinner dance at a club of which they were both members two years and two months ago.

The Carl Potter related allegation. Well, you have Linda Donovan's testimony which is in effect that Carl Potter driving an ATV on property which she doesn't own, by the way, she doesn't even own. He's the person who supposedly the caretaker for this property for these properties, he's there and he gets too close to her and she is frightened; that's the extent of that testimony.

Also that Carl Potter drove behind her and that there were times when she saw there were gates put up over horse trails and holes dug over horse trails and she feels certain an that Carl Potter did it, and B, that Jim Donovan had had him do it and that, C, the purpose was to frighten her.

This is property which at various points in her direct testimony she admitted they own. She thinks they stole it from the father even though this was a resolution reached over three months with sets of lawyers on both sides and both sophisticated parties she think the party was stolen

but forget about that that's the extent of what she says Jim Donovan did to her and that basically there was an event, there was an ATV incident in September of 2004.  So now that would be what 15, 16 months ago directly contradicting Linda Donovan's version of what happened with the ATV is Steven Lambara who is Linda's employee, Linda's employee.

Now, again, maybe this strikes the Court as standing on ceremony but it does not us. If Steven Lambara were in a position to corroborate Linda then you would expect you might expect that Linda would call Steven Lambara to support her version of what occurred with the ATV.  She didn't call Steven Lambara, we have called Steven Lambara and took his deposition and we offered the testimony because Steven Lambara says as the court pointed out that based on what happened was entirely benign, it was a nonincident; there was nothing.

That testimony in turn is reinforced by Jeremy Clark, it is reinforced by the testimony of Carl Potter and to the extent that the suggestion, the theory is that the ATV event from 16 months ago can be laid at the feet of Jim Donovan as I said before, there is -- the two people who would

be in the position to know if Jim Donovan had anything to do with Carl Potter driving his ATV on the trail are an Carl Potter and B Jim Donovan.

Both have provided testimony that Jim Donovan had absolutely nothing to do with where Carl Potter drove the ATV, nothing to do with where Carl Potter dug holes or put trails sore put gates on horse trails, there is no evidence there is no evidence that Jim Donovan had anything to do with that other than Linda Donovan saying I hear that Carl Potter told Steve Lambara that Jim Donovan told Carl Potter that everything he does -- that he works for Jim Donovan.

Now, Lambara doesn't corroborate that, Carl Potter doesn't corroborate that, Jim Donovan refutes that, Carl Potter refutes that; that's not evidence on which this Court would whatever stand or could impose a 209A order against. Donovan for supposedly something that that happens with Carl Potter.

We are in 2004, there is zero evidence apart from Linda Donovan saying I feel certain that Jim Donovan must have been behind it. That I submit is not in the real word evidence and

Hearing, Vol. 2

01/25/2006

Page 499

shouldn't be regarded as such and frankly is indicative of the kind of thing that is going on here.

January 2005, ski slope allegation. Even that is is a little over a year ago but -- and you have Linda Donovan and you have Jim and Christy Donovan.  Linda Donovan says that Jim Donovan  -- and by the way why this would why would anybody make any threats against Linda Donovan is beyond anybody's understanding.

Everything you've heard is about a dispute between the siblings and John Donovan Sr.,. Who carrys about Linda Donovan Linda Donovan isn't part of this dispute, nobody holds Linda done responsible for what John Donovan did.  Doctor isn't even any rational explanation assuming why anybody who make a threat which think didn't they had make a threat having to do about Linda Donovan who carrys with all due respect to her, she's John Donovan, Sr.'s, third wife.  She's got no relation, they could care less.  The notion that they're making threats against her is frankly ridiculous.

So we hear all of a sudden about a -- well, we have heard of different variations the

Court doesn't regard it seriously but you know there are allegations made, filed in a court of the law with all that requires under Rule 11 and everything else in which actually a complained in the nature of a motion to dismiss it it is amended to survive a motion to dismiss and facts are added so as to enable it to withstand a motion to dismiss.  So there's consultation between client and lawyer and then details are added and somehow what is put in is an allegation that Christy and Jim flanked her and skied down the slope.

Now, I obviously can't -- the court needs to draw its own conclusions about that but it surely is not meaningless that those allegations were deliberate lit added to a complaint.  They were added to a complaint for the purpose of enabling a standard of motion to dismiss that at the present time chopped liver a decision was made to add those facts now it turns out that is totally untrue.

Now of course because it would be clear that the nothing's would have to be that Christy and Jim together flanked her and boxed her and the Court presumably would not buy that.  Now all of a sudden it's forget about that version we'll

Hearing, Vol. 2

01/25/2006

Page 501

go back to another version but even the version that's left requires you to believe that Christy Donovan and Jim Donovan simply lying -- number one you've got to believe that Jim Donovan finds it necessary with his kids out for a trip on and child's slope on New Year's Day over a year ago would find it in his interest for some reason when you've heard all about them trying like heck to stay the heck away from these people because they are petrified of exactly this kind of scenario that for some reason he's going to go by her and say, "Any time, any place"; what does that mean? Why would you say that? This is like a third grade line on a playground, it means nothing. Why would you say that? Why would he say that to Linda? It doesn't make sense at all.

You have two witnesses. Who if it happened would have heard it happened would have participated in it. Jim and Christy, they say it didn't happen. You've got a witness if there were an event John Donovan, Sr., who loudly is not here. Not even an affidavit, not even an affidavit.

You've got a -- the Rosenbaum affidavit about which is not an affidavit it's a

snippet of an affidavit it's a whited out affidavit of a -- an affidavit that we have not seen for the Court has alleging that in November of 2002 so that would be three and a third or a quarter years ago, Jim Donovan said at a dinner in New York, "If I could get away with killing my father I would."  I don't even know where to begin with that.

It sounds trivial to point out that that's tree that have years ago it sounds trivial to point out that even that threat if you believed it isn't directed at Linda at all but that's giving it to too many serious serious news you've got three witnesses that is at that didn't occur at all two of them lies, you have a snippet of a whited out affidavit and against that you have life testimony of two witnesses who say it simply didn't occur and a third affidavit of a person who was pose supposedly present who said it didn't occur.

Quite apart from what you know enough to know is the kind of thing that happens in bitter divorces.  But in its best light you have an affidavit from somebody who is an out of court out of state witness against two witnesses who would have been present who say it didn't happen, a third

witness who would have been present saying it didn't happen about a supposed statement that was made about somebody other than LInda Donovan three and a quarter years ago.

Now, you say that I was understating things; what I said is that nothing really happened in the last year. I didn't mean to narrowly state it. I mean, it's all what it is and over the course of the next weeks one hopes that one very much hopes that what occurred in December of 2005 with respect to John Donovan Sr., will be gotten to the bottom of. I mean we'll know that, we hope let's show within a matter of weeks.

But in any event, nobody allege is nobody asserts that Jim nobody provides any evidence that Jim Donovan shot or arranged to have John Donovan, Sr., shot or knew anything about it. Nobody can provide evidence of such an anything nobody. And to kind of waltz into this court as though this is some kind of a 209A dispensing machine that can be used to get advantage in other disputes and say, well, there was a shooting I'm entitled to a 209A order, that seems to us, frankly, an afront to the system.

It is an attempt to smear somebody's reputation and get the benefit of that it should not be allowed. To suggest for a minute that Jim Donovan had anything do with that is an outrage. If there is an iota of evidence to that effect let us see it. There is none. There's no policeman who had has said such a thing; there is no law enforcement person who has said such a thing. Nobody has said such a thing.

And, frankly, again if they were a witness to what he occurred that night, the witness, to be blunt about it would be John Donovan, Sr., it would be him. He made the decision not to be here. His and Linda's lawyers made the decision not to have him testify before Linda rested her case, why? Why?

With respect to the two remaining events, the alleged he had break-in at did he have Glenn and alleged break-in in Vermont, there is no evidence at all likewise not a bit nothing, nothing that suggests that Jim Donovan had anything to do with that not one shred.

And again it is to take advantage of this Court and hope that the Court will not

01/25/2006

scrutinize these theories and that's what it is an attempt to get the Court to not scrutinize this that results in people saying, well, there was an alarm break-in, the alarm went off and we called the police came because the alarm went off both in Devon Glen and Vermont, therefore, I'm entitled to an order smearing, ruining Jim Donovan's reputation.

A final word about that. The reason that we've talked about the impact of the 209A order on the Donovan family is not lightly is not because we think that is necessarily the paramount interest but as these cases that I have cited point out this is a statute with an enormous amount of potential for exactly the kind of abuse that we have been subjected to here where not only people's reputation is ruined and unwarranted and other way for the purpose of gaining leverage in other disputes which, of course, is what this is all about. But if you can really nail somebody, if you can make them live in fear of being placed in a situation where you're committing a crime, and that's the idea here.

The Donovans and their three kids live in Hamilton. They move around Hamilton, the kids' friends live in Hamilton; they go shopping in

Hamilton.  She's got parents in Hamilton.  She's got a grandmother in Hamilton.  Her parents in live in Hamilton.  She's got a sister who lives in Hamilton and five nieces and nephews that live in Hamilton.  And the idea here is, ha-ha, we can really turn the screws to you.  Who is psychologically terrorizing whom?

Now, if this order issues then every time -- they cannot move around this town, they can't function without being in fear of these guys popping up snapping pictures, coming over to them, placing themselves around, being at the top of hills snapping, snapping pictures and so forth and allowing them to say, well, you've committed a crime, you're dead, you're essentially over.

And that's what this is all about and I ask the Court to contemplate as seriously as it can the impact of permitting a Court to be used in the way that this Court has been used.  We ask the Court to do two things:  One is to deny this outright and to do so in a way, as I said in the opening, that serves a message that no more use of this Court, no more use of this Court for this purpose.  This is wrong.

That is what we think is warranted. The Court should issue no order because it is unwarranted under the statute, it's unwarranted as a matter of law given this record and it should resist the attempt to be used in the fashion that this is attempted to be used here. If it issued any order at all, which we thing it should not, it should be a crossorder because what you've heard about is the stalking, the intimidation, the terrorizing by Linda Donovan to a young family for the purpose of turning the screws to it and this shouldn't be permitted, thank you.

JUDGE ABANY: Thank you, counselor. Counsel.

CLOSING ARGUMENT

MR. KLICKSTEIN: Your Honor, generally when somebody starts out an argument or a statement with, "I don't want to be impolite," the next thing that happens is you get to add homonyms that are an inappropriate attack to the character of counsel or character of the witness; that's what inappropriate.

What's also inappropriate about this proceeding is the implicit threat that defendant

01/25/2006

makes to this Court and the implicit representation to this Court that whatever Your Honor does here is under a microscope; that Your Honor has to be very careful about what you do.

Your Honor, this is a 209A proceeding filed pursuant to the statute falling directly within the parameters of that statute by a woman seeking protection that only this court can offer. And you cannot substitute pounds of paper and mounds of argument for the facts, the credibility of the witnesses that are necessary.

James Donovan is a very, very wealthy man and he's able to have multiple teams of attorneys prepare reams of documents such as I have never seen in a 209A proceeding in my entire career. Those documents were prepared over the last couple of weeks by a team of attorneys and we saw some of those attorneys here in this court room. They were carefully written with only one thought in mind -- well one thought in mind at this point, other thoughts in mind before when they got the case, miss transfer to the superior court.

But as far as the papers were concerned you have to believe that Mintz for their

Hearing, Vol. 2                                        01/25/2006

Page 509

client used every possible effort to draft the strongest, most persuasive, tightest affidavits they could draft to impress this court with the credibility of their witnesses, the veracity of their defense and the believability of their claims.

Yet nonetheless when these witnesses talked about here before you Your Honor and James Donovan and his wife Christy took the stand, the court heard an entirely new, brand new story not referred to in any of those hundreds of pages of documents, not referred to in James Donovan's affidavit, not referred to in any other lawsuit, not referenced in any of the multiplicity of the letters the lawyers sent back and forth and those things that were said on the stand under oath to you completely destroyed the integrity and credibility of James Donovan and his wife because they came into this court and they intentionally made factual misrepresentations and those misrepresentations are absolutely obvious in the state of the record. And if anybody is imposing on the court, Your Honor, it's James Donovan and the way he is opposing this motion, the evidence that he presents to you and the method in which he does it.

Let me get to the details of exactly what happened. We all agree on one thing. In a 209A proceeding as the bench guidelines tell the court, the key note, the gold standard is a finding a substantial likelihood of immediate danger of abuse.

Those standards also tell the judge and suggest that the judge consider certain factors and the court is aware of those factors. One of the factors that the court is well aware of is that often multiple threats take place. Any one of which would have been sufficient to support is a 209A claim, but for reasons of fear and reasons of shame and reason of embarrassment very often a lengthy period of time goes by before the witness seeks the protection of the court. And that is not to be construed against the validity of those claims.

In a case like this, Your Honor, what we have is an individual who is clearly covered by the statute. As Your Honor noted she's related by marriage. It's an individual that came into this court and testified about a pattern of increasing threats made by James Donovan. As Your Honor points out that's what critical to this thing. It isn't

critical about the litigation that's goes on between the children resulting from the hundreds of million dollars of property and funds that they now have and that is going on.

And incidentally, the settlement my brother refer to is taking place in March of '03 didn't settle anything.  In fact after that settlement he refers to in '03 the children filed litigation against their father to try and enforce the settlement, that went on for a while.  It was referred out of that court it's in the papers they filed; that went on to that mediation; that failed that's flipped into an arbitration and this tragedy for the Donovan family continues onward.

The fight between the children over that does not take away Mrs. Donovan's rights to safety and to not be abused by this man whatever his feelings are about her husband.  How ever he feels about what he alleges Professor Donovan did.  And I'd also point out to the court there's absolutely no evidence before the court that any of the allegations against Professor Donovan which the kids use as an excuse to seize his money and his property, no basis for those before the court;

nonetheless it's clearly a basis that supports his earnings and what he's prepared to do and how he's prepared to take him.

He testified that he apparently because he was still angry at his father for not rolling over to this, tried to evict Linda Donovan from Devon Glen which she and Professor Donovan live that's him around her. It's all about what he's doing to her. Let's talk about exactly what happened, all right and we'll go through the events.

The prior 209A proceeding, Your Honor, was not the subject of evidence that we offered here. I'm not going to waste any of the courts time by going back to that. In February of 2003 James Donovan intentionally confronted Linda Donovan in that area and you're honor has got pictures of it now which he first described as an open area of off the end of the room and likes to make some argument about when the doors were put on but in fact it's clear to Your Honor from looking at the pictures and the testimony that it's an area that is not within the view of most of the rooms that if you go 6 feet into it you can't be seen.

He admits he admits and his wife

Page 513

backs up his admission that he and Linda Donovan had a confrontation in that room, they both said that. They didn't say it didn't happen, they admit that it happened. Linda Donovan testified in this court and her lawyer wrote a letter way back in February of 2003 that you saw detailing that James Donovan 6 foot tall threatened her, Linda Donovan 5 foot two in the room, that he grabbed her, that he said to her you better be very, very careful that she was terrified as a result of what he had done to her.

It wasn't until yesterday, Your Honor, not until yesterday that like Alice in Wonderland, it's a Lewis Carol story, I think it was if I recall the Queen of Spades saying up is down and down is up; white is black, black is white. We here for the very first time, never appears in a pleading doesn't appear in his attorneys contemporaneous response doesn't appear in his affidavit doesn't appear in Christy's affidavit.

Yesterday the man gets on the stand and for the very first time makes the preposterous statement that Linda in fact threatened him in the coat room. Linda threatened him in the coat room and said to him you better be very, very careful.

Page 514

And then it's backed up.  His wife said oh he looked upset when he came maybe he looked upset when he came up because he just threatened Linda Donovan.

They admit the event happened and it wasn't until yesterday when he took the stand he turned it upside down.  Credibility Your Honor? This man is an attorney although somehow he can't remember whether or not he was ever sworn in to the bar; do you believe that?  Somehow he couldn't remember quite how long he was at Yale and quite why he left.  Do you believe that?  Somehow even though he has an MBA he can't figure out how he acquired property.

Somehow although he's investment banker at Goldman Sachs and is a pillar of the community apparently he doesn't understand how things get paid for and how trusts work and how money is distributed; this is the man who testified before you, Your Honor.  That's the credibility you have to assess and that's the new story he put out there.

Your Honor, Linda Donovan's story is perfectly truthful, it's perfectly reasonable it's consistent with the admitted meeting that they say

they had and it alone, that event alone Your Honor, her fear of only meant harm from that threat would alone support a 209A order.  But that's not all. They go on.  James Donovan they want to trivialize this.  They want to trivialize Mrs. Donovan.

I mean, how many guys with wives -- they're saying he's on the third wife.  What does that mean?  That means this court isn't going to protect her because she is only the third wife.  My brother says she's not important; quite frankly we don't care about her.

Well, Your Honor, this court needs to care about her because that's what a 209A is.  She testified very clearly about a second event where James Donovan looked at her and menaced her and as Your Honor knows threatening looks and threatening glances by someone who has previously threatened you is reasonable for you to fear that that that person is going to carry out that menacing.

And the business about the tables, isn't it cute?  You know the seating chart said this and penny said that, Linda Donovan told you exactly what this man did because he's shrewd what he did was the sheet seating chart and he made sure because

she knew the Donovan's shouldn't be near each other and incidentally don't you find it strange that Christy Donovan who is worried that this woman's going to kidnap her children Christy Donovan she doesn't have any problems going out to a dinner party at the Myopia club, just doesn't sit too close to her and she don't have any problem going over to at a party at the barn at Devon Glen to get a little award for riding her horse even though this woman is going to kidnap her kids.

But anyhow they sit at the dinner party and James Donovan does something very simple he picks up the label from Table No. 23 and moves it, switches it to Table 24 and boom he's menacing her which is what exactly what he wants her to make sure she knows any time anyplace he can get to her.

Now, Carl Potter sir.  Carl Potter incident if Your Honor reads through Exhibit 37 now is the additional deposition testimony that you had that I referred to, that additional deposition testimony that's an exhibit goes to the Carl Potter ATV incident.  And boiling that down to what everybody says is the guy's -- the men, they didn't get scared because it didn't really worry them that

the guy comes rev'ing down the trail in an ATV.

But Linda Donovan was scared because this man Carl Potter is malevolent.  Carl Potter has done things and threat threatened her before Carl Potter as James testified works for the siblings and as the other men testified again, it's in Exhibit 37, David Elwell, Potter blocks off trails, closes gates because he's told to do it.

Carl Potter plays games as Steve Jaworski testified Linda's scared of Potter.  As a matter of fact Steve Jaworski is a guy, he's personally frightened of CArl Potter himself; you've got that sworn testimony.

Not only that but you've got Steve Jaworski's sworn testimony that Steve Jaworski feels threatened and intimidated by James.  So when my brother tells you that not one sled of evidence that anybody else is frightened or intimidated by James that's not quite accurate it's on the second page of Exhibit 37.

Jaworski was listening on the phone when Linda Donovan called her husband as she was running down the path with her cell phone in her hand screaming in fright.  He may not have thought

that it was anything she should be frightened about, he wasn't there.  He did confirm that she was frightened.

Steve Lambara, Your Honor, said Linda was upset by the ATV incident he had to catch up with her because she ran away.  She was panting and looked upset.  I knew she felt threatened by it. That's evidence before you, it's not Linda Donovan talking it's other people corroborating on the manifestations of Linda's fright.

And Linda Donovan was also aware and Your Honor has the exhibit that Carl Potter was convicted of domestic abuse.  He's a violent man. So Linda Donovan a woman knows that Carl Potter has been convicted, convicted of assaulting women before so when she sees Carl Potter coming, the minion of the siblings, she's fearful and she runs.

As Your Honor points out you know, it takes three incidents of harassment before a criminal complaint can issue, an impartial court magistrate of this court heard the Carl Potter incident, had the opportunity to examine the witnesses that were present and a complaint issued on that.

Now, how it got dismissed is a matter of grave dispute with us but the fact of the matter is and it's not disputed again, it happened, nobody denies the ATV incident happened, they just put a spin on it and they trivialize it because it if Linda Donovan is terrified you know that's trivial. Unfortunately they couldn't turn that upside down because LInda didn't have an ATV to drive at Carl Potter so they can't flip that over and say LInda threatened Carl Potter like James now claims she threatened him.

Oh another flip, James' credibility. You heard yesterday for the first time ever in this proceeding, Linda Donovan testified that on the ski slope on January of '05, James Donovan came up from behind her, skied by her and said any time, anyplace and that she was terrified by it.

James Donovan in responding to these papers having had that affidavit having known about the allegation because it was in the other lawsuit nowhere does it appear in the affidavit but yesterday he decided he would say, oh, incidentally my father, John Donovan threatens me.  One time we had a meeting and my father John Donovan told me,

"Any time, any place." Your Honor has to say where did this come from?  Do I believe this what is the context of this.  Why isn't this in the extensive pleadings.

The other incident, the ski slope incident, Your Honor if you notice the numbering of the exhibits, Exhibit 5 didn't go in when I had Linda on the stand and put other exhibits in Exhibit 5 although it was prenumbered didn't go in until I had James on the stand.  And Your Honor that was a tactical decision because James hasn't admitted he was there and it was my decision that I wanted to see what he would say whether he would admit he was there so we did that picture.

The fact of the matter is Your Honor again these people -- it's the Alice In Wonderland game, let's turn it upside down; they admit they were on the ski slope that day, they deny that they saw Linda and John Donovan; they somehow find it amazing and offensive that John was able to pull a cardboard disposable camera and catch James as he made his get away.

And then they said what can we do to rebut this one?  This is a little tougher.  For

example we'll say they took the picture at a different time oh we'll say that we never saw them. The fact is, Your Honor, Linda's testimony was clear, it was convincing this man went up there and talked her.  As his wife said there was a baby-sitter available; there were family members available.  Somebody could have watched the other kid who wasn't in the picture and Your Honor just has to evaluate the credibility of that.

Now, the Rosenbaum affidavit my brother says well although other events where James threatened her there's no witnesses so that's a real problem here.  Your Honor as Your Honor knows, somebody can be clever enough and smart enough and the Lord knows with all the education James has had he's smart enough to make sure that when he's making threats there are no witnesses who can hear him making the threats, so I don't find that very astounding and I'm sure the court doesn't.  The -- and the timeliness of this it's a course of action somebody can make a threat to you and it frightens you and you're fearful of harm.

The immence of that harm is something in the belief that the person is finally going to do

what they have threatened to do is something that can build up over a corporation of time as Your Honor knows.  And that's exactly happened here.

What's the Rosenbaum affidavit tell us?  My brother says forget about the Rosenbaum affidavit he's a disaffected husband and involved in a divorce with her sister and we're all incidently Jim and his wife they're all supporting the sister and Eric's the bad guys who is divorcing the sister; dismiss what Eric has to say.

James Donovan says he never threatened anyone well.  You've got Jaworski's testimony that he felt threatened by James Donovan and you have Eric Rosenbaum provides an affidavit at great personal risk and files -- we feel that affidavit and that affidavit says that James Donovan said if I could kill my father and get away with it I would do it.  Linda Donovan learns of this threat some time as she testified to you late summer of this year and my brother's quite right that wasn't a threat to her.  But what does what reasonable person think of somebody in the state of mind like that who says if I could kill my father and get away with it, I would do it.  What does it say to her about the

Page 523

threats he's made to her.

It says to her one thing and one clear message, this man is going to do it to me. He's going to carry out those threats that he's made. That's the meaning of the Rosenbaum affidavit. When it was communicated to Linda that gave her reason to believe that the threats that had been made by James were all important and that's the evidentiary importance of that.

The break-ins, just a shooting. I thought I wasn't paying attention when I heard that. Professor Donovan was shot multiple times. At the same time it was not her home which is only either a quarter of a mile or half a mile from where this man lives was broken into and knives were scattered around and you've got the police report in evidence.

Now, unlike the second time the house was broken into when James has somebody am buying being up in Vermont, nobody all buys him for where he was at the time of the shooting and at the time of when the house was broken into. In fact Mintz, Levin very carefully crafted his wife's affidavit and I suggest that Your Honor read it because she doesn't quite alibi him for that time. She says at

the time of the shooting and the first break-in James was either at work, on the way home or at home.

James didn't testify where he was at that time. What we do know about where James was at that time is that after the home was broken into when the Hamilton police went over to James house, he says he was then home. So clearly he was home in Hamilton quarter to a half a mile away from that house. And knives were in Linda Donovan's bedroom. Is that something Linda should have fear that her husband who is involved in or risk litigation with his children has been shot and at the same time her home is broken into and the only person, the only person in the world who has ever threatened her or who has ever expressed any reason to hurt hurt her or has any motive to hurt her is James Donovan who is threatened her; does that place her in imminent fear? Is her fear reasonable that he's going to do exactly what he's saying he was going to do? What could be more reasonable?

Finally the second break-in, the second break-in James has got an alibi and Linda has no way of knowing that James did that himself. What

Page 525

the second break-in is Your Honor in Linda's mind it's James Donovan any time, anyplace. One-two punch. He said he's going to do it, now it's happening. I'm fearful that he's carrying out the threats he made. I don't have to prove that Linda Donovan doesn't have to prove to you that James Donovan had anything to do with the break-in or the shooting.

The Cambridge police will determine whether he had anything to do with the shooting, the Hamilton police will determine who had what to do with the break-in. Those events crystalize the fear that Linda reasonably has based on his threats that harm is imminent from James from those threats and that is exactly and precisely what 209A is supposed to do to protect her.

Now, they argue about well Your Honor if you should somehow and judicially decide to issue a restraining order it's going to have a horrific effect on the wife. Well, wait a minute he said he worked if I recall him on on the stand 60 or 70 hours a week. I'm reasonably certain he's not the one wandering around doing errands. She is the full time mom. So Linda Donovan doesn't have kids in

school, she certainly doesn't visit Professor Donovan's first wife, she certainly doesn't visit James Donovan's mother-in-law.  She certainly doesn't visit any of the classmates of the school. So where is this major impact that he's claiming it's going to have on his life if he's ordered to keep away from this woman who was threatened?

The major impact is that at some events at Myopia Hunt Club he might not be able to go there.  Well, Your Honor has two weigh the risk and the rewards; these are not people that are prisoners in their homes; they're not people that don't have any alternatives.  The man testified on the stand that he's bought a second home for 14 and a half million dollars down in Virginia.

Now, if his life is so unpleasant here unlike most people if he's subject to an order that he doesn't like, he can leave.  He can leave. He's lived here six years, he can go if it's too much for him.  He has the means.  He already has the place; that's not a problem to him, Your Honor.

I think Your Honor that the law is clear, I think that the facts are clear, I think that the credible evidence is entirely one way and

even if one of these incidents standing alone would be insufficient, certainly each one of these together reaches that critical mass in a requires this court to issue the protection of the 209A order, thank you.

JUDGE ABANY:  Gentlemen, I want to thank you, first of all, for being patient.  It's been a long two days.  You've done yeoman's work for your clients and I don't say that lightly.  It's -- I haven't been on the bench that long but it's evident to me that you came in, all of you, very well prepared and I appreciate you taking some of the advice from the bench which you did.  And try to make this unpleasant situation as pleasant as possible under the circumstances.

It was very clear that the record be assembled in case there are any appeals and I believe, if I'm not incorrect, the appeal on any restraining order would be to the Appeals Court.  I think that's based on case law as opposed to statute.  Having heard all the testimony, having reviewed the exhibits, having listened to the argument of counsel, I am going to extend the restraining order.  And, counsel, at this juncture a

restraining order can be extended for you to a year if your client wishes or a shorter time if she wishes.

MR. KLICKSTEIN: We request a year given the difficulty of these proceedings.

JUDGE ABANY: I just want to go over what the restraining order says just to make sure that we're clear. Presently the restraining order says that Mr. James Donovan's not to abuse Linda Donovan by threats or attempting to put her in fear. He is ordered not to contact the Plaintiff either directly or indirectly and is to stay a hundred yards away from her.

He is to stay away from 482 Bay Road, South Hamilton, Mass. He is to deliver any guns or FID cards, should he have them, to the Hamilton Police. He is also ordered to stay away from 19 Smith's Point Road, Manchester, Mass. and 2568 Pomfret Road, South Pomfret, Vermont. Is there any need that, counsel, for any modification of the order in your mind?

MR. KLICKSTEIN: No, Your Honor.

JUDGE ABANY: Counsel, is there any need for modification of the order in your mind? I

know I'm sure you wish there were no order at all and I appreciate that but as far as the order as it stands is there anything pertinent to a modification I should know at this juncture?

MR. ROBBINS: Your Honor, I raise a couple of points. One is that if it would be useful if the Court can do it to include some provision that the plaintiff is not to cause Jim Donovan to be within 100 yards of Plaintiff?

JUDGE ABANY: Okay, unfortunately, counsel, this is an order of Linda Donovan against James Donovan and I appreciate what you're saying and I don't assume that Linda Donovan -- and I'll say it for what it's worth anyway --

Mrs. Donovan, I'm going to implore you not to voluntarily or intentionally engage in any behavior that might place Mr. Donovan close to you because he has a right and I'll say it on the record and you're both sophisticated lawyers he also has a right to come in seeking the protection of the court if he feels threatened. So I'm just going to implore you, I'm not going to make it as part of this order, that not to engage in any behavior, please, that might make him subject to the sanctions

01/25/2006

of this order.

LINDA DONOVAN:  I would not do that, Judge.

JUDGE ABANY:  Anything else, gentlemen?

MR. ROBBINS:  Your Honor, I'm not sure that it makes a practical difference but in so far as the court is purporting to effectively exercise jurisdiction over activity outside of Massachusetts, namely with respect to the property in Vermont, I'm concerned about that.

Obviously, it's not because there is going to be any intent to get anywhere near Linda Donovan anyplace but I'm not so sure the court has jurisdiction sufficient to effect where he can go outside of the Commonwealth of Massachusetts.

JUDGE ABANY:  I believe my understanding of the case law is, and I could be incorrect, but I believe my understanding of the case law is that I do and that a crime of violating that part of the order would be -- jurisdiction would be here in this court.  But I'll review it and I'm going to make that an order and if I prove to be incorrect, by all means file a motion and I'll hear

you on that.

MR. ROBBINS:  Thank you.

JUDGE ABANY:  So prior court order extended that which Defendant appeared, the Court is ordering the prior order dated January 24 which was yesterday's order shall continue without modification, so the date today is -- date of this order now is January 25, '06, time of order is 4:40 p.m.  Expiration, one year dated, Madam Clerk?

THE CLERK:  January 25th, 2007.

JUDGE ABANY:  Okay, and I've instituted the order.  That will be delivered to your client in hand before he leaves the courthouse. And Mr. Robbins, just again I know there are many, many unhappy people in this courtroom.  I would just ask you to please, please impress upon your client, again, I know there's strong feelings here, a violation of this order is a criminal -- until it's overruled a violation of this order is a criminal offense subject to 2 1/2 years in the house of correction.

I don't say that to intimidate anybody but it is the law and the preferred response by the police for a violation of restraining order,

as you know from studying the statute, unfortunately is arrest. So it is very, very important that he be aware that he doesn't want to place himself in any position where he may be accused of violating this order.

MR. ROBBINS: Your Honor, I can assure you that although I appreciate that and I'm grateful to you for placing it on the record there is absolutely no need to be concerned in that regard.

JUDGE ABANY: Okay, this I have to say and let me say this and we'll end today and again I know there are many unhappy people in this court room. This is one of the sadest, one of the sadest cases I've had the displeasure to have to sit on. It is very, very sad.

I can only hope that somehow if it's possible in the future, if it's possible, that somehow this family which has been rendered some -- can somehow heal and I am not a psychologist and I'm not a see'er and I can't look into the future but that would be my wish.

Since being provided those photographs of an once happy family with all the

wealth to accommodate them and all the beautiful children being produced, that if there's any way hopefully in the future that some piece can come to this family that's what I wish; that's what I wish.

In any event, again, gentlemen, a well tried case, thank you.  The record's in intact for any appeal you talk with your brothers about.  Okay, thank you.

(Whereupon the proceedings concluded at 4:03 p.m.)

CERTIFICATE

I, Donna J. Whitcomb, do hereby certify that the foregoing record, Pages 270 through 533, is a complete, accurate and true transcription of my stenographic notes taken in the aforementioned matter to the best of my skill and ability.

_____

DONNA J. WHITCOMB

Page 269

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. Konarski, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT the witnesses whose testimony is hereinbefore set forth were duly sworn and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of January, 2006.

———————————————————

JANET M. KONARSKI

Notary Public

My Commission Expires:
July 19, 2007